**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VALORES MUNDIALES, S.L., and<br>CONSORCIO ANDINO, S.L., | |
|    Plaintiffs, | |
| v. | Case No. 19-cv-46-FYP-RMM |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
|    Defendant. | |

## REPORT AND RECOMMENDATION

The International Convention on the Settlement of Investment Disputes between States and Nationals of Other States, or "ICSID Convention," is a multilateral treaty aimed at stimulating private foreign investment in developing countries. One of its accomplishments was the creation of an arbitration forum for adjudicating and enforcing disputes between investors and the countries in which they invest. The Plaintiffs in this case, two Spanish companies, won an ICSID arbitral award against the Bolivarian Republic of Venezuela ("Venezuela"), the defendant here, in 2017. Plaintiffs have now asked this Court to enforce their award pursuant to Article 54 of the ICSID Convention and its implementing statute, 22 U.S.C. § 1650a. Venezuela contends that the award cannot be enforced because Venezuela was denied due process in the underlying arbitration proceedings.

Four motions are now before the Court: Plaintiffs' Motion for Default Judgment, ECF No. 16; Venezuela's Motion to Set Aside the Default, ECF No. 20; Plaintiffs' Motion for Judgment on the Pleadings or for Summary Judgment, ECF No. 24; and Venezuela's Cross-Motion for Summary Judgment, ECF No. 25. The motions were referred to the undersigned for a report and recommendation by Minute Orders dated October 28, 2019; March 5 and 18, 2020;

and January 24, 2022.  Having now reviewed the parties' pleadings, briefs, and proffered evidence,[1] as well as the relevant law, the undersigned recommends that the Court **GRANT** Venezuela's Motion to Set Aside Default and **DENY** the Plaintiffs' Motion for Default Judgment as moot.  The undersigned further recommends that the Court **GRANT** Plaintiffs' Motion for Summary Judgment and **DENY** Venezuela's Cross-Motion for Summary Judgment, for the reasons that follow.

## BACKGROUND

### I.      The ICSID Convention

The ICSID Convention is a multilateral treaty "aimed at encouraging and facilitating private foreign investment in developing countries."  *Mobil Cerro Negro, Ltd. v. Bolivian Republic of Venezuela*, 863 F.3d 96, 100 (2d Cir. 2017).  To stimulate investment and mitigate risk, the Convention established the International Centre for Settlement of Investment Disputes, called the "Centre" or "ICSID" for short.  *Id.* at 101.  The Centre is based in Washington, D.C.,

---

[1] The relevant filings include the ICSID Award, ECF No. 1-1 ("ICSID Award"); Plaintiffs' Motion for Default Judgment, ECF No. 16 ("Pls. Default Mot."), and the affidavit and exhibits attached thereto; Venezuela's Memorandum in Support of its Motion to Set Aside Default, ECF No. 20-1 ("Def. Default Mot."), and the declarations and exhibits attached thereto, including the Declaration of José Ignacio Hernández, ECF No. 20-2 ("Hernández Decl.") and ICSID Procedural Resolution No. 2, ECF No. 20-7 ("Resolution 2"); Plaintiffs' Motion for Judgment on the Pleadings or Summary Judgment, ECF No. 24 ("Pls. Summ. J. Mot."), the declaration and exhibits attached thereto, and the supporting Statement of Undisputed Material Facts, ECF No. 24-1 ("Pls. Fact Stmt."); Venezuela's Memorandum in Support of its Cross-Motion for Summary Judgment, ECF No. 25-1 ("Def. Summ. J. Mot."), and the Combined Statement of Material Facts, ECF No. 25-2 ("Def. Fact Stmt.") attached thereto; Plaintiffs' Reply in Support of their Motion for Summary Judgment and in Opposition to Venezuela's Cross-Motion for Summary Judgment, ECF No. 27 ("Pls. Reply"), and the Response to Defendant's Statement of Material Facts, ECF No. 27-1 ("Pls. Supp. Fact Stmt."); Venezuela's Reply in Support of its Cross-Motion for Summary Judgment, ECF No. 31 ("Def. Reply"), and the declaration and exhibit attached thereto; and the parties' Joint Status Report, ECF No. 32 ("Jt. Status Rep.").  Throughout this Report and Recommendation, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

and is empowered to convene arbitration panels to adjudicate disputes between investors and the States in which they invest.  *See id*.  The United States and Spain are both ICSID member States. *See* ICSID List of Contracting States and Other Signatories at 4, 5.[2]  Venezuela was a participating State from 1995 until July 25, 2012.  *Id.* at 5.

The ICSID arbitration process works as follows:  When a dispute between an investor and a State arises, either the State or the investor may file a request to convene an arbitral panel. *See* ICSID Convention art. 36 (Apr. 2006).[3]  So long as ICSID's jurisdiction appears appropriate, the request is registered and an arbitral tribunal appointed.  *See id.* arts. 36–37.  Both parties to the arbitration may be represented by counsel.  *See* ICSID Arbitration Rule 18.[4]  Arbitration proceeds through written and oral phases at which the parties present evidence and legal arguments in favor of their position.  *See id.* Rules 29–36.  The tribunal must then decide the parties' dispute and issue an award.  *See* ICSID Convention arts. 41–49.  The award must be in writing, address "every question submitted" to the tribunal, and "state the reasons upon which [the award] is based."  *Id.* art. 48.

The Convention also establishes procedures for challenging an award issued by an ICSID tribunal.  One such mechanism is "annulment."  *See id.* art. 52.  Annulment is available if, among other things, tribunal proceedings were marred by a "serious departure from a fundamental rule of procedure."  *Id.* art. 52(1)(d).  When a party seeks annulment, the Centre convenes an *ad hoc* committee of three.  *See id.* art. 52(3).  The committee can stay enforcement of the award pending its annulment decision, *see id.* art. 52(5), but except to the extent that

---

[2] List as of September 3, 2021, available at
https://icsid.worldbank.org/sites/default/files/documents/2021_Sep.ICSID.ENG.pdf.

[3] The full text of the ICSID Convention is available at https://icsid.worldbank.org/.

[4] The ICSID Arbitration Rules are appended to the English language version of the ICSID Convention.

enforcement is stayed, "the tribunal's award remains 'binding on the parties and . . . not subject to any appeal or any other remedy' other than those set forth in the ICSID Convention." *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94, 97 (D.D.C. 2019) (quoting ICSID Convention art. 53(1)). Appeals to courts or institutions outside ICSID are barred. *See id.*; *Mobil Cerro Negro*, 863 F.3d at 101.

ICSID's procedures extend only to the issuance and appeal of awards; the Centre does not hold enforcement power. A prevailing party must accordingly seek "recognition or enforcement" of an ICSID award through the court of an ICSID member State. ICSID Convention art. 54. Member States agreed upon joining the Convention to "recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by that award . . . as if [the award] were a final judgment of a court in that State." *Id.* Member States' courts are "not permitted to examine [the] ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction to render the award; under the Convention's terms, they may do no more than examine the judgment's authenticity and enforce the obligations imposed by the award." *Mobil Cerro Negro*, 863 F.3d at 102. The United States codified this obligation at 22 U.S.C. § 1650a, which provides that ICSID awards "create a right arising under a treaty of the United States" and are "given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several [s]tates."[5] 22 U.S.C. § 1650a(a).

---

[5] For clarity, throughout this report and recommendation the undersigned refers to the several states of the United States as "states" with a lowercase s, and foreign States as "States" with an uppercase S.

## II.      The Present Dispute

Plaintiffs Valores Mundiales, S.L. and Consorcio Andino, S.L.—for ease of reference the undersigned refers to them collectively as "Valores"—are companies organized under the laws of the Kingdom of Spain.  *See* Pls. Fact Stmt. ¶ 1.  The companies are shareholders of two Venezuelan corporations engaged in the production and commercialization of grains and other food products.  *See* Pls. Summ. J. Mot. at 3; ICSID Award ¶¶ 79–84.  In 2009 and 2010, under the leadership of former Venezuelan president Hugo Chávez, the Venezuelan corporations became targets of an expropriation decree and other government measures.  *See* Def. Default Mot. at 4; Pls. Summ. J. Mot. at 3; ICSID Award ¶¶ 88–97, 102.  Valores believed the Venezuelan government's actions adversely affected their investments, so they commenced an arbitration proceeding against Venezuela under the ICSID Convention.  *See* Def. Fact. Stmt. ¶ 3.

A three-member arbitral tribunal was convened at the Centre to adjudicate the parties' dispute.  *See* Def. Fact. Stmt. ¶ 4; ICSID Award ¶ 26.  Venezuela, by then under the leadership of Nicolás Maduro, denied there had been an expropriation.  *See* Def. Default Mot. at 5.  The tribunal issued its decision in July 2017, referred to here as the "Award," which unanimously rejected several jurisdictional arguments raised by Venezuela and found that Venezuela had treated Valores inequitably and breached its treaty obligations.  *See* Def. Fact Stmt. ¶ 4; ICSID Award ¶ 834.  The Award directs Venezuela to pay hundreds of millions of dollars in compensation to Valores, plus compound interest "at Libor + 2% rate from January 22, 2013 until the date of payment."  Pl. Fact Stmt. ¶ 5; ICSID Award ¶ 834.

Venezuela, still under Maduro's leadership, then initiated annulment proceedings.  *See* Def. Fact Stmt. ¶¶ 6, 8; Def. Default Mot. at 4.  The ICSID Secretary General provisionally stayed enforcement of the Award and constituted a three-member *ad hoc* committee, referred to here as the "Committee," to consider the annulment request.  *See* Def. Fact Stmt. ¶¶ 7–8; Def.

Default Mot. at 4.  The Committee lifted the enforcement stay in September 2018, prompting

Valores to file this suit seeking enforcement of the Award.  *See* Def. Fact Stmt. ¶¶ 9–10.

Because the Committee's ultimate decision on the merits of the annulment request could "greatly

impact the terms of the arbitration award," however, then-District Judge Ketanji Brown Jackson

stayed the proceedings here pending the Committee's final decision.  *See* Jt. Status Rep. ¶ 1;

Nov. 17, 2020 Min. Order.

     In the meantime, Venezuela entered a period of "unparalleled constitutional,

humanitarian[,] and economic crisis."  Def. Default Mot. at 1.  In May 2018, Nicolás Maduro

declared victory in an election widely understood to be rigged and fraudulent.  *See id.* [6]  An

alternative government lead by the President of the Venezuelan National Assembly, Juan

Guaidó, was formed in January 2019.  *See id.*; Hernández Decl. ¶ 3; Def. Fact Stmt. ¶ 12.  The

President of the United States and the heads of over fifty other countries recognized Interim

President Guaidó as the legitimate leader of Venezuela later that month.  *See* Def. Default Mot.

at 1; Def. Fact Stmt. ¶ 13.

     The competing Venezuelan regimes unsurprisingly took competing positions about the

country's continued participation in the ICSID annulment proceedings against Valores.  In

February 2019, Interim President Guaidó's Special Attorney General, José Ignacio Hernández,

sent a letter to the Centre claiming exclusive authority to represent Venezuela in the proceedings.

*See* Hernández Decl. ¶ 4; Pl. Summ. J. Mot. at 5 (describing letter and citing Resolution 2 ¶¶ 1–

---

[6] Also in May 2018, the President of the United States condemned "recent activities of
the Maduro regime, including endemic economic mismanagement and public corruption at the
expense of the Venezuelan people and their prosperity, and ongoing repression of the political
opposition; attempts to undermine democratic order by holding snap elections that are neither
free nor fair; and the regime's responsibility for the deepening humanitarian and public health
crisis in Venezuela."  Executive Order 13885, 83 Fed. Reg. 24,001 (May 21, 2018).

2); Ex. A to Decl. of Joseph E. Neuhaus, ECF No. 31-2.  In April 2019, Reinaldo Enrique Muñoz Pedroza, Attorney General in the Maduro regime, sent a letter to the Centre in response.  *See* Resolution 2 ¶¶ 4, 21–22; *see also OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16-cv-1533, 2019 WL 2185040, at *4 (D.D.C. May 21, 2019) (explaining Mr. Pedroza's relationship to the Maduro government).

The ICSID Committee temporarily halted the substantive annulment proceedings to consider the issue of Venezuela's representation.  In August 2019, the Committee determined that Mr. Hernández had "not proven his legitimacy to represent Venezuela," so the representative of Venezuela "already constituted in the file"—a representative of the Maduro regime—would continue to represent the country in the annulment proceedings.  Resolution 2 ¶ 51; *see also* Pl. Summ. J. Mot. at 5; Def. Summ. J. Mot. at 10.  The Committee then issued a final decision rejecting Venezuela's annulment application and affirming the Award.  *See* Jt. Status Report ¶ 2.

After receiving notice of the Committee's final decision, Judge Florence Y. Pan lifted the stay in this case and re-referred the parties' disputes to the undersigned for a report and recommendation.  *See* Jan. 24, 2022 Min Order.  Those disputes involve a preliminary procedural issue prompted by the Deputy Clerk of Court's entry of default against Venezuela on October 23, 2019.  Valores moved for a default judgment the next day.  *See* Pls. Default Mot. When Venezuela appeared and filed its Answer the following March, the country requested that the Clerk's default be set aside.  *See* Def. Default Mot.  Valores did not respond to that motion, and instead requested judgment on the pleadings or summary judgment.  *See* Pls. Summ. J. Mot. Venezuela then cross-moved for summary judgment.  *See* Def. Summ. J. Mot.  These motions are now ripe for review.

## LEGAL STANDARD

An entry of default may be set aside "for good cause" at the discretion of the trial court. Fed. R. Civ. P. 55(c); *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980). "[E]xercise of that discretion entails consideration of whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense [is] meritorious." *Keegel*, 627 F.2d at 373 (internal citation omitted). A defense is meritorious if it contains "even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 10 n.5 (D.D.C. 2005) (citing *Keegel*, 627 F.2d at 374).

If a defaulted party later appears and files a responsive pleading, once the pleadings have closed, either party may move for judgment on the pleadings pursuant to Rule 12(c). *See* Fed. R. Civ. P. 12(c). Judgment on the pleadings is "rare." *Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760 (D.C. Cir. 2019). The party seeking such a judgment "shoulders a heavy burden" because the court will "accept as true the allegations in the opponent's pleadings, and as false all controverted assertions of the movant." *Id.* at 760–61. The "pleadings" to be considered include copies of exhibits to a pleading, "such as relevant and authentic documents" submitted with the answer or complaint. *Id.* at 760 (citing Fed. R. Civ. P 10(c)).

The parties may also ask the Court to consider matters outside the pleadings. *See* Fed. R. Civ. P. 12(d). If the additional matters are not excluded, a motion for judgment on the pleadings "must be treated as one for summary judgment under Rule 56." *Id.* "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). The court must draw

"all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true." *Turkmani v. Republic of Bolivia*, 193 F. Supp. 2d 165, 169 (D.D.C. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). If the parties file cross-motions for summary judgment, the court must review each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *McMullen v. Synchrony Bank*, 300 F. Supp. 3d 292, 300 (D.D.C. 2018). "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* (internal quotation omitted).

## DISCUSSION

Before addressing the parties' concerns, this Court has a preliminary and independent duty to assure itself of its subject-matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Although this suit was brought by foreign plaintiffs against a foreign defendant, this Court has jurisdiction pursuant to the ICSID Convention's implementing statute and the Foreign Sovereign Immunities Act, or "FSIA," 28 U.S.C. §§ 1330 *et seq.* The Convention's implementing statute creates an exception to sovereign immunity and provides the winner of an ICSID arbitral award "a right" to enforce the award "arising under a treaty of the United States." 22 U.S.C. § 1650a(a). Jurisdiction over the proceedings is vested exclusively in the federal district courts. *Id.* § 1650a(b). The FSIA operates in tandem by permitting federal courts to hear disputes against foreign sovereigns "regardless of the citizenship of the plaintiff," so long as the "substantive standards" of the FSIA are satisfied. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490–91 (1983); *see also Mobil Cerro Negro*, 863 F.3d at 113 (discussing the relationship between § 1650a and the FSIA). The FSIA's arbitral award exception applies to ISCID award enforcement actions. *See Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*,

9

No. 17-cv-1457, 2018 WL 6605633, at *4 (D.D.C. Dec. 17, 2018) (collecting cases); *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 280 (D.D.C. 2019), *aff'd*, 805 F. App'x 1 (D.C. Cir. 2020) (concluding same).  This Court therefore has subject-matter jurisdiction over this dispute, and the parties have raised no concerns about the Court's exercise of personal jurisdiction over Venezuela.

## I.     The Default Against Venezuela Should Be Set Aside

Satisfied of the Court's jurisdiction, the undersigned turns to the first set of motions referred for a report and recommendation.  Both are related to the Deputy Clerk of Court's entry of default against Venezuela on October 23, 2019.  *See* Clerk's Default, ECF No. 15; *see also* Pl. Default Mot.; Def. Default Mot.  The federal rules mandate that the Clerk "must" enter a default when a party against whom judgment is sought "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  Valores served Venezuela with the summons and complaint in this case via diplomatic channels on July 26, 2019.  *See* Return of Service, ECF No. 10.  When Venezuela failed to timely respond, Valores filed a declaration evidencing the failure.  *See* Declaration of Miguel López Forastier, ECF No. 14-1. The Clerk then entered a default against Venezuela as mandated by the Rules.  *See* Clerk's Default.

Considering the *Keegel* factors, good cause exists to set aside the default here.  First, Venezuela says its default was not willful, and was due instead to the "extraordinary conditions facing the Republic, including the press of more than [fifty] cases alleging wrongdoing by the former regimes of Venezuela brought at a time of profound transition and political turmoil." Def. Default Mot. at 17.  Second, a set-aside will not prejudice Valores, as Venezuela has now appeared and responded to the companies' complaint, *see id.* at 17–18, and filed briefs responding to the merits of Valores's request for judgment on the pleadings or for summary

judgment.  Third, Venezuela has moreover alleged a "meritorious" defense, as that concept is construed for purposes of a motion to set aside default.  *See Keegel*, 627 F.2d at 374; *Owens*, 374 F. Supp. 2d at 10 n.5.  Venezuela's articulated defense is based on the ICSID implementing statute, which it contends incorporates this country's "full faith and credit" jurisprudence and due process guarantees.  *See* Def. Default Mot. at 8–12.  If proven at trial, the theory "would constitute a complete defense."  *Keegel*, 627 F.2d at 374; *Owens*, 374 F. Supp. 2d at 10 n.5.  All three of the *Keegel* factors are thus satisfied.

In addition, the default here should be set aside because Venezuela is a foreign sovereign that has evidenced a desire to respond to the merits of Valores's claims.  Federal courts of the United States will almost always permit a foreign State to confront a plaintiff's claims on their merits.  *See Owens*, 374 F. Supp. 2d at 9; *First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda*, 877 F.2d 189, 196 (2d Cir. 1989) (setting aside a default judgment as "disfavored, especially against foreign sovereigns"); *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838–89 (D.C. Cir. 2006) (citing concerns that default judgments against other States could "adversely affect this nation's relations with other nations").  The undersigned accordingly recommends that the Court GRANT Venezuela's Motion to Set Aside Default, set aside the Clerk's default entry, and DENY Valores's Motion for Default Judgment as moot.

## II.     Valores is Entitled to Judgment as a Matter of Law

The other set of motions referred to the undersigned are Valores's Motion for Judgment on the Pleadings or Summary Judgment and Venezuela's Cross-Motion for Summary Judgement.  As even Valores's initial motion included materials for the Court to consider outside the pleadings, *see* ECF Nos. 24-2, 24-3, and 24-4, the undersigned assesses the motions exclusively under the Rule 56 standard for summary judgment.  *See* Fed. R. Civ. P. 12(d).

Judgment under Rule 56 is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Valores's theory for summary judgment is that the companies obtained an authentic arbitral award against Venezuela through the Centre, and Congress has given this Court a strict statutory command to enforce the pecuniary obligations imposed by ICSID awards.  *See* Pl. Summ. J. Mot. at *6.  Venezuela counters that the Award cannot be enforced consistent with Congress's command because an ICSID arbitral award must be treated "as if it were a final judgment of a court of general jurisdiction of one of the several [s]tates."  Def. Summ. J. Mot. at 2–3 (quoting 22 U.S.C. § 1650a(a)).  Further, Venezuela notes that federal courts will not enforce state court judgments obtained in violation of due process.  *See id.* at 8 (citing *Williams v. North Carolina*, 317 U.S. 287, 306 (1942) (Frankfurter, J., concurring); *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 483 (1982)).  Venezuela claims it was denied due process when the Centre denied representatives of Interim President Guaidó's government the opportunity to participate in the ICSID annulment proceedings against Valores.  *See id.* at 3.  Thus, this alleged due process error rendered the Centre's Award unenforceable in the federal courts of this country.  *See id*.  Venezuela also challenges the amount of post-judgment interest owed to Valores in the event the Award is enforceable.  *See id.* at 14–17.

### A.     *This Court Should Give the ICSID Award Full Faith and Credit*

The parties' dispute over enforcement of the ICSID arbitral award is grounded in the language of the ICSID Convention and the treaty's implementing statute.  *See* Pl. Summ. J. Mot. at *7–8; Def. Summ. J. Mot. at 1.  The Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by that award within its territories *as if it were a final judgment of a court of*

*that State*." ICSID Convention art. 54(1) (emphasis added). Congress codified this treaty

obligation at 22 U.S.C. § 1650a, which provides in relevant part:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [C]onvention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given *the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several [s]tates*.

22 U.S.C. § 1650a(a) (emphasis added).

The role of the courts in this scheme is largely limited to enforcing ICSID awards, which

"is no accident. The Convention's aim is to streamline the enforcement of authenticated ICSID

arbitral awards, and thus, under the Convention's terms, member-states' courts are generally 'not

permitted to examine an ICSID award's merits.'" *TECO Guatemala Holdings*, 414 F. Supp. 3d

at 101 (quoting *Mobil Cerro Negro*, 863 F.3d at 102). "Rather, an enforcing court must

generally do no more than examine the judgment's authenticity and enforce the obligations

imposed by the award." *Id*. (internal quotation omitted).

Valores encourages the Court to do just that—to assure itself of the authenticity of the

Award and enter an enforcement order consistent with the Award. *See* Pl. Summ. J. Mot. at *14

(citing *TECO Guatemela Holdings*, 414 F. Supp. at 101). Venezuela does not dispute the

Award's authenticity. *See* Def. Fact Stmt. ¶ 10. Valores reasons that "[w]hat is left to comply

with the mandate of the ICSID Convention and its enabling statute is for this Court to enter

judgment enforcing the pecuniary obligations of the Award," as requested in Valores's

complaint. Pl. Summ. J. Mot. at *15.

That position is oversimplified, though ultimately correct. Congress directed the federal

courts to enforce ICSID awards in the same manner that the federal courts enforce state court

final judgments. *See* 22 U.S.C. § 1650a(a). "As a result, in enforcing an ICSID award, district

courts must 'look to established procedures for enforcing state court judgments in federal

court.'"  *TECO Guatemala Holdings*, 414 F. Supp. 3d at 101 (quoting *Mobil Cerro Negro*, 863 F.3d at 122).  Federal courts accord authenticated state court judgments "the 'same full faith and credit . . . as they have by law or usage in the courts of such [s]tate . . . from which they are taken.'"  *Id.* (quoting 28 U.S.C. § 1738).  "[S]tate proceedings need to do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law."  *Kremer*, 456 U.S. at 481.[7]  Venezuela latches on to this concept to advance its theory that, if the country was denied due process at arbitration proceedings at the Centre, the Centre's arbitral award would not qualify for full faith and credit in this Court.  *See* Def. Reply at 8–9.

Although the ICSID implementing statute appears to incorporate the full faith and credit standard's due process requirements, that does not compel the result Venezuela seeks.  *See* 22 U.S.C. § 1650a; *TECO Guatemala Holdings*, 414 F. Supp. 3d at 105 (noting that the rule against giving full faith and credit to a state court judgment if the court lacked jurisdiction "presumably applies" to cases seeking enforcement of an ICSID award).  In full faith and credit disputes,

---

[7] *Kremer* references the Due Process Clause of the Fourteenth Amendment because the case involves consideration of the credit due to the judgment of a state court.  *See id.*  Valores insists the Fourteenth Amendment is inapplicable here, as this case arises under a federal statute and does not involve the action of one of the several states.  *See* Pl. Summ. J. Mot. at *17 (quoting authorities for the uncontroversial proposition that when "a federal statute provides the basis for jurisdiction, constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment").  Foreign States are not "persons" protected by the due process guarantees of the Fifth Amendment.  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002).  But Venezuela does not claim Fifth Amendment due process rights that it fears will be violated if this Court enforces the ICSID Award.  The theory is instead that, "for purposes of enforcing an ICSID award," Venezuela's rights "arise under the [Convention] and the enabling statute, which require the judgment to be treated *as if* it were a state court judgment."  Def. Summ. J. Mot. at 19 (emphasis original).  The undersigned is satisfied that the due process inquiry is therefore whether the ICSID Award was rendered consistent with fundamental concepts of due process as contemplated by 22 U.S.C. § 1650a, not whether Venezuela has due process rights arising under the Fifth Amendment in this proceeding.

federal courts do not impose their own rules or laws designed to ensure due process in federal court onto other tribunals.  The federal courts instead "accept the rules chosen by the [s]tate from which the judgment is taken," in part because "no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause."  *Kremer*, 456 U.S. at 481–82, 483.  Accordingly, "only if the state court *itself* would decline to enforce the judgment" will a federal court decline to give the state court's judgment full faith and credit.  *TECO Guatemala Holdings*, 414 F. Supp. 3d at 103 (emphasis original).  If the judgment is instead "binding in the state where it was rendered, it is equally binding in every other state" as well as in the federal courts.  *Williams v. North Carolina*, 317 U.S. 287, 306 (1942) (Frankfurter, J., concurring).  The ICSID enforcement statute imports these concepts through 22 U.S.C. § 1650a(a), so the same rule applies:  If the Centre would treat one of its awards as binding, that award is binding in a United States federal court.  *See TECO Guatemala Holdings*, 414 F. Supp. 3d at 103 (observing that "if the state court—or, here, the ICSID—would treat the judgment—or, here, the award—as binding, so must the federal district court").  The undisputed facts in this matter demonstrate that the Centre would treat the Award issued in favor of Valores as a binding arbitral award.

The Supreme Court has nevertheless sometimes reviewed the judgment-rendering jurisdiction's procedures to ensure they satisfy a constitutional floor of due process.  *See Kremer*, 456 U.S. at 480–85; *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950) (defining that floor to require "at a minimum . . . notice and opportunity for hearing appropriate to the nature of the case").  Following suit here, the undersigned reviewed both ICSID's procedures generally and the procedures observed in the arbitration between Valores and Venezuela.  That review reveals that the ICSID arbitral proceedings provided Venezuela with sufficient process to give full faith and credit to the ICSID Award.

As a general matter, the Convention provides robust internal mechanisms to ensure the Centre's awards are rendered consistent with core principles of due process.  ICSID only arbitrates disputes between States that consent to participate in the Convention and investing nationals of other participating States.  *See* ICSID Convention art. 25.  Requests for arbitration must be made in writing and delivered to the other party.  *See id.* art. 36.  Both sides may be represented by counsel and may participate in both written and oral advocacy to advance their positions.  *See* ICSID Arbitration Rules 18, 29–36.  An arbitral award must be in writing and state "the reasons upon which it is based."  ICSID Convention art. 48(2)–(3).  And annulment proceedings before a reviewing committee are available if a party is concerned the arbitral tribunal was not properly constituted, manifestly exceeded its powers, was "infected with corruption," failed to state the reasons for its award, or seriously departed from "a fundamental rule or procedure."  *Id.* art. 52.

Sufficient procedures were observed in the ICSID arbitration between Venezuela and Valores.  When Mr. Hernández sent a letter to the Centre claiming sole authority via Interim President Guaidó's government to represent Venezuela in the annulment proceedings, the Committee promptly considered Mr. Hernández's position and solicited statements on the issue from Valores and the representative of Venezuela already named in the Centre's files.  *See* Resolution 2 ¶¶ 1–4, 21–22, 51; *see also* Pl. Summ. J. Mot. at 5; Def. Summ. J. Mot. at 10. Based on those position statements and the legal authorities cited, the Committee determined Mr. Hernández had "not proven his legitimacy to represent Venezuela."  Resolution 2 ¶ 51.  As a result, the Committee permitted the representative for Venezuela "already constituted in the file" to continue representing the country in the annulment proceedings.  *Id.*

16

Venezuela cites a number of cases to suggest that this Court would have reached a different conclusion than the Committee about Mr. Hernández's exclusive authority to represent Venezuela. *See* Def. Summ. J. Mot. at 13–14; Def. Reply at 10–11. But that question was not for this Court to decide. Pursuant to the Convention, the issue was to be decided "in accordance with such rules of law as may be agreed by the parties" or, in the absence of an agreement, "the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable." ICSID Convention art. 42(1) (parenthetical original). The annulment Committee reached its decision about Venezuela's proper representation based on its understanding of Venezuelan law. *See* Def. Default Mot. at 6, 14–15 (describing decision based on a ruling by Venezuela's Supreme Tribunal of Justice); Def. Summ. J. Mot. at 6 n.9 (same); Def. Reply at 10–11 (same). It is irrelevant that Interim President Guaidó's government is the only representative of Venezuela authorized to participate in proceedings *here*, in this federal court, including in this enforcement proceeding. *See* Def. Summ. J. Mot. at 4–5, 13–14 (citing in favor of this position *OI Eur. Grp.*, 2019 WL 2185040, at *4–5; *Guar. Tr. Co. v. United States*, 304 U.S. 126, 137 (1938)). The alleged due process error occurred at ICSID, not before a court in the United States.

It is similarly irrelevant whether this Court would have interpreted Venezuelan law in the same manner as the ICSID Committee. *See* Def. Default Mot. at 6, 14–15 (arguing this Court would have interpreted Venezuelan law differently). ICSID decided the question about Venezuela's proper representation for purposes of the ICSID arbitration and consistent with ICSID's arbitration rules and procedures, including ICSID's rules for conflicts of law. Now, "having been unsuccessful in convincing the *ad hoc* committee" of its position, representatives of Mr. Guaidó's government may not "'reopen those questions in a collateral attack'" in this

Court.  *TECO Guatemala Holdings*, 414 F. Supp. 3d at 106 (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 709 n.9 (1982)) (internal modifications omitted); *see also Mobil Cerro Negro*, 863 F.3d at 102 (holding that courts may not evaluate an ICSID award's "compliance with international law").

Refusing to second-guess the Committee's decision about Venezuela's proper representation for proceedings at the Centre hobbles Venezuela's substantive claim that it was denied due process by the Centre.  When the Committee's conclusion is credited, the Court is left with no evidence that Venezuela was deprived of representation or the right to be heard.  Venezuela's reliance on cases such as *Texaco* and *Cohen* is thus misplaced.  *See* Def. Summ. J. Mot. at 2–3 (citing *Texaco Inc. v. Penzoil Co.*, 626 F. Supp. 250 (S.D.N.Y. 1986), *aff'd*, 784 F.2d 1133 (2d Cir. 1986), *rev'd*, 481 U.S. 1 (1987), for the proposition that due process "is violated where a state creates a right to appeal, but then prevents a party from exercising that right"); *id.* at 10–11 (citing *Cohen v. Bd. Trustees of Univ. of D.C.*, 311 F. Supp. 3d 242, 256–57 (D.D.C. 2018), for the proposition that procedural due process requires access to a meaningful right of review—a right that can be impaired when review is conditioned on a third party's actions).  Venezuela was not prevented from exercising its right to pursue an appeal.  Venezuela filed an annulment request, and the annulment request was considered, along with the collateral issue of who was entitled to represent Venezuela in the proceedings.  *See* Def. Fact Stmt. ¶¶ 6–8, 17–19; Resolution 2 ¶¶ 1–4, 21–22, 51.  Both *Cohen* and *Texaco* are simply inapposite here.

Venezuela's arguments and cited authorities thus do not warrant departure from the general rule that an authentic ICSID arbitral award will be enforced by the federal courts of this country except in the most extraordinary of circumstances.  *See TECO Guatemala Holdings*, 414 F. Supp. 3d at 103 (declining to "revisit issues decided by the ICSID tribunal and *ad hoc*

committee" as "at odds with the purpose of the treaty and the clear terms of the implementing legislation"); *Mobil Cerro Negro*, 863 F.3d at 102 ("[T]he Convention reflects an expectation that the courts of a member nation will treat the award as final."); *Micula*, 404 F. Supp. 3d at 275–76 ("A federal court's role in enforcing an ICSID award is limited . . . [reflecting] an expectation under the Convention that the courts of a member nation will treat the award as final."). No such extraordinary circumstances are present here, so this Court should give the Award full faith and credit and enforce its pecuniary obligations against Venezuela and in favor of Valores.

### B.    *Valores is Entitled to the Interest Specified in the Award*

Venezuela also raises a concern with the post-judgment interest due under the Award. Valores requested that the terms of the Award be enforced in their entirety, including the requirement that Venezuela pay "compound interest at Libor + 2% rate from January 22, 2013 until the date of payment." Pl. Summ. J. Mot. at *19–20 (citing Award ¶ 834). Venezuela contends post-judgment interest should be calculated under 28 U.S.C. § 1961, instead, which governs interest on "any money judgment in a civil case recovered in district court." Def. Summ. J. Mot. at 8. If § 1961 controls, the post-judgment interest rate will be lower than the rate specified in the Award, because the statutory rate is "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve system, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

Just two courts have squarely addressed § 1961's application to ICSID arbitral awards. *See* Def. Reply at 11. In *Mobil Cerro Negro Ltd. v. Bolivarian Republic of Venezuela*, the Southern District of New York concluded that applying the statute to an ICSID award would be inconsistent with the federal courts' duty to enforce the pecuniary obligations of Centre awards under the ICSID implementing statute. *See* No. 14-cv-8163, 2015 WL 926011, at *2 (S.D.N.Y.

Mar. 4, 2015).  The Second Circuit reversed on other grounds and explicitly declined to reach the interest rate issue.  *See Mobil Cerro Negro*, 863 F.3d at 125.  The second on-point decision is from this District, which the undersigned will call "*OI*" for short.  *See OI*, 2019 WL 2185040.  In that case, Judge Amy Berman Jackson reached the opposite conclusion and imposed § 1961's lower post-judgment interest rate on an ISCID arbitral award, the terms of which provided for a different rate "until payment."  *See id.* at *7.  Neither decision binds this Court.  Reviewing both for their persuasive authority, the undersigned respectfully disagrees with Judge Jackson and recommends that this Court instead follow the rule suggested by *Mobil Cerro Negro*.

This District's decision in *OI* was based on two interrelated legal conclusions.  The first is that an ICSID award merges with a federal court order enforcing the award, thus making § 1961 applicable to ICSID award enforcement proceedings.  *See* 2019 WL 2185040, at *6.  The second is that § 1961's post-judgment interest rate is "mandatory" unless the parties express an intent to replace the rate through "clear, unambiguous and unequivocal language."  *Id.* (internal quotations omitted).  Caselaw suggests that other kinds of arbitral awards that specify an interest rate "until payment" do not express an intent to replace the post-judgment interest rate mandated by § 1961.  *See id.* (citing authorities from the 2d, 5th, 10th, and Federal Circuits).  So *OI* pairs these two conclusions to reason that an ICSID award specifying an interest rate "until payment" does not displace the post-judgment interest rate mandated by § 1961.  *See id.* at *7.

The undersigned recommends that this Court decline to follow *OI* based on concerns with the first conclusion—that § 1961 applies to ICSID award enforcement proceedings in the first place.  *OI* reasons that § 1961 is applicable to cases like this because of the doctrine of merger, which teaches that "when the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon the judgment are substituted for it."  *Id.* at *6 (quoting

Restatement (Second) of Judgments § 18 cmt. a (1982)).  Other kinds of arbitral awards merge into federal court decisions confirming those awards.  *See id*.  So the *OI* court concludes that, like a claim or most other arbitration awards, an ICSID award merges into the federal court decision enforcing it, thus making the statute enforcing a post-judgment interest rate on a money judgment in a civil case recovered in federal district court applicable.  *See id.*; 28 U.S.C. § 1961.

Yet there is a difference between other arbitral awards confirmed by a federal court and an ICSID arbitral award, because Congress has instructed the federal courts to treat the latter "*as if* the award were *a final judgment of a court of general jurisdiction of one of the several [s]tates*."  22 U.S.C. § 1650a(a) (emphasis added).  Neither *OI* nor the parties point to any law on whether a state court *judgment* merges with a federal court judgment enforcing the state court judgment in federal court.  And that is not surprising.  The merger doctrine usually functions to bar relitigation of a *claim* once judgment is entered on that claim—much like *res judicata*, merger precludes a second bite at the same cause of action.  *See* 46 Am. Jr. 2d § 431.  The doctrine of merger works to ensure a tortfeasor is held accountable just once for his tort, or that a contract remedied through specific performance is not the basis for a second claim for money damages.  *See* Restatement (Second) of Judgments § 18 illustrations to cmt. b.  A claim committed to arbitration and ultimately enforced in federal court might warrant similar treatment, because parties should not be permitted to re-arbitrate a single claim any more than they could re-litigate it.  But a claim on which a state court has entered *judgment*, and a federal court is now asked to enforce the state court's judgment, does not.  The federal court will already give the state court judgment *res judicata* effect, as explained above.  *See Kremer*, 456 U.S. at 481; *TECO Guatemala Holdings*, 414 F. Supp. 3d at 103; *Williams*, 317 U.S. at 306 (Frankfurter,

J., concurring).[8]  The common-law principles of merger simply do not neatly fit an arbitral award that this Court must treat like a pre-existing state court judgment.

There is a second reason to depart from *OI*'s merger assessment, as well.  *OI*'s logic is premised in part the on recognition that "numerous circuits have held that once a federal court confirms an arbitral award, the award merges into the judgment[.]"  2019 WL 2185040, at *6 (citing *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456–60 (5th Cir. 2013); *Newmont U.S.A. Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1275–77 (10th Cir. 2010); *Fid. Fed. Bank FSP v. Durga Ma Corp.*, 387 F.3d 1021, 1023–24 (9th Cir. 2004)).  That is a correct summation of what the cited cases hold,[9] but does not address *why* the cited cases reach that conclusion. *Tricon Energy* and *Fidelity Federal* both conclude that a "judgment confirming an arbitration award—like any other civil judgment—is subject to § 1961," because that result is compelled by the statutory language of the Federal Arbitration Act (abbreviated "FAA").  *Tricon Energy*, 718 F.3d at 457 & n.13 (quoted language); *Fid. Fed.*, 387 F.3d at 1023 (citing an FAA provision for the proposition that "[a] judgment confirming an arbitration award is treated similarly to any other federal judgment").

The FAA and the ICSID implementing statute do not employ the same language, however.  The FAA directs that, when an "order confirming, modifying, or correcting an [FAA arbitral] award" is sought, "judgment shall be docketed as if it was rendered in an action," and

---

[8] This may be why the Restatement comment describing enforcement of one state's judgment in another state does not use the word "judgment" to refer to the enforcing state's action.  *See* Restatement (Second) of Judgments § 18 cmt. f.  The proceedings in the second state are instead described as an "action" on "the [first state's] judgment."  *Id.*  The hedging likely reflects that the core concept of merger—that a *claim* merges with the *judgment* upon it—does not cleanly apply to a judgment about the enforceability of a preexisting judgment entered in another jurisdiction.

[9] Indirectly, at least.  *Newmont* does not explain why § 1961 applies—it simply applies § 1961 to the facts of that case.  *See* 615 F.3d at 1275–77.

> The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced *as if it had been rendered in an action in the court in which it is entered*.

9 U.S.C. § 13 (emphasis added).  When a federal court confirms an arbitral award under the FAA, the award is thus treated "as if" the award was a judgment in federal court—that is, "*the court in which [the confirming judgment] is entered*."  *Id.* (emphasis added).  The ICSID implementing statute by contrast instructs that ICSID arbitral awards must be treated "as if the award were a final judgment *of a court of general jurisdiction of one of the several [s]tates*."  22 U.S.C. § 1650a(a) (emphasis added).  A judgment enforcing an ICSID award is thus akin to a *state* court judgment, not a *federal* court judgment, so § 1961's mandatory post-judgment interest rate for *federal* judgments does not apply.

OI addresses concerns about the applicability of FAA cases by noting that "the merger doctrine and whether or not § 1961 applies does not find authority in the FAA—it is a common law doctrine that applies to all money judgments recovered in federal district court."  2019 WL 2185040, at *7.  That explanation overlooks the reason that the merger doctrine applies to FAA arbitral awards.  Like claims, FAA arbitral awards merge into federal court judgments.  *See* 2019 WL 2185040, at *6.  But FAA arbitral awards only "merge" in this way because of the plain language of the FAA.  *See Tricon Energy*, 718 F.3d at 457 & n.13; *Fid. Fed.*, 387 F.3d at 1023.  The text of 22 U.S.C. § 1650a compels a different result, because that statute classes ICSID awards in the same category as *state court* judgments, and state court judgements do not necessarily merge into federal court judgments entered to enforce the preexisting judgment, as explained above.

This is quite a long walk to a simple conclusion, but it explains the basis of the undersigned's departure from *OI*.  Thus, because an ICSID award must be treated "as if the

23

award were a final judgment" of a *state* court, 22 U.S.C. § 1650a, and § 1961 applies only to "judgment[s] in a civil case recovered in a [*federal*] district court," § 1961 does not apply to ICSID awards at all.

Additional assurance on that point can be gained from the reasoning of *Mobil Cerro Negro*. There, the Southern District of New York articulated the same simple rule recommended here—that the interest rate specified in an ICSID award controls—as consistent both with the command of § 1650a and with international law concerns unique to the United States' participation in the ICSID Convention. The Court in *Mobil Cerro Negro* interpreted a request to impose § 1961's post-judgment interest rate as an attempt to "modify the terms" of an ICSID award—a request the court concluded was "flatly precluded by the principles governing recognition of ICSID awards," since "under the treaty and the statute, courts of the United States . . . are required to recognize all aspects of awards issued by ICSID arbitral panels, and have no charter to undertake any substantive review of such awards," including their "pecuniary obligations." 2015 WL 926011, at *1. Interest is a pecuniary obligation. *See id.* at *2 (citing Black's Law Dictionary (10th ed. 2014)). "Thus, when an ICSID panel . . . awards interest 'until payment,' a federal court must recognize and enforce that pecuniary term" as commanded by "the plain language of the enabling statute." *Id*.

This logic is consistent with the undersigned's departure from *OI*, as well as with more general principles governing the federal courts' enforcement of ICSID arbitral awards. *See, e.g.*, *TECO Guatemala Holdings*, 414 F. Supp. 3d at 101 ("[A]n enforcing court must generally do no more than examine the judgment's authenticity and enforce the obligations imposed by the award."). The analysis is also consistent with familiar canons of statutory construction, including guidance that specific statutes such as § 1650a control over general ones like § 1961,

*see Mobil Cerro Negro*, 2015 WL 926011, at *2 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)), and that a later-enacted statute can inform the courts' construction of a broader earlier-enacted law, since § 1650a post-dates § 1961 by eighteen years. *See id.* (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)).  And the rule to treat ICSID awards like final judgments obtained in state courts matches other decisions—including at least one from this District—that apply the interest rate specified in an ICSID award without robustly articulating why.  *See, e.g.*, *Duke Energy Int'l Peru Invs. No. 1 Ltd. v. Republic of Peru*, 904 F. Supp. 2d 131, 132–33 (D.D.C. 2012) (enforcing the interest rate specified in an ICSID award because the award was "sufficiently clear" to "determine the applicable interest rate," and the court believed it was "required by statute to give the Award full faith and credit and confirm it accordingly").

*Mobil Cerro Negro* also recognized its duty to enforce the interest rate specified in an ICSID award as a matter of international law.  International relations are a delicate matter usually outside the federal courts' competence.  That is why, "where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."  2015 WL 926011, at *2 (citing Restatement (Third) of Foreign Relations Law § 114 (1987)).  Upon joining the ICSID Convention, the United States agreed that ICSID awards would be "binding on the parties," and that United States courts would "recognize an award rendered pursuant to [the] Convention as binding and enforce the pecuniary obligations imposed by [the] award within its territories as if it were a final judgment of a court in that State."  ICSID Convention arts. 53(1), 54(1).  The United States thus has "an international obligation" to enforce every term in an ICSID award—including an award's specified interest rate.  *Mobil Cerro Negro*, 2015 WL 926011, at *2.  The undersigned therefore recommends that

this Court impose the interest rate specified in the ICSID Award, thereby enforcing Venezuela's full pecuniary obligations under the Award "until the date of payment" to Valores.

## CONCLUSION

For these reasons, the undersigned recommends that the Court **GRANT** Venezuela's Motion to Set Aside Default, **DENY** the Plaintiffs' Motion for Default Judgment as moot, **DENY** Venezuela's Motion for Summary Judgment, **GRANT** Plaintiffs' Motion for Summary Judgment, and **ORDER** Venezuela to pay its full pecuniary obligations under the ICSID Award, including compound interest at Libor + 2% rate from January 23, 2013, until the date of payment.

## REVIEW BY THE DISTRICT COURT

The parties are advised that under the provisions of Local Rule 72.3(b), any party who objects to a Report and Recommendation must file a written objection with the Clerk of Court within 14 days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: August 3, 2022

_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE