# EXHIBIT A

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceedings between

**VALORES MUNDIALES, SL AND CONSORCIO ANDINO, SL**

Defendants in Annulment

and

**BOLIVARIAN REPUBLIC OF VENEZUELA**

Petitioner in Annulment

ICSID Case No. ARB/13/11

---

**DECISION ON ANNULMENT**

---

**Members of the *ad hoc* Committee**
Prof. Luca G. Radicati di Brozolo, President
Prof. José Antonio Moreno Rodríguez, Member of the *ad hoc* Committee
Prof. Fausto de Quadros, Member of the *ad hoc* Committee

**Secretary of the *ad hoc* Committee**
Mrs. Marisa Planells-Valero

**Assistant to the *ad hoc* Committee**
Dr. Emilio Bettoni

*Date of delivery to the Parties:* December 21, 2021

[ . . . ]

[p. 101]

VIII.   DECISION

475. For the reasons set forth in this Decision, the Committee unanimously resolves to:

   a) Reject in its entirety the Request for Annulment of the Award filed by the Petitioner in Annulment; and
   b) Order the Petitioner in Annulment to pay the Defendants in Annulment US$ 2,348,033.79 as costs.
   c) Order the Petitioner in Annulment to pay US$ 660,031.57 as costs of the annulment proceeding.

**SPANISH ORIGINAL**

**CIADI**

CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS
A INVERSIONES

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  EE.UU.
TELÉFONO +1 (202) 458 1534  |  FACSÍMIL +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A D O

### VALORES MUNDIALES, S.L. Y CONSORCIO ANDINO, S.L.

C.

### REPÚBLICA BOLIVARIANA DE VENEZUELA

### (CASO CIADI NO. ARB/13/11) – PROCEDIMIENTO DE ANULACIÓN

Por la presente certifico que lo adjunto es una copia fiel de la Decisión sobre Anulación del Comité *ad hoc* de fecha 21 de diciembre de 2021.

Gonzalo Flores
Secretario General Interino

Washington, D.C., 21 de diciembre de 2021

**CENTRO INTERNACIONAL DE ARREGLO DE DIFERENCIAS RELATIVAS A INVERSIONES**

En el procedimiento de anulación entre

**VALORES MUNDIALES, S.L. Y CONSORCIO ANDINO, S.L.**

Demandadas en Anulación

y

**REPÚBLICA BOLIVARIANA DE VENEZUELA**

Demandante en Anulación

**Caso CIADI No. ARB/13/11**

---

**DECISIÓN SOBRE ANULACIÓN**

---

**Miembros del Comité *ad hoc***
Prof. Luca G. Radicati di Brozolo, Presidente
Prof. José Antonio Moreno Rodríguez, Miembro del Comité *ad hoc*
Prof. Fausto de Quadros, Miembro del Comité *ad hoc*

**Secretaria del Comité *ad hoc***
Sra. Marisa Planells-Valero

**Assistente del Comité *ad hoc***
Dr. Emilio Bettoni

*Fecha de envío a las Partes:* 21 de diciembre de 2021

**REPRESENTACIÓN DE LAS PARTES**

*En representación de Valores Mundiales, S.L. y Consorcio Andino, S.L.*:

Sr. Miguel López Forastier
Sr. José E. Arvelo
Sra. Clovis Trevino
Sr. Santiago M. Zalazar
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC, 20001-4956
Estados Unidos de América
  y
Lic. Rodrigo Martínez Villarreal
GRUMA S.A.B. DE C.V.
Calzada del Valle 407 Ote,
San Pedro Garza García, NL
CP 66230
México
  y
Sr. Duane H. Zobrist
ZOBRIST LAW GROUP
Virginia National Bank Building
1900 Arlington Boulevard
Suite B, Second Floor
Charlottesville, VA, 22903-1520
Estados Unidos de América

*En representación de la República Bolivariana de Venezuela*:

Dr. Reinaldo Enrique Muñoz Pedroza
Dr. Henry Rodríguez Facchinetti
PROCURADURÍA GENERAL DE LA REPÚBLICA
Av. Los Ilustres, c/c calle Francisco Lazo Martí
Urb. Santa Mónica, Caracas
Venezuela
  y
Dr. Osvaldo C. Guglielmino
Sr. Guillermo Moro
Sr. Alejandro Vulejser
GUGLIELMINO Y ASOCIADOS
Cerrito 1320 - Piso 9
Buenos Aires, C1010ABB
Argentina

# ÍNDICE DE CONTENIDOS

REPRESENTACIÓN DE LAS PARTES.............................................................................. I

ÍNDICE DE CONTENIDOS........................................................................................... II

ÍNDICE DE TÉRMINOS DEFINIDOS............................................................................. VI

ÍNDICE DE ABREVIACIONES DE DOCUMENTOS PROCESALES ........................................ VIII

ÍNDICE DE JURISPRUDENCIA CITADA ......................................................................... IX

I.  INTRODUCCIÓN Y PARTES .................................................................................. 1

II.  ANTECEDENTES PROCESALES ............................................................................. 2

III.  LOS PETITORIOS DE LAS PARTES ....................................................................... 8

    A.  Petitorio de Venezuela .................................................................................... 8

    B.  Petitorio de Valores y Consorcio ...................................................................... 8

IV.  EL LAUDO IMPUGNADO Y LAS CUESTIONES SOMETIDAS A LA DECISIÓN DEL COMITÉ ............ 8

    A.  Breve resumen del Laudo................................................................................ 8

    B.  Las cuestiones sometidas a la decisión del Comité............................................. 15

V.  EL ALCANCE DE LAS CAUSALES DE ANULACIÓN INVOCADAS POR VENEZUELA ................... 16

    A.  Introducción ................................................................................................ 16

    B.  La extralimitación manifiesta de facultades (Artículo 52(1)(b) del Convenio del CIADI) ... 17

        1.  Argumentos de Venezuela ......................................................................... 17

        2.  Argumentos de Valores y Consorcio ........................................................... 19

        3.  Análisis del Comité ................................................................................... 21

            a)  El doble requisito y el enfoque metodológico para determinar la existencia de una extralimitación manifiesta de facultades.................................... 21

            b)  El significado del adverbio "manifiestamente" y el análisis para determinar si la alegada extralimitación es manifiesta ........................................... 22

            c)  Las posibles formas de extralimitación y su alcance ........................... 24

               (1) Error en la asunción o en la denegación de jurisdicción ................... 24

               (2) La no aplicación del derecho aplicable ........................................ 26

    C.  El quebrantamiento grave de una norma fundamental de procedimiento (Artículo 52(1)(d) del Convenio del CIADI) ............................................................. 27

        1.  Argumentos de Venezuela ......................................................................... 27

        2.  Argumentos de Valores y Consorcio ........................................................... 29

        3.  Análisis del Comité ................................................................................... 29

    D.  La falta de expresión de motivos (Artículo 52(1)(e) del Convenio del CIADI).................. 33

1.  Argumentos de Venezuela ................................................................. 33

2.  Argumentos de Valores y Consorcio ...................................................... 35

3.  Análisis del Comité ....................................................................... 37

    a)  La obligación de motivar los laudos: ratio y requisito mínimo .......................... 37

    b)  El alcance de la obligación de motivación y la necesidad de que la falta de motivación incumba a una cuestión necesaria o esencial para el resultado del caso ...................................................................................... 39

    c)  Las formas de falta de motivación ................................................... 40

        (1) Ausencia completa de motivación ............................................... 41

        (2) Motivaciones contradictorias .................................................. 41

        (3) Motivaciones insuficientes o inadecuadas ...................................... 42

VI.  ANÁLISIS DE LOS VICIOS DEL LAUDO ALEGADOS POR LA DEMANDANTE EN ANULACIÓN ....... 44

A.  Sobre la decisión acerca de la violación del estándar de TJE en relación con la Providencia Administrativa .......................................................................... 44

1.  Argumentos de Venezuela ................................................................. 44

2.  Argumentos de Valores y Consorcio ...................................................... 46

3.  Análisis del Comité ....................................................................... 49

    a)  ¿Se quejaron las Demandadas en Anulación de la Providencia Administrativa con respecto al TJE? ....................................................... 49

    b)  ¿Asumió el Tribunal jurisdicción sobre la Providencia Administrativa exclusivamente en relación con el reclamo por expropiación? .............................. 51

    c)  Conclusión ......................................................................... 52

B.  Sobre la decisión de asumir jurisdicción respecto del reclamo por expropiación ............ 52

1.  Argumentos de Venezuela ................................................................. 53

    a)  Extralimitación manifiesta de las facultades del Tribunal .............................. 53

    b)  Quebrantamiento grave de una norma fundamental de procedimiento .......... 54

2.  Argumentos de Valores y Consorcio ...................................................... 54

    a)  Extralimitación manifiesta de las facultades del Tribunal .............................. 54

    b)  Quebrantamiento grave de una norma fundamental de procedimiento .......... 56

3.  Análisis del Comité ....................................................................... 56

C.  Sobre el test de nacionalidad en la cuarta objeción jurisdiccional .................. 60

1.  Argumentos de Venezuela ................................................................. 60

    a)  Falta de motivación ................................................................. 60

    b)  Quebrantamiento grave de una norma fundamental de procedimiento .......... 61

2. Argumentos de Valores y Consorcio ........................................................................ 61

   a) Falta de motivación ............................................................................................ 62

   b) Quebrantamiento grave de una norma fundamental de procedimiento .......... 63

3. Análisis del Comité ................................................................................................. 63

   a) ¿El abuso al que se refiere Venezuela en este procedimiento fue invocado en el Arbitraje Subyacente? ...................................................................................... 63

   b) Las consecuencias sobre las causales de anulación ........................................... 66

   c) Conclusión ........................................................................................................ 67

D. Sobre la condena con relación al Decreto No. 7.394 ..................................................... 67

1. Argumentos de Venezuela ....................................................................................... 67

2. Argumentos de Valores y Consorcio ........................................................................ 69

3. Análisis del Comité ................................................................................................. 71

   a) La decisión sobre el Artículo IV del APPRI ......................................................... 71

   b) La decisión sobre el Artículo III(1) del APPRI ..................................................... 75

   c) Conclusión ........................................................................................................ 77

E. Sobre el tratamiento de la prueba en relación con la Comisión de Enlace ..................... 77

1. Argumentos de Venezuela ....................................................................................... 77

   a) Quebrantamiento grave de una norma fundamental de procedimiento .......... 77

   b) Falta de motivación ............................................................................................ 78

2. Argumentos de Valores y Consorcio ........................................................................ 78

   a) Quebrantamiento grave de una norma fundamental de procedimiento .......... 78

   b) Falta de motivación ............................................................................................ 79

3. Análisis del Comité ................................................................................................. 79

   a) La alegada inversión de la carga de la prueba ................................................... 80

   b) La alegada omisión en el análisis de las afirmaciones de las Partes y de las pruebas por ellas aportadas ..................................................................................... 81

   c) Conclusión ........................................................................................................ 82

F. Sobre la decisión con respecto a los daños ................................................................... 82

1. Argumentos de Venezuela ....................................................................................... 82

   a) Falta de motivación ............................................................................................ 82

   b) Quebrantamiento grave de una norma fundamental de procedimiento .......... 84

2. Argumentos de Valores y Consorcio ........................................................................ 84

   a) Falta de motivación ............................................................................................ 84

b)   Quebrantamiento grave de una norma fundamental de procedimiento .......... 86

3.   Análisis del Comité ................................................................................ 87

a)   Falta de motivación .......................................................................... 87

(1) La metodología para cuantificar los daños ............................... 87

(2) La existencia del daño y el nexo causal .............................. 90

(3) La alegada contradicción entre lo resuelto en cuanto al reclamo por expropiación y en cuanto a las pretensiones por violaciones no expropiatorias ........................................................................... 91

b)   Quebrantamiento grave de una norma fundamental de procedimiento .......... 92

c)   Conclusión ........................................................................................ 92

G.   Sobre la decisión de atribución de costos en el Arbitraje Subyacente ............................. 93

1.   Argumentos de Venezuela ..................................................................... 93

a)   Quebrantamiento grave de una norma fundamental de procedimiento .......... 93

b)   Falta de motivación ........................................................................... 93

2.   Argumentos de Valores y Consorcio ...................................................... 94

a)   Quebrantamiento grave de una norma fundamental de procedimiento .......... 94

b)   Falta de motivación ........................................................................... 94

3.   Análisis del Comité ................................................................................ 95

a)   Quebrantamiento grave de una norma fundamental de procedimiento .......... 96

b)   Falta de motivación ........................................................................... 97

c)   Conclusión ........................................................................................ 98

VII.   COSTOS .................................................................................................................. 98

VIII.   DECISIÓN ................................................................................................................ 101

## ÍNDICE DE TÉRMINOS DEFINIDOS

| | |
|---|---|
| APPRI o Tratado | Acuerdo para la Promoción y Protección Recíproca de Inversiones entre el Reino de España y la República de Venezuela suscrito el 2 de noviembre de 1995 (C-3) |
| Arbitraje Subyacente | Procedimiento de arbitraje subyacente a este procedimiento de anulación entre Valores Mundiales, S.L. y Consorcio Andino, S.L. (en calidad de demandantes) y la República Bolivariana de Venezuela (en calidad de demandada), Caso CIADI No. ARB/13/11 |
| Audiencia de Anulación | Audiencia de Anulación celebrada los días 20 y 21 de octubre de 2020 por videoconferencia |
| CIADI | Centro Internacional de Arreglo de Diferencias Relativas a Inversiones |
| Comisión de Enlace | Comisión Oficial de Transición, conocida luego como la Comisión Nacional de Enlace Monaca Bolivariana |
| Comité | Comité de anulación *ad hoc* en el Caso CIADI No. ARB/13/11 integrado por los Profs. Luca G. Radicati di Brozolo (Presidente), José Antonio Moreno Rodríguez y Fausto de Quadros |
| Compañías | Monaca y Demaseca |
| Consorcio | Consorcio Andino, S.L. |
| Convención de Viena | Convención sobre el Derecho de los Tratados concluida en Viena el 23 de mayo de 1969 (1155 U.N.T.S. 331) |
| Convenio del CIADI | Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados |
| Decreto No. 7.394 o Decreto | Decreto No. 7.394 del Presidente de la República Bolivariana de Venezuela del 12 de mayo de 2010 (C-12) |
| Demandadas en Anulación | Valores Mundiales, S.L. y Consorcio Andino, S.L |
| Demandante en Anulación o Venezuela o República | República Bolivariana de Venezuela |

| Demaseca | Derivados de Maíz Seleccionado, Demaseca, C.A. |
|---|---|
| Documento de antecedentes | Documento actualizado de antecedentes sobre el mecanismo de anulación para el Consejo Administrativo del CIADI del 5 de mayo de 2016 preparado por la Secretaría General del CIADI (CLA-245 y RLA-173) |
| Gruma | Gruma S.A.B. de C.V. |
| Laudo | Laudo dictado por el Tribunal en el Arbitraje Subyacente el 25 de julio de 2017 |
| Monaca | Molinos Nacionales, S.C. |
| Notificación de Controversia | Notificación de la controversia realizada por Valores y Consorcio el día 7 de noviembre de 2011 al amparo del Artículo XI(1) del Tratado |
| Partes | Demandante en Anulación y Demandadas en Anulación |
| Providencia Administrativa o Providencia | Providencia Administrativa No. 004-13 del 21 de enero de 2013 del Ministerio del Poder Popular para Relaciones Interiores y Justicia (C-017) |
| Reglas de Arbitraje | Reglas Procesales Aplicables a los Procedimientos de Arbitraje del CIADI |
| SAREN | Servicio Autónomo de Registros y Notarías de la República Bolivariana de Venezuela |
| SIEX | Superintendencia de Inversiones Extranjeras de la República Bolivariana de Venezuela |
| SUDEBAN | Superintendencia de Bancos y Otras Instituciones Financieras de la República Bolivariana de Venezuela |
| TJE | Trato justo y equitativo |
| Tribunal | Tribunal de Arbitraje en el Arbitraje Subyacente, integrado por los Dres. Eduardo Zuleta (Presidente), Yves Derains y Horacio A. Grigera Naón |
| US$ | Dólares Estadounidenses |
| Valores | Valores Mundiales, S.L. |

## ÍNDICE DE ABREVIACIONES DE DOCUMENTOS PROCESALES

| | |
|---|---|
| C-[#] | Anexo Documental de las Demandadas en Anulación |
| CLA-[#] | Autoridad Legal de las Demandadas en Anulación |
| Declaración Costos de las Demandadas en Anulación | Declaración sobre Costos de las Demandadas en Anulación del 5 de diciembre de 2020 |
| Declaración Costos de la Demandante en Anulación | Declaración sobre Costos de la Demandante en Anulación del 5 de diciembre de 2020 |
| Dúplica de Anulación | Dúplica de las Demandadas en Anulación del 15 de marzo de 2019 |
| Dúplica de Venezuela | Dúplica de la República del 19 de octubre de 2015 (R-222) |
| MdA | Memorial de Anulación de la Demandante en Anulación del 23 de agosto de 2018 |
| MdC de Anulación | Memorial de Contestación de las Demandadas en Anulación del 16 de noviembre de 2018 |
| Memorial de Contestación de Venezuela | Memorial de Contestación de la República del 9 de marzo de 2015 (R-221) |
| Memorial de Demanda de Valores y Consorcio | Memorial de Demanda de Valores y Consorcio del 28 de julio de 2014 (R-219) |
| Primer Informe Credibility Consulting | Primer Informe Credibility Consulting de 5 de marzo de 2015 (R-228) |
| R-[#] | Anexo Documental de la Demandante en Anulación |
| Réplica de Anulación | Memorial de Réplica de la Demandante en Anulación del 15 de enero de 2019 |
| RLA-[#] | Autoridad Legal de la Demandante en Anulación |
| RP1 | Resolución Procesal No. 1 del 21 de junio de 2018 |
| Solicitud de Anulación | Solicitud de Anulación del Laudo Presentada por la República Bolivariana de Venezuela del 22 de noviembre de 2017 |
| Tr. Día [#], [página:línea] | Transcripción de la Audiencia de Anulación (versión corregida por las Partes el 20 de noviembre de 2020) |

## ÍNDICE DE JURISPRUDENCIA CITADA

| | |
|---|---|
| *AES c. Hungría* | *AES Summit Generation Limited y AES-Tisza Erömü Kft. c. Republica de Hungría*, Caso CIADI No. ARB/07/22, Decisión del Comité *ad hoc* sobre la Solicitud de Anulación, 29 de Junio de 2012 (RLA-192) |
| *Alapli c. Turquía* | *Alapli Elektrik B.V. c. República de Turquía*, Caso CIADI No. ARB/08/13, Decisión sobre Anulación, 10 de julio de 2014 (RLA-231) |
| *Amco c. Indonesia* (Anulación I) | *Amco Asia Corporation y otros c. República de Indonesia*, Caso CIADI No. ARB/81/1, Decisión sobre la Solicitud de Anulación, 16 de mayo de 1986 (RLA-245) |
| *Amco c. Indonesia* (Anulación II) | *Amco Asia Corporation y otros c. República de Indonesia*, Caso CIADI No. ARB/81/1, Decisión de Anulación del Laudo del 5 de junio de 1990 y del Laudo Suplementario del 17 de octubre de 1990, 3 de diciembre 1992 (RLA-220) |
| *Azurix c. Argentina* | *Azurix Corp. c. República Argentina*, Caso CIADI No. ARB/01/12, Decisión sobre la Solicitud de Anulación de la República Argentina, 1 de septiembre de 2009 (RLA-208) |
| *Azurix c. Argentina (Laudo)* | *Azurix Corp. c. República Argentina*, Caso CIADI No. ARB/01/12, Laudo, 23 de junio de 2016 (CLA-058) |
| *Barcelona Traction* | *Barcelona Traction, Light and Power Company, Limited (Bélgica c. España)*, Corte Internacional de Justicia, Decisión, 5 de febrero de 1970 (CLA-120) |
| *Capital Financial c. Camerún* | *Capital Financial Holdings Luxembourg S.A. c. República de Camerún*, Caso CIADI No. ARB/15/18, Decisión sobre la Solicitud de Anulación de Capital Financial Holdings Luxembourg S.A.,25 de octubre de 2019 |
| *Caratube c. Kazajistán* | *Caratube International Oil Company LLP c. República de Kazajistán*, Caso CIADI No. ARB/08/12, Decisión sobre la Solicitud de Anulación de Caratube International Oil Company LLP, 21 de febrero de 2014 (RLA-202) |
| *CDC c. Seychelles* | *CDC Group Plc c. República de Seychelles*, Caso CIADI No. ARB/02/14, Decisión del Comité Ad Hoc sobre la Solicitud de Anulación de la República de Seychelles, 29 de junio de 2005 (RLA-198) |

| | |
|---|---|
| *CEAC c. Montenegro* | *CEAC Holdings Limited c. Montenegro*, Caso CIADI No. ARB/14/8, Decisión sobre Anulación, 1 de mayo de 2018 |
| *CMS c. Argentina* | *CMS Gas Transmission Company c. República Argentina*, Caso CIADI No. ARB/01/8, Decisión del Comité *Ad Hoc* sobre la Solicitud de Anulación de la República Argentina, 25 de septiembre de 2007 (RLA-214) |
| *Consortium R.F.C.C. c. Marruecos* | *Consortium R.F.C.C. c. Reino de Marruecos*, Caso CIADI No. ARB/00/6, Decisión del Comité Ad Hoc sobre la Solitud de Anulación de Consortium R.F.C.C., 18 de enero de 2006 (CLA-247) |
| *Continental Casualty c. Argentina* | *Continental Casualty Company c. la República Argentina*, Caso CIADI No. ARB/03/9, Decisión sobre la Solicitud de Anulación Parcial presentada por Continental Casualty Company y la Solicitud de Anulación Parcial presentada por la República Argentina, 16 de septiembre de 2011 (RLA-230) |
| *Daimler c. Argentina* | *Daimler Financial Services A.G. c. República Argentina*, Caso CIADI No. ARB/05/1, Decisión sobre Anulación, 7 de enero de 2015 (RLA-200) |
| *Desert Line c. Yemen* (Laudo) | *Desert Line Projects LLC c. La República de Yemen*, Caso CIADI No. ARB/05/17, Laudo, 6 de febrero de 2008 (RLA-078) |
| *Dogan c. Turkmenistán* | *Adem Dogan c. Turkmenistán*, Caso CIADI No. ARB/09/9, Decisión sobre Anulación, 15 de enero de 2016 (RLA-246) |
| *Duke c. Perú* | *Duke Energy International Peru Investments No. 1, Limited c. República de Perú*, Caso CIADI No. ARB/03/28, Decisión del Comité *Ad Hoc*, 1 de marzo de 2011 (CLA-261) |
| *EDF c. Argentina* | *EDF International S.A., SAUR International S.A. y León Participaciones Argentinas S.A. c. República Argentina*, Caso CIADI No. ARB/03/23, Decisión, 5 de febrero de 2016 (RLA-195) |
| *EDF c. Rumania* | *EDF (Services) Limited c. Rumania*, Caso CIADI No. ARB/05/13, Laudo, 8 de octubre de 2009 (RLA-089) |
| *Eiser c. España* | *Eiser Infrastructure Limited y Energía Solar Luxembourg S.à r.l. c. Reino de España*, Caso CIADI No. ARB/13/36, Decisión sobre la Solicitud de Anulación del Reino de España, 11 de junio de 2020 |
| *El Paso c. Argentina* | *El Paso Energy International Company c. La República de Argentina*, Caso CIADI No. ARB/03/15, Decisión del |

| | |
|---|---|
| | Comité *Ad Hoc* sobre la Solicitud de Anulación de la República Argentina, 22 de septiembre de 2014 (RLA-203) |
| *ELSI* | *Elettronica Sicula S.p.A. (ELSI) (Estados Unidos c. Italia)*, Corte Internacional de Justicia, Decisión, 20 de julio de 1989 (RLA-252) |
| *Enron c. Argentina* (Anulación) | *Enron Creditors Recovery Corporation (formerly Enron Corporation) y Ponderosa Assets, L.P. c. República Argentina*, Caso CIADI No. ARB/01/3, Decisión sobre la Solicitud de Anulación de la República Argentina, 30 de julio de 2010 (RLA-216) |
| *Enron c. Argentina* (Rectificación) | *Enron Corporation Ponderosa Assets, L.P. c. La República Argentina*, Caso CIADI No. ARB/01/3, Decisión sobre la Solicitud de las Demandantes de Rectificación y/o Decisión Suplementaria del Laudo, 25 de octubre de 2007 (RLA-239) |
| *Fábrica de Chorzów* | *Caso relativo a la Fábrica de Chorzów (Alemania c. Polonia)*, Corte Permanente de Justicia Internacional, Sentencia, 13 de septiembre de 1928 (CLA-077) |
| *Fraport c. Filipinas (I)* | *Fraport AG Frankfurt Airport Services Worldwide c. República de Filipinas*, Caso CIADI No. ARB/03/25, Decisión sobre la Solicitud de Anulación de Fraport AG Frankfurt Airport Services Worldwide, 23 de diciembre de 2010 (RLA-191) |
| *Generation Ukraine c. Ucrania* (Laudo) | *Generation Ukraine, Inc. c. Ucrania*, Caso CIADI No. ARB/00/9, Laudo, 16 de septiembre de 2003 (CLA-022) |
| *Glencore c. Colombia* | *Glencore International AG & CI Prodeco SA c. República de Colombia*, Caso CIADI No. ARB/16/6, Decisión sobre Anulación, 22 de septiembre de 2021 |
| *Gold Reserve c. Venezuela* (Laudo) | *Gold Reserve Inc. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB(AF)/09/1, Laudo, 22 de septiembre de 2014 (CLA-103) |
| *Hydro c. Albania* | *Hydro S.r.l. y otros c. República de Albania*, Caso CIADI No. ARB/15/28, Decisión sobre Anulación, 2 de abril de 2021 |
| *Iberdrola c. Guatemala (I)* | *Iberdrola Energía, S.A. c. República de Guatemala*, Caso CIADI No. ARB/09/5, Decisión sobre la Solicitud de Anulación del Laudo Presentada por Iberdrola Energía, S.A., 13 de enero de 2015 (RLA-223) |

| | |
|---|---|
| *Impregilo c. Argentina* | *Impregilo S.p.A. c. República Argentina*, Caso CIADI No. ARB/07/17, Decisión del Comité *Ad Hoc* sobre la Solicitud de Anulación, 24 de enero de 2014 (RLA-226) |
| *Kilic c. Turkmenistán* | *Kilic Insaat Ithalat Ihracat Sanayi ve Ticaret Anonim Sirketi c. Turkmenistán*, Caso CIADI No. ARB/10/1, Decisión sobre Anulación, 14 de julio de 2015 (RLA-228) |
| *Klöckner c. Camerún* | *Klöckner Industrie-Anlagen GmbH y otros c. República Unida de Camerún y Société Camerounaise des Engrais*, Caso CIADI No. ARB/81/2 (primer procedimiento de anulación), Decisión sobre la Solicitud de Anulación Presentada por Klöckner contra el Laudo Arbitral dictado el 21 de octubre de 1983, 3 de mayo de 1985 (RLA-248) |
| *Lahoud c. Congo* | *Antoine Abou Lahoud y Leila Bounafeh-Abou Lahoud c. República Democrática del Congo*, Caso CIADI No. ARB/10/4, Decisión sobre la Solicitud de Anulación de la República Democrática del Congo, 29 de marzo de 2016 |
| *Lauder c. República Checa* (Laudo) | *Ronald S. Lauder c. República Checa*, CNUDMI, Laudo Final, 3 de septiembre de 2001 (CLA-040) |
| *Lemire c. Ucrania* | *Joseph C. Lemire c. Ucrania*, Caso CIADI No. ARB/06/18, Decisión sobre la Solicitud de Anulación del Laudo de Ucrania, 8 de julio de 2013 (RLA-193) |
| *Libananco c. Turquía* | *Libananco Holdings Co. Limited c. República de Turquía*, Caso CIADI No. ARB/06/8, Decisión sobre Anulación, 22 de mayo de 2013 (RLA-233) |
| *Lucchetti c. Perú* | *Industria Nacional de Alimentos, S.A. y Indalsa Perú, S.A. c. República del Perú*, Caso CIADI No. ARB/03/4, Decisión sobre Solicitud de Anulación, 5 de septiembre de 2007 (RLA-206) |
| *M.C.I. c. Ecuador* | *M.C.I. Power Group, L.C. y New Turbine, Inc. c. República del Ecuador*, Caso CIADI No. ARB/03/6, Decisión sobre Anulación, 19 de octubre de 2009 (RLA-207) |
| *Malicorp c. Egipto* | *Malicorp Limited c. República Árabe de Egipto*, Caso CIADI No. ARB/08/18, Decisión sobre la Solicitud de Anulación de Malicorp Limited, 3 de julio de 2013 (RLA-227) |
| *Micula c. Rumania* | *Ioan Micula, Viorel Micual y otros c. Rumania*, Caso CIADI No. ARB/05/20, Decisión sobre Anulación, 26 de febrero de 2016 (RLA-235) |

| MINE c. Guinea | *Maritime International Nominees Establishment (MINE) c. República de Guinea*, Caso CIADI No. ARB/84/4, Decisión sobre la Solicitud de Guinea de Anulación Parcial del Laudo Arbitral de fecha 6 de enero de 1988, 14 de diciembre de 1989 (RLA-213) |
| MTD c. Chile | *MTD Equity Sdn. Bhd. y MTD Chile S.A. c. República de Chile*, Caso CIADI No. ARB/01/7, Decisión sobre Anulación, 21 de marzo de 2007 (RLA-215) |
| Occidental c. Ecuador | *Occidental Petroleum Corporation y Occidental Exploration and Production Company c. La República del Ecuador*, Caso CIADI No. ARB/06/11, Decisión sobre Anulación del Laudo, 2 de noviembre de 2015 (RLA-194) |
| OI European c. Venezuela | *OI European Group B.V. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/11/25, Decisión sobre la Solicitud de Anulación de la República Bolivariana de Venezuela, 6 de diciembre de 2018 (CLA-267) |
| Perenco c. Ecuador | *Perenco Ecuador Limited c. República del Ecuador*, Caso CIADI No. ARB/08/6, Decisión sobre Anulación, 28 de mayo de 2021 |
| Pey Casado c. Chile (Anulación I) | *Víctor Pey Casado y Fundación "Presidente Allende" c. República de Chile*, Caso CIADI No. ARB/98/2 (primer procedimiento de anulación), Decisión sobre la Solicitud de Anulación de la República de Chile, 18 de diciembre de 2012 (RLA-201) |
| Pey Casado c. Chile (Anulación II) | *Víctor Pey Casado y Fundación Presidente Allende c. República de Chile*, Caso CIADI No. ARB/98/2 (segundo procedimiento de anulación), Decisión sobre Anulación, 8 de enero de 2020 |
| Quiborax c. Bolivia | *Quiborax S.A. y Non-Metallic Minerals S.A. c. Estado Plurinacional de Bolivia*, Caso CIADI No. ARB/06/2, Decisión sobre la Solicitud de Anulación del Estado Plurinacional de Bolivia, 18 de mayo de 2018 (CLA-252) |
| Repsol c. Ecuador | *Repsol YPF Ecuador, S.A. c. Empresa Estatal Petróleos del Ecuador (Petroecuador)*, Caso CIADI No. ARB/01/10, Decisión sobre la Solicitud de Anulación, 8 de enero de 2007 (RLA-222) |
| Rumeli c. Kazajistán | *Rumeli Telekom A.S. y Telsim Mobil Telekomunikasyon Hizmetleri A.S. c. República de Kazajistán*, Caso CIADI No. ARB/05/16, Decisión del Comité *Ad Hoc*, 25 de marzo de 2010 (RLA-237) |

| | |
|---|---|
| *SAUR c. Argentina* | *SAUR International S.A. c. República Argentina*, Caso CIADI No. ARB/04/4, Decisión sobre la Solicitud de Anulación de la República Argentina, 19 de diciembre de 2016 (RLA-212) |
| *Sempra c. Argentina* | *Sempra Energy International c. República Argentina*, Caso CIADI No. ARB/02/16, Decisión sobre la Solicitud de Anulación del Laudo Presentada por la República Argentina, 29 de junio de 2010 (RLA-190) |
| *SGS c. Paraguay* | *SGS Société Générale de Surveillance S.A. c. República del Paraguay*, Caso CIADI No. ARB/07/29, Decisión sobre Anulación, 19 de mayo de 2014 |
| *Soufraki c. EAU* | *Hussein Nuaman Soufraki c. Emiratos Árabes Unidos*, Caso CIADI No. ARB/02/7, Decisión del Comité *Ad Hoc* sobre la Solicitud de Anulación del Sr. Soufraki, 5 de junio de 2007 (RLA-205) |
| *Standard Chartered c. Tanzania* | *Standard Chartered Bank (Hong Kong) Limited c. Tanzania Electric Supply Company Limited*, Caso CIADI No. ARB/10/20, Decisión sobre la Solicitud de Anulación, 22 de agosto de 2018 (CLA-254) |
| *TECO c. Guatemala* | *TEC Guatemala Holdings LLC c. República de Guatemala*, Caso CIADI No. ARB/10/23, Decisión sobre Anulación, 5 de abril de 2016 (RLA-197) |
| *Teinver c. Argentina* | *Teinver S.A., Transportes de Cercanías S.A. y Autobuses Urbanos del Sur S.A. c. República Argentina*, Caso CIADI No. ARB/09/1, Decisión sobre la Solicitud de Anulación de Argentina, 29 de mayo de 2019 |
| *Tenaris c. Venezuela (II)* | *Tenaris S.A. & Talta − Trading e Marketing Sociedade Unipessoal Lda. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/12/23, Decisión sobre Anulación, 28 de diciembre de 2018 (CMTLA-1) |
| *Tidewater c. Venezuela* | *Tidewater Investment SRL y Tidewater Caribe, C.A. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/10/5, Decisión sobre Anulación, 27 de diciembre de 2016 (RLA-232) |
| *Tidewater c. Venezuela (Jurisdicción)* | *Tidewater Investment SRL y Tidewater Caribe, C.A. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/10/5, Decisión sobre Jurisdicción, 8 de febrero de 2013 (CLA-011) |

| | |
|---|---|
| *Togo Electricité c. Togo* | *Togo Electricité y GDF-Suez Energie Services c. República Togolesa*, Caso CAIDI No. ARB/06/7, Decisión sobre Anulación, 6 de septiembre de 2011 |
| *Total c. Argentina* | *Total S.A. c. República Argentina*, Caso CIADI No. ARB/04/01, Decisión sobre Anulación, 1 de febrero de 2016 (RLA-196) |
| *Tulip c. Turquía* | *Tulip Real Estate y Development Netherlands B.V. c. República de Turquía*, Caso CIADI No. ARB/11/28, Decisión sobre Anulación, 30 de diciembre de 2015 (RLA-229) |
| *Venezuela Holdings c. Venezuela* | *Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd., Mobil Venezolana De Petróleos Holdings, Inc., Mobil Cerro Negro, Ltd. y Mobil Venezolana De Petróleos, Inc. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/07/27, Decisión sobre Anulación, 9 de marzo de 2017 (RLA-218) |
| *Venoklim c. Venezuela (I)* | *Venoklim Holding B.V. c. República Bolivariana de Venezuela*, Caso CIADI No. ARB/12/22, Decisión sobre la Solicitud de Anulación, 2 de febrero de 2018 (RLA-217) |
| *Vivendi c. Argentina (I)* | *Compañía de Aguas del Aconquija S.A. y Vivendi Universal (antes Compagnie Générale des Eaux) c. República Argentina*, Caso CIADI No. ARB/97/3, Decisión sobre la Anulación, 3 de julio de 2002 (RLA-204) |
| *Vivendi c. Argentina (II)* | *Suez, Sociedad General de Aguas de Barcelona S.A. y Vivendi Universal S.A c. la República Argentina*, Caso CIADI No. ARB/03/19, Decisión sobre la Solicitud de Anulación de Argentina, 5 de mayo de 2017 (RLA-247) |
| *Wena c. Egipto* | *Wena Hotels Limited c. República Árabe de Egipto*, Caso CIADI No. ARB/98/4, Decisión sobre la Solicitud de la República Árabe de Egipto para la Anulación del Laudo Arbitral de fecha 8 de diciembre de 2000, 5 de febrero de 2002 (CLA-109) |

I.      **INTRODUCCIÓN Y PARTES**

1.      Esta es la decisión final del presente procedimiento de anulación originado por una solicitud de la República Bolivariana de Venezuela ("**Venezuela**", "**República**" o "**Demandante en Anulación**") de fecha 22 de noviembre de 2017. Mediante la misma, Venezuela solicita la anulación del Laudo dictado el 25 de julio de 2017 ("**Laudo**") por el Tribunal de Arbitraje constituido por los Dres. Eduardo Zuleta (Presidente), Yves Derains y Horacio Grigera Naón ("**Tribunal**") en el procedimiento arbitral subyacente *Valores Mundiales, S.L. y Consorcio Andino, S.L. c. la República Bolivariana de Venezuela*, Caso CIADI No. ARB/13/11 ("**Arbitraje Subyacente**").

2.      El Laudo resolvió una controversia presentada ante el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones ("**CIADI**") sobre la base del Acuerdo entre el Reino de España y la República de Venezuela para la Promoción y Protección Recíproca de Inversiones, firmado el 2 de noviembre de 1995, y en vigencia desde el 10 de septiembre de 1997 ("**APPRI**" o "**Tratado**"), y el Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, que entró en vigor el 14 de octubre de 1966 ("**Convenio del CIADI**").

3.      El Arbitraje Subyacente fue iniciado por las empresas españolas Valores Mundiales, S.L. ("**Valores**") y Consorcio Andino, S.L. ("**Consorcio**"), que son las demandadas en este procedimiento de anulación (en conjunto, "**Demandadas en Anulación**")[1] y que controlaban dos compañías venezolanas dedicadas a la producción y comercialización de harina de maíz y de trigo y otros productos alimenticios: Molinos Nacionales, C.A. ("**Monaca**") y Derivados de Maíz Seleccionado, Demaseca, C.A. ("**Demaseca**") (en conjunto, "**Compañías**")[2]. Valores y Consorcio plantearon que Venezuela había violado el Tratado a través de la imposición de ciertas medidas en relación con las Compañías. Específicamente, alegaron la expropiación de sus inversiones, la violación por parte de Venezuela del estándar de trato justo y equitativo ("**TJE**"), la aplicación de medidas arbitrarias y discriminatorias, y la imposición de restricciones a la transferencia de pagos en contra de lo dispuesto por el APPRI.

4.      En el Laudo, el Tribunal resolvió de manera unánime rechazar las cuatro objeciones jurisdiccionales presentadas por Venezuela y decidió que tenía jurisdicción para determinar todas las reclamaciones planteadas por Valores y Consorcio[3]. En cuanto al fondo, el Tribunal desestimó el reclamo por expropiación de las inversiones de Valores y Consorcio bajo el Artículo V del APPRI, pero concluyó que Venezuela había violado el Tratado y específicamente:

(i)      el Artículo IV del APPRI, por no haber otorgado un TJE a las inversiones de las Demandadas en Anulación;

---

[1] En adelante, se hará referencia a la Demandante en Anulación y a las Demandadas en Anulación, en conjunto, como "**Partes**". Los nombres de los representantes de las Partes y sus direcciones se encuentran detallados en la página (i) *supra*.

[2] En particular, Valores se convirtió en propietaria del 100% de las acciones de Monaca el 10 de mayo de 2006, mientras que Consorcio adquirió todas las acciones de Demaseca el 24 de julio del mismo año (Laudo, ¶¶ 83-84).

[3] Laudo, ¶ 834(i).

(ii)   el Artículo III del APPRI, por haber tomado medidas arbitrarias que obstaculizaron la gestión y desarrollo de las inversiones de las Demandadas en Anulación; y

(iii)   el Artículo VII del APPRI, por haber impedido la libre transferencia de fondos relacionados con las inversiones de las Demandadas en Anulación[4].

5.   Como consecuencia de lo anterior, el Tribunal condenó a Venezuela a pagar 430,4 millones de Dólares Estadounidenses ("**US\$**") a Valores y Consorcio a título de indemnización por daños y perjuicios, más un interés compuesto a la tasa Libor + 2%, desde el 22 de enero de 2013 hasta la fecha de pago, con la orden de no imponer sobre esta indemnización gravámenes o impuestos adicionales a los tomados en cuenta en los cálculos de los peritos de las Demandadas en Anulación. La República fue también condenada a pagar US\$ 5.925.705,14 como contribución al pago de los costos del arbitraje de Valores y Consorcio[5].

6.   En este procedimiento, Venezuela solicita la anulación del Laudo con base en el Artículo 52 del Convenio del CIADI, invocando – como se discutirá en detalle más adelante – tres causales de anulación:

(i)   la extralimitación manifiesta en las facultades del Tribunal (Artículo 52(1)(b));

(ii)   el quebrantamiento grave de una norma de procedimiento (Artículo 52(1)(d)); y

(iii)   la falta de expresión en el Laudo de los motivos en los que se funda (Artículo 52(1)(e)).

## II.   ANTECEDENTES PROCESALES

7.   El 22 de noviembre de 2017 Venezuela presentó ante la Secretaría General del CIADI la *Solicitud de Anulación del Laudo Presentada por la República Bolivariana de Venezuela* ("**Solicitud de Anulación**"). Esta incluía un pedido de suspensión de la ejecución del Laudo hasta que el comité *ad hoc* emitiera su Decisión conforme al Artículo 52 del Convenio del CIADI y la Regla 54(2) de las Reglas Procesales Aplicables a los Procedimiento de Arbitraje del CIADI ("**Reglas de Arbitraje**").

8.   El 7 de diciembre de 2017 la Secretaría General del CIADI registró la Solicitud de Anulación y notificó a las Partes la suspensión provisional de la ejecución del Laudo.

9.   El 5 de marzo de 2018 la Secretaría General notificó a las Partes la constitución del Comité *ad hoc* ("**Comité**") de conformidad con la Regla de Arbitraje 52(2). El Comité quedó compuesto por el profesor Luca G. Radicati di Brozolo, nacional de Italia y del Reino Unido, Presidente del Comité, la Sra. Dyalá Jiménez Figueres, nacional de Costa Rica, y el profesor Fausto de Quadros, nacional de Portugal, designados a la Lista de Árbitros del CIADI, respectivamente, por la República de Italia, la República de Costa Rica y la República de Portugal.

10.   En esa misma fecha se informó a las Partes de que el procedimiento de anulación se consideraba iniciado de conformidad con las Reglas de Arbitraje 6 y 53, y de que la Sra. Marisa Planells-Valero,

---

[4] Laudo, ¶ 834(ii).

[5] Laudo, ¶ 834(iv)-(vii).

Consejera Jurídica del CIADI, se desempeñaría como Secretaria del Comité.

11.  El 7 de marzo de 2018 el CIADI solicitó a Venezuela el pago de un primer anticipo para sufragar los gastos del procedimiento.

12.  El 9 de abril de 2018, ante el acuerdo de las Partes para que la continuación de la suspensión del Laudo se discutiera en una ronda de escritos y sin audiencia, el Comité fijó un calendario procesal a tal fin.

13.  En esa misma fecha el Comité informó a las Partes de la falta de pago del primer anticipo solicitado a Venezuela y de que, si el anticipo no se recibía por alguna de las Partes antes del 16 de abril de 2018, la primera sesión programada para el 20 de abril de 2018 quedaría suspendida. El 17 de abril de 2018, no habiéndose recibido el pago, y de acuerdo con la Regla 14 del Reglamento Administrativo y Financiero del CIADI, se suspendió la celebración de la primera sesión.

14.  El 25 de abril de 2018 la Sra. Dyalá Jiménez Figueres presentó su renuncia como miembro del Comité y el procedimiento quedó suspendido en esa fecha de conformidad con la Regla de Arbitraje 10.

15.  El 21 de mayo de 2018, luego de consultar a las Partes y sin que mediase objeción de estas, el Presidente del Consejo Administrativo del CIADI designó al profesor José Antonio Moreno Rodríguez, nacional de Paraguay y designado a la Lista de Árbitros del CIADI por la República de Paraguay, para reemplazar a la Sra. Jiménez como miembro del Comité.

16.  El 23 de mayo de 2018 el CIADI confirmó el pago del primer anticipo para cubrir los gastos del procedimiento por parte de Venezuela.

17.  El 25 de mayo de 2018 el Comité estableció un calendario procesal revisado para las presentaciones de las Partes sobre la suspensión de la ejecución del Laudo y propuso a las Partes que la primera sesión se celebrara el 30 de mayo de 2018, lo que fue aceptado por estas.

18.  El 30 de mayo de 2018, el Comité celebró la primera sesión con las Partes y la Secretaria del Comité mediante conferencia telefónica.

19.  Las siguientes personas asistieron a la primera sesión:

Miembros del Comité *ad hoc*:

Prof. Luca G. Radicati di Brozolo, Presidente del Comité
Prof. José Antonio Moreno Rodríguez, Miembro del Comité
Prof. Fausto de Quadros, Miembro del Comité

Secretariado del CIADI:

Sra. Marisa Planells-Valero, Secretaria del Comité

Asistente del Comité *ad hoc*:

Dr. Emilio Bettoni, Asistente del Comité

(participante con el consentimiento de las Partes)

3

Demandante en Anulación:

| | |
|---|---|
| Sra. Verónica Lavista | Guglielmino & Asociados |
| Sr. Guillermo Moro | Guglielmino & Asociados |
| Sr. Alejandro Vulejser | Guglielmino & Asociados |
| Sr. Henry Rodríguez Facchinetti | Procuraduría General de la República |
| Sra. Patricia Díaz | Procuraduría General de la República |

Demandadas en Anulación:

| | |
|---|---|
| Sr. Miguel López Forastier | Covington & Burling LLP |
| Sr. José E. Arvelo | Covington & Burling LLP |
| Sr. Duane H. Zobrist | Zobrist Law Group |
| Lic. Salvador Vargas | Gruma, S.A.B. de C.V. |
| Lic. Guillermo Elizondo | Gruma, S.A.B. de C.V. |

20.   El 4 de junio de 2018 Venezuela presentó su *Escrito de Mantenimiento de la Suspensión de la Ejecución del Laudo de la República Bolivariana de Venezuela*.

21.   El 21 de junio de 2018 el Comité emitió la Resolución Procesal No. 1 ("**RP1**"), que dispuso, *inter alia*, que el idioma del procedimiento sería el español y que el lugar del procedimiento sería Washington, D.C. Asimismo, confirmó el nombramiento del Dr. Emilio Bettoni como Asistente del Comité con el acuerdo de las Partes. El Anexo A de la RP1 estableció el calendario procesal.

22.   El 25 de junio de 2018 Valores y Consorcio presentaron su *Escrito de Oposición de las Demandadas en Anulación al Escrito de la Demandante en Anulación Solicitando la Suspensión de la Ejecución del Laudo* en el que solicitaron que la suspensión se condicionara al otorgamiento de una garantía financiera por parte de Venezuela, a lo que esta contestó el 5 de julio de 2018 mediante su *Escrito sobre la Solicitud de una Garantía*.

23.   El 23 de agosto de 2018 Venezuela presentó su *Memorial de Anulación* ("**MdA**").

24.   El 6 de septiembre de 2018 el Comité emitió su *Decisión sobre la Solicitud de Continuación de la Suspensión de la Ejecución del Laudo*, en la que rechazó el pedido de Venezuela y levantó la suspensión provisional de la ejecución del Laudo.

25.   El 16 de noviembre de 2018 Valores y Consorcio presentaron su *Memorial de Contestación* ("**MdC de Anulación**").

26.   El 15 de enero de 2019 Venezuela presentó su *Memorial de Réplica* ("**Réplica de Anulación**").

27.   El 18 de marzo de 2019 Valores y Consorcio presentaron su *Dúplica* ("**Dúplica de Anulación**").

28.   El 26 de marzo de 2019 el CIADI solicitó a Venezuela el pago de un segundo anticipo para cubrir los gastos del procedimiento.

29.   El 27 de marzo de 2019 la Secretaria General del CIADI recibió una carta del Sr. José Ignacio Hernández G., quien invocaba la calidad de Procurador Especial de la República Bolivariana de Venezuela designado por el Sr. Juan Guaidó, presidente encargado de la República bajo el control de la Asamblea Nacional. El objeto de la misiva era informar que la facultad de representar al

Estado venezolano correspondía exclusivamente al Sr. Hernández y, por lo tanto, pedir que toda comunicación del CIADI a Venezuela fuera dirigida a su persona. Además, el Sr. Hernández solicitó al CIADI que no tramitara ninguna solicitud realizada por personas que actuaran en nombre del Sr. Nicolás Maduro ni de la Procuraduría General de la República, y que se tuviera por inválida toda instrucción o comunicación presentada a partir del 5 de febrero de 2019 por persona diversa de él.

30.    Tras haber suspendido la audiencia programada para el 20 de mayo de 2019 y haber invitado a los comparecientes por las Demandadas en Anulación, a los comparecientes por Venezuela y al Sr. Hernández a presentar observaciones y réplicas sobre la carta de este último del 27 de marzo de 2019, el 29 de agosto de 2019 el Comité emitió la Resolución Procesal No. 2, en la que resolvió (*i*) rechazar la solicitud del Sr. José Ignacio Hernández G. de asumir la representación de la República Bolivariana de Venezuela; (*ii*) confirmar la prosecución del procedimiento con la representación ya constituida de la República Bolivariana de Venezuela; (*iii*) distribuir las costas del incidente entre las Partes según el orden causado; y (*iv*) reanudar el curso del procedimiento.

31.    El 18 de septiembre de 2019, el Comité informó a las Partes de la falta de pago del segundo anticipo solicitado a Venezuela[6] e invitó a cualquiera de ellas a pagar el monto pendiente a más tardar el 3 de octubre de 2019.

32.    Ante la falta de pago, de conformidad con las Reglas 14(3)(d) y (e) del Reglamento Administrativo y Financiero del CIADI, el Comité suspendió el procedimiento el 11 de noviembre de 2019. El 27 de marzo de 2020, luego de que la Secretaria del Comité informara de que el segundo anticipo había sido pagado, el Comité levantó la suspensión.

33.    El 6 de abril de 2020 el Comité y las Partes discutieron las posibles fechas y la modalidad de la audiencia ("**Audiencia de Anulación**").

34.    El 8 de abril de 2020, a la luz de la incertidumbre causada por el COVID-19, el Comité consultó a las Partes acerca de la posibilidad de celebrar la Audiencia de Anulación (*i*) mediante videoconferencia el 21 de septiembre de 2020 (con el 22 de septiembre de 2020 en reserva), o (*ii*) de forma presencial en Washington D.C. el 20 de octubre de 2020 (con el 21 de octubre de 2020 en reserva).

35.    Las Demandadas en Anulación y la Demandante en Anulación confirmaron su disponibilidad en las fechas propuestas por el Comité, respectivamente, el 8 y el 15 de abril de 2020. La República solicitó además que, de ser presencial, la Audiencia de Anulación se celebrara fuera de los Estados Unidos de América, y propuso que tuviera lugar en París (Francia).

36.    El 17 de abril de 2020 las Demandadas en Anulación objetaron esta solicitud de Venezuela. El 23 de abril de 2020, el Comité rechazó la solicitud.

37.    El 22 de junio de 2020 el CIADI solicitó a Venezuela el pago de un tercer anticipo.

38.    El 10 de julio de 2020 el Comité propuso a las Partes que, debido a la crisis del COVID-19, la Audiencia de Anulación se celebrarse virtualmente preferentemente el 20 de octubre de 2020

---

[6] Véase ¶ 28 *supra*.

(con el 21 de octubre de 2020 en reserva), lo que fue aceptado por estas. De conformidad con el ¶ 18.1 de la RP1, el 28 de septiembre de 2020 el Comité y las Partes celebraron la Reunión de Coordinación Preliminar a la Audiencia.

39.    El 1 de octubre de 2020 el Comité emitió la Resolución Procesal No. 3, en la que se plasmaron los acuerdos de las Partes en relación con la organización de la Audiencia de Anulación.

40.    Los días 20 y 21 de octubre de 2020 se celebró la Audiencia de Anulación mediante videoconferencia, en la cual participaron las siguientes personas:

*Comité* ad hoc:

| | |
|---|---|
| Prof. Luca G. Radicati di Brozolo | Presidente del Comité |
| Prof. José Antonio Moreno Rodríguez | Miembro del Comité |
| Prof. Fausto de Quadros | Miembro Comité |

*Asistentes del Comité:*

| | |
|---|---|
| Dr. Emilio Bettoni | Asistente del Comité |
| Sra. Caterina Coroneo | Asistente del Presidente del Comité |

*Secretariado del CIADI:*

| | |
|---|---|
| Sra. Marisa Planells-Valero | Secretaria del Comité |

*Por la Demandante en Anulación*:

Asesores Legales

| | |
|---|---|
| Sr. Osvaldo César Guglielmino | Guglielmino Derecho Internacional |
| Sr. Guillermo Moro | Guglielmino Derecho Internacional |
| Sr. Alejandro Vulejser | Guglielmino Derecho Internacional |
| Sra. Camila Guglielmino | Guglielmino Derecho Internacional |

Parte

| | |
|---|---|
| Dr. Reinaldo Muñoz Pedroza | Procuraduría General de la República |
| Sr. Henry Rodríguez Facchinetti | Procuraduría General de la República |

*Por las Demandadas en Anulación*:

Asesores Legales

| | |
|---|---|
| Sr. Miguel López Forastier | Covington & Burling LLP |
| Sr. José E. Arvelo | Covington & Burling LLP |
| Sra. Mary T. Hernández | Covington & Burling LLP |
| Sra. Clovis Trevino | Covington & Burling LLP |
| Sr. Duane Zobrist | Zöblaw |

Parte

Sr. Rodrigo Martínez Villarreal          Valores Mundiales, S.L., Consorcio Andino, S.L.,
                                         Gruma, S.A.B. de C.V.
Sr. Ing. Homero Huerta                   Valores Mundiales, S.L., Consorcio Andino, S.L.,
                                         Gruma, S.A.B. de C.V.

*Estenógrafos:*

Sra. María Eliana Da Silva               D-R Esteno
Sr. Virgilio Dante Rinaldi               D-R Esteno

41.     El 20 de noviembre de 2020 las Partes presentaron las correcciones acordadas a las transcripciones de la Audiencia de Anulación.

42.     El 5 de diciembre de 2020 las Partes presentaron sus declaraciones sobre costos (respectivamente, "**Declaración Costos de la Demandante en Anulación**" y "**Declaración Costos de las Demandadas en Anulación**").

43.     El 11 de diciembre de 2020 la República formuló ciertas consideraciones acerca de la Declaración Costos de las Demandadas en Anulación, a las cuales Valores y Consorcio contestaron el 14 de diciembre de 2020.

44.     El mismo día, el Secretariado remitió a las Partes y al Comité las versiones finales de las transcripciones de la Audiencia que incorporaban las correcciones acordadas por las Partes.

45.     El 17 de diciembre de 2020 Venezuela remitió a la Secretaria del Comité el comprobante de pago del tercer anticipo[7]. No obstante, el 9 de febrero de 2021, la Secretaria del Comité informó a las Partes de que el CIADI no había recibido los fondos solicitados ni había podido localizarlos. Por consiguiente, solicitó a la República que proporcionara cualquier información adicional al respecto.

46.     En febrero y marzo de 2021 Venezuela informó de que la demora en el pago se debía a las restricciones financieras y bancarias impuestas unilateralmente por los Estados Unidos de América y que estaba comprometida a realizar el pago a la mayor brevedad.

47.     El pago del tercer anticipo fue recibido el 31 de marzo de 2021.

48.     A pedido del Comité, el 8 de octubre de 2021 la Secretaria del Comité solicitó a Valores y Consorcio que aclararan si el monto de los honorarios indicado en la Declaración Costos Demandadas en Anulación incluía sus costos de representación ocasionados a raíz de la presentación del Sr. Hernández, lo cual fue confirmado por Valores y Consorcio el 11 de octubre de 2021.

49.     El 19 de octubre de 2021, la República informó al Comité que la Declaración Costos de la Demandante en Anulación no incluía el monto de US$ 199.958 correspondiente al tercer anticipo, ya que este pago de este anticipo se había realizado después de presentar dicha Declaración. Venezuela solicitó al Comité considerar este dato a la hora de dictar la presente Decisión.

---

[7] Véase ¶ 37 *supra*.

50.   El Comité declaró cerrado el procedimiento el 7 de diciembre de 2021, conforme a las Reglas de Arbitraje 38(1) y 53.

## III.   LOS PETITORIOS DE LAS PARTES

### A.   PETITORIO DE VENEZUELA

51.   En la Réplica de Anulación, Venezuela solicitó al Comité lo siguiente:

   (a)   *que anule el Laudo emitido en el presente caso, de conformidad con el Artículo 52 del Convenio CIADI y la Regla de Arbitraje 50; y*

   (b)   *que condene a las Demandadas en Anulación al pago de todas las costas y costos del procedimiento[8].*

52.   El petitum de la Demandante en Anulación fue ratificado durante la Audiencia[9].

### B.   PETITORIO DE VALORES Y CONSORCIO

53.   En la Dúplica de Anulación, las Demandadas en Anulación solicitaron al Comité que:

   *[R]echace en su totalidad la Solicitud de Anulación planteada por la República y la condene a pagar todos los costos y honorarios legales relacionados con este procedimiento, incluido el incidente de levantamiento de la suspensión de la ejecución del Laudo[10].*

## IV.   EL LAUDO IMPUGNADO Y LAS CUESTIONES SOMETIDAS A LA DECISIÓN DEL COMITÉ

### A.   BREVE RESUMEN DEL LAUDO

54.   El Laudo resolvió la controversia suscitada por la imposición de parte de Venezuela de una serie de medidas sobre las Compañías que, como fue dicho anteriormente, son empresas venezolanas enteramente controladas por las Demandadas en Anulación, las cuales son a su vez controladas por la sociedad mexicana Gruma S.A.B. de C.V. ("**Gruma**").

55.   Al presentar los hechos del caso en la § III del Laudo, el Tribunal distinguió dos grupos de medidas.

56.   El primer grupo está compuesto por ciertas medidas de aseguramiento y administración especial, que fueron impuestas a partir de noviembre de 2009 en el contexto de un proceso penal contra el empresario venezolano Ricardo Fernández Barrueco sobre las empresas vinculadas con este, incluyendo entre ellas a Monaca, Demaseca, Valores y Consorcio. Las medidas adoptadas eran (*i*) la Circular del Servicio Autónomo de Registros y Notarías ("**SAREN**") del 10 de diciembre de 2009, que prohibió la protocolización o autenticación de negocios jurídicos; (*ii*) las Resoluciones del

---

[8] Réplica de Anulación, ¶ 277.

[9] Tr. Día 1, 122:4-12; Tr. Día 2, 305:14-20.

[10] Dúplica de Anulación, ¶ 215.

Ministerio de Finanzas No. 2.549 del 22 de diciembre de 2009[11] y No. 2.628 del 1 de marzo de 2010[12] en las que se designaron a ciertos administradores especiales y representantes en nombre de la República en Monaca y Demaseca, respectivamente; (*iii*) la inmovilización de productos financieros dispuesta por la Superintendencia de Bancos y Otras Instituciones Financieras ("**SUDEBAN**"); (*iv*) la Resolución No. 3.268 del Ministerio del Poder Popular de Planificación y Finanzas del 10 de diciembre de 2012[13], por la que se designaron nuevos administradores especiales de Monaca; (*v*) la Providencia Administrativa del Ministerio del Poder Popular para Relaciones Interiores y Justicia del 21 de enero de 2013[14], a través de la cual la República designó a cuatro administradores especiales en Monaca y Demaseca ("**Providencia Administrativa**" o "**Providencia**")[15].

57.     El 1 de febrero de 2010 Valores, Consorcio, Monaca y Demaseca iniciaron un incidente de tercerías ante las cortes venezolanas para solicitar el levantamiento de las medidas descritas en (*i*)-(*iii*) del párrafo anterior, alegando que las Compañías no eran bienes del Sr. Fernández Barrueco. La solicitud fue denegada y contra esta denegación dichas entidades presentaron una apelación que, a la fecha del Laudo, no había sido resuelta[16].

58.     El segundo grupo de medidas incluye el Decreto No. 7.394 de 27 de abril de 2010 expedido por el entonces Presidente de la República Hugo Chávez Frías ("**Decreto No. 7.394**" o "**Decreto**"), en el que se decretó la adquisición forzosa de los bienes de Monaca, para la cual se creó una Comisión Oficial de Transición ("**Comisión de Enlace**")[17].

59.     El 7 de noviembre de 2011 Valores y Consorcio presentaron la notificación de controversia ("**Notificación de Controversia**") al amparo del Artículo XI(1) del Tratado, que fue recibida por la República el 9 de noviembre del mismo año. Tras el fracaso de las negociaciones amistosas durante un periodo de 6 meses, el 10 de mayo de 2013 Valores y Consorcio presentaron la Solicitud de Arbitraje contra Venezuela por reclamaciones al amparo de los Artículos IV (TJE), III (medidas arbitrarias y discriminatorias) y VII (libre transferencia de fondos) del APPRI. El 28 de julio de 2014, Valores y Consorcio presentaron su Memorial de Demanda en el que incluyeron además una reclamación por violación del Artículo V (expropiación)[18].

---

[11] Resolución 2.549 del 4 de diciembre de 2009 del Ministerio del Poder Popular para la Economía y Finanzas, publicada en la Gaceta Oficial No. 39.333 del 22 de diciembre de 2009 (C-10).

[12] Resolución 2.628 del 1 de marzo de 2010 del Ministerio del Poder Popular para la Economía y Finanzas, publicada en la Gaceta Oficial No. 39.377 del 2 de marzo de 2010 (C-11).

[13] Resolución 3.268 del 10 de diciembre de 2012 del Ministerio del Poder Popular de Planificación y Finanzas publicada en la Gaceta Oficial No. 40.069 del 11 de diciembre de 2012 (C-64).

[14] Providencia Administrativa No. 004-13 del 21 de enero de 2013 del Ministerio del Poder Popular para Relaciones Interiores y Justicia, publicada en la Gaceta Oficial No. 40.095 del 22 de enero de 2013 (C-017).

[15] Laudo, ¶¶ 88-93, 96-97. En el ¶ 101 del Laudo, el Tribunal afirmó que el 30 de julio de 2014 se decidió el sobreseimiento de la causa seguida contra el Sr. Fernández Barrueco y el levantamiento de las medidas cautelares impuestas sobre sus bienes, aunque tal decisión había sido apelada.

[16] Laudo, ¶¶ 94-95.

[17] Laudo, ¶¶ 102-103.

[18] Laudo, ¶¶ 8, 37, 99, 142, 195.

60.   En cuanto a la reclamación bajo el Artículo V del APPRI, Valores y Consorcio sostuvieron que las referidas medidas de aseguramiento y administración especial, el Decreto No. 7.394 y la Providencia Administrativa (que Valores y Consorcio definieron como el "*punto culminante*" de todas las medidas) tuvieron carácter permanente e irreversible, y su imposición cumulativa causó la pérdida tanto del control de las Compañías como del valor de sus acciones, dando todo ello lugar a una expropiación progresiva de sus inversiones[19]. Además, alegaron que las medidas expropiatorias eran ilícitas, pues no cumplían con los requisitos establecidos en el APPRI[20].

61.   En cuanto a la violación del TJE, Valores y Consorcio alegaron que las referidas medidas les privaron del uso, goce y disfrute de las Compañías por más de cuatro años sin compensación alguna, les impidieron recibir los beneficios básicos de sus inversiones, incluyendo la facultad de distribuir dividendos y disponer de su participación accionaria en las Compañías, y que además estas medidas eran discriminatorias, arbitrarias y contrarias al debido proceso y al principio de buena fe[21].

62.   Respecto a la reclamación bajo el Artículo III, Valores y Consorcio sostuvieron que el mantenimiento de una administración especial sobre las Compañías, la adopción y ejecución del Decreto No. 7.394 y las otras medidas de interferencia puestas al servicio de los fines expropiatorios proclamados en ese Decreto constituían medidas arbitrarias o discriminatorias[22]. Valores y Consorcio estimaban que todas estas medidas carecían de fundamento fáctico o jurídico legítimo, habían sido aplicadas exclusivamente a las Compañías y no a empresas similares, y habían obstaculizado o impedido la gestión, el mantenimiento, el desarrollo, la utilización, el disfrute, la extensión, la venta y la liquidación de sus inversiones[23].

63.   Con relación al Artículo VII, Valores y Consorcio consideraron que Venezuela había violado el Tratado al impedirles la repatriación de capitales, el pago de dividendos, los pagos relacionados con la adquisición de materias primas y otros productos necesarios para la inversión, y la obtención de divisas necesarias para efectuar transferencias, así como la realización de estas transferencias sin demoras ni restricciones[24].

64.   Venezuela presentó cuatro objeciones jurisdiccionales, tres de ellas relacionadas con su denuncia del Convenio CIADI que, según ella, privaban al Tribunal de jurisdicción para decidir sobre el fondo de la controversia[25].

65.   En cuanto a la primera objeción jurisdiccional, Venezuela argumentó que la recepción de la Notificación de Controversia no perfeccionó el consentimiento al arbitraje CIADI, ya que este solamente se perfecciona una vez cumplidos todos los requisitos del Artículo XI del APPRI, incluyendo el agotamiento del plazo de seis meses para buscar un acuerdo amistoso. Ello no

---

[19] Laudo, ¶¶ 285-314.

[20] Laudo, ¶¶ 315-323.

[21] Laudo, ¶¶ 489-500.

[22] Laudo, ¶¶ 592-599.

[23] Laudo, ¶ 592.

[24] Laudo, ¶¶ 620-626.

[25] Laudo, ¶ 138.

habría ocurrido en este caso porque este periodo de negociación venció el 8 de mayo de 2012, tres meses y medio después de la denuncia del Convenio del CIADI por parte de Venezuela del 24 de enero de 2012[26].

66.    El Tribunal rechazó esta objeción jurisdiccional porque entendió que Venezuela dio su consentimiento a la jurisdicción del CIADI en el Artículo XI del APPRI, el cual entró en vigor el 10 de septiembre de 1997, y las Demandadas en Anulación dieron su consentimiento válidamente en la Notificación de Controversia. Así, entendió que el consentimiento se perfeccionó con anterioridad a la denuncia del Convenio y que, por lo tanto, la denuncia no afectaba a la jurisdicción del Tribunal[27].

67.    Respecto a la segunda objeción, Venezuela sostuvo que el Tribunal carecía de jurisdicción con relación a la reclamación por expropiación indirecta por dos razones que calificó como independientes[28].

68.    En primer lugar, la República alegó que la Notificación de Controversia fue prematura y, en consecuencia, inválida respecto del reclamo de expropiación dado que, según las propias Valores y Consorcio, la expropiación indirecta se había cristalizado con la Providencia Administrativa, es decir, después de la recepción de la Notificación de Controversia y de la denuncia del Convenio del CIADI por parte de Venezuela. En segundo lugar, Venezuela afirmó que la controversia sobre la supuesta pérdida total de control de Gruma sobre las Compañías — que Valores y Consorcio calificaban como expropiación indirecta — no había sido notificada a la República como lo exige el Artículo XI(1) del Tratado y, por lo tanto, el periodo de negociaciones de seis meses previsto en el Tratado no se había iniciado[29].

69.    Esta objeción fue rechazada, ya que el Tribunal consideró que Valores y Consorcio notificaron válidamente la disputa sobre el incumplimiento del Artículo V del Tratado en la Notificación de Controversia y perfeccionaron su consentimiento con anterioridad a la denuncia del Convenio del CIADI por parte de Venezuela. En particular, el Tribunal razonó que "de facto *ha existido una relación entre el Decreto No. 7.394 y las medidas de aseguramiento y administración especial, incluida la Providencia Administrativa, y que todas forman parte de la misma controversia notificada por las Demandantes en su Notificación de Controversia*"[30]. Por lo tanto, el Tribunal consideró que tenía jurisdicción para conocer sobre la reclamación de expropiación en los términos planteados por Valores y Consorcio[31].

70.    En relación con la tercera objeción, Venezuela sostuvo que, independientemente del Artículo 72

---

[26] Laudo, ¶¶ 141-150, 194, 208.

[27] Laudo, ¶¶ 210-224.

[28] Laudo, ¶ 225.

[29] Laudo, ¶¶ 153-157, 225-226.

[30] Laudo, ¶ 241.

[31] Laudo, ¶ 243.

del Convenio del CIADI[32], el Artículo XI(2)(b) del APPRI[33] exige que ambos Estados — España y Venezuela — sean Estados contratantes del Convenio del CIADI al momento en que el inversor somete la controversia a arbitraje. Según la República, tal requisito no se cumplió en este caso, pues a la fecha de la presentación de la Solicitud de Arbitraje ya habían transcurrido seis meses desde la notificación de denuncia y, por lo tanto, Venezuela había dejado de ser Estado contratante del Convenio del CIADI[34].

71. El Tribunal rechazó esta objeción hallando que el consentimiento a la jurisdicción del CIADI se perfeccionó antes de que Venezuela denunciara el Convenio del CIADI, ya que el Artículo XI(2)(b) del APPRI no puede interpretarse en el sentido de exigir que ambos Estados sean parte del dicho Convenio al momento de someter la controversia a arbitraje porque tal interpretación sería contraria al sentido corriente de los términos del Tratado e ignoraría su contexto y las circunstancias de su negociación y celebración[35].

72. La cuarta objeción jurisdiccional se basó en el argumento de que el verdadero inversor en Venezuela era Gruma, sociedad mexicana, que no tiene derecho a beneficiarse del Convenio del CIADI por no ser nacional de un Estado contratante[36]. Para fundamentar esta objeción Venezuela señaló que Valores y Consorcio eran empresas de papel que fungían como tenedoras de las acciones de Gruma en las Compañías para dar apariencia española a las inversiones y simplemente heredaron la inversión extranjera directa de Gruma mediante un traspaso de acciones "*en papel*"[37]. Venezuela sostuvo que los órganos de administración de Valores y Consorcio no tenían actividad en España y solamente suscribían actas como si hubieran sido celebradas en ese país y que las supuestas inversiones de Valores y Consorcio en las Compañías no se habían realizado con capital del exterior[38]. La República agregó que, incluso si Valores y Consorcio calificaran como inversores bajo el Artículo I(1)(b) del APPRI, no podrían considerarse nacionales de otro Estado contratante a efectos del Convenio del CIADI porque ser "inversor" español bajo el APPRI no es automáticamente equivalente a ser nacional español para cumplir

---

[32] Artículo 72 del Convenio CIADI: "*Las notificaciones de un Estado Contratante hechas al amparo de los Artículos 70 y 71* [i.e. las notificaciones de denuncia del Convenio CIADI] *no afectarán a los derechos y obligaciones, conforme a este Convenio, de dicho Estado, sus subdivisiones políticas u organismos públicos, o de los nacionales de dicho Estado nacidos del consentimiento a la jurisdicción del Centro dado por alguno de ellos con anterioridad al recibo de dicha notificación por el depositario*".

[33] Artículo XI (2)(b) del APPRI: "*Si la controversia no pudiera ser resuelta de esta forma en un plazo de seis meses, a contar desde la fecha de notificación escrita mencionada en el párrafo 1, será sometida a la elección del inversor: Al Centro Internacional para el Arreglo de Diferencias Relativas a Inversiones (CIADI) creado por el Convenio para Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de otros Estados, abierto a la firma en Washington el 18 de marzo de 1965, cuando cada Estado parte en el presente Acuerdo se haya adherido a aquél. En caso de que una de las Partes Contratantes no se haya adherido al citado Convenio, se recurrirá al Mecanismo Complementario para la Administración de Procedimientos de Conciliación, Arbitraje y Comprobación de Hechos por la Secretaría de CIADI*".

[34] Laudo, ¶¶ 158-160, 245.

[35] Laudo, ¶¶ 260-261.

[36] Laudo, ¶¶ 161-162, 165-166, 263.

[37] Laudo, ¶¶ 163, 166, 264.

[38] Laudo, ¶ 164.

con el requisito de ser "nacional de otro Estado Contratante" del Artículo 25 del Convenio del CIADI. La República añadió que Valores y Consorcio no cumplen con los requisitos para hacerlo porque no califican como nacionales españoles bajo el derecho español[39].

73.   El Tribunal rechazó también esta última objeción. Una vez determinado que el Artículo 25 del Convenio del CIADI no contiene ningún criterio para determinar la nacionalidad de los inversores que sean personas jurídicas, el Tribunal razonó que les corresponde a los Estados establecer los requisitos de nacionalidad, por lo que concluyó que la definición de inversor del APPRI era determinante para establecer su jurisdicción tanto bajo el propio APPRI como bajo el Convenio del CIADI[40]. Al apreciar que la definición de inversor del APPRI solo requiere que Valores y Consorcio estén constituidas de conformidad con las leyes de España, y que este asunto no estaba controvertido entre las Partes, el Tribunal determinó que ellas cumplían con dicho requisito[41]. El Tribunal también añadió que la única excepción al criterio de la constitución establecido en el Tratado es la existencia de alguna forma de abuso, pero indicó que Venezuela no había invocado ningún argumento a estos efectos[42].

74.   En cuanto al fondo de la disputa, el Tribunal desestimó la reclamación por expropiación, pero concluyó que Venezuela había violado el Tratado en relación con los Artículos IV, III y VII.

75.   El Tribunal consideró, primero, que el Decreto No. 7.394 no constituyó por sí mismo una expropiación indirecta[43]. Luego, desestimó el argumento de Valores y Consorcio según el cual hubo expropiación progresiva culminada con la Providencia Administrativa[44]. Además, y a mayor abundamiento, estimó que no estaba probado que Valores y Consorcio hubieran perdido el control total o sustancial sobre las Compañías como consecuencia de las medidas de aseguramiento y administración especial y del Decreto[45]. Tampoco consideró probado que el valor de sus inversiones hubiera sido "*aniquilado o destruido*"[46]. Así, concluyó que no hubo una expropiación indirecta en violación del Artículo V. Con base en lo anterior, el Tribunal no estimó necesario pronunciarse sobre la alegada ilicitud de la expropiación[47].

76.   En cuanto a la reclamación por violación de la obligación de brindar un TJE a las inversiones de Valores y Consorcio, el Tribunal observó preliminarmente que no existía objeción alguna a su jurisdicción que se refiriera de manera específica a dicha reclamación[48]. El Tribunal indicó que, aunque las medidas y conductas de Venezuela no generaron la pérdida total o sustancial del control de las Compañías por parte de Valores y Consorcio, sí violaron el estándar de TJE. Según

---

[39] Laudo, ¶¶ 166, 265.

[40] Laudo, ¶¶ 266-275.

[41] Laudo, ¶¶ 273-284.

[42] Laudo, ¶¶ 280, 282-283.

[43] Laudo, ¶¶ 401-405.

[44] Laudo, ¶¶ 406-420.

[45] Laudo, ¶¶ 421-458.

[46] Laudo, ¶¶ 459-479.

[47] Laudo, ¶ 480.

[48] Laudo, ¶ 521.

el Tribunal, la República violó el Artículo IV del Tratado a través de: (*i*) las medidas de aseguramiento y administración especial, en la forma en que habían sido ejecutadas por los poderes ejecutivo y judicial[49], (*ii*) la imposición sobre las Compañías de restricciones derivadas del Decreto No. 7.394, mientras el proceso de adquisición forzosa continuaba suspendido por casi diez años sin avanzar en las negociaciones[50] y (*iii*) la confusión en cuanto al origen y el efecto de las facultades de los administradores especiales y las de la Comisión de Enlace[51].

77.     Con relación a la prohibición de imposición de medidas arbitrarias y discriminatorias, el Tribunal halló que Venezuela había violado el Artículo III(1) del APPRI. En concreto, el Tribunal concluyó que las siguientes conductas carecían de fundamento fáctico o jurídico, y por ende eran arbitrarias y obstaculizaban la gestión y desarrollo de las inversiones de Valores y Consorcio: (*i*) la denegación de la Superintendencia de Inversiones Extranjeras de la República Bolivariana de Venezuela ("**SIEX**") de dar trámite a las solicitudes de actualización del registro de inversión extranjera de las Compañías y de Valores y Consorcio[52], (*ii*) la imposición de la Comisión de Enlace[53], (*iii*) la suspensión indefinida del procedimiento de expropiación y la simultánea aplicación de algunas restricciones del Decreto No. 7.394[54] y (*iv*) el redireccionamiento de materias primas por parte de Venezuela[55].

78.     Respecto al Artículo VII, el Tribunal consideró que la República lo incumplió al restringir la repatriación sin demoras de capitales y pagos relacionados con la inversión en la moneda convertible elegida por las Demandantes[56], y decidió que la conducta de Venezuela respecto a la actualización del registro de inversión extranjera era arbitraria[57]. Por otro lado, el Tribunal decidió que Valores y Consorcio no habían probado que se hubieran dejado de decretar dividendos o celebrar actos societarios como consecuencia de las conductas de Venezuela[58].

79.     Como resultado de lo anterior, el Tribunal determinó que las violaciones a los Artículos IV, III y VII del Tratado ocasionaron daños y perjuicios a Valores y Consorcio, y ordenó a Venezuela el pago de una indemnización en la suma de US$ 430,4 millones, más intereses a la tasa Libor + 2% a partir del 22 de enero de 2013 y hasta la fecha de pago del Laudo[59].

80.     Por último, el Tribunal condenó la República a pagar US$ 5.925.705,14 como contribución al pago de los costos del arbitraje de Valores y Consorcio[60].

---

[49] Laudo, ¶¶ 550-563, 587.

[50] Laudo, ¶¶ 564-583, 587.

[51] Laudo, ¶¶ 584-586, 587.

[52] Laudo, ¶¶ 612-613.

[53] Laudo, ¶ 614.

[54] Laudo, ¶ 615.

[55] Laudo, ¶ 616.

[56] Laudo, ¶ 636.

[57] Laudo, ¶ 639.

[58] Laudo, ¶ 640.

[59] Laudo, ¶ 834.

[60] Laudo, ¶ 834.

### B.    LAS CUESTIONES SOMETIDAS A LA DECISIÓN DEL COMITÉ

81.    La República solicita la anulación del Laudo invocando tres de las cinco causales de anulación previstas en el Artículo 52(1) del Convenio del CIADI, en concreto, la extralimitación manifiesta en las facultades del Tribunal (literal (b)), el quebrantamiento grave de una norma fundamental de procedimiento (literal (d)) y la falta de expresión de motivos (literal (e)).

82.    Con base en su postura acerca del alcance de estas tres causales[61], Venezuela sostiene que el Tribunal incurrió en ellas con relación a siete cuestiones decididas en el Laudo. La República postula que el Tribunal:

   (i)     se extralimitó manifiestamente en sus facultades al decidir *ultra petita* en relación con el estándar de TJE y la Providencia Administrativa[62];

   (ii)    se extralimitó manifiestamente en sus facultades y quebrantó una norma fundamental de procedimiento al asumir jurisdicción sobre el reclamo por expropiación bajo el Artículo V del Tratado[63];

   (iii)   no expresó motivos y quebrantó una norma de procedimiento respecto a las alegaciones fácticas sobre el test de nacionalidad[64];

   (iv)    expresó razones contradictorias en relación con los efectos del Decreto No. 7.394[65];

   (v)     no expresó razones y quebrantó una norma de procedimiento en cuanto al tratamiento de la prueba con relación a la Comisión de Enlace[66];

   (vi)    no expresó motivos y quebrantó una norma de procedimiento en su decisión sobre los daños[67]; y

   (vii)   no expresó motivos y quebrantó una norma de procedimiento en su determinación sobre la atribución de costos en el Arbitraje Subyacente[68].

83.    Por su parte, las Demandadas en Anulación sostienen que Venezuela no ha demostrado que el Laudo deba ser anulado, pues el procedimiento de anulación no es un procedimiento de apelación y las causales invocadas por la República tienen un alcance más limitado de lo que esta sugiere[69]. Además, Valores y Consorcio niegan que el Laudo incurra en los vicios imputados[70].

---

[61] MdA, § IV; Réplica de Anulación, § III

[62] MdA, § V.A; Réplica de Anulación, § IV.A.

[63] MdA, § V.B; Réplica de Anulación, § IV.B.

[64] MdA, § V.C; Réplica de Anulación, § IV.C.

[65] MdA, § V.E; Réplica de Anulación, § IV.D.

[66] MdA, § V.D; Réplica de Anulación, § IV.E.

[67] MdA, § V.F; Réplica de Anulación, § IV.F.

[68] MdA, § V.G; Réplica de Anulación, § IV.G.

[69] MdC de Anulación, §§ III.A y III.B; Dúplica de Anulación, § II.A.

[70] MdC de Anulación, §§ III.C a III.I; Dúplica de Anulación, §§ II.B a II.H.

15

84. A la luz de los términos en los que las Partes han desarrollado sus posiciones, el Comité determinará en la **Sección V** el alcance de cada una de las tres causales de anulación invocadas por Venezuela. Una vez aclarado este aspecto, el Comité abordará, en la **Sección VI**, los vicios que la República atribuye al Laudo, a fin de establecer si en el caso concreto se han verificado la existencia de esas causales de anulación.

85. Al tratar cada una de las cuestiones antes mencionadas, el Comité ha considerado todas las alegaciones y los argumentos presentados por las Partes por escrito y oralmente. El hecho de que una alegación o un argumento no haya sido citado o resumido en esta decisión no significa que no haya sido considerado por el Comité para llegar a su conclusión.

86. Para llegar a sus conclusiones, el Comité ha considerado, entre otras fuentes, las decisiones de anulación de varios comités *ad hoc* CIADI. Dada la importancia de las cuestiones discutidas en este procedimiento respecto a las tres causales de anulación invocadas, el Comité ha analizado también decisiones de comités *ad hoc* que no forman parte del expediente (incluso algunas emitidas después de la Audiencia de Anulación), que han sido utilizadas para respaldar posiciones ya consolidadas en la jurisprudencia. Estas últimas decisiones guardan relación con argumentos que han sido extensamente debatidos por las Partes en este proceso, y se encuentran además en línea con otras decisiones que forman parte de este expediente[71]. A fin de simplificar la lectura de este documento, las decisiones de anulación consideradas han sido definidas en una lista al comienzo de la presente decisión.

## V.   EL ALCANCE DE LAS CAUSALES DE ANULACIÓN INVOCADAS POR VENEZUELA

### A.   INTRODUCCIÓN

87. La República ha identificado los estándares legales aplicables a cada una de las tres causales de anulación que invoca. A su juicio, no existe una controversia real entre las Partes respecto de estos estándares, pues Valores y Consorcio solamente se limitaron a "*forzar interpretaciones restrictivas*" de sus verdaderos alcances[72]. En general, la República sostiene que el propósito del remedio de la anulación es proteger la integridad de los laudos CIADI. Venezuela también destaca que el procedimiento de anulación es distinto de un procedimiento de apelación, pero señala que esto no significa que las causales de anulación deban ser interpretadas de manera extremadamente restrictiva[73].

88. Las Demandadas en Anulación alegan que las tres causales de anulación invocadas por Venezuela no tienen al alcance amplio que ella pretende indebidamente atribuirles para intentar volver a litigar la controversia decidida en el Laudo. Por el contrario, sostienen que el margen de aplicación de esas causales de anulación es "*muy limitado*" y la función de los comités *ad hoc* no es

---

[71] El Comité nota que varias de estas decisiones se encuentran referenciadas en el Documento actualizado de antecedentes sobre el mecanismo de anulación par el Consejo Administrativo del CIADI de 5 de mayo de 2016 ("**Documento de antecedentes**") (RLA-173).

[72] Réplica de Anulación, ¶¶ 18-20.

[73] Tr. Día 1, 41:1-42:7; Tr. Día 2, 257:19-258:9.

reexaminar la conclusiones fácticas y legales de los árbitros, ya que el procedimiento de anulación de los laudos CIADI no es un proceso de apelación y que este fue diseñado simplemente para resguardar la integridad de los laudos. En todo caso, Valores y Consorcio destacan que le corresponde a la República probar que se verificaron las causales que invoca[74].

89.   El Comité comenzará su análisis determinando en la presente Sección los principios para definir el alcance de las tres causales de anulación invocadas por Venezuela. El Comité aplicará estos principios al analizar, en la Sección siguiente, los vicios que la República atribuye al Laudo.

**B.   LA EXTRALIMITACIÓN MANIFIESTA DE FACULTADES (ARTÍCULO 52(1)(B) DEL CONVENIO DEL CIADI)**

90.   Venezuela invoca la extralimitación manifiesta de facultades conforme al Artículo 52(1)(b) del Convenio del CIADI en relación con la decisión del Tribunal sobre (*i*) el estándar de TJE y la Providencia Administrativa y (*ii*) la jurisdicción respecto del reclamo por expropiación.

**1.   Argumentos de Venezuela**

91.   La República afirma que, para determinar si se ha producido una extralimitación manifiesta de las facultades del Tribunal, las decisiones de anulación más representativas han utilizado un enfoque de "*dos pasos*" que consiste en determinar, primero, si existió un exceso de poder por parte del tribunal de arbitraje y, segundo, si ese exceso fue manifiesto[75].

92.   En cuanto al adjetivo "*manifiesto*", Venezuela sostiene que este significa "*obvio*" o "*evidente*". Basándose en un artículo de Philippe Pinsolle[76], la República sostiene que "*manifiesto*" se refiere exclusivamente al grado de extralimitación y no a que el exceso de poder deba ser evidente *prima facie*, ya que, de ser así, una redacción competente y cuidadosa del laudo lo tornaría inmune a anulación. Por ende, los comités deben realizar un análisis del exceso de poder invocado, lo que puede incluir examinar el laudo y las argumentaciones de las partes. Para Venezuela, las Demandadas en Anulación tratan de desnaturalizar esta causal de anulación argumentando que la extralimitación de facultades tiene que surgir de una simple lectura del laudo. Esta interpretación vacía de contenido práctico al Artículo 52(1)(b) del Convenio del CIADI. Además, la necesidad de un análisis *in extenso* ha sido reconocida por las decisiones de anulación en los casos *Pey Casado c. Chile*, *Caratube c. Kazajistán* y *Occidental c. Ecuador*[77]. Al contestar en su alegato de cierre a una pregunta del Comité, la República indicó que, si bien las decisiones de anulación en *Venoklim c. Venezuela (I)* y *Tenaris c. Venezuela (II)* describen el significado del término "*manifiesto*" de manera distinta a los tres precedentes antes citados, en realidad, las cinco decisiones coinciden en su aplicación, pues todas demuestran que hubo una lectura atenta del

---

[74] MdC de Anulación, ¶ 38; Dúplica de Anulación, ¶¶ 6-7; Tr. Día 1, 140:5-141:16, 146:12-17.

[75] MdA, ¶ 35; Réplica de Anulación, ¶¶ 26-27, citando varias decisiones de anulación de comités *ad hoc* del CIADI. Véase también Tr. Día 1, 44:3-9.

[76] P. PINSOLLE, *Manifest Excess of Power and Jurisdictional Review of ICSID Awards*, en *2 Transnational Dispute Management* (2005) (RLA-199).

[77] MdA, ¶¶ 36-38; Réplica de Anulación, ¶¶ 22, 24-25, 28-32; Tr. Día 1, 44:10-45:20, 50:9-51:3; Tr. Día 2, 259:18-260:16, citando *Pey Casado c. Chile* (Anulación I), ¶ 70 (RLA-201); *Caratube c. Kazajistán*, ¶ 84 (RLA-202); *Occidental c. Ecuador*, ¶¶ 57-59 (RLA-194).

laudo tomando en cuenta los argumentos de las partes y la documentación de soporte relevante[78].

93.   Venezuela expone que, como lo reconocen las Demandadas en Anulación, existen dos tipos de extralimitación manifiesta de facultades por parte de los tribunales[79].

94.   El primero es la extralimitación de facultades por falta de jurisdicción, que ocurre tanto cuando un tribunal decide una controversia fuera del alcance de su jurisdicción, como cuando no ejerce plenamente su jurisdicción, independientemente de que la falta de jurisdicción sea parcial o total. Para determinar si hubo un exceso de facultades relativo a cuestiones jurisdiccionales es necesario analizar conjuntamente los hechos del caso y el marco jurídico que determina la jurisdicción invocada. Esto requiere interpretar los tratados de inversión y el Convenio del CIADI, incluso – de ser necesario – a través de un análisis de precedentes, jurisprudencia, doctrina y trabajos preparatorios del Convenio del CIADI, tal como ocurrió en los procedimientos de anulación de los casos *Azurix c. Argentina* y *SAUR c. Argentina*[80]. Todo ello conlleva que el Comité debe realizar "*un análisis completo de la jurisdicción erróneamente arrogada por el Tribunal, desde un punto inicial*", ya que, de no ser así, le sería imposible comprobar la existencia de la causal de anulación en cuestión y el Artículo 52(1)(b) "*no sería más que un derecho 'virtual'*"[81]. En su Réplica de Anulación, Venezuela agrega que Valores y Consorcio se equivocan al argumentar que el Comité no puede analizar las pruebas y los hechos del Arbitraje Subyacente, dado que este análisis es necesario para determinar si el Tribunal asumió su jurisdicción erróneamente. La República aclara que el Comité no está llamado a revisar todos los hechos y las pruebas del caso como si fuera un juez de apelación, sino que debe solamente analizar los hechos y las pruebas relacionados con el ejercicio de la jurisdicción del Tribunal[82]. En todo caso, para Venezuela, la lectura propuesta por las Demandadas en Anulación es irrelevante en este caso, puesto que la extralimitación de facultades por parte del Tribunal fue clara[83].

95.   El segundo tipo de extralimitación de facultades ocurre cuando los árbitros no aplican el derecho aplicable. Esto puede ocurrir cuando el derecho aplicable es ignorado completamente o cuando el laudo se funda en un derecho distinto al derecho aplicable. En ambas circunstancias la consecuencia es la anulación del laudo en su totalidad. Para darle efecto útil a esta causal de anulación, el Comité "*no puede limitarse al registro formal de ciertas normas aplicables*", sino que tiene que analizar si el Tribunal les dio aplicación efectiva y la interpretación que hizo de las mismas. En este caso concreto, el Comité debe analizar el APPRI y el derecho local, así como el Convenio del CIADI y sus Reglas de Arbitraje, y cualquier otro derecho aplicable convenido por las Partes[84].

---

[78] Tr. Día 2, 258:10-262:19.

[79] MdA, ¶ 39; Réplica de Anulación, ¶ 22.

[80] *Azurix c. Argentina*, ¶ 82 (RLA-208); *SAUR c. Argentina*, ¶ 172 (RLA-212).

[81] MdA, ¶¶ 41-48; Tr. Día 1, 42:13-43:6, 46:1-7.

[82] Réplica de Anulación, ¶¶ 34-37.

[83] Réplica de Anulación, ¶ 38; Tr. Día 2, 262:20-263:16.

[84] MdA, ¶¶ 49-56, 59; Réplica de Anulación, ¶¶ 39, 46.

96.  Según Venezuela, las Demandadas en Anulación buscan restringir forzadamente esta causal de anulación argumentando que no existe un requisito de "*aplicación efectiva*" del derecho aplicable y que, de ser así, el procedimiento de anulación se convertiría en una apelación. Si bien Venezuela acepta que una aplicación razonable del derecho aplicable a la disputa o un error "*simple*" en su interpretación no alcanzan el umbral para anular el Laudo, advierte de que un error de derecho puede ser tan grave que equivalga a una omisión en la aplicación del derecho aplicable, conllevando así la anulación del Laudo. A este respecto, cita como respaldo las decisiones de los comités en *Dogan c. Turkmenistán* y *Micula c. Rumania*[85]. A criterio de Venezuela, la evaluación de la aplicación efectiva del derecho no "*borra la frontera entre 'anulación' y 'apelación'*", pues no requiere el intercambio del juicio interpretativo de los árbitros con el del comité, sino solamente un control para verificar si las normas fueron en efecto aplicadas o si, aunque mencionadas, fueron construidas de tal manera que "*carecieron de un efecto normativo real para el caso en concreto*"[86].

97.  La República añade que, de todos modos, en el presente caso ella invoca una "*no aplicación lisa y llana*" del derecho aplicable, por lo que la discrepancia entre las Partes sobre si el Comité debería determinar si el Tribunal realizó una aplicación efectiva del derecho aplicable es puramente académica[87].

98.  Finalmente, Venezuela señala que, como destacó el comité en el caso *EDF c. Argentina*[88], la extralimitación de facultades por no aplicación del derecho aplicable permite también anular la estimación de daños realizada por los árbitros. Esto ocurrió, por ejemplo, en el caso *Venezuela Holdings c. Venezuela*[89], en el que el comité concluyó que el tribunal se había extralimitado manifiestamente en sus facultades al calcular los daños con base en el derecho general internacional en lugar de aplicar las disposiciones específicas del tratado bilateral de inversión[90].

### 2.  Argumentos de Valores y Consorcio

99.  De entrada, Valores y Consorcio coinciden con la Demandante en Anulación en que la parte que solicita la anulación de un laudo bajo el Artículo 52(1)(b) del Convenio del CIADI debe probar dos requisitos: (*i*) que el tribunal se extralimitó en sus facultades y (*ii*) que dicha extralimitación fue manifiesta. Además, coinciden en que el término "*manifiesto*" significa "*obvio*" o "*evidente*"[91].

100.  No obstante, las Demandadas en Anulación discrepan de la postura de Venezuela en lo que hace al análisis que los comités deben conducir para determinar si los árbitros se extralimitaron manifiestamente de sus facultades. En particular, Valores y Consorcio afirman que una extralimitación de facultades es manifiesta cuando es "'*evidente por sí sola' de la simple lectura*

---

[85] *Dogan c. Turkmenistán*, ¶ 105 (RLA- 246); *Micula c. Rumania*, ¶ 130 (RLA-235).

[86] Réplica de Anulación, ¶¶ 40, 42-45, 47.

[87] MdA, ¶ 59; Réplica de Anulación, ¶ 41.

[88] *EDF c. Argentina*, ¶ 368 (RLA-195).

[89] *Venezuela Holdings c. Venezuela*, ¶ 188(a) (RLA-218).

[90] MdA, ¶¶ 57-58.

[91] MdC de Anulación, ¶¶ 39, 45; Tr. Día 1, 141:21-142:1; Tr. Día 2, 309:14-310:6.

*del laudo*", tal y como lo reconocieron distintos comités[92]. Para respaldar esta lectura, Valores y Consorcio hacen hincapié en el significado ordinario del adjetivo "*manifiesto*", así como en el hecho de que este término debe ser interpretado de forma congruente con el adverbio "*manifiestamente*" que se halla en el Artículo 36(3) del Convenio del CIADI[93] y que, según el Profesor Schreuer, significa "*so obvious that the request does not deserve consideration by a tribunal*"[94]. Por ende, concluyen que, contrariamente a lo que sostiene la República, el Comité no puede examinar en detalle el contenido del Laudo y ni siquiera tiene la facultad de hacerlo, pues la extralimitación de facultades del Tribunal debería ser clara a primera vista[95]. Contestando a una pregunta del Comité durante la Audiencia de Anulación, Valores y Consorcio indicaron que compartían el análisis de los comités en *Venoklim c. Venezuela (I)* y *Tenaris c. Venezuela (II)*, criticando, en cambio, el planteamiento de los comités en *Caratube c. Kazajistán* y *Occidental c. Ecuador*, pues es contrario al significado ordinario del término "*manifiesto*" y cruza la línea que separa la anulación de una apelación[96].

101.     En cuanto a las posibles formas de extralimitación de facultades, Valores y Consorcio aceptan que el Artículo 52(1)(b) abarca tanto la falta de ejercicio de jurisdicción por parte de los árbitros como la no aplicación del derecho aplicable[97]. Sin embargo, controvierten la descripción que Venezuela hace de estas dos hipótesis.

102.     En lo que hace a la extralimitación de facultades relativa a la jurisdicción del tribunal, Valores y Consorcio sostienen que un comité se excedería en sus facultades si examinara *de novo* la jurisdicción del tribunal y evaluara la prueba o la interpretación de los hechos adoptada por los árbitros. Si los comités actuasen como propone la República, los procedimientos de anulación se convertirían en procesos de apelación. Las Demandadas en Anulación destacan que el intento de la República de convertir esta causal de anulación en un revisión *de novo* de los laudos ha sido ya rechazado en *OI European c. Venezuela*[98], así como por otros comités[99].

103.     Por otro lado, en lo que concierne a la extralimitación de facultades por inaplicación del derecho aplicable, Valores y Consorcio sostienen que no existe un requisito de "*aplicación efectiva*" del derecho aplicable. Así, cuando un tribunal realiza los esfuerzos necesarios para aplicar correctamente el derecho aplicable no existe fundamento de anulación. Citando las decisiones de

---

[92] MdC de Anulación, ¶ 41. Las Demandadas en Anulación hacen referencia, *inter alia*, a *Repsol c. Ecuador*, ¶ 36 (RLA-222); *CDC c. Seychelles*, ¶ 41 (RLA-198); *Wena c. Egipto*, ¶ 25 (CLA-109). Véanse también *Occidental c. Ecuador*, ¶ 57 (RLA-194); *Malicorp c. Egipto*, ¶ 53 (RLA-227).

[93] El Artículo 36(3) del Convenio del CIADI prevé lo siguiente: "*El Secretario General registrará la solicitud salvo que, de la información contenida en dicha solicitud, encuentre que la diferencia se halla manifiestamente fuera de la jurisdicción del Centro. Notificará inmediatamente a las partes el acto de registro de la solicitud, o su denegación*".

[94] C. Schreuer, L. Malintoppi, A. Reinisch y A. Sinclair, *The ICSID Convention: A Commentary*, 2da Ed., 2009, pág. 939, ¶ 141 (CLA-250).

[95] MdC de Anulación, ¶¶ 40-41; Dúplica de Anulación, ¶¶ 10-13.

[96] Tr. Día 2, 308:18-313:18.

[97] MdC de Anulación, ¶¶ 39, 42.

[98] *OI European c. Venezuela*, ¶¶ 160, 183 (CLA-267).

[99] MdC de Anulación, ¶ 42; Dúplica de Anulación, ¶¶ 14-17; Tr. Día 1, 142:3-143:6.

anulación en los casos *CMS c. Argentina* y *MINE c. Guinea*[100], Valores y Consorcio alegan que debe distinguirse entre la no aplicación de las reglas del derecho aplicable y su errónea aplicación que, aun si fuera manifiestamente injustificada, no configuraría una causal de anulación. A este respecto, destacan que los redactores del Convenio del CIADI consideraron la posibilidad de incluir entre las causales de anulación de los laudos los errores de derecho, pero la rechazaron. Finalmente, las Demandadas en Anulación señalan que el comité en *OI European c. Venezuela*[101] ya rechazó el intento de la República de introducir un requisito de "*aplicación efectiva*" del derecho aplicable[102].

### 3.   Análisis del Comité

104.   La primera causal de anulación invocada por Venezuela está prevista en el Artículo 52(1)(b) del Convenio del CIADI, el cual establece:

> *(1) Cualquiera de las partes podrá solicitar la anulación del laudo mediante escrito dirigido al Secretario General fundado en una o más de las siguientes causas: [...]*

> *(b) que el Tribunal se hubiere extralimitado manifiestamente en sus facultades.*

105.   El Comité toma nota de que las Partes concuerdan en un punto, a saber, que, para que se dé esta causal de anulación, Venezuela debe demostrar que hubo una extralimitación de facultades por parte del Tribunal y que esta fue manifiesta[103]. Sin embargo, discrepan sobre la interpretación del término "*manifiestamente*" y el alcance de las dos formas de extralimitación de facultades posibles: la falta de ejercicio de jurisdicción por parte de los árbitros y la no aplicación del derecho aplicable.

106.   El Comité abordará a continuación estos tres puntos.

### a)   El doble requisito y el enfoque metodológico para determinar la existencia de una extralimitación manifiesta de facultades

107.   En lo que concierne al punto de concordancia entre las Partes, es indiscutible que el Artículo 52(1)(b) del Convenio del CIADI impone dos requisitos: (*i*) una extralimitación del tribunal en sus facultades y (*ii*) el carácter manifiesto de dicha extralimitación[104].

108.   Es cierto que algunos comités *ad hoc* han aplicado un método enfocado principalmente en el segundo requisito, que consiste en examinar sumariamente (*prima facie*) el laudo para determinar si alguna de las extralimitaciones alegadas por la parte solicitante tiene carácter manifiesto, lo que, en caso de respuesta negativa, permitiría rechazar la solicitud de anulación sin

---

[100] *CMS c. Argentina*, ¶¶ 50-51 (RLA-214); *MINE c. Guinea*, ¶ 5.04 (RLA-213).

[101] *OI European c. Venezuela*, ¶¶ 184-185 (CLA-267).

[102] MdC de Anulación, ¶¶ 43-44; Dúplica de Anulación, ¶¶ 18-21.

[103] Véanse ¶¶ 91, 99 *supra*.

[104] Véanse, entre otros, *Micula c. Rumania*, ¶ 123 (RLA-235); *TECO c. Guatemala*, ¶ 76 (RLA-197).

siquiera determinar si hubo extralimitación[105]. Sin embargo, este Comité estima que el método de análisis más adecuado es el "*de dos pasos*" en que concuerdan las Partes, que consiste en determinar, primero, la presencia de una extralimitación de los árbitros en sus facultades y, luego, el carácter manifiesto o no del exceso de poder. Este método no solamente es aceptado por la mayoría de los comités[106], sino que se ajusta mejor al texto del Artículo 52(1)(b)[107].

### b) El significado del adverbio "**manifiestamente**" y el análisis para determinar si la alegada extralimitación es manifiesta

109.   En cuanto a la interpretación del adverbio "*manifiestamente*", si bien las Partes coinciden en que significa que la extralimitación debe ser obvia o evidente, estas discrepan en cómo se debe identificar el carácter manifiesto. Para Venezuela, no es necesario que este surja *prima facie* y puede requerir un análisis extenso del Laudo y de las argumentaciones de las Partes en el Arbitraje Subyacente. En cambio, Valores y Consorcio sostienen que una extralimitación manifiesta debe surgir "'[...] *por sí sola' de la simple lectura del laudo*"[108].

110.   De manera preliminar, el Comité señala que el término "*manifiestamente*" indica que el umbral para anular – total o parcialmente – un laudo CIADI con base en el Artículo 52(1)(b) es elevado. Ello está en línea con la naturaleza excepcional del procedimiento de anulación bajo el Convenio del CIADI y el rol limitado que tienen los comités *ad hoc*, tal y como ha sido reconocido por la jurisprudencia[109].

111.   Dicho esto, el Comité estima que, a fin de interpretar correctamente el término "*manifiestamente*" y de resolver la diferencia entre las Partes sobre este punto, debe determinar dos cuestiones que, aunque entrelazadas, tienen matices distintos. La primera consiste en determinar el significado de ese adverbio. La segunda atañe al tipo de análisis que el Comité debe conducir para establecer si hubo una extralimitación manifiesta.

112.   Empezando por la primera cuestión, el adverbio "*manifiestamente*" significa, tal y como ambas Partes destacan, "*evidente*" u "*obvio*", y también "*patente*" o "*claro*"[110]. Así las cosas, una interpretación puramente literal del Artículo 52(1)(b) y tal y como ha sido destacado por cierta

---

[105] *AES c. Hungría*, ¶ 32 (RLA-192), aunque el comité en *AES* aplicó esta metodología en conjunto con el análisis "*de dos pasos*". Véase también Documento de antecedentes, ¶ 82 (RLA-173).

[106] Véanse, entre otros, *CDC c. Seychelles*, ¶ 39 (RLA-198); *Lemire c. Ucrania*, ¶ 240 (RLA-193); *Occidental c. Ecuador*, ¶ 57 (RLA-194); *Venoklim c. Venezuela (I)*, ¶ 197 (RLA-217); *OI European c. Venezuela*, ¶ 180 (CLA-267).

[107] *Sempra c. Argentina*, ¶ 212 (RLA-190) ("*la extralimitación de facultades es un requisito* sine qua non *para la necesidad de medir el carácter manifiesto de la extralimitación, y permite un análisis más contundente de lo que constituye una violación, por un lado, y lo que la hace manifiesta, por el otro*").

[108] Véanse ¶¶ 92, 100 *supra*.

[109] Para la jurisprudencia hasta el año 2016, véase Documento de antecedentes, ¶ 74(2) (págs. 42-45) (RLA-173). Para casos más recientes, véanse *Venoklim c. Venezuela (I)*, ¶ 189 (RLA-217); *Tenaris c. Venezuela (II)*, ¶ 73 (CMTLA-1).

[110] Real Academia Española, Diccionario de la lengua española (https://dle.rae.es/manifiesto).

jurisprudencia[111], parecería sugerir que "*manifiestamente*" no hace referencia al nivel de gravedad de la extralimitación, sino exclusivamente a la facilidad e inmediatez con la cual la extralimitación es percibida durante el proceso cognitivo del comité de anulación[112].

113.   El Comité observa que existe también otra interpretación del término "*manifiestamente*", según la cual una extralimitación por parte de los árbitros no podría conducir a la anulación de un laudo si, incluso siendo patente, no afectase sustancialmente al resultado del caso. Esta interpretación fue inicialmente enunciada en el caso *Soufraki c. EAU*[113] y ha sido aceptada luego por varios comités *ad hoc*[114].

114.   A juicio del Comité, esta lectura – además de ser coherente con el adjetivo "*grave*" del literal (d) del Artículo 52(1) del Convenio del CIADI – parece razonable a la luz del carácter excepcional del recurso de anulación de los laudos en los arbitrajes CIADI[115], como se desprende del Artículo 52(1), que contiene un listado exhaustivo de causales de anulación[116], y del Artículo 53(1)[117], que establece el principio de la finalidad de los laudos, limitando su impugnación a los recursos expresamente previstos en el Convenio[118].

115.   En efecto, la interpretación del comité en *Soufraki* no conduciría a la anulación si la extralimitación, aunque patente, no fuera grave. Esto ocurriría, por ejemplo, si un tribunal aceptara ejercer la jurisdicción sobre un caso considerando al inversor como nacional del estado A, frente a prueba contundente de que es nacional del estado B, cuando ambos estados son miembros del Convenio del CIADI y del tratado de protección de las inversiones invocado por el inversor. Bajo esta hipótesis la extralimitación sería patente, pero no grave, porque el resultado del caso no se vería afectado de manera sustancial.

116.   Pasando a la segunda de las dos cuestiones antes mencionadas (a saber, el tipo de análisis que debe conducirse para establecer si una extralimitación ha sido manifiesta), es oportuno distinguir

---

[111] Véanse, entre otros, *Wena c. Egipto*, ¶ 25 (CLA-109) ("*The excess of power must be self-evident rather than the product of elaborate interpretations one way or the other. When the latter happens the excess of power is no longer manifest*"); *Standard Chartered c. Tanzania*, ¶ 181 (CLA-254) ("*The excess is 'manifest' in nature if it is obvious, clear, self-evident, and discernible without the need for an elaborate analysis of the award*").

[112] C. Schreuer, L. Malintoppi, A. Reinisch y A. Sinclair, *The ICSID Convention: A Commentary*, 2da Ed., 2009, pág. 939, ¶ 135 (CLA-250). Véase también Documento de antecedentes, ¶ 83 (RLA-173).

[113] *Soufraki c. EAU*, ¶ 40 (RLA-205) ("*the Committee believes that a strict opposition between two different meanings of 'manifest' – either 'obvious' or 'serious' – is an unnecessary debate. It seems to this Committee that a manifest excess of power implies that the excess of power should at once be textually obvious and substantively serious*").

[114] *Fraport c. Filipinas (I)*, ¶ 44 (RLA-191); *Pey Casado c. Chile* (Anulación I), ¶ 70 (RLA-201); *Libananco c. Turquía*, ¶ 102 (RLA-233); *Malicorp c. Egipto*, ¶¶ 53-56 (RLA-227); *Impregilo c. Argentina*, ¶ 128 (RLA-226); *SGS c. Paraguay*, ¶ 122; *El Paso c. Argentina*, ¶ 142 (RLA-203); *Kilic c. Turkmenistán*, ¶ 53 (RLA-228); *Lahoud c. Congo*, ¶¶ 122-128; *Tenaris c. Venezuela (II)*, ¶ 74 (CMTLA-1); *Pey Casado c. Chile* (Anulación II), ¶ 198.

[115] Véase ¶ 110 *supra*.

[116] Documento de antecedentes, ¶ 74(1) (págs. 39-42) (RLA-173).

[117] El Artículo 53(1) del Convenio del CIADI dispone: "[e]*l laudo será obligatorio para las partes y no podrá ser objeto de apelación ni de cualquier otro recurso, excepto en los casos previstos en este Convenio*".

[118] En este sentido, véase *Repsol c. Ecuador*, ¶ 81 (RLA-222).

entre dos tipos de análisis, tal y como aclaró el comité en *Tenaris c. Venezuela (II)*[119]. Por un lado, el comité debe entender el razonamiento de los árbitros. A este fin, una simple lectura del laudo no siempre es suficiente y el comité podría necesitar un análisis profundizado del laudo dependiendo del nivel de complejidad de la cuestión y del grado de detalle y extensión del razonamiento del tribunal[120]. Por otro lado, una vez entendido el razonamiento del tribunal, el comité debe preguntarse si hubo una extralimitación manifiesta. Es en este segundo tipo de análisis en el que el comité debe percibir la extralimitación como patente, evidente, obvia o clara (además de grave)[121]. Así las cosas, incluso los razonamientos detallados y extensos de los árbitros pueden dar lugar a una extralimitación al amparo del Artículo 52(1)(b) del Convenio del CIADI, si la extralimitación es, al mismo tiempo, patente y grave[122].

### c)   Las posibles formas de extralimitación y su alcance

117.   Otro punto en el que las Partes discrepan es el relativo al contenido de las dos formas de extralimitación de facultades, o sea, el error en la asunción o en la denegación de jurisdicción y la no aplicación del derecho aplicable.

### (1)   Error en la asunción o en la denegación de jurisdicción

118.   En cuanto a la extralimitación de facultades que atañe a la jurisdicción, no está en disputa que puede configurarse tanto cuando el tribunal se arroga jurisdicción sin tenerla realmente (o teniéndola solo de manera limitada) como cuando declina el ejercicio de la jurisdicción en casos en los que correspondería ejercerla[123]. Sin embargo, las Partes difieren en la manera en que se debería determinar esta forma de extralimitación. Venezuela sostiene que el Comité debería hacer un análisis completo de la jurisdicción, valorando los hechos, las pruebas y el marco jurídico del caso subyacente para determinar si el Tribunal asumió la jurisdicción erróneamente, sin que esto implique actuar como corte de apelación[124]. En cambio, Valores y Consorcio aseveran que el

---

[119] *Tenaris c. Venezuela (II)*, ¶¶ 75-79 (CMTLA-1).

[120] Véase también *EDF c. Argentina*, ¶ 193 (RLA-195) ("*Si bien el Comité concuerda con que la extralimitación en las facultades solo será manifiesta si se puede identificar con facilidad, considera que esto no significa que la extralimitación deba saltar a la vista en la primera lectura del Laudo. El razonamiento que subyace a un caso puede ser tan complejo que se requiere cierto grado de análisis y estudio para determinar con claridad exactamente qué decidió el tribunal. En tal caso, la necesidad de análisis y estudio no privarán a la extralimitación de su carácter de 'manifiesta'*").

[121] A juicio del Comité, la distinción que se acaba de ilustrar entre los dos análisis permite obviar el problema, destacado por la doctrina en la que se basa Venezuela, de que una redacción competente del laudo lo tornaría inmune de una anulación (P. PINSOLLE, *Manifest Excess of Power and Jurisdictional Review of ICSID Awards*, en *2 Transnational Dispute Management* (2005), pág. 8 (RLA-199)). Dado que para entender el razonamiento del tribunal puede recurrirse a un análisis profundizado, una redacción atenta y cuidadosa del laudo no podría ocultar una extralimitación manifiesta por parte de los árbitros.

[122] Véase *Pey Casado c. Chile* (Anulación I), ¶ 70 (RLA-201).

[123] Véase Documento de antecedentes, ¶ 87 (RLA-173).

[124] Véase ¶ 94 *supra*.

planteamiento sugerido por la República convertiría esta causal de anulación en una apelación[125].

119.    De entrada, el Comité nota que ambas Partes parecen coincidir en que los comités de anulación no pueden actuar como jueces de apelación, tal y como ha sido reconocido unánimemente en la jurisprudencia CIADI[126] y surge claramente del Artículo 53(1) del Convenio del CIADI. En concreto, esto significa que el Comité no puede pronunciarse sobre el carácter supuestamente incorrecto o injusto del Laudo, ni reemplazar la visión de los hechos y del derecho del Tribunal por la suya. Al contrario, el papel del Comité está limitado a evaluar la legitimidad e integridad del Arbitraje Subyacente con base en las causales de anulación previstas en el Artículo 52(1) del Convenio del CIADI que invoca la parte solicitante[127].

120.    En lo que hace específicamente a la causal en cuestión, el inciso (b) del Artículo 52(1) dispone que la extralimitación en las facultades de los árbitros debe ser manifiesta, lo que, como se ha dicho, eleva el umbral para anular un laudo. Si bien el Comité es consciente de que se ha considerado que las extralimitaciones en el ámbito jurisdiccional deben analizarse con más rigor[128], este Comité considera que, como ha destacado la jurisprudencia mayoritaria, no existe en el Artículo 52(1)(b) ni en otra disposición del Convenio del CIADI ningún indicio que apunte a que las cuestiones de jurisdicción deban ser abordadas diferentemente de otras cuestiones[129]. Por ende, como se ha indicado anteriormente, el Comité podría anular el Laudo solo si comprobara que el Tribunal se ha extralimitado en su jurisdicción de manera, al mismo tiempo, patente y grave.

121.    Con base en lo anterior, el Comité concluye que no le compete efectuar un análisis *de novo* de los hechos, las pruebas y el marco jurídico presentados en el Arbitraje Subyacente con relación a la jurisdicción del Tribunal[130]. Sin embargo, esto no significa que el Comité no pueda valorar esos elementos de ninguna forma, pues, de ser así, no podría ejercer su función de determinar si hubo una violación del Artículo 52(1)(b) del Convenio del CIADI. El Comité deberá entonces considerar el marco jurídico que determina la competencia del Tribunal (en este caso el Convenio del CIADI y el APPRI) y los elementos fácticos y probatorios relevantes que, a tal fin, formaban parte del expediente del Arbitraje Subyacente. Por lo tanto, sin reabrir el debate sobre cuestiones de hecho,

---

[125] Véase ¶ 102 *supra*.

[126] Para la jurisprudencia hasta el año 2016, véase el Documento de antecedentes, ¶ 74(3) (págs. 45-54) (RLA-173). Para casos más recientes, véanse *Capital Financial c. Camerún*, ¶ 116; *Tenaris c. Venezuela (II)*, ¶ 64 (CMTLA-1).

[127] Véanse, entre otros, *CDC c. Seychelles*, ¶ 34 (RLA-198); *M.C.I. c. Ecuador*, ¶ 24 (RLA-207); *Iberdrola c. Guatemala (I)*, ¶ 74 (RLA-223); *Dogan c. Turkmenistán*, ¶ 29 (RLA-246); *Micula c. Rumania*, ¶ 122 (RLA-235); *TECO c. Guatemala*, ¶ 73 (RLA-197).

[128] Véase P. PINSOLLE, *Manifest Excess of Power and Jurisdictional Review of ICSID Awards*, en *2 Transnational Dispute Management* (2005), págs. 9-10 (RLA-199). En *Venezuela Holdings* el comité afirmó que "*tiene cierta solidez*" el argumento según el cual el análisis de la extralimitación respecto a la jurisdicción requiere un enfoque más riguroso que otras cuestiones, sin embargo, no se pronunció sobre este aspecto (*Venezuela Holdings c. Venezuela*, ¶¶ 110-111 (RLA-218)).

[129] Véanse, entre otros, *Soufraki c. EAU*, ¶¶ 118-119 (RLA-205); *MTD c. Chile*, ¶ 54 (RLA-215); *Azurix c. Argentina*, ¶¶ 66-67 (RLA-208); *Lucchetti c. Perú*, ¶ 101 (RLA-206); *M.C.I. c. Ecuador*, ¶ 55 (RLA-207); *SAUR c. Argentina*, ¶ 173 (RLA-212); *Vivendi c. Argentina (II)*, ¶ 117 (RLA-247).

[130] *Azurix c. Argentina*, ¶ 68 (RLA-208); *Enron c. Argentina* (Anulación), ¶ 69 (RLA-216); *SGS c. Paraguay*, ¶ 114; *Total c. Argentina*, ¶ 242 (RLA-196); *OI European c. Venezuela*, ¶ 183 (CLA-267).

el Comité tendrá que establecer si la decisión del Tribunal de aceptar o rechazar la jurisdicción constituye una extralimitación manifiesta[131]. Todo ello, en el marco del análisis ilustrado en el ¶ 116 *supra*.

122. A este respecto cabe precisar que, en aquellos casos en los que la determinación de la jurisdicción del Tribunal sea una cuestión sobre la que se puede debatir o diferir, no le compete al Comité reemplazar su evaluación por la efectuada por el Tribunal, aun si no estuviera de acuerdo con ella[132]. De ser así, el Comité actuaría como juez de apelación ignorando el adverbio "*manifiestamente*".

### (2)   La no aplicación del derecho aplicable

123. La segunda forma de extralimitación de facultades, sobre cuyo alcance las Partes también discrepan, consiste en la no aplicación del derecho aplicable. Para la República, un laudo es anulable si el tribunal no aplica el derecho acordado por las partes o funda el laudo en un derecho distinto al derecho aplicable. Esto requiere que el comité determine si hubo una aplicación efectiva de las normas aplicables, no siendo suficiente una evaluación formal, ya que un error de derecho grave puede equivaler a una no aplicación del derecho aplicable[133]. En cambio, Valores y Consorcio niegan que exista un requisito de "*aplicación efectiva*" y sostienen que es suficiente que el tribunal haya realizado los esfuerzos necesarios para aplicar correctamente el derecho aplicable, pues su errónea aplicación no constituye causal de anulación[134].

124. De entrada, el Comité señala que, tal y como lo recuerdan las Demandadas en Anulación, durante la redacción del Convenio del CIADI se debatió la posibilidad de que un error de derecho, incluyendo la aplicación "*manifiestamente incorrecta de la ley*" constituyera una causal de anulación, pero esta propuesta fue expresamente excluida[135].

125. Así, la jurisprudencia de los comités de anulación ha sido unánime en afirmar que existe una distinción entre la no aplicación del derecho aplicable, que es una causal de anulación de los laudos, y su incorrecta o errónea aplicación (*error in judicando*), que no justifica la anulación, sujeto a los casos excepcionales contemplados en el ¶ 127 *infra*[136]. De hecho, la evaluación de la correcta aplicación del derecho aplicable es un papel típico de los jueces de apelación, mientras,

---

[131] *Duke c. Perú*, ¶ 99 (CLA-261); *SAUR c. Argentina*, ¶¶ 171-173 (RLA-212).

[132] *Azurix c. Argentina*, ¶ 67 (RLA-208); *Rumeli c. Kazajistán*, ¶ 96 (RLA-237); *Enron c. Argentina* (Anulación), ¶ 69 (RLA-216); *Duke c. Perú*, ¶ 99 (CLA-261); *SGS c. Paraguay*, ¶¶ 118-119.

[133] Véanse ¶¶ 95-96 *supra*.

[134] Véase ¶ 103 *supra*.

[135] Documento de antecedentes, ¶¶ 15, 21 (RLA-173); Centro Internacional de Arreglo de Diferencias Relativas a Inversiones, *History of the ICSID Convention*, Volumen II-1, 1968, pág. 518 (CLA-270); Centro Internacional de Arreglo de Diferencias Relativas a Inversiones, *History of the ICSID Convention*, Volumen IV, 1969, págs. 482, 485.

[136] Véanse, entre otros, *Amco c. Indonesia* (Anulación I), ¶ 23 (RLA-245); *MINE c. Guinea*, ¶ 5.04 (RLA-213); *OI European c. Venezuela*, ¶ 231 (CLA-267); *Tenaris c. Venezuela (II)*, ¶ 69 (CMTLA-1).

como se ha visto[137], el rol de los comités *ad hoc* bajo el Convenio del CIADI es más limitado[138].

126. Así las cosas, el Comité se ceñirá a determinar si el Tribunal aplicó el derecho acordado por las Partes según lo establecido en el Artículo 42(1) del Convenio del CIADI[139], pero no anulará el Laudo "*cuando más de una interpretación o enfoque para concluir cuál debería ser el derecho aplicable sea posible*"[140] o si, una vez identificado el derecho aplicable, tiene una opinión distinta acerca de su interpretación y aplicación[141].

127. Dicho esto, el Comité coincide con la jurisprudencia citada por la Demandante en Anulación, en que, en casos excepcionales, la aplicación errónea del derecho aplicable puede conllevar la anulación de un laudo si es de tal gravedad o magnitud que equivale a una no aplicación del derecho acordado por las partes[142]. Sin embargo, el umbral para que se dé una circunstancia de esta naturaleza es muy elevado, pues, de no ser así, se desdibujaría la distinción entre el proceso de anulación, previsto por el Convenio del CIADI, y un proceso de apelación, que está expresamente prohibido por el Artículo 53(1) del Convenio del CIADI[143].

**C.   El quebrantamiento grave de una norma fundamental de procedimiento (Artículo 52(1)(d) del Convenio del CIADI)**

128. Venezuela invoca el quebrantamiento grave de una norma fundamental de procedimiento conforme al Artículo 52(1)(d) del Convenio del CIADI en relación con la decisión del Tribunal sobre: (*i*) la jurisdicción respecto del reclamo por expropiación; (*ii*) el test de nacionalidad respecto a la cuarta objeción jurisdiccional; (*iii*) el tratamiento de la prueba con relación a la Comisión de Enlace; (*iv*) los daños; y (*v*) la atribución de costos.

**1.   Argumentos de Venezuela**

129. La Demandante en Anulación aduce que la causal de anulación prevista por el Artículo 52(1)(d) del Convenio del CIADI se da cuando se cumplen dos requisitos: (*i*) existe un quebrantamiento de una norma de procedimiento y (*ii*) ese quebrantamiento califica como grave. Además, si bien la

---

[137] Véase ¶ 119 *supra*.

[138] Documento de antecedentes, ¶ 90 (RLA-173). En particular, véanse, entre otros antecedentes, *Amco c. Indonesia* (Anulación I), ¶ 23 (RLA-245); *Soufraki c. EAU*, ¶ 85 (RLA-205); *Total c. Argentina*, ¶ 180 (RLA-196).

[139] El Artículo 42(1) del Convenio del CIADI prevé: "*El Tribunal decidirá la diferencia de acuerdo con las normas de derecho acordadas por las partes. A falta de acuerdo, el Tribunal aplicará la legislación del Estado que sea parte en la diferencia, incluyendo sus normas de derecho internacional privado, y aquellas normas de derecho internacional que pudieren ser aplicables*".

[140] *Total c. Argentina*, ¶ 184 (RLA-196).

[141] *TECO c. Guatemala*, ¶ 78 (RLA-197).

[142] *Amco c. Indonesia* (Anulación II), ¶¶ 7.19, 7.28 (RLA-220); *Soufraki c. EAU*, ¶ 86 (RLA-205); *AES c. Hungría*, ¶ 33 (RLA-192); *Libananco c. Turquía*, ¶ 97 (RLA-233); *Malicorp c. Egipto*, ¶ 49 (RLA-227); *Impregilo c. Argentina*, ¶ 132 (RLA-226); *Caratube c. Kazajistán*, ¶ 81 (RLA-202); *Iberdrola c. Guatemala (I)*, ¶ 97 (RLA-223); *Occidental c. Ecuador*, ¶ 56 (RLA-194); *Dogan c. Turkmenistán*, ¶¶ 105-108 (RLA-246); *Micula c. Rumania*, ¶ 130 (RLA-235); *Teinver c. Argentina*, ¶ 60. Ver también, Documento de antecedentes, ¶ 94 (RLA-173).

[143] *AES c. Hungría*, ¶ 33 (RLA-192); *Caratube c. Kazajistán*, ¶ 81 (RLA-202); *Occidental c. Ecuador*, ¶ 56 (RLA-194); *Micula c. Rumania*, ¶ 130 (RLA-235).

versión en castellano del Convenio del CIADI no lo indica, las versiones francesa e inglesa del Convenio requieren que la norma de procedimiento infringida sea "*fundamental*"; este requisito adicional ha sido adoptado por la jurisprudencia de los comités de anulación del CIADI[144].

130.   Según la República, los trabajos preparatorios del Convenio del CIADI sugieren que el adjetivo "*fundamental*" se refiere al carácter de las normas de procedimiento violadas. Además, la jurisprudencia del CIADI califica como normas fundamentales del proceso a los principios generales del derecho y a los estándares mínimos que deben respetarse en los procedimientos internacionales[145].

131.   Por otro lado, el requisito de la gravedad se relaciona con el quebrantamiento de una norma de procedimiento fundamental. Para Venezuela, la evaluación de la gravedad del quebrantamiento debe llevarse a cabo caso por caso, tal y como lo destaca la Secretaría General del CIADI en el Documento de antecedentes[146]. Ahora bien, el adjetivo "*grave*" no debe ser interpretado en el sentido de que la parte que solicita la anulación debe probar que el quebrantamiento ha conducido a un resultado distinto del que hubiera correspondido en ausencia del vicio, ni que fue decisivo en el resultado de la disputa, sino que es suficiente que se pruebe que el quebrantamiento tiene un "*potencial efecto material*" sobre el Laudo y que el resultado podría haber sido diferente[147].

132.   En su Réplica de Anulación, Venezuela destacó que este último aspecto es esencialmente el único desacuerdo entre las Partes acerca del estándar aplicable a esta causal de anulación. En concreto, la República alega que, al argumentar que el quebrantamiento debe tener un "*impacto material*" sobre el resultado del laudo, Valores y Consorcio tratan de restringir sumamente el alcance de la causal de anulación en cuestión. Para Venezuela, además de no desarrollar su argumentación y no citar autoridades legales, la lectura abogada por las Demandadas en Anulación obligaría al solicitante a efectuar un ejercicio especulativo, vaciando de contenido la causal de anulación bajo examen y privándola de *effet utile*[148].

133.   Venezuela añade que, en cualquier caso, incluso si el Comité considerara que el solicitante en anulación debe acreditar una afectación material del Laudo, este requisito habría sido cumplido en este caso pues es evidente que, si el Tribunal no hubiese infringido la normas de procedimiento fundamentales que quebrantó, sus conclusiones habrían sido distintas[149].

134.   Si resultan probados los requisitos antes analizados, los comités tienen la obligación de anular el laudo que quebranta gravemente una norma fundamental de procedimiento, sin gozar de

---

[144] MdA, ¶ 62.

[145] MdA, ¶¶ 63-66; Réplica de Anulación, ¶ 48; Tr. Día 1, 46:11-19.

[146] Documento de antecedentes, ¶ 99 (RLA-173).

[147] MdA, ¶¶ 67-73; Réplica de Anulación, ¶¶ 53-55; Tr. Día 1, 47:1-22, 51:4-15, citando *Continental Casualty c. Argentina*, ¶ 268 (RLA-230); *Pey Casado c. Chile* (Anulación I), ¶ 80 (RLA-201); *Malicorp c. Egipto*, ¶ 37 (RLA-227); *Kilic c. Turkmenistán*, ¶ 70 (RLA-228); *Occidental c. Ecuador*, ¶ 62 (RLA-194); *Tulip c. Turquía*, ¶ 78 (RLA-229); *TECO c. Guatemala*, ¶ 193 (RLA-197).

[148] Réplica de Anulación, ¶¶ 48-52. Véase también MdA, ¶ 71.

[149] Réplica de Anulación, ¶ 55.

discrecionalidad al respecto[150].

### 2.   Argumentos de Valores y Consorcio

135.   Valores y Consorcio coinciden con Venezuela en que esta causal de anulación requiere que los árbitros hayan quebrantado una norma fundamental de procedimiento y que el quebrantamiento haya sido grave. Tampoco cuestionan la interpretación de los conceptos de "*quebrantamiento*" y de "*norma fundamental*" que ofrece la República. No obstante, rechazan la descripción que hace Venezuela de lo que se entiende por quebrantamiento "*grave*"[151].

136.   Según Valores y Consorcio, no es suficiente que Venezuela pruebe que la violación de una norma fundamental de procedimiento por parte del Tribunal haya producido un impacto potencial sobre el Laudo, sino que se debe demostrar la existencia de un "*impacto material actual*"[152].

137.   Las Demandadas en Anulación alegan que no es su postura la que vacía de contenido al Artículo 52(1)(d) del Convenio del CIADI, sino la de Venezuela. Para ellas, el término "*grave*" significa "*de mucha entidad o importancia*", por lo que una violación de una norma de procedimiento alcanza el estándar de gravedad solo si tiene un "*impacto material actual*" en el Laudo. Como respaldo de esta tesis, Valores y Consorcio citan varias decisiones de comités *ad hoc,* entre ellas la del caso *OI European c. Venezuela*[153], en el que – afirman – la República planteó un argumento similar al del presente caso y este fue rechazado[154].

138.   Como conclusión, las Demandadas en Anulación afirman que Venezuela no ha probado el quebrantamiento de ninguna norma procedimental y, menos aún, un quebrantamiento grave que habría alterado el resultado plasmado en el Laudo[155].

### 3.   Análisis del Comité

139.   La segunda causal de anulación invocada por Venezuela está prevista por el Artículo 52(1)(d) del Convenio del CIADI, el cual establece:

> *(1) Cualquiera de las partes podrá solicitar la anulación del laudo mediante escrito dirigido al Secretario General fundado en una o más de las siguientes causas: […]*
>
> *(d) que hubiere quebrantamiento grave de una norma de procedimiento.*

140.   De entrada, el Comité observa que hay acuerdo entre las Partes en que esta causal de anulación requiere la demostración de dos requisitos: el quebrantamiento de una norma fundamental de procedimiento y la gravedad del quebrantamiento[156]. El Comité coincide con las Partes en este

---

[150] MdA, ¶ 74; Réplica de Anulación, ¶ 54; Tr. Día 1, 47:22-48:6.

[151] MdC de Anulación, ¶¶ 46-47; Dúplica de Anulación, ¶ 22.

[152] MdC de Anulación, ¶ 48; Dúplica de Anulación, ¶ 24; Tr. Día 1, 143:7-144:18.

[153] Dúplica de Anulación, ¶ 24; *OI European c. Venezuela*, ¶ 248 (CLA-267).

[154] MdC de Anulación, ¶ 48; Dúplica de Anulación, ¶¶ 23-25.

[155] Dúplica de Anulación, ¶ 26; Tr. Día 1, 144:18-145:1.

[156] Véanse ¶¶ 129, 135 *supra*.

punto[157].

141.    En cuanto al primer requisito, la República señala[158], sin que Valores y Consorcio lo cuestionen[159], que aunque en la versión en castellano del Convenio CIADI no aparece el término "*fundamental*", este adjetivo debe considerarse implícito, puesto que aparece en las versiones francesa e inglesa (que hablan respectivamente de "*règle fondamentale de procédure*" y "*fundamental rule of procedure*"). Dado que los tres textos del Convenio del CIADI son igualmente auténticos[160], el Comité está de acuerdo en que – a la luz del Artículo 33(4) de la Convención de Viena[161] – el adjetivo "*fundamental*" debe considerarse incorporado en la versión castellana del Convenio[162], dado el carácter excepcional del procedimiento de anulación.

142.    Las Partes también coinciden en la identificación de las normas fundamentales de procedimiento, que son los principios generales del derecho y los estándares mínimos de procedimiento que deben ser respetados en los procesos internacionales[163]. La jurisprudencia de los comités de anulación ha precisado que estas reglas fundamentales se relacionan con el debido proceso y la integridad de los procedimientos arbitrales, contándose entre ellas las siguientes: el trato equitativo de las partes, el derecho de cada parte a ser oída y a presentar sus demandas y defensas, la imparcialidad e independencia del tribunal, el correcto tratamiento de la evidencia y la correcta atribución de la carga de la prueba, y las deliberaciones entre los miembros del tribunal[164].

143.    La disputa entre las Partes se ciñe, por lo tanto, al requisito de la gravedad del quebrantamiento de la norma fundamental de procedimiento. Si bien no está debatido que el quebrantamiento depende de los hechos del caso concreto e impone al Comité examinar cómo el Tribunal condujo el Arbitraje Subyacente[165], las Partes discrepan sobre el significado del adjetivo "*grave*". Mientras Venezuela afirma que es suficiente que el quebrantamiento haya tenido un "*potencial efecto material*" sobre el Laudo[166], Valores y Consorcio sostienen que solo puede anularse el Laudo si el

---

[157] Véase Documento de antecedentes, ¶ 99 (RLA-173).

[158] MdA, ¶¶ 62-63.

[159] MdC de Anulación, ¶ 47.

[160] Luego del articulado, el Convenio del CIADI reza lo siguiente: "*HECHO en Washington, en los idiomas español, francés e inglés, cuyos tres textos son igualmente auténticos* […]".

[161] El Artículo 33(4) de la Convención de Viena prevé: "*Salvo en el caso en que prevalezca un texto determinado conforme a lo previsto en el párrafo 1, cuando la comparación de los textos auténticos revele una diferencia de sentido que no pueda resolverse con la aplicación de los artículos 31 y 39, se adoptará el sentido que mejor concilie esos textos, habida cuenta del objeto y fin del tratado*". Como dicho, en el caso del Convenio del CIADI, ninguno de los tres textos prevalece sobre los demás.

[162] En este sentido, véanse *Repsol c. Ecuador*, ¶ 81 (RLA-222); *Iberdrola c. Guatemala (I)*, ¶ 103 (RLA-223); *Venoklim c. Venezuela (I)*, ¶ 211 (RLA-217).

[163] Véanse ¶¶ 130, 135 *supra*.

[164] Documento de antecedentes, ¶ 99 (RLA-173). Véanse también, entre otros, *Pey Casado c. Chile* (Anulación I), ¶ 73 (RLA-201); *Total c. Argentina*, ¶¶ 309, 314 (RLA-196); *Venoklim c. Venezuela (I)*, ¶ 213 (RLA-217).

[165] Documento de antecedentes, ¶ 100 (RLA-173).

[166] Véanse ¶¶ 131-132 *supra*.

quebrantamiento tuvo un "*impacto material actual*" sobre el resultado de la controversia[167].

144.    El Comité empieza observando que la jurisprudencia está dividida al respecto. Algunos comités han requerido la prueba de un impacto *actual*[168]. Esta jurisprudencia suele basarse en la decisión de anulación del caso *Wena c. Egipto*, en la que se afirmó que el quebrantamiento de una norma fundamental de procedimiento "*must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed*"[169]. Sin embargo, el Comité nota que, tal y como fue resaltado en *Pey Casado c. Chile*[170], a pesar de esta afirmación, *Wena* aplicó el estándar del impacto *potencial*, pues concluyó que la parte que había solicitado la anulación no había probado "*the impact that this issue __may have had__ on the Award*"[171].

145.    El Comité considera que el planteamiento efectivamente adoptado en *Wena*, que valora la existencia de un efecto *potencial* sobre el laudo, es el correcto. De hecho, sería excesivo imponer a la parte que solicita la anulación de un laudo que demuestre que los árbitros habrían llegado a un resultado materialmente distinto en ausencia del alegado quebrantamiento. Aún más oneroso sería obligar a la parte solicitante a demostrar que, en dichas circunstancias, habría ganado el caso. Si este fuera el significado del adjetivo "*grave*", la parte solicitante debería desarrollar un razonamiento no solo contrafáctico, sino – dependiendo de la norma de procedimiento violada y del tipo de violación – potencialmente muy especulativo, hasta llegar a ser de casi imposible demostración[172].

146.    Por ejemplo, si hubiese un quebrantamiento meramente parcial del derecho de la parte solicitante a ser oída sobre un hecho o un argumento potencialmente relevante, a esta le sería excesivamente difícil demostrar con cierto grado de certidumbre cómo el respeto pleno de tal derecho habría podido influir en la deliberación entre los árbitros y en el consiguiente razonamiento cristalizado en el laudo (que no necesariamente recoge todas las dinámicas y los matices de la deliberación). Esta dificultad incluso podría tornarse en imposibilidad si el supuesto quebrantamiento incumbiera a un aspecto de la decisión para llegar al cual los árbitros tuvieron que considerar y ponderar múltiples elementos o factores, circunstancia que no es infrecuente en las disputas de inversión complejas.

147.    Esta dificultad ha sido expresada claramente por el comité en el caso *Tulip c. Turquía*, que dijo:

> To require an applicant to prove that the award would actually have been different, had the rule of procedure been observed, may impose an unrealistically high burden of proof. Where a complex

---

[167] Véanse ¶¶ 136-137 *supra*.

[168] Véanse, entre otros, *Impregilo c. Argentina*, ¶ 164 (RLA-226); *El Paso c. Argentina*, ¶ 269 (RLA-203); *Micula c. Rumania*, ¶ 134 (RLA-235).

[169] *Wena c. Egipto*, ¶ 58 (CLA-109), citado por *CDC c. Seychelles*, ¶ 49 (RLA-198); *Repsol c. Ecuador*, ¶ 81 (RLA-222); *Enron c. Argentina* (Anulación), ¶ 71 (RLA-216); *Azurix c. Argentina*, ¶ 51 (RLA-208); *Continental Casualty c. Argentina*, ¶ 96 (RLA-230); *Dogan c. Turkmenistán*, ¶ 208 (RLA-246); *SAUR c. Argentina*, ¶ 183 (RLA-212).

[170] *Pey Casado c. Chile* (Anulación I), ¶ 78 (RLA-201). Véanse también *TECO c. Guatemala*, ¶¶ 83-85 (RLA-197); *Vivendi c. Argentina (II)*, ¶ 129 (RLA-247); *CEAC c. Montenegro*, ¶ 93.

[171] *Wena c. Egipto*, ¶ 61 (CLA-109) (énfasis añadido).

[172] *Tulip c. Turquía*, ¶ 78 (RLA-229); *TECO c. Guatemala*, ¶ 85 (RLA-197); *Vivendi c. Argentina (II)*, ¶ 131 (RLA-247); *CEAC c. Montenegro*, ¶ 93; *Perenco c. Ecuador*, ¶ 133.

decision depends on a number of factors, it is almost impossible to prove with certainty whether the change of one parameter would have altered the outcome[173].

148.　La misma complejidad (o imposibilidad) de determinar el efecto concreto o el "*impacto material actual*"[174] sobre el laudo aplica si la norma fundamental de procedimiento violada no es el derecho a ser oído, como en el ejemplo anterior, sino cualquiera de las reglas indicadas en el ¶ 142 *supra*.

149.　Habiendo concluido que el término "*grave*" no requiere la demostración de que, en ausencia del alegado quebrantamiento, el tribunal hubiera llegado a un resultado materialmente distinto o que la parte solicitante hubiera ganado el caso, queda abierta la cuestión del significado de ese término.

150.　Preliminarmente, el Comité considera que, al igual que el adverbio "*manifiestamente*" del Artículo 52(1)(b) del Convenio del CIADI, también el adjetivo "*grave*" eleva el umbral para anular un laudo CIADI con base en el Artículo 52(1)(d)[175]. Esto sin perjuicio de que ese umbral no se eleva, como se ha dicho antes, hasta el deber de demostrar un impacto material actual sobre el resultado de la controversia.

151.　El Comité encuentra que el requisito de la gravedad tiene una doble implicación. Por un lado, requiere que la parte que solicita la anulación demuestre que la observancia de la regla quebrantada tenía el *potencial* de conducir al tribunal a un resultado sustancialmente distinto al que llegó en el laudo[176]. Por otro lado, el adjetivo "*grave*" indica que, para justificar la anulación de un laudo, el quebrantamiento no debe ser *de minimis* o, en otras palabras, debe ser sustancial. Esto significa, según jurisprudencia consolidada, que la parte que invoca el quebrantamiento debe demostrar que ha sido privada "*of the benefit or protection which the rule was intended to provide*"[177].

152.　Finalmente, la República sostiene que, una vez comprobado el quebrantamiento grave de una norma fundamental de procedimiento, el Comité no goza de discrecionalidad alguna, sino que está obligado a anular el Laudo[178]. Valores y Consorcio no parecen cuestionar este punto. El Comité coincide con la postura de Venezuela, sujeto a las consideraciones expuestas a continuación. A criterio del Comité, su discrecionalidad ya está englobada en la evaluación de los

---

[173] *Tulip c. Turquía*, ¶ 78 (RLA-229).

[174] Esta es la expresión utilizada por las Demandadas en Anulación (Dúplica de Anulación, ¶ 24).

[175] Véase ¶ 110 *supra*.

[176] *Pey Casado c. Chile* (Anulación I), ¶ 78 (RLA-201); *Caratube c. Kazajistán*, ¶ 99 (RLA-202); *Iberdrola c. Guatemala (I)*, ¶ 104 (RLA-223); *Tulip c. Turquía*, ¶ 78 (RLA-229); *TECO c. Guatemala*, ¶ 85 (RLA-197); *Vivendi c. Argentina (II)*, ¶¶ 129-131 (RLA-247); *Venoklim c. Venezuela (I)*, ¶ 212 (RLA-217); *CEAC c. Montenegro*, ¶ 93; *Eiser c. España*, ¶ 252; *Perenco c. Ecuador*, ¶ 133.

[177] Véanse, entre otros, *MINE c. Guinea*, ¶ 5.05 (RLA-213); *Wena c. Egipto*, ¶ 58 (CLA-109); *Enron c. Argentina* (Anulación), ¶ 71 (RLA-216); *Continental Casualty c. Argentina*, ¶ 96 (RLA-230); *Alapli c. Turquía*, ¶ 131 (RLA-231); *Daimler c. Argentina*, ¶ 263 (RLA-200); *Iberdrola c. Guatemala (I)*, ¶ 104 (RLA-223); *Tulip c. Turquía*, ¶ 78 (RLA-229); *Micula c. Rumania*, ¶ 132 (RLA-235); *TECO c. Guatemala*, ¶ 82 (RLA-197); *SAUR c. Argentina*, ¶ 183 (RLA-212); *Venoklim c. Venezuela (I)*, ¶ 212 (RLA-217); *OI European c. Venezuela*, ¶ 247 (CLA-267); *Perenco c. Ecuador*, ¶ 133.

[178] Véase ¶ 134 *supra*.

dos requisitos del carácter "*fundamental*" de la norma de procedimiento quebrantada y de que el quebrantamiento fue "*grave*" [179], según el significado atribuido a estos dos adjetivos en los párrafos anteriores[180]. Así las cosas, el Laudo deberá ser anulado al amparo del Artículo 52(1)(d) si el Comité determina que (*i*) el Tribunal violó una regla relacionada con el debido proceso y la integridad de los procedimientos arbitrales, y, además, que (*ii*) esa violación privó en concreto a Venezuela del beneficio que la norma violada estaba destinada a proteger y, (*iii*) que ello tuvo el *potencial* de conducir el Tribunal a un resultado sustancialmente distinto al que llegó en el Laudo.

### D.   LA FALTA DE EXPRESIÓN DE MOTIVOS (ARTÍCULO 52(1)(E) DEL CONVENIO DEL CIADI)

153.   Venezuela invoca la falta de expresión de motivos conforme al Artículo 52(1)(e) del Convenio del CIADI en relación con la decisión del Tribunal sobre: (*i*) el test de nacionalidad respecto a la cuarta objeción jurisdiccional, (*ii*) la condena relativa al Decreto No. 7.394, (*iii*) el tratamiento de la prueba en relación a la Comisión de Enlace, (*iv*) los daños y (*v*) la atribución de costos.

#### 1.   Argumentos de Venezuela

154.   Venezuela empieza su argumentación sobre la falta de expresión de motivos en el Laudo alegando que esta causal de anulación – contenida en el Artículo 52(1)(e) del Convenio del CIADI – no puede entenderse separadamente del Artículo 48(3) del mismo Convenio, que prevé: "*[e]l laudo contendrá declaración sobre todas las pretensiones sometidas por las partes al Tribunal y será motivado*". De una lectura combinada de estas normas se desprende que la motivación es un requisito esencial de los laudos CIADI y que los tribunales tienen la obligación de motivar sus decisiones. Así las cosas, la ausencia de motivación, que, para la República, consiste en la "*ausencia de 'un razonamiento coherente y adecuado'*", invalida el laudo[181].

155.   Según Venezuela, la *ratio* de las normas mencionadas es permitir a las partes comprender las decisiones de los tribunales, asegurando así su derecho de defensa y el debido proceso, y protegiéndolas de decisiones arbitrarias. Además, como observó el comité de anulación en *Tidewater c. Venezuela*[182], la necesidad de motivar los laudos es una condición necesaria de su validez a la que ni siquiera las partes pueden renunciar. Esto se debe a que el papel de los tribunales CIADI es determinar la licitud o ilicitud de actos de Estados soberanos y a que entre los potenciales lectores de sus laudos se encuentra la población del Estado demandado[183].

156.   La República sostiene que la obligación de expresar motivos incumbe a todas las secciones de los laudos, independientemente de si incumben a cuestiones de jurisdicción, fondo, daños o costos. Además, asevera que – contrariamente a lo que alegan las Demandadas en Anulación – es irrelevante el grado de importancia de la "*cuestión*" acerca de la cual el tribunal no ha expresado

---

[179] Véase ¶ 140 *supra*.

[180] Véanse *CDC c. Seychelles*, ¶ 49, nota al pie 71 (RLA-198); *Pey Casado c. Chile* (Anulación I), ¶¶ 79-80 (RLA-201); *Eiser c. España*, ¶ 254.

[181] MdA, ¶¶ 75-78.

[182] *Tidewater c. Venezuela*, ¶¶ 163-165 (RLA-232).

[183] MdA, ¶¶ 78-81; Tr. Día 1, 48:7-12; Tr. Día 2, 275:7-11.

los motivos. Esto se deprende del texto del Artículo 52(1)(e), que no restringe de ninguna forma la obligación de los árbitros de expresar motivos, pues – contrariamente a lo que ocurre con otras causales de anulación – no requiere que la falta de motivos sea ni "*grave*", ni "*manifiesta*". Esto significa que la interpretación restrictiva propuesta por Valores y Consorcio no puede prosperar y que los comités no tienen más opción que anular los laudos si estos carecen de motivación. En todo caso, Venezuela afirma que esta discusión no tiene relevancia práctica, dado que las instancias de falta de motivación invocadas en el presente procedimiento se relacionan con "*cuestiones*" sumamente centrales e importantes para la controversia bajo examen, que van desde la determinación de la jurisdicción y la violación del APPRI a los daños y costos del arbitraje[184].

157.     Venezuela también discrepa de lo sostenido por las Demandadas en Anulación en lo que se refiere a la extensión de la obligación de los árbitros de motivar sus decisiones. Para la República, esta obligación abarca todos los "*argumentos*" y las "*pretensiones*" de las partes, mientras que Valores y Consorcio no explican cuáles serían los argumentos sobre los que un tribunal debe indicar los motivos de su decisión y los que no necesitan motivación. Venezuela también sostiene que las Demandadas en Anulación descontextualizan la opinión del Profesor Schreuer, que solamente dice que los tribunales no están obligados a analizar los "*argumentos irrelevantes*"[185]. Ahora bien, en el presente caso, los argumentos sobre los que el Tribunal no expresó motivos son trascendentes para la resolución de la disputa. Además, como destacaron los comités de *TECO c. Guatemala* y *Vivendi c. Argentina (II)*[186], los árbitros también tienen el deber de analizar las pruebas aportadas que son relevantes (tanto desde un punto de vista objetivo como subjetivo) y de explicar el razonamiento que les llevó a concluir que las demás pruebas no lo son[187].

158.     Venezuela añade que, si bien se puede dar una falta completa de expresión de motivos, este es un escenario muy improbable. Por ende, si ese escenario fuera el único capaz de llevar a la anulación de un laudo CIADI, se privaría a esta causal de anulación de efecto útil, tal y como lo reconoció el comité de *Sempra c. Argentina*[188]. Por lo tanto, lo que debe probar la parte que solicita la anulación de un laudo es que el razonamiento, en algún punto esencial, (*i*) ha estado ausente, (*ii*) ha sido insuficiente o inadecuado, o (*iii*) ha sido contradictorio[189].

159.     En cuanto al razonamiento ausente, Venezuela sostiene que no es necesario probar una ausencia total del razonamiento[190].

160.     En lo que hace a las motivaciones insuficientes o inadecuadas, la República expone que son aquellas que no conducen lógicamente a la conclusión adoptada. Así, cuando no es posible

---

[184] MdA, ¶¶ 83-84; Réplica de Anulación, ¶¶ 57-60; Tr. Día 2, 270:2-271:9.

[185] Réplica de Anulación, ¶ 63, citando a C. SCHREUER, L. MALINTOPPI, A. REINISCH Y A. SINCLAIR, *The ICSID Convention: A Commentary*, 2da Ed., 2009, págs. 1018-1019, ¶ 419 (CLA-250).

[186] *TECO c. Guatemala*, ¶ 131 (RLA-197); *Vivendi c. Argentina (II)*, ¶ 163 (RLA-247).

[187] MdA, ¶ 82; Réplica de Anulación, ¶¶ 61-67; Tr. Día 1, 48:16-49:3, 51:16-21.

[188] *Sempra c. Argentina*, ¶ 167 (RLA-190).

[189] MdA, ¶¶ 86-88.

[190] MdA, ¶ 88.

entender la lógica que los árbitros adoptan para llegar de un punto A a un punto B (las premisas del razonamiento) y de allí al punto C (las conclusiones) se da un caso de ausencia de motivos tanto como si no se hubiera expresado ninguna razón. Esto significa que no es suficiente una mera expresión de los motivos por parte del tribunal, sino que es necesario que estos motivos estén expresados de manera coherente y adecuada. En concreto, para la República, el requisito de la adecuación debe entenderse en el sentido de que las razones proporcionadas deben ser "*argumentativamente adecuadas*", aunque no sean "*jurídicamente adecuadas*"[191].

161.   Por último, Venezuela describe como motivos contradictorios los que se encuentran en oposición entre sí y se cancelan mutuamente. Dado que en esas circunstancias no sería posible entender el razonamiento del tribunal, el supuesto de motivación contradictoria equivale a un caso de ausencia de motivos. En otras palabras, el Convenio del CIADI debe leerse en el sentido de que no es suficiente expresar cualquier fundamentación de las decisiones, sino que se requieren razonamientos congruentes. Tal y como razonó el comité en *Tidewater c. Venezuela*[192], a falta de congruencia, el razonamiento de los árbitros no es comprensible y esto, a su vez, equivale a una falta de expresión de motivos[193].

162.   En su Réplica de Anulación, Venezuela añadió que la postura de Valores y Consorcio – según las cuales sería suficiente que la motivación se pudiera "*seguir de la mano del tribunal y entender cómo éste llegó a su conclusión*" – es muy poco clara, pues no permite entender si lo que se critica es la necesidad de que las motivaciones sean adecuadas o de que no sean contradictorias. En todo caso, la República señala que la jurisprudencia y el Documento de antecedentes indican que tanto los razonamientos inadecuados como los contradictorios equivalen a una falta de expresión de motivos. Con base en esto y en la decisión de anulación del caso *Venoklim c. Venezuela (I)*[194], la República insiste en que no es posible validar laudos con motivaciones frívolas y tergiversadas o que contienen una "*antinomia de razonamientos*"[195].

163.   Finalmente, Venezuela señala que la mera mención de los elementos en debate no es suficiente para cumplir con el deber de motivación de los laudos, sino que se debe investigar si ha habido un uso efectivo y lógicamente consistente de esos elementos por parte del tribunal. No es tarea de los comités de anulación suplir la ausencia de motivos o los motivos expresados de manera contradictoria o insuficiente. Por consiguiente, en estas circunstancias, el Comité solo puede anular el Laudo[196].

### 2.   Argumentos de Valores y Consorcio

164.   Las Demandadas en Anulación califican la causal de anulación del Artículo 52(1)(e) del Convenio

---

[191] MdA, ¶¶ 92-99; Réplica de Anulación, ¶¶ 69, 72; Tr. Día 1, 49:4-21; Tr. Día 2, 271:4-275:21, citando, entre otros casos, *MINE c. Guinea*, ¶ 5.09 (RLA-213).

[192] *Tidewater c. Venezuela*, ¶ 195 (RLA-232).

[193] MdA, ¶¶ 89-91, 100; Tr. Día 1, 49:21-50:8, 51:16-52:4; Tr. Día 2, 271:4-275:21.

[194] *Venoklim c. Venezuela (I),* ¶ 225 (RLA-217).

[195] Réplica de Anulación, ¶¶ 68-70, 75-76.

[196] MdA, ¶¶ 101-103.

del CIADI como un "*estándar* [...] *alto*", que no permite a un comité cuestionar los razonamientos del tribunal, sino que impone al solicitante la carga de probar que el razonamiento "*estaba ausente, era incomprensible, contradictorio o frívolo*" en una "*cuestión que es esencial*"[197].

165.	Valores y Consorcio aceptan que la ausencia total de expresión de motivos es causa de anulación de un laudo CIADI y que la obligación de motivación aplica a todas las partes operativas de los laudos, incluyendo jurisdicción, fondo, daños y costos. Sin embargo, afirman que Venezuela se equivoca en tres aspectos[198].

166.	Primero, en cuanto al grado de importancia de las "*cuestiones*" no motivadas por los árbitros, los comités *ad hoc* han sido casi unánimes en afirmar que la cuestión no motivada debe ser "*necesaria*" y "*esencial para el resultado del* caso"[199].

167.	Segundo, las Demandadas en Anulación sostienen que es falso que la obligación de los tribunales de expresar motivos abarca tanto los argumentos como las pretensiones de las partes. En cambio, se debe distinguir entre las "*pretensiones*", cuyo tratamiento es obligatorio, y los "*argumentos*" desarrollados por las partes para respaldar sus pretensiones, sobre los que no existe obligación de motivar o comentar[200].

168.	Para sustentar esta tesis, Valores y Consorcio hacen referencia al Artículo 48(3) del Convenio del CIADI, que prevé que los laudos deben contener una declaración sobre "*todas las pretensiones sometidas por las partes*". El significado ordinario de "*pretensiones*" – término al que corresponden en las versiones inglesa y francesa del Convenio, respectivamente, "*question*" y "*chefs de conclusions*" – no es equiparable a todos los argumentos planteados por las partes. Esta postura ha sido adoptada también por varios comités y por el Profesor Schreuer[201]. Así las cosas, el Comité debería concluir que el Tribunal solo tenía la obligación de resolver cada una de las pretensiones de las Partes, y que esto es lo que hizo[202].

169.	Tercero, Valores y Consorcio rechazan el argumento de Venezuela según el cual la inadecuación de los motivos equivaldría a una falta de motivación. Según ellas, no les compete a los comités determinar si las razones expresadas por los árbitros son convincentes o correctas, sino que, en palabras del comité del caso *Quiborax c. Bolivia*, "*es suficiente que se pueda seguir de la mano del tribunal y cómo éste llegó a su conclusión, 'aunque cometiera un error de hecho o derecho'*"[203].

170.	En su Dúplica de Anulación, Valores y Consorcio añadieron que analizar si el razonamiento del tribunal es convincente o correcto permitiría la revisión de la sustancia de los laudos, en violación del Artículo 53 del Convenio del CIADI que establece que "[e]*l laudo* [...] *no podrá ser objeto de*

---

[197] MdC de Anulación, ¶ 49, citando *Total c. Argentina*, ¶ 269 (RLA-196).

[198] MdC de Anulación, ¶ 50; Tr. Día 2, 324:11-20.

[199] MdC de Anulación, ¶ 51.

[200] MdC de Anulación, ¶ 52; Dúplica de Anulación, ¶ 27; Tr. Día 1, 145:2-13.

[201] MdC de Anulación, ¶ 52; Dúplica de Anulación, ¶¶ 28-31, citando, entre otros, *Enron c. Argentina* (Anulación), ¶ 72 (RLA-216); *Iberdrola c. Guatemala (I)*, ¶ 114 (RLA-223); C. Schreuer, L. Malintoppi, A. Reinisch y A. Sinclair, *The ICSID Convention: A Commentary*, 2da Ed., 2009, pág. 1018, ¶ 419 (CLA-250).

[202] Dúplica de Anulación, ¶ 32; Tr. Día 2, 327:16-328:8.

[203] MdC de Anulación, ¶ 53, citando *Quiborax c. Bolivia*, ¶ 117 (CLA-252); Tr. Día 1, 146:1-11.

*apelación*". Así, la causal de anulación en cuestión sirve para asegurar que un lector razonablemente informado entienda el razonamiento del tribunal y, como reconoció el comité en *OI European c. Venezuela*, el objeto de revisión bajo este estándar es limitado y el umbral para la anulación, elevado[204]. Esto significa que Venezuela debe probar que (*i*) algún punto específico del Laudo carece de motivación y que (*ii*) esto no permite comprender la decisión del Tribunal[205].

171. De manera similar, en lo que concierne a los razonamientos contradictorios, la jurisprudencia de los comités de anulación ha destacado que estos constituyen circunstancias muy inusuales y que la carga de probar una contradicción, que corresponde al solicitante, es onerosa y consiste en demostrar que los motivos expresados por los árbitros se cancelan entre sí[206].

172. Las Demandadas en Anulación concluyen afirmando que la República ha incumplido con su carga de probar que el Laudo está inmotivado y que la falta de motivación atañe a un punto específico y esencial para la resolución del caso[207].

### 3.   Análisis del Comité

173. La tercera causal de anulación invocada por Venezuela está prevista en el Artículo 52(1)(e) del Convenio del CIADI, el cual establece:

> (1) Cualquiera de las partes podrá solicitar la anulación del laudo mediante escrito dirigido al Secretario General fundado en una o más de las siguientes causas: […]
>
> (e) que no se hubieren expresado en el laudo los motivos en que se funde.

#### a)   *La obligación de motivar los laudos:* **ratio** *y requisito mínimo*

174. Preliminarmente, el Comité coincide con las Partes en que la causal de anulación de la falta de motivación debe interpretarse conjuntamente con el Artículo 48(3) del Convenio del CIADI, el cual establece que un laudo CIADI debe contener una declaración "*sobre todas las pretensiones sometidas por las partes al Tribunal*" y debe ser "*motivado*"[208]. El Comité también está de acuerdo con las Partes en que la obligación de expresar motivos incumbe a todas las secciones de un laudo, a saber, tanto a cuestiones de jurisdicción y fondo como de daños y costos[209].

175. La *ratio* del requisito de la expresión de motivos es que las partes entiendan la decisión de los árbitros y sus premisas fácticas y jurídicas, así como su apreciación de la prueba, lo que constituye una garantía de transparencia e inteligibilidad para evitar decisiones arbitrarias[210]. La obligación de motivar los laudos es tan central en el sistema del CIADI que ni siquiera las partes pueden

---

[204] Dúplica de Anulación, ¶ 33; *OI European c. Venezuela*, ¶ 320 (CLA-267).

[205] Dúplica de Anulación, ¶¶ 33-34.

[206] Dúplica de Anulación, ¶ 35.

[207] MdC de Anulación, ¶ 54; Dúplica de Anulación, ¶ 36.

[208] Véanse ¶¶ 154, 168 *supra*. Véanse también *Wena c. Egipto*, ¶ 75 (CLA-109); *Fraport c. Filipinas (I)*, ¶ 249 (RLA-191).

[209] Véanse ¶¶ 156, 165 *supra*. Véase también *Tenaris c. Venezuela (II)*, ¶ 114 (CMTLA-1).

[210] Véanse, entre otros, *MINE c. Guinea*, ¶ 5.08 (RLA-213); *Wena c. Egipto*, ¶¶ 79, 81 (CLA-109); *Fraport c. Filipinas (I)*, ¶¶ 249-250 (RLA-191); *Tidewater c. Venezuela*, ¶ 163 (RLA-232).

renunciar a la misma[211]. Esto se debe a que, como destacó el comité en *Tidewater c. Venezuela*, las controversias sometidas a la jurisdicción del CIADI versan sobre actuaciones de los distintos poderes estatales (legislativo, ejecutivo y judicial) e implican una renuncia por parte de los Estados a sus prerrogativas soberanas a efectos de permitir que los árbitros determinen la legalidad o ilegalidad de sus actuaciones. Así las cosas, entender la decisión de los tribunales de arbitraje del CIADI es un interés de todos los que forman parte del Estado involucrado en la controversia, incluida su población[212].

176. Por esto, el Comité estima que, tal y como lo destaca la jurisprudencia, la obligación de motivar los laudos es un requisito mínimo ("*minimum requirement*", según la expresión inglesa que se suele utilizar). Esto significa que la función de los comités de anulación debe ceñirse a investigar si el laudo permite seguir el razonamiento del tribunal, que, partiendo de premisas fácticas y jurídicas, y pasando por eventuales puntos intermedios, llega a una conclusión[213]. Para llevar a cabo esta investigación, el Comité considera que es necesario adoptar la perspectiva de un lector informado, lo que significa que no es necesario para el tribunal detallar todos los argumentos planteados por las partes y contextualizar toda la prueba en la que se basa para su decisión[214].

177. Por lo tanto, no le compete al Comité considerar ni pronunciarse al respecto de si las motivaciones proporcionadas por el Tribunal son correctas o persuasivas ni si el razonamiento del Tribunal es superficial, deficiente o de otro modo incorrecto. De hacerlo, el Comité se estaría inmiscuyendo en el fondo de la controversia y actuaría como un juez de apelación, lo que está prohibido por el Artículo 53(1) del Convenio del CIADI[215]. Esto ha sido destacado esencialmente por todos los comités de anulación[216].

---

[211] Documento de antecedentes, ¶ 102 (RLA-173).

[212] *Tidewater c. Venezuela*, ¶¶ 164-165 (RLA-232).

[213] En un pasaje frecuentemente citado de la decisión de anulación en *MINE c. Guinea*, el comité dijo: "[…] *the requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies that, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (l)(e), because it almost inevitably draws an ad hoc Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention. A Committee might be tempted to annul an award because that examination disclosed a manifestly incorrect application of the law, which, however, is not a ground for annulment. In the Committee's view, the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons*" (*MINE c. Guinea*, ¶¶ 5.08-5.09 (RLA-213)).

[214] Véanse *Amco c. Indonesia* (Anulación II), ¶ 7.57 (RLA-220); *Impregilo c. Argentina*, ¶ 180 (RLA-226); *Tulip c. Turquía*, ¶ 98 (RLA-229); *SAUR c. Argentina*, ¶ 188 (RLA-212); *Tidewater c. Venezuela*, ¶ 172 (RLA-232); *Venoklim c. Venezuela (I)*, ¶ 224 (RLA-217); *OI European c. Venezuela*, ¶ 315 (CLA-267).

[215] Véanse ¶¶ 119, 122, 125, 127 *supra*.

[216] *MINE c. Guinea*, ¶ 5.08 (RLA-213); *Wena c. Egipto*, ¶ 79 (CLA-109); *Vivendi c. Argentina (I)*, ¶ 64 (RLA-204); *CDC c. Seychelles*, ¶¶ 70, 72 (RLA-198); *Azurix c. Argentina*, ¶ 53 (RLA-208); *Fraport c. Filipinas (I)*, ¶ 277 (RLA-191); *Duke c. Perú*, ¶ 162 (CLA-261); *Lemire c. Ucrania*, ¶ 278 (RLA-193); *Impregilo c. Argentina*, ¶ 181 (RLA-226); *SGS c. Paraguay*, ¶¶ 138, 142; *Alapli c. Turquía*, ¶¶ 197, 210 (RLA-231); *El Paso c. Argentina*, ¶ 217 (RLA-203); *Daimler c. Argentina*,

178. Teniendo en cuenta estas consideraciones, el Comité abordará a continuación los aspectos relativos a la interpretación del Artículo 52(1)(e) sobre los que las Partes discrepan.

> **b)** **El alcance de la obligación de motivación y la necesidad de que la falta de motivación incumba a una cuestión necesaria o esencial para el resultado del caso**

179. La primera discordancia entre las Partes concierne al alcance de la obligación de los árbitros de motivar el laudo. Venezuela alega que la obligación se extiende tanto a las "*pretensiones*" de las partes como a los "*argumentos*" que ellas realizaron ante el tribunal y sostiene que, a efecto de la anulación de un laudo, es irrelevante el grado de importancia de las "*cuestiones*" no motivadas[217]. Por su parte, las Demandadas en Anulación aseveran que los árbitros tienen el deber de pronunciarse solo sobre las "*pretensiones*", pero no sobre los "*argumentos*" que las respaldan, y que únicamente la falta de motivación sobre una "*cuestión*" necesaria y esencial para el resultado del caso puede justificar la anulación[218].

180. Para comenzar, el Comité hará algunas observaciones acerca de los términos empleados por las Partes ("*cuestiones*", "*argumentos*" y "*pretensiones*"). Aunque ninguno de estos aparece en el Artículo 52 del Convenio del CIADI, el Artículo 48 utiliza tanto "*cuestiones*", como "*pretensiones*". En concreto, el Artículo 48(1) establece que "[e]*l Tribunal decidirá todas las cuestiones por mayoría de votos de todos sus miembros*"[219], mientras el Artículo 48(3) prevé que "[e]*l laudo contendrá declaración sobre todas las pretensiones sometidas por las partes al Tribunal y será motivado*"[220]. En cambio, no aparece la palabra "*argumentos*".

181. Para atribuir un significado a estos términos, el Comité considera oportuno, sobre todo a la luz del Artículo 33(4) de la Convención de Viena[221], considerar las versiones inglesa y francesa del Convenio del CIADI. Mientras el texto inglés utiliza el término "*question*" tanto en el párrafo 1 como en el párrafo 3 del Artículo 48, el texto francés adopta, respectivamente, "*question*" y "*chefs de conclusions*". A juicio del Comité, una lectura conjunta de los textos oficiales del Convenio del CIADI apunta a que el término "*pretensiones*" se refiere a los reclamos planteados por las partes[222] y es distinto y más restringido que "*cuestiones*", pese a que la versión inglesa utiliza la misma palabra en los Artículos 48(1) y 48(3).

---

¶ 76 (RLA-200); *Kilic c. Turkmenistán*, ¶¶ 64, 137 (RLA-228); *Occidental c. Ecuador*, ¶¶ 64, 66 (RLA-194); *Tulip c. Turquía*, ¶¶ 102-104 (RLA-229); *Total c. Argentina*, ¶¶ 265-267, 271 (RLA-196); *EDF c. Argentina*, ¶¶ 195-196, 198 (RLA-195); *Micula c. Rumania*, ¶¶ 135-136 (RLA-235); *SAUR c. Argentina*, ¶ 190 (RLA-212); *Tidewater c. Venezuela*, ¶¶ 166-172 (RLA-232); *Vivendi c. Argentina (II)*, ¶ 154 (RLA-247); *Quiborax c. Bolivia*, ¶ 117 (CLA-252); *OI European c. Venezuela*, ¶ 321 (CLA-267); *Tenaris c. Venezuela (II)*, ¶ 110 (CMTLA-1).

[217] Véanse ¶¶ 156-157 *supra*.

[218] Véanse ¶¶ 166-168 *supra*.

[219] Énfasis añadido. El mismo término aparece también en la Regla de Arbitraje 47(1)(i): "*la decisión del Tribunal sobre cada cuestión que le haya sido sometida, junto con las razones en que funda su decisión*".

[220] Énfasis añadido.

[221] Véase la nota al pie 161 *supra*.

[222] *Daimler c. Argentina*, ¶ 87 (RLA-200).

182. Ahora bien, el Comité considera que la referencia a "*pretensiones*" en el Artículo 48(3) se une a la expresión "*contendrá declaración*", lo que significa que, en la parte dispositiva del laudo, los árbitros deben pronunciarse sobre todos los reclamos de las partes. En cambio, las palabras "*y será motivado*" en la última parte del Artículo 48(3) no se refieren a las pretensiones, sino a la necesidad para el tribunal de resolver – y, por ende, motivar – las cuestiones que surgen de los argumentos de las partes y que son los puntos lógicamente intermedios que conducen a una conclusión sobre la pretensión. Le compete al tribunal distinguir entre aquellas cuestiones relevantes e indispensables para poder decidir sobre las pretensiones de la partes y aquellas otras que son irrelevantes.

183. Tal y como han destacado de manera prácticamente unánime los comités de anulación, para que la falta de motivación pueda acarrear la anulación de un laudo, debe incumbir a una cuestión "*necesaria para la decisión del tribunal*"[223] o "*esencial para el resultado del caso*"[224]. En cambio, no se exige a los tribunales que aborden aquellas cuestiones que surgen de los argumentos de las partes que no son necesarias para llegar a la conclusión sobre una pretensión[225].

184. En opinión del Comité, esta conclusión no se ve afectada por el hecho, destacado por la República[226], de que el inciso (e) del Artículo 52(1) no prevé – contrariamente a lo que ocurre con los incisos (b) y (d) del mismo Artículo – que la falta de expresión de motivos haya ocurrido "*manifiestamente*" o que sea "*grave*". Si bien la presencia de términos calificadores de este tipo para las demás causales de anulación denota la voluntad de elevar el umbral para anular los laudos[227], este Comité considera que sería excesivo interpretar la ausencia de estos términos en el inciso (e) del Artículo 52(1) en el sentido de que cualquier falta de expresión de motivos traería aparejada la anulación del Laudo[228].

185. En resumidas cuentas, el Comité reitera que, para dar lugar a la anulación del Laudo, la alegada falta de motivación del Tribunal debe incumbir una cuestión que surja de los argumentos de las Partes y resulte necesaria o esencial para decidir sobre las pretensiones.

### c)    Las formas de falta de motivación

186. Otro punto sobre el que discrepan las Partes concierne a dos de las tipologías de falta de

---

[223] *Vivendi c. Argentina (I)*, ¶ 65 (RLA-204); *Lucchetti c. Perú*, ¶ 128 (RLA-206); *Azurix c. Argentina*, ¶ 55 (RLA-208); *Enron c. Argentina* (Anulación), ¶ 76 (RLA-216); *Pey Casado c. Chile* (Anulación I), ¶¶ 83-85 (RLA-201); *Libananco c. Turquía*, ¶ 192 (RLA-233); *Lemire c. Ucrania*, ¶ 279 (RLA-193); *Daimler c. Argentina*, ¶ 77 (RLA-200); *Standard Chartered c. Tanzania*, ¶¶ 606, 611 (CLA-254).

[224] *Pey Casado c. Chile* (Anulación I), ¶ 86 (RLA-201); *Alapli c. Turquía*, ¶ 202 (RLA-231); *Daimler c. Argentina*, ¶ 79 (RLA-200); *Dogan c. Turkmenistán*, ¶ 263 (RLA-246); *Micula c. Rumania*, ¶ 139 (RLA-235); *SAUR c. Argentina*, ¶ 189 (RLA-212); *OI European c. Venezuela*, ¶ 321 (CLA-267).

[225] *Vivendi c. Argentina (I)*, ¶ 87 (RLA-204); *Azurix c. Argentina*, ¶ 240 (RLA-208); *M.C.I. c. Ecuador*, ¶ 67 (RLA-207); *Enron c. Argentina* (Anulación), ¶ 72 (RLA-216); *Continental Casualty c. Argentina*, ¶¶ 98, 229 (RLA-230); *Occidental c. Ecuador*, ¶ 67 (RLA-194); *EDF c. Argentina*, ¶¶ 197-198 (RLA-195); *SAUR c. Argentina*, ¶ 191 (RLA-212).

[226] Véase ¶ 156 *supra*.

[227] Véanse ¶¶ 110, 150 *supra*.

[228] Véase también *Tenaris c. Venezuela (II)*, ¶ 112 (CMTLA-1).

motivación que pueden dar lugar a una anulación, a saber, la motivación insuficiente o inadecuada y la motivación contradictoria, mientras que no cuestionan el alcance de la ausencia completa de motivos. En concreto, en lo que hace a la motivación insuficiente o inadecuada, la República sostiene que las motivaciones ofrecidas por el Tribunal deben permitir entender la lógica de los árbitros y ser "*argumentativamente adecuadas*". En cuanto a la motivación contradictoria, para Venezuela esta hipótesis ocurre cuando las motivaciones se cancelan entre sí[229]. En cambio, Valores y Consorcio sostienen que la inadecuación de los motivos no equivale a una falta de motivación y que no le compete al Comité investigar si el razonamiento del Tribunal es correcto o convincente, pues de esta forma estaría actuando como juez de apelación. Afirman, asimismo, que las hipótesis de motivos contradictorios son muy inusuales y su carga probatoria es onerosa[230].

### (1)    Ausencia completa de motivación

187.    Venezuela alega que la falta completa de motivación conduciría a la anulación del Laudo y las Demandadas en Anulación lo aceptan. El Comité coincide con esta postura. Si bien la falta absoluta de motivos es una circunstancia improbable[231], como se ha indicado en la decisión de anulación del caso *Soufraki c. EAU*, ella podría dar lugar a anulación no solo si incumbiera a la totalidad de la decisión, sino también a una cuestión particular de la disputa que es necesaria o esencial[232].

### (2)    Motivaciones contradictorias

188.    También hay concierto entre las Partes en que los motivos contradictorios pueden dar lugar a la anulación del Laudo con base en el Artículo 52(1)(e). Sin embargo, parece haber discrepancia acerca de cuándo una contradicción conlleva anulación.

189.    A juicio del Comité, existen motivos contradictorios cuando los árbitros ofrecen motivaciones antinómicas para su decisión. Tal y como ha sido destacado por amplia jurisprudencia, no todas las instancias de contradicción conllevan la anulación del Laudo, sino que ello solo ocurriría cuando las motivaciones "*completely cancel each other out*"[233]. De hecho, en ese caso no le sería posible al lector entender por qué y cómo el Tribunal llegó a su conclusión, y esto equivale a una

---

[229] Véanse ¶¶ 158-162 *supra*.

[230] Véanse ¶¶ 169-171 *supra*.

[231] Véanse, entre otros, *Soufraki c. EAU*, ¶ 122 (RLA-205); *Tidewater c. Venezuela*, ¶ 169 (RLA-232).

[232] *Soufraki c. EAU*, ¶¶ 122, 126 (RLA-205).

[233] *Klöckner c. Camerún*, ¶ 116 (RLA-248); *Vivendi c. Argentina (I)*, ¶ 65 (RLA-204); *Consortium R.F.C.C. c. Marruecos*, ¶ 243; *Soufraki c. EAU*, ¶ 125 (RLA-205); *Azurix c. Argentina*, ¶ 364 (RLA-208); *Rumeli c. Kazajistán*, ¶ 82 (RLA-237); *Togo Electricité c. Togo*, ¶ 63; *Continental Casualty c. Argentina*, ¶ 103 (RLA-230); *Malicorp c. Egipto*, ¶ 119 (RLA-227); *Lemire c. Ucrania*, ¶ 279 (RLA-193); *Caratube c. Kazajistán*, ¶ 102 (RLA-202); *Alapli c. Turquía*, ¶ 200 (RLA-231); *El Paso c. Argentina*, ¶ 221 (RLA-203); *Daimler c. Argentina*, ¶ 77 (RLA-200); *Occidental c. Ecuador*, ¶ 65 (RLA-194); *Total c. Argentina*, ¶ 268 (RLA-196); *TECO c. Guatemala*, ¶¶ 90, 275 (RLA-197); *SAUR c. Argentina*, ¶¶ 192-193 (RLA-212); *Tidewater c. Venezuela*, ¶ 170 (RLA-232); *Standard Chartered c. Tanzania*, ¶ 610 (CLA-254). Ver también, más recientemente, *Perenco v. Ecuador*, donde el comité aclaró que existen motivos contradictorios "*when two (or more) contradictory premises supporting a conclusion cannot stand together and cannot both be true*".

falta de motivación. Sin embargo, cabe aclarar que, como para cualquier forma de falta de motivos, a fin de que la contradicción pueda conducir a la anulación del Laudo, esa debe atañer a una cuestión necesaria o esencial para resolver una pretensión[234]. Además, debe preferirse, en la medida de lo posible, una interpretación del Laudo que confirme la coherencia de los razonamientos del Tribunal, en lugar de una lectura que resalte sus incoherencias[235].

190. El Comité añade que, a efectos de identificar una contradicción en los términos antes ilustrados, es necesario analizar el Laudo en su totalidad, no siendo suficiente un análisis aislado de los motivos que la parte solicitante alega se cancelan entre sí[236]. Además, no puede soslayarse que, como ha destacado el comité en *Vivendi c. Argentina (I)*, las motivaciones pueden ser el resultado de "*compensar consideraciones conflictivas una con otras*"[237], que pueden originarse o bien de la necesidad de abordar distintos argumentos planteados por las partes, o bien de las posturas mantenidas por los miembros del tribunal en sus deliberaciones que, aunque estén alineadas sobre la necesidad de aceptar o rechazar un argumento, tienen matices distintos.

191. En particular, no puede dar lugar a anulación la contradicción entre la motivación principal y una motivación adicional (*obiter dictum*), puesto que estas están en diferentes niveles de razonamiento, lo que hace que se sumen entre sí, sin cancelarse recíprocamente. Esto ocurre cuando los árbitros, tras haber aceptado o rechazado una pretensión con base en un razonamiento, y aunque no sea indispensable a efectos de cumplir con la obligación de motivar un laudo al amparo del Artículo 48(3) del Convenio del CIADI, entablan un razonamiento adicional que llega a la misma conclusión que el razonamiento principal[238]. Un ejemplo emblemático son aquellos razonamientos que empiezan con expresiones tales como "incluso si", "aun si" o "a mayor abundamiento", que, aunque parecen contradecir el argumento principal, conducen a la misma conclusión, tomando generalmente como punto de partida una premisa fáctica o jurídica distinta de la que subyace al razonamiento principal[239].

### (3)   Motivaciones insuficientes o inadecuadas

192. La discrepancia más acentuada entre las Partes es si las motivaciones insuficientes o inadecuadas pueden dar lugar a anulación: Venezuela sostiene que sí, mientras Valores y Consorcio lo niegan.

---

[234] Véase ¶ 183 *supra*.

[235] *CDC c. Seychelles*, ¶ 81 (RLA-198); *TECO c. Guatemala*, ¶ 275 (RLA-197); *Hydro c. Albania*, ¶ 114.

[236] *Daimler c. Argentina*, ¶ 135 (RLA-200); *SAUR c. Argentina*, ¶ 216 (RLA-212).

[237] *Vivendi c. Argentina (I)*, ¶ 65 (RLA-204), citado, entre otros, por *MTD c. Chile*, ¶ 50 (RLA-215); *Azurix c. Argentina*, ¶¶ 55, 178 (RLA-208); *M.C.I. c. Ecuador*, ¶ 85 (RLA-207); *Rumeli c. Kazajistán*, ¶¶ 82, 137 (RLA-237); *Enron c. Argentina* (Anulación), ¶ 76 (RLA-216); *Fraport c. Filipinas (I)*, ¶ 274 (RLA-191); *Duke c. Perú*, ¶ 204 (CLA-261); *Continental Casualty c. Argentina*, ¶ 102 (RLA-230); *Pey Casado c. Chile* (Anulación I), ¶ 83 (RLA-201); *Malicorp c. Egipto*, ¶ 43 (RLA-227); *Alapli c. Turquía*, ¶ 200 (RLA-231); *Daimler c. Argentina*, ¶ 77 (RLA-200); *Iberdrola c. Guatemala (I)*, ¶ 122 (RLA-223); *Tulip c. Turquía*, ¶ 109 (RLA-229); *EDF c. Argentina*, ¶ 195 (RLA-195); *TECO c. Guatemala*, ¶ 90 (RLA-197); *SAUR c. Argentina*, ¶ 193 (RLA-212); *CEAC c. Montenegro*, ¶ 95; *Quiborax c. Bolivia*, ¶ 120 (CLA-252).

[238] *Daimler c. Argentina*, ¶ 135 (RLA-200), citado también en *Tulip c. Turquía*, ¶ 112 (RLA-229); *SAUR c. Argentina*, ¶ 216 (RLA-212).

[239] *Tulip c. Turquía*, ¶ 111 (RLA-229).

193.    La jurisprudencia está dividida sobre este punto. Algunos comités han sugerido que las motivaciones insuficientes o inadecuadas pueden conducir a una anulación[240]; otros adoptan la solución opuesta[241].

194.    El Comité estima necesario distinguir entre la insuficiencia y la inadecuación de la motivación. En el caso de motivos insuficientes – esto es cuando los motivos no permiten "*to bring about the solution*"[242] o justificar la conclusión de los árbitros "*desde el punto de vista lógico*"[243] – el Comité estima que se da una vulneración del requisito mínimo de motivación descrito en el ¶ 176 *supra*, lo que justifica la anulación con base en el Artículo 52(1)(e) si la insuficiencia de motivación incumbe a una cuestión necesaria o esencial para el caso.

195.    La situación es distinta en el caso de motivos inadecuados, es decir, aquellos que no son "*sufficiently pertinent*"[244] o que son "*inadequate to explain the result arrived at by the Tribunal*"[245] o "*frívolos, [...] incorrectos o poco convincentes*"[246]. El Comité está de acuerdo con la línea jurisprudencial que sostiene que a los comités no solo no les compete cuestionar la corrección y persuasión de las motivaciones del laudo (pues de ser así actuarían como juez de apelación)[247],

---

[240] Véanse *Klöckner c. Camerún*, ¶ 120 (RLA-248) ("*A middle and reasonable path is to be satisfied with reasons that are 'sufficiently relevant,' that is, reasonably capable of justifying the result reached by the Tribunal*"); *Amco c. Indonesia* (Anulación I), ¶¶ 41-43 (RLA-245) (que concuerda con *Klockner (I)*: "*there must be a reasonable connection between the bases invoked by a tribunal and the conclusions reached by it. The phrase 'sufficiently pertinent reasons' appears to this ad hoc Committee to be a simple and useful clarification of the term 'reasons' used in the Convention*"); *Soufraki c. EAU*, ¶¶ 123-124, 126 (RLA-205) (que describe los motivos insuficientes e inadecuados como "*insufficient to bring about the solution or inadequate to explain the result arrived at by the Tribunal*"); *TECO c. Guatemala*, ¶¶ 248-250 (RLA-197) (que describe los motivos insuficientes como "*insuficientes desde el punto de vista lógico para justificar la conclusión de dicho tribunal*" y aquellos inadecuados como "*frívolos, [...] incorrectos o poco convincentes*").

[241] *Amco c. Indonesia* (Anulación II), ¶ 7.55 (RLA-220) ("*The wording of Sub-paragraph (1)(e) of Article 52 does not permit an interpretation beyond the 'ordinary meaning' of the term used in the context and in the light of the object and purpose of the Convention. The Committee can find no justification for adding a further requirement that the reasons stated be 'sufficiently pertinent'. To add such a phrase would be to amend the clear and unambiguous text of Article 52(1)(e). The Committee has neither authority nor inclination to introduce any amendment to or modification of the provisions of the Convention. Furthermore, the Committee must resist the temptation of arrogating to itself the power to review or to correct the decision of the Second Tribunal. To require the sufficiency of pertinent reasons, as distinguished from their mere existence, is to provide an Ad Hoc Committee with an unwarranted opportunity to act as a Court of Appeal. This the Committee will not do*"); *El Paso c. Argentina*, ¶ 235 (RLA-203) ("*El Comité [...] [n]o tiene facultades para valorar si esos motivos fueron insuficientes o inadecuados ya que la causal expresada en el Artículo 52[(1)](e) del Convenio CIADI es la falta de expresión de motivos, no si estos fueron inadecuados o insuficientes*"); *Dogan c. Turkmenistán*, ¶ 263 (RLA-246) (que cita *El Paso*: "*The Committee [...] further considers that the 'sufficiency and adequacy' of reasons is not what is required under Article 52(1)(e); as held by another* ad hoc *committee, the ground 'is the failure to state reasons, not if these were inadequate or insufficient'*").

[242] *Soufraki c. EAU*, ¶ 126 (RLA-205).

[243] *TECO c. Guatemala*, ¶ 249 (RLA-197).

[244] *Amco c. Indonesia* (Anulación I), ¶ 43 (RLA-245).

[245] *Soufraki c. EAU*, ¶ 126 (RLA-205).

[246] *TECO c. Guatemala*, ¶ 250 (RLA-197).

[247] Véase ¶ 177 *supra*.

sino que ni siquiera les compete valorar la calidad y la adecuación de los motivos expresados por el tribunal[248]. En efecto, a falta de indicaciones en el Convenio del CIADI – y, en particular, en sus Artículos 48 y 52 – acerca de cómo se deben expresar los motivos en los laudos, los árbitros tienen discrecionalidad sobre este aspecto. Por lo tanto, una vez que hayan cumplido con el requisito mínimo de motivación descrito en el ¶ 176 *supra*, los árbitros pueden expresar sus motivos de manera más o menos exhaustiva, con o sin referencias a precedentes jurisprudenciales[249]. En palabras del comité de anulación del caso *Tenaris c. Venezuela (II)*, "[e]*fforts to move the exercise further by labelling reasons as 'frivolous' or 'inadequate' will inevitably cross the border to the scrutiny of the quality of the award and thereby to an appeal award*"[250].

196.   Así las cosas, este Comité concluye que solo puede declarar una falta de motivación bajo el Artículo 52(1)(e) en caso de que el lector informado no pueda seguir la lógica del razonamiento del Tribunal porque no se ha cumplido la obligación de alcanzar el requisito mínimo de motivación (motivación insuficiente). En cambio, el Comité no está facultado para considerar ni para pronunciarse sobre la pertinencia, la adecuación o la convicción de los motivos ofrecidos por el Tribunal (motivación inadecuada).

## VI.   ANÁLISIS DE LOS VICIOS DEL LAUDO ALEGADOS POR LA DEMANDANTE EN ANULACIÓN

197.   Habiendo aclarado lo que considera como el correcto alcance de las tres causales de anulación en las que se basa la solicitud de Venezuela, el Comité pasará a analizar si alguna de ellas se configura en relación con los siete vicios que la República atribuye al Laudo.

### A.   Sobre la decisión acerca de la violación del estándar de TJE en relación con la Providencia Administrativa

198.   En el Laudo, el Tribunal decidió que una de las medidas que resultaron violatorias del Artículo IV del APPRI relativo al TJE fue la Providencia Administrativa adoptada por Venezuela en 2013[251]. La primera impugnación de la República consiste en que el Tribunal incurrió en una extralimitación manifiesta de facultades al pronunciarse *ultra petita* por haber incluido esa medida entre las medidas contrarias al TJE.

### 1.   Argumentos de Venezuela

199.   La República sostiene que el Tribunal incurrió en una extralimitación manifiesta de sus facultades al decidir *ultra petita* que la adopción de la Providencia Administrativa violaba el estándar del TJE, ya que (*i*) tal medida no había sido invocada por Valores y Consorcio en el marco del reclamo por

---

[248] *Impregilo c. Argentina*, ¶ 181 (RLA-226); *Kilic c. Turkmenistán*, ¶ 134 (RLA-228); *Tulip c. Turquía*, ¶ 104 (RLA-229); *SAUR c. Argentina*, ¶ 190 (RLA-212); *Tidewater c. Venezuela*, ¶ 168 (RLA-232); *Vivendi c. Argentina (II)*, ¶ 154 (RLA-247).

[249] *Vivendi c. Argentina (I)*, ¶ 64 (RLA-204); *Kilic c. Turkmenistán*, ¶ 137 (RLA-228); *Tulip c. Turquía*, ¶ 103 (RLA-229); *Tidewater c. Venezuela*, ¶ 168 (RLA-232).

[250] *Tenaris c. Venezuela (II)*, ¶ 113 (CMTLA-1).

[251] Laudo, § V.B.3; véanse ¶¶ 56, 76 *supra*.

TJE y (*ii*) el mismo Tribunal había aclarado que solo asumiría jurisdicción sobre el reclamo por expropiación vinculado a la Providencia Administrativa[252].

200.    Con respecto al punto (*i*), Venezuela afirma que Valores y Consorcio nunca plantearon que la Providencia Administrativa fuera una medida violatoria del TJE, sino que solo la invocaron en su reclamo por expropiación aduciendo que era la última medida que había tenido por efecto privarles del control de sus inversiones. Para sustentar su afirmación, la República enumera las medidas que fueron incluidas como violatorias del TJE en los escritos de las Demandadas en Anulación en el Arbitraje Subyacente y explica que entre aquellas no figuraba la Providencia[253].

201.    La República también alega que, no obstante lo anterior, tras concluir que la Providencia Administrativa no violaba el estándar de expropiación, el Tribunal en los ¶¶ 447 y 448 del Laudo "*retomó el análisis de dicha medida* [a saber, la Providencia] *al tratar el estándar de trato justo y equitativo*"[254]. En efecto, al abordar el reclamo por TJE, en el ¶ 587 del Laudo el Tribunal determinó que las medidas de aseguramiento y administración de la República, entre las que se encontraba la Providencia Administrativa, habían violado ese estándar. Según la República, el Tribunal "[a]*l proceder de esta manera* […] *incurrió en una extralimitación*", "*modificando* […] *el reclamo presentado por las Demandadas en Anulación*", pues ellas no habían presentado un reclamo por TJE en relación con la Providencia[255].

202.    Venezuela rechaza el argumento de Valores y Consorcio de que el Tribunal incluyó la Providencia Administrativa dentro de las medidas de aseguramiento y administración especial a la hora de analizar el reclamo por violación del TJE. Para la República, los pasajes del Laudo citados por las Demandadas en Anulación solo se refieren a las medidas de aseguramiento y de administración especial de manera genérica; además, cuando el Tribunal analizó el reclamo por expropiación, aludió en forma separada a las medidas de aseguramiento y administración especial y a la Providencia[256].

203.    Con base en la decisión de rectificación de *Enron c. Argentina*[257] – que falló que hay exceso de poder no solo cuando un tribunal no decide un asunto debidamente presentado y peticionado, sino también cuando decide un asunto no solicitado – la Demandante en Anulación concluye que

---

[252] MdA, ¶ 118; Réplica de Anulación, ¶ 79; Tr. Día 1, 58:1-6. El Comité nota que la posición de la República no es del todo clara: mientras en el MdA (¶ 118) la fundamentación consistía en que el Tribunal había decidido algo que no había sido reclamado por Valores y Consorcio, en la Réplica de Anulación (¶¶ 79-81) Venezuela parecería restarle importancia a esto último para sostener que lo verdaderamente relevante era que el Tribunal había excedido el ámbito de jurisdicción que él mismo había delimitado; sin embargo, durante la Audiencia de Anulación retornó al primer argumento (Tr. Día 1, 58:1-6). El Comité observa que, a menudo, Venezuela mezcla ambas cuestiones, por lo que se hace difícil la comprensión de su postura. En los párrafos siguientes, el Comité intentará reflejar lo mejor posible los argumentos de la República.

[253] MdA, ¶¶ 112-115; Réplica de Anulación, ¶¶ 82-84; Tr. Día 1, 56:6-57:22.

[254] Réplica de Anulación, ¶ 94.

[255] MdA, ¶¶ 116-117 (el Comité resalta que, en el ¶ 116 del MdA, Venezuela cita el ¶ 587 del Laudo, pero se equivoca en la referencia de la nota al pie 136, ya que allí se consigna el ¶ 240 del Laudo); Réplica de Anulación, ¶¶ 89, 95.

[256] Réplica de Anulación, ¶¶ 90-92; Tr. Día 1, 59:6-17.

[257] *Enron c. Argentina* (Rectificación), ¶ 42 (RLA-239). Venezuela se apoya también en *Occidental c. Ecuador*, ¶ 50 (RLA-194) y *Wena c. Egipto*, ¶ 25 (CLA-109).

la decisión del Tribunal constituye una extralimitación manifiesta de facultades[258].

204. Con respecto al punto (*ii*), la República asevera que hubo extralimitación también porque el Tribunal la condenó por la adopción de la Providencia bajo el TJE "*no obstante haber concluido que asumiría jurisdicción en relación con la Providencia Administrativa bajo el reclamo por expropiación, no el de trato justo y equitativo*"[259].

205. La República explica que, cuando el Tribunal analizó la segunda objeción jurisdiccional[260], "*reconoció que la Providencia Administrativa estaba vinculada al reclamo por expropiación*" y, al dar su conclusión al respecto en el ¶ 243 del Laudo, confirmó que trataría la Providencia solo bajo el estándar de expropiación. Asimismo, Valores y Consorcio citan el ¶ 241 del Laudo de manera equivocada, porque cuando el Tribunal concluyó allí que el Decreto No. 7.394 y la Providencia Administrativa formaban parte de la misma controversia no estaba analizando el estándar de TJE, sino la segunda objeción sobre jurisdicción, que se refiere solamente al reclamo por expropiación. A juicio de Venezuela, en todo momento el Tribunal relacionó la Providencia con la expropiación y no con el TJE; es más, solo la mencionó al resumir la postura de Valores y Consorcio sobre el reclamo por expropiación, pero no sobre el de TJE en los ¶¶ 481 a 500 del Laudo[261].

206. Contraponiéndose a Valores y Consorcio, la República sostiene que el principio de *non ultra petita* puede referirse tanto a argumentos como a pretensiones, aunque señala que esto carece de relevancia en el presente caso, ya que no hay duda de que es "*una pretensión lo que está en juego aquí*". Para ella, "*el Tribunal determinó tener jurisdicción sobre cierto reclamo y luego, excediéndose en los límites establecidos, decidió sobre otro distinto*"[262].

207. Por último, Venezuela afirma que la extralimitación es manifiesta. Contrastando la postura de las Demandadas en Anulación, y apoyándose en la decisión del comité en *Occidental c. Ecuador*[263] y la posición de Philippe Pinsolle[264], la República explica que una extralimitación puede ser manifiesta aunque su demostración requiera una argumentación y un análisis extensos. Asimismo, señala que la extralimitación es grave porque impactó en la determinación del monto de la compensación, ya que el Tribunal tomó como fecha de valuación para el cómputo de los daños de Valores y Consorcio la fecha de promulgación de la Providencia Administrativa[265].

### 2.    Argumentos de Valores y Consorcio

208. Las Demandadas en Anulación niegan que el Tribunal se haya extralimitado manifiestamente en sus facultades al decidir que la Providencia Administrativa constituía una medida violatoria del

---

[258] MdA, ¶¶ 116-122.

[259] Réplica de Anulación, ¶ 89.

[260] Véanse ¶¶ 67-69 *supra*.

[261] MdA, ¶¶ 110-111; Réplica de Anulación, ¶¶ 79-80, 83-85, 95; Tr. Día 1, 55:12-22.

[262] Réplica de Anulación, ¶¶ 80, 86-89.

[263] *Occidental c. Ecuador*, ¶¶ 57-59 (RLA-194).

[264] P. Pinsolle, *Manifest Excess of Power and Jurisdictional Review of ICSID Awards*, en *2 Transnational Dispute Management* (2005), pág. 8 (RLA-199).

[265] Réplica de Anulación, ¶¶ 97-99.

TJE, dado que esta decisión no fue *ultra petita*. Según ellas, Venezuela recurre a premisas falsas para fundar su posición y lo que en realidad pretende es introducir una objeción jurisdiccional relativa al TJE que no fue presentada en el Arbitraje Subyacente[266].

209.   En primer lugar, Valores y Consorcio afirman que – tal como surge del resumen de su posición sobre el reclamo por violación del TJE en los ¶¶ 489, 492 y 493 del Laudo – en el Arbitraje Subyacente ellas alegaron que las medidas de aseguramiento y administración especial impuestas sobre Monaca y Demaseca[267] violaban el TJE, y que una de esas medidas era, precisamente, la Providencia Administrativa[268].

210.   Valores y Consorcio explican que el Tribunal entendió que la Providencia era una de las medidas de administración especial – a saber, la última – y así lo consignó al describir la génesis y secuencia de aquellas medidas en los ¶¶ 91, 92, 97, y – sobre todo – 241 del Laudo. Incluso la misma Venezuela lo reconoció en el Arbitraje Subyacente cuando afirmó que la Providencia "*no ha*[bía] *cambiado en nada la situación* […] *en cuanto al régimen de administración especial que se v*[enía] *llevando* [a cabo] *desde fines del año 2009*"[269].

211.   Por lo tanto, para Valores y Consorcio, cuando en el ¶ 587 del Laudo el Tribunal determinó que las medidas de aseguramiento y administración especial violaban el TJE, incluyó también la Providencia Administrativa, tal como lo habían peticionado y argumentado ellas. De esto se desprende que el Tribunal no decidió *ultra petita* ni modificó el reclamo en el ¶ 447 del Laudo, como sugiere Venezuela. En todo caso, Valores y Consorcio aducen que la decisión del Tribunal tampoco sería *ultra petita*, ya que este principio solo aplica a las pretensiones y no a los argumentos de las Partes[270].

212.   En segundo lugar, Valores y Consorcio niegan que el Tribunal haya analizado la Providencia Administrativa exclusivamente con relación al reclamo por expropiación, como afirma la República. Al tratar el reclamo de TJE, el Tribunal analizó detalladamente todas las medidas de Venezuela invocadas como violatorias del TJE; esas incluyeron las medidas de aseguramiento y administración especial, entre las cuales se encontraba la Providencia. Con base en lo anterior, Valores y Consorcio sostienen que la República tergiversa el Laudo cuando afirma que el Tribunal no hizo referencia a la Providencia al tratar el reclamo por TJE, pues esta referencia estaba englobada en la mención de las medidas de administración especial[271].

213.   En tercer lugar, Valores y Consorcio advierten que, ante la evidencia de que el Tribunal decidió la reclamación tal como fue planteada por ellas, en la Réplica de Anulación Venezuela cambia su argumento original y sostiene que el Tribunal, al "*asumir jurisdicción* […] *explicitó que tenía jurisdicción para* entender *el reclamo vinculado a la Providencia Administrativa bajo una expropiación indirecta omitiendo cualquier referencia a esta medida con relación con los demás*

---

[266] MdC de Anulación, ¶ 57; Tr. Día 1, 161:4-162:9.

[267] Véase ¶ 56 *supra*.

[268] MdC de Anulación, ¶¶ 57-58.

[269] MdC de Anulación, ¶¶ 59-62; Dúplica de Anulación, ¶¶ 49-52.

[270] MdC de Anulación, ¶ 64, nota al pie 92; Dúplica de Anulación, ¶¶ 53-55.

[271] MdC de Anulación, ¶¶ 65-66, 73.

*estándares*"[272]. Las Demandadas en Anulación señalan que el nuevo argumento fracasa por los siguientes motivos.

214.    Primero, Venezuela nunca objetó específicamente la jurisdicción del Tribunal para resolver la disputa sobre la violación del estándar del TJE. La República planteó cuatro objeciones jurisdiccionales que fueron decididas por el Tribunal; la segunda de ellas[273], referida exclusivamente al reclamo por expropiación, consistió en que Valores y Consorcio no habían perfeccionado el consentimiento al arbitraje, puesto que la Providencia Administrativa – medida que según ellas completaba el *iter* expropiatorio – había sido publicada después de que Venezuela hubiera denunciado el Convenio el CIADI. Dado que esta objeción solo se refirió al reclamo por expropiación, el Tribunal "*no podría haber resuelto una objeción jurisdiccional relativa al reclamo de* [TJE] *que la República nunca planteó*"[274].

215.    Segundo, el nuevo argumento tergiversa el Laudo, ya que, al decidir la segunda objeción jurisdiccional, el Tribunal nunca dijo que solamente tenía jurisdicción para entender el reclamo vinculado a la Providencia Administrativa bajo una expropiación indirecta. El Tribunal consideró que, pese a que la Providencia era posterior a la denuncia del Convenio del CIADI, esta formaba parte de la misma controversia derivada de la adopción de las medidas de aseguramiento y administración especial sobre Monaca y Demaseca, y del Decreto No. 7.394, por lo que "*concluyó que tenía 'jurisdicción para conocer sobre el reclamo de expropiación en los términos planteados por [Valores y Consorcio] en este arbitraje'*"[275].

216.    Así, la referencia del Tribunal a la Providencia Administrativa simplemente correspondió a la objeción específica planteada por Venezuela y no implicó que el Tribunal hubiera limitado su jurisdicción sobre la disputa que incluía tal Providencia al reclamo de expropiación. Además, las Demandadas en Anulación destacan que, al rechazar las otras tres objeciones a la jurisdicción – que abarcaban todas las pretensiones de Valores y Consorcio, y no solo la expropiación – el Tribunal necesariamente asumió jurisdicción sobre esas pretensiones, las cuales se sustentaban en las mismas medidas ilícitas de la República (incluida la Providencia) que habían servido de base al reclamo por expropiación[276].

217.    Por otra parte, Valores y Consorcio señalan que, incluso si el Tribunal hubiera incurrido en una extralimitación de facultades, esta no sería manifiesta, pues requeriría un análisis detallado del Laudo y de los argumentos y escritos de las Partes en el Arbitraje Subyacente; sin embargo, este no es un análisis que le corresponda hacer a un comité de anulación. Asimismo, la extralimitación tampoco sería manifiesta "*porque no tendría consecuencias graves sobre el resultado del Laudo*", ya que (*i*) el Tribunal consideró que el TJE había sido violado no solo por las medidas de administración especial, sino también por la forma en que la República ejecutó el Decreto No. 7.394, y (*ii*) es "*pura especulación*" que el monto de la indemnización hubiera sido impactado de

---

[272] Dúplica de Anulación, ¶ 39.

[273] Véanse ¶¶ 67-68 *supra*.

[274] Dúplica de Anulación, ¶¶ 40-41.

[275] Dúplica de Anulación, ¶¶ 42-47.

[276] Dúplica de Anulación, ¶ 48.

manera sustancial por una fecha de valuación distinta y, en todo caso, la República nunca sugirió una fecha de valuación alternativa[277].

### 3.  Análisis del Comité

218.  La primera causal de anulación tiene por objeto la decisión del Tribunal de considerar que la adopción de la Providencia Administrativa por parte de Venezuela violó el Artículo IV del Tratado referido al TJE. Según la República, el Tribunal tomó esta decisión de manera *ultra petita*, extralimitándose manifiestamente en sus facultades en los términos del Artículo 52(1)(b) del Convenio CIADI, puesto que, por un lado, Valores y Consorcio no se habían quejado respecto a la Providencia en relación con el TJE y, por el otro, el Tribunal había afirmado que solo trataría la Providencia en relación con el reclamo por expropiación. Venezuela plantea ambos argumentos como independientes, ya que ha aclarado que, para decidir su segundo cuestionamiento, es irrelevante determinar si las Demandadas en Anulación incluyeron la Providencia como una medida violatoria del TJE.

219.  Por su parte, Valores y Consorcio controvierten que la decisión del Tribunal haya sido *ultra petita* y sostienen que ambas premisas del razonamiento de Venezuela son falsas, ya que ellas sí invocaron la adopción de la Providencia como una de las medidas violatorias del TJE, en particular, dentro de las medidas de administración especial impuestas a las Compañías y, por otra parte, el Tribunal nunca dijo que trataría la Providencia exclusivamente en relación con el reclamo por expropiación.

220.  Vistos los argumentos y defensas principales de las Partes, el Comité debe determinar preliminarmente si las premisas en las que se basa Venezuela son verdaderas. Para ello, ambos cuestionamientos serán tratados de manera separada.

### a)  *¿Se quejaron las Demandadas en Anulación de la Providencia Administrativa con respecto al TJE?*

221.  A los fines de resolver el primer cuestionamiento de la República, el Comité tiene que indagar si la decisión del Tribunal de incluir la Providencia dentro de las medidas violatorias del TJE – presupuesto en el que ambas Partes coinciden[278] – fue tomada en respuesta a una petición de Valores y Consorcio, como ellas afirman, o *sua sponte*, como sostiene la República. Dado que, según las Demandadas en Anulación, su reclamo por TJE incluyó la Providencia en cuanto esta era una de las medidas de administración especial adoptadas por Venezuela, el Comité verificará cuál fue el reclamo por TJE de Valores y Consorcio en el Arbitraje Subyacente.

222.  El Comité nota que las medidas consideradas ilícitas por Valores y Consorcio fueron detalladas en la § II.C de su Memorial de Demanda titulada "*Los actos ilícitos de la República*". En la § II.C.4[279], las Demandadas en Anulación identificaron, en particular, las medidas mediante las que se consolidó la intervención de Venezuela en las Compañías iniciada a raíz del proceso penal contra

---

[277] MdC de Anulación, nota al pie 111; Dúplica de Anulación, ¶¶ 56-58.

[278] MdC de Anulación, ¶ 55; Réplica de Anulación, ¶ 89.

[279] Memorial de Demanda de Valores y Consorcio, § II.C.4 (R-219).

el Sr. Fernández Barrueco[280]. Dichas medidas incluían las medidas de administración especial, con respecto a las cuales Valores y Consorcio expresaron lo siguiente, en los ¶¶ 107 y 108 del Memorial de Demanda:

> 107. La interferencia progresiva de la República en MONACA y DEMASECA tuvo su punto culminante con la Providencia Administrativa[.]

> 108. La Providencia Administrativa marcó un hito en la evolución del régimen de administración especial impuesto por la República sobre MONACA y DEMASECA.

223.    A criterio del Comité, estos párrafos demuestran que Valores y Consorcio consideraban a la Providencia Administrativa como una de las medidas de administración especial impuestas por Venezuela. La consecuencia lógica de esto es que en cada referencia de las Demandadas en Anulación a las medidas de administración especial debía entenderse incluida también la Providencia Administrativa.

224.    Esto conlleva a que, cuando Valores y Consorcio se quejaron de las medidas de administración especial impuestas por Venezuela en el marco de la violación del TJE, se quejaron también de la Providencia Administrativa. En efecto, en los ¶¶ 216 y 217 de su Memorial de Demanda Valores y Consorcio afirmaron:

> 216. Como se demostró en la Sección sobre expropiación, la Demandada ha implementado y mantenido una serie de medidas sobre MONACA y DEMASECA que han privado a las Demandantes del uso, goce y disfrute de las mismas por más de cuatro años sin compensación alguna.

> 217. **Este régimen de intervención creado por las medidas de aseguramiento y administración especial**, y el Decreto de Adquisición Forzosa que ha impedido que las Demandantes reciban los beneficios básicos de sus inversiones – incluyendo la facultad de distribuir dividendos y disponer de su participación accionaria en MONACA y DEMASECA – **también contraviene el estándar de tratamiento justo y equitativo** del Acuerdo. (énfasis añadido)

225.    El Comité resalta que también el Tribunal, al analizar el reclamo por TJE, dejó en claro que la Providencia era una de las medidas de administración especial. El ¶ 544 del Laudo dice:

> En el presente caso está probado que, a partir del año 2009, Venezuela impuso unas medidas de aseguramiento y administración especial sobre Monaca y Demaseca derivadas del proceso penal seguido contra el Sr. Fernández Barrueco, presunto accionista de las Compañías. Estas medidas incluyen […] el nombramiento de administradores especiales facultados, en general, para ejercer acciones tendientes a garantizar la posesión, guarda, custodia, uso y conservación de los bienes de las Compañías y, en particular, para custodiar sus activos bancarios.

226.    Para soportar estas aseveraciones, en la nota al pie 667 el Tribunal hizo referencia específica a la Providencia Administrativa y, en particular, a sus Artículos 2 y 7.

227.    De lo anterior se desprende que las Demandadas en Anulación sí incluyeron la Providencia en su reclamo por TJE y que el Tribunal así lo entendió. En cualquier caso, el Comité concuerda con Valores y Consorcio en que el principio de *ultra petita* únicamente aplica a las pretensiones y no a los argumentos expuestos por las partes ante el Tribunal. Por lo tanto, el Comité debe rechazar el primer cuestionamiento de Venezuela de que el Tribunal decidió sobre una pretensión no

---

[280] Véase ¶ 56 *supra*.

incluida en el Arbitraje Subyacente, ya que reposa sobre una premisa incorrecta[281].

### b) ¿Asumió el Tribunal jurisdicción sobre la Providencia Administrativa exclusivamente en relación con el reclamo por expropiación?

228. Pasando al segundo cuestionamiento de Venezuela, el Comité tiene que verificar si, como sostiene la República, el Tribunal asumió jurisdicción sobre la Providencia exclusivamente en relación con el reclamo por expropiación. Venezuela se basa en el ¶ 243 del Laudo donde el Tribunal, al rechazar la segunda objeción jurisdiccional[282], sostuvo:

> El Tribunal encuentra que la controversia sobre expropiación existía por lo menos desde el 9 de noviembre de 2011. En su Notificación de Controversia, las Demandantes notificaron válidamente la existencia de una disputa relativa al cumplimiento de las obligaciones de Venezuela bajo el Artículo V del Tratado y, a su vez, perfeccionaron el consentimiento al arbitraje respecto a la controversia en relación con la expropiación con anterioridad a la denuncia del Tratado [283] por parte de Venezuela. Por lo tanto, el Tribunal tiene jurisdicción para conocer sobre el reclamo de expropiación en los términos planteados por las Demandantes.

229. Es cierto que en ese párrafo el Tribunal asumió jurisdicción sobre el reclamo por expropiación según el planteo de Valores y Consorcio, incluyendo la Providencia Administrativa, ya que esta era la medida con la cual culminaba la expropiación indirecta.

230. Ahora bien, el Comité destaca que, contrariamente a lo que sostiene la República, en ninguna parte el Tribunal expresó que analizaría la Providencia solo al tratar el reclamo por expropiación. Venezuela parecería fundar su argumento en que, al asumir jurisdicción sobre el reclamo por expropiación, el Tribunal omitió "*cualquier referencia a esta medida* [la Providencia] *en relación con los demás estándares*"[284].

231. Sin embargo, el Comité no encuentra ninguna razón por la cual el Tribunal, al rechazar la segunda objeción jurisdiccional de Venezuela, debería haber mencionado las reclamaciones fundadas en los demás estándares. La segunda objeción cuestionaba exclusivamente la jurisdicción sobre el reclamo por expropiación, por lo que es lógico que el Tribunal solo se expidiera acerca de ese

---

[281] El Comité destaca que incluso la República, en el Arbitraje Subyacente, ha considerado a la Providencia Administrativa como una de las medidas de administración especial, tal como se desprende de los ¶¶ 215, 223, 334 y 343, y de las notas al pie 315 y 592 del Memorial de Contestación de Venezuela (R-221). En particular, en el ¶ 215, Venezuela explicó los objetivos para los que se habían designado desde el comienzo administradores especiales en Monaca y Demaseca y, entre otras fuentes, en la nota al pie 315, mencionó a la Providencia; en el ¶ 223, la República sostuvo que la Providencia había designado "*una nueva Administración Especial para ambas empresas* [Monaca y Demaseca]"; en el ¶ 334, afirmó que la Providencia había sido la más reciente de las resoluciones que designaron administradores especiales; en la nota al pie 592, para fundamentar la inexistencia de expropiación progresiva afirmada en el ¶ 343, Venezuela expresó que la Providencia no había cambiado la situación de las Compañías "*en cuanto al régimen de administración especial que se viene llevando desde fines del año 2009*".

[282] Véanse ¶¶ 67-69 *supra*.

[283] El Comité entiende que la referencia debería ser a la denuncia del Convenio del CIADI y no al Tratado.

[284] Réplica de Anulación, ¶ 79.

reclamo[285].

232.    Por otra parte, Venezuela no cuestionó específicamente la jurisdicción del Tribunal para entender sobre el reclamo por TJE, tal como lo reconoció el Tribunal al iniciar el análisis de ese estándar de protección en el ¶ 521 del Laudo:

> Como cuestión preliminar, observa el Tribunal que no existe objeción alguna a su jurisdicción que se refiera de manera específica a la reclamación por violación del Artículo IV del APPRI.

233.    Teniendo en cuenta que, tal como se ha dicho en los ¶¶ 222 a 227 *supra*, el reclamo por TJE incluía la Providencia Administrativa, el Comité encuentra que la falta de presentación de una objeción jurisdiccional específica sobre tal reclamación implica que Venezuela aceptó que la Providencia, al igual que el resto de las medidas impugnadas por las Demandadas en Anulación, fuera analizada por el Tribunal también bajo el TJE. Si la República hubiera querido evitar que se analizara la Providencia bajo el TJE, debería haber interpuesto una objeción específica al respecto, tal como lo hizo en relación con el reclamo por expropiación.

234.    Así las cosas, para el Comité resulta claro que también el segundo cuestionamiento de Venezuela reposa en una premisa incorrecta, ya que el Tribunal no solo nunca dijo que analizaría la Providencia únicamente en relación con el reclamo de expropiación, sino que, además, dejó en claro que su jurisdicción para entender las medidas invocadas en el reclamo del TJE – entre las que se incluía la Providencia – no había sido objetada. Por lo tanto, también este cuestionamiento se debe rechazar.

### c)    Conclusión

235.    En conclusión, el Comité encuentra que la República no ha probado ni que las Demandadas en Anulación no se hayan quejado respecto a la Providencia Administrativa en relación con el TJE ni que el Tribunal haya asumido jurisdicción sobre la Providencia únicamente bajo el reclamo por expropiación. Por lo tanto, la República no ha probado que el Tribunal haya decidido *ultra petita* que la Providencia era contraria al TJE, con lo cual no se configura la causal de anulación de extralimitación manifiesta de facultades respecto a esta decisión.

**B.    SOBRE LA DECISIÓN DE ASUMIR JURISDICCIÓN RESPECTO DEL RECLAMO POR EXPROPIACIÓN**

236.    En el Laudo el Tribunal rechazó la segunda objeción jurisdiccional, referida al reclamo por expropiación indirecta[286]. A este respecto, Venezuela invoca dos motivos de anulación. En primer lugar, sostiene que el Tribunal se extralimitó manifiestamente en sus facultades al haber decidido sobre este reclamo (*i*) careciendo de jurisdicción y (*ii*) no aplicando el derecho aplicable. En segundo lugar, alega que el Tribunal incurrió en un quebrantamiento grave de una norma fundamental de procedimiento al no tratar todas las cuestiones que le habían sido sometidas.

---

[285] El Comité destaca, además, que las otras tres objeciones jurisdiccionales, que abarcaban de manera genérica todas las reclamaciones, también fueron rechazadas por el Tribunal.

[286] Laudo, § IV.C.2; *véanse* ¶¶ 67-69 *supra*.

1.   **Argumentos de Venezuela**

   *a)*   ***Extralimitación manifiesta de las facultades del Tribunal***

237.   En cuanto a la primera extralimitación planteada respecto a la decisión del Tribunal de asumir jurisdicción sobre el reclamo de expropiación, Venezuela afirma que dicho reclamo no figuraba en la Solicitud de Arbitraje y solo fue incluido en el Memorial de Demanda como demanda subordinada. Para la República, este era un reclamo adicional cuya incorporación no respetó los requisitos del Artículo 46 del Convenio CIADI y de la Regla de Arbitraje 40[287].

238.   En concreto, la República argumenta que las Demandadas en Anulación "*no activaron el procedimiento para la incorporación de un reclamo adicional ni justificaron que se relacionaba directamente con los reclamos incluidos en la Solicitud de Arbitraje*", lo que conllevaba que el Tribunal no tuviera jurisdicción sobre tal reclamación[288].

239.   Venezuela cuestiona la interpretación que hacen Valores y Consorcio del Artículo 46 del Convenio del CIADI y de la Regla de Arbitraje 40. Según ella, dichas reglas exigen la activación de un procedimiento para demostrar que la demanda adicional se relaciona directamente con la diferencia y cae dentro de la jurisdicción del CIADI con el fin de evitar que la parte demandante tenga la posibilidad de modificar su reclamo tras el inicio del arbitraje y de establecer que la demanda adicional se encuentra dentro los límites del consentimiento de las partes[289].

240.   En cuanto a la segunda extralimitación, Venezuela sostiene que el Tribunal no aplicó el derecho aplicable, a saber el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40, porque no analizó si la demanda adicional relativa a la expropiación estaba dentro de su jurisdicción y del consentimiento de la Partes, a pesar de que esta cuestión jurisdiccional fue planteada por la República y ese planteo fue incluido en la descripción de las posiciones de las Partes en el Laudo[290].

241.   La República afirma que sí presentó una objeción relativa a la procedencia del reclamo adicional, contrariamente a lo que sostienen las Demandadas en Anulación. De hecho, en su Memorial de Contestación en el Arbitraje Subyacente la República solicitó el rechazo del reclamo sobre expropiación dado que no había sido parte de los reclamos presentados en la Notificación de Controversia y en la Solicitud de Arbitraje, lo que equivale a decir que el reclamo no formaba parte del reclamo original, sino de uno nuevo. Su planteo no es solamente que dicho reclamo no fue presentado de acuerdo con el procedimiento previsto, sino que ni siquiera fue planteado como uno adicional, de lo que se deriva que no se podía criticar a la República por no haber opuesto una defensa de no procedencia del reclamo adicional. Si las Demandadas en Anulación hubieran presentado un reclamo por expropiación como adicional, la República habría actuado según lo

---

[287] MdA, ¶¶ 129-132; Réplica de Anulación, ¶ 102.

[288] MdA, ¶¶ 130-131.

[289] Réplica de Anulación, ¶¶ 103-108.

[290] MdA, ¶¶ 133-135.

prescrito por la Regla de Arbitraje 40(3)[291].

### b) Quebrantamiento grave de una norma fundamental de procedimiento

242. La República alega que el Tribunal incurrió en un quebrantamiento grave de una norma fundamental de procedimiento "*al no tratar todas las cuestiones que le ha*[bía]*n sido sometidas*". Señala que, a pesar de que en sus escritos en el Arbitraje Subyacente Venezuela se refirió a "*la falta de jurisdicción del Tribunal por la cuestión de la expropiación que no fue solicitada en la Solicitud de Arbitraje*", esta cuestión no fue tratada por el Tribunal, el cual, en la sección del Laudo relativa a la segunda objeción jurisdiccional, solo se refirió a la Notificación de Controversia y no a la Solicitud de Arbitraje[292].

243. Apoyándose en los casos *Pey Casado c. Chile*[293] y *MINE c. Guinea*[294], Venezuela considera que este quebrantamiento es grave, pues de haberse respetado el Artículo 48 del Convenio del CIADI, que es una regla fundamental, el Tribunal podría haber declinado jurisdicción sobre el reclamo de expropiación, lo que potencialmente podría haber tenido un "*impacto no sólo en el análisis sobre expropiación sino también en el de trato justo y equitativo*". Además, añade que se le privó del derecho a que fueran decididas todas las cuestiones que presentó ante el Tribunal[295].

### 2. Argumentos de Valores y Consorcio

### a) Extralimitación manifiesta de las facultades del Tribunal

244. Las Demandadas en Anulación señalan que Venezuela alegó por primera vez en el marco de este procedimiento de anulación que el Tribunal debió haber decidido sobre la admisibilidad del reclamo por expropiación de acuerdo con el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40, y que dicho reclamo no cumplió con estas normas. En el Arbitraje Subyacente la República ni siquiera mencionó estas normas y solo sostuvo que el Tribunal carecía de jurisdicción para resolver ese reclamo, debido a que la alegada expropiación indirecta se había consumado con la Providencia Administrativa, que fue publicada después de la denuncia del Convenio CIADI por Venezuela, y por lo tanto no existía disputa alguna sobre expropiación indirecta. El Tribunal resolvió la objeción específica planteada por Venezuela y no es posible ahora reprocharle que no se haya pronunciado sobre una objeción que la República nunca planteó[296].

245. Valores y Consorcio observan que en la Solicitud de Arbitraje se reservaron el derecho de presentar un reclamo por expropiación en caso de que Venezuela siguiera tomando medidas de interferencia en sus inversiones. Como la República continuó adoptando ese tipo de medidas,

---

[291] Réplica de Anulación, ¶¶ 109-111.

[292] MdA, ¶¶ 136-138.

[293] *Pey Casado c. Chile* (Anulación I) (RLA-201).

[294] *MINE c. Guinea* (RLA-213).

[295] MdA, ¶ 139; Réplica de Anulación, ¶¶ 116-117.

[296] MdC de Anulación, ¶¶ 79-82; Dúplica de Anulación, ¶ 66.

ellas presentaron su reclamo en el Memorial de Demanda, indicando expresamente que lo hacían de conformidad con el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40[297].

246.   Valores y Consorcio aclaran que estas normas "[no] *requieren que 'se active un procedimiento' para incorporar un reclamo adicional*", sino que solo disponen que el tribunal resuelva reclamos adicionales cuando estos se relacionan con la diferencia y el tribunal tiene jurisdicción, y obligan al Tribunal a garantizar a la parte demandada una oportunidad razonable de responder. Añaden que la jurisprudencia y la doctrina reconocen que la inclusión de un reclamo adicional es oportuna cuando se hace – tal como lo hicieron las Demandadas en Anulación en este caso – con el primer escrito, lo cual no requiere cambios de plazos en relación con la fase escrita del procedimiento. El Tribunal cumplió con esta obligación en cuanto la República tuvo más de siete meses para preparar su objeción a la jurisdicción y solo hubiera incurrido en una causal de anulación si no hubiese conocido de la reclamación por expropiación presentada por Valores y Consorcio[298].

247.   Las Demandadas en Anulación notan que el Tribunal comprobó que el reclamo por expropiación estaba directamente relacionado con la controversia, tal como lo requieren el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40(1). En efecto, dicen Valores y Consorcio, el Tribunal reconoció que Venezuela objetó su jurisdicción sobre el reclamo por expropiación indirecta alegando que la expropiación no se había consumado a la fecha de la Notificación de Controversia, con lo cual, al no darse una notificación válida sobre tal reclamo, este no podía ser sometido a arbitraje. Al analizar si el consentimiento otorgado mediante la Notificación de Controversia cubría la reclamación por expropiación indirecta, el Tribunal identificó las medidas mencionadas en la Notificación de Controversia y observó que, en tal Notificación, Valores y Consorcio informaron que, como resultado de dichas medidas, había surgido una controversia y que las medidas contravenían el Artículo V del APPRI relativo a expropiación[299].

248.   Agregan las Demandadas en Anulación que el Tribunal rechazó el argumento de Venezuela de que en la Notificación de Controversia ellas notificaron una expropiación directa y que solo en el Memorial se quejaron de una expropiación indirecta que se habría cristalizado con la Providencia Administrativa. Según ellas, el Tribunal manifestó que los efectos de las medidas denunciadas en la Notificación de Controversia eran los mismos discutidos a lo largo del Arbitraje Subyacente y que fueron atribuidos, entre otros, a las medidas de aseguramiento y administración especial, y que todas las medidas denunciadas, incluyendo la Providencia Administrativa, formaban parte de la misma controversia notificada en la Notificación de Controversia. Todo esto demostraría que el Tribunal realizó un análisis meticuloso de la única objeción a la jurisdicción presentada por Venezuela específicamente respecto al reclamo de expropiación indirecta y no se extralimitó en sus facultades[300].

---

[297] MdC de Anulación, ¶ 84; Dúplica de Anulación, ¶¶ 61-62.

[298] MdC de Anulación, ¶¶ 83-88; Dúplica de Anulación, ¶¶ 68-69.

[299] MdC de Anulación, ¶¶ 89-92; Dúplica de Anulación, ¶¶ 65-66.

[300] MdC de Anulación, ¶¶ 93-95.

### b) Quebrantamiento grave de una norma fundamental de procedimiento

249.  Valores y Consorcio niegan que se haya configurado un quebrantamiento. Señalan que todas las citas de la República para sustentar su argumento de que el Tribunal no trató todas las cuestiones que le habían sido sometidas demuestran que la objeción jurisdiccional que en realidad planteó Venezuela no fue la que ahora menciona. Manifiestan que, al contrario de lo que señala la República, en el Laudo[301] "*el Tribunal sí se refirió expresamente a su argumento relativo a que la Solicitud de Arbitraje no incluyó un reclamo de expropiación*", por medio del cual Venezuela argüía que "*lo sucedido hasta la fecha de la Solicitud de Arbitraje no era suficiente para fundamentar un reclamo de expropiación*"[302].

250.  De manera subsidiaria, las Demandadas en Anulación añaden que, aun si se considerara que el Tribunal no se hubiera pronunciado sobre esa cuestión, el quebrantamiento no sería grave, ya que no produjo un impacto material en el Laudo. En efecto, pese a asumir jurisdicción sobre el reclamo por expropiación en contra de lo solicitado por Venezuela, el Tribunal le dio la razón en cuanto al fondo y rechazó la reclamación, por lo que la República no sufrió agravio alguno. Adicionalmente, Valores y Consorcio rechazan la postura de Venezuela de que la desestimación de la objeción jurisdiccional sobre el reclamo por expropiación haya influido en el tratamiento que el Tribunal dio al reclamo por TJE[303].

### 3. Análisis del Comité

251.  La República afirma que, al rechazar su segunda objeción jurisdiccional[304] y al asumir jurisdicción sobre el reclamo de expropiación indirecta, el Tribunal incurrió en dos causales de anulación. Por un lado, se habría extralimitado manifiestamente en sus facultades porque, aunque ese reclamo era un reclamo adicional, lo abordó sin que Valores y Consorcio activaran el procedimiento para la incorporación de reclamos adicionales y justificaran que estaba relacionado con los reclamos incluidos en la Solicitud de Arbitraje, en violación del Artículo 46 del Convenio CIADI y de la Regla de Arbitraje 40. Por otro lado, el Tribunal habría quebrantado una norma fundamental del procedimiento al no pronunciarse sobre "*la cuestión de la expropiación que no fue solicitada en la Solicitud de Arbitraje*"[305].

252.  Valores y Consorcio sostienen que la objeción jurisdiccional de Venezuela respecto al reclamo de expropiación indirecta solo se centró en la inexistencia de una disputa sobre tal expropiación a la fecha de la Notificación de Controversia y de la Solicitud de Arbitraje, y que en el Arbitraje Subyacente la República nunca objetó el incumplimiento de las dos normas cuya violación invoca por primera vez en este procedimiento. Precisan que el Tribunal decidió la objeción específica presentada por Venezuela, por lo que no se le puede reprochar el no haber decidido una objeción

---

[301] Laudo, ¶ 154.

[302] MdC de Anulación, ¶¶ 97-98; Dúplica de Anulación, ¶¶ 74-75.

[303] MdC de Anulación, ¶ 99; Dúplica de Anulación, ¶¶ 76-77.

[304] Véanse ¶¶ 67-69 *supra*.

[305] MdA, ¶ 138.

no planteada.

253.   El Comité observa que, a los fines de decidir sobre ambas causales invocadas por Venezuela, debe determinarse una cuestión preliminar: ¿invocó la República en el Arbitraje Subyacente que el reclamo por expropiación fue introducido después de la Solicitud de Arbitraje, recién en el Memorial de Demanda, sin respetar el Artículo 46 del Convenio del CIADI[306] y la Regla de Arbitraje 40[307], disposiciones que se ocupan de las demandas adicionales?

254.   En efecto, en lo que hace a la primera causal de anulación, la propia Venezuela sostiene que el Tribunal excedió manifiestamente sus facultades al asumir jurisdicción sobre el reclamo por expropiación sin aplicar el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40. En cambio, en lo que concierne a la segunda causal de anulación, Venezuela alega que el Tribunal no trató su objeción de que el reclamo por expropiación había sido presentado después de la Solicitud de Arbitraje, lo que presupone que la República planteó esta objeción con base en las dos normas antes mencionadas en el Arbitraje Subyacente[308].

255.   En relación con la cuestión preliminar bajo examen, la República sostiene que alegó la inadmisibilidad del reclamo por expropiación en los términos del Artículo 46 del Convenio del CIADI en la § II.B.4 de su Memorial de Contestación[309]. Sin embargo, tras una detenida lectura de esa sección (¶¶ 78 a 91), el Comité no ha encontrado ninguna mención del Artículo 46 ni tampoco de la Regla de Arbitraje 40.

256.   Tal como correctamente lo sostienen Valores y Consorcio[310], la lectura de dicha sección – que contiene la segunda objeción jurisdiccional de Venezuela – demuestra que la objeción planteada por la República consistió principalmente en que, a la fecha de la Notificación de Controversia, aún no existía una controversia por expropiación indirecta sobre la cual pudiera perfeccionarse el consentimiento al arbitraje. A criterio del Comité, resulta revelador del alcance de tal objeción la conclusión de Venezuela en los ¶¶ 88 a 90 de su Memorial de Contestación:

        88.   Los párrafos anteriores demuestran que la controversia sobre expropiación que las Demandantes han presentado por primera vez en su Memorial, no existía al 9 de noviembre de 2011, la fecha de la Notificación de Controversia en que las Demandantes alegan haber

---

[306] El Artículo 46 del Convenio del CIADI prevé lo siguiente: "*Salvo acuerdo en contrario de las partes, el Tribunal deberá, a petición de una de ellas, resolver las demandas incidentales, adicionales o reconvencionales que se relacionen directamente con la diferencia, siempre que estén dentro de los límites del consentimiento de las partes y caigan además dentro de la jurisdicción del Centro*".

[307] La Regla de Arbitraje 40(1) prevé lo siguiente: "*Salvo acuerdo en contrario de las partes, cualquiera de ellas podrá presentar una demanda incidental o adicional o una reconvención que se relacione directamente con la diferencia, siempre que esté dentro de los límites del consentimiento de las partes y caigan además dentro de la jurisdicción del Centro*".

[308] El Comité nota que, si bien en el ¶ 132 del MdA se encuentra bajo la § V.B.1 "*Extralimitación Manifiesta de Facultades*", este se refiere a la causal del quebrantamiento grave de una norma fundamental de procedimiento, tal como lo corrobora la remisión en él incluida ("*como se verá más adelante*") y la identidad de contenido entre las citas de los escritos del Arbitraje Subyacente que se mencionan en el ¶ 132 y en el ¶ 138 bajo la § V.B.2 "*Quebrantamiento de una norma fundamental de procedimiento*".

[309] Réplica de Anulación, ¶ 109, nota al pie 133.

[310] Dúplica de Anulación, ¶ 65.

perfeccionado el consentimiento.

89. Pero más importante aún para efectos jurisdiccionales, la controversia sobre expropiación indirecta ni siquiera existía a la fecha crítica de la denuncia del Convenio por parte de la República el 24 de enero de 2012. La controversia sobre expropiación indirecta no podía haber existido, aun aceptando como ciertos los argumentos de las Demandantes –que no lo son– hasta el 22 de enero de 2013, un año después de la denuncia del Convenio por parte de la República.

90. Cualquier intento de las Demandantes para perfeccionar el consentimiento posterior al 24 de enero de 2012 no puede ser utilizado para conferirle jurisdicción al CIADI. Por lo tanto, las Demandantes no podían haber perfeccionado el consentimiento sobre un reclamo de expropiación indirecta que no existía antes de la notificación de la denuncia del Convenio por parte de la República[311].

257.    Asimismo, el Comité nota que la "*cuestión de la expropiación que no fue solicitada en la Solicitud de Arbitraje*" no fue una objeción relativa a la inadmisibilidad de un reclamo adicional, como pretende Venezuela en este procedimiento, sino uno de los argumentos propuestos para demostrar que, a la fecha de tal Solicitud, aún no existían los eventos que pudieran configurar una expropiación indirecta. Esto surge con claridad de los ¶¶ 100, 101 y 103 de la Dúplica de Venezuela[312]:

100. […] Con respecto a un reclamo de expropiación indirecta, en la Solicitud de Arbitraje las Demandantes reservaron el derecho a presentar reclamos adicionales contra la República en caso que sucedieran medidas adicionales[.]

101. En su Memorial, las Demandantes alegaron que una expropiación indirecta se cristalizó el 22 de enero de 2013. Por lo tanto, es claro que a la fecha crítica de la denuncia del Convenio (24 de enero de 2012), todavía no estaban presentes los eventos que podrían sustentar un reclamo de expropiación indirecta. […] Por lo tanto, la Notificación de Controversia presentada el 7 de noviembre de 2011 fue inválida con respecto a un reclamo de expropiación.

103. En todo caso, el Tribunal no tiene jurisdicción porque para la fecha en que las Demandantes presentaron por primera vez un reclamo de expropiación en su Memorial, ya era demasiado tarde, por dos razones independientes. Primero, la República ya había denunciado el Convenio […]. Y segundo, también era demasiado tarde porque la República ya había dejado de ser un Estado Contratante del Convenio a la fecha de la presentación de la Solicitud de Arbitraje, por lo cual no se podía iniciar un reclamo de expropiación ante el CIADI por la aplicación independiente del artículo XI(2)(b) del Acuerdo, que requiere que ambos Estados Parte del Acuerdo (Venezuela y España) deben ser parte del Convenio en la fecha del sometimiento de una controversia a un arbitraje CIADI.

258.    Por su parte, el Tribunal entendió la segunda objeción jurisdiccional de la República en los términos precisos en que había sido planteada, es decir, como basada en la inexistencia del consentimiento al arbitraje sobre el reclamo por expropiación al momento de la Notificación de Controversia. Esto se aprecia en el resumen de la posición de Venezuela en los ¶¶ 153 a 157 del Laudo y, en particular, de los siguientes pasajes:

153. Segundo, Venezuela alega que no existe jurisdicción para que el Tribunal pueda decidir el reclamo de expropiación indirecta, en la medida en que la misma no existía en la fecha crítica de la denuncia del Convenio CIADI, el 24 de enero de 2012 […].

---

[311] Memorial de Contestación de Venezuela, ¶¶ 88-90 (R-221).

[312] Dúplica de Venezuela, ¶¶ 100, 101, 103 (R-222).

154. Las Demandantes tampoco incluyeron un reclamo sobre expropiación en su Solicitud de Arbitraje. Las Demandantes presentaron alegaciones bajo los Artículos III, IV y VII del APPRI. Adicionalmente, la reserva de derechos de las Demandantes indica que lo sucedido hasta la fecha de la Solicitud de Arbitraje no era suficiente para fundamentar un reclamo de expropiación. [...]

156. Según Venezuela, las afirmaciones de las Demandantes son el mejor testimonio de que los hechos ocurridos cumulativamente antes del 22 de enero de 2013 no habían representado la pérdida de control de Monaca y Demaseca. Por lo tanto, no pudo existir consentimiento perfeccionado sobre un reclamo de expropiación. La controversia sobre expropiación indirecta no existía a la fecha crítica de la denuncia del Convenio CIADI por parte de Venezuela [...].

259. Por consiguiente, como se desprende de los pasajes citados, la República nunca incluyó, como parte de su segunda objeción jurisdiccional, un cuestionamiento relativo a la inadmisibilidad del reclamo por expropiación en los términos del Artículo 46 del Convenio del CIADI o de la Regla de Arbitraje 40.

260. Esta conclusión sobre la cuestión preliminar evidenciada en el ¶ 253 *supra* conlleva la desestimación de ambas causales invocadas por Venezuela.

261. En cuanto a la extralimitación de facultades, incluso si el Artículo 46 del Convenio del CIADI y la Regla de Arbitraje 40 hubieran sido aplicables al reclamo por expropiación presentado por Valores y Consorcio en su Memorial de Demanda, la República debería haber objetado su violación en los términos de la Regla de Arbitraje 41(1)[313]. Al no haberlo hecho, no puede ahora cuestionar que el Tribunal haya asumido jurisdicción sobre un reclamo cuya inadmisibilidad no fue planteada oportunamente.

262. En cuanto al quebrantamiento de una norma fundamental, Venezuela no puede cuestionar en este procedimiento que el Tribunal haya omitido pronunciarse sobre una "*objeción de inadmisibilidad*" que nunca fue planteada.

263. Adicionalmente, el Comité señala que incluso Venezuela reconoce implícitamente, en el ¶ 111 de la Réplica de Anulación, que no presentó una objeción de admisibilidad. En efecto, Venezuela sostiene allí que "[s]*i las Demandadas en Anulación hubieran presentado el reclamo por expropiación como lo que era, es decir un reclamo adicional, la República habría actuado según lo prescripto por la Regla de Arbitraje 40(3)*".

264. En opinión del Comité, este argumento de la República ignora que el reclamo por expropiación fue presentado como adicional, ya que Valores y Consorcio especificaron que lo habían introducido, *inter alia*, en los términos de la Regla de Arbitraje 40. Esto lo reconoció la propia

---

[313] La Regla de Arbitraje 41(1) dispone lo siguiente: "*Toda excepción que la diferencia o una demanda subordinada no cae dentro de la jurisdicción del Centro o que, por otras razones, no es de la competencia del Tribunal, deberá oponerse lo antes posible. La parte que oponga la excepción deberá presentársela al Secretario General a más tardar antes del vencimiento del plazo fijado para la presentación del memorial de contestación o, si la excepción se refiere a una demanda subordinada, para la presentación de la réplica, a menos que la parte no haya tenido conocimiento entonces de los hechos en los que se funda la excepción*".

República en el MdA[314] en contradicción con su argumento de la Réplica de Anulación. A la luz de esto, si Venezuela consideraba que el reclamo no era admisible, debería haberlo planteado lo antes posible y en todo caso directamente en su Memorial de Contestación tal como dispone la Regla de Arbitraje 41(1), no siendo necesario que se active un procedimiento especial al efecto.

265.    En conclusión, el Comité considera que la República no ha probado que, al asumir jurisdicción sobre el reclamo por expropiación, el Tribunal se haya extralimitado en sus facultades o haya quebrantado una norma fundamental de procedimiento.

## C.    Sobre el test de nacionalidad en la cuarta objeción jurisdiccional

266.    En el Laudo, el Tribunal rechazó la cuarta objeción jurisdiccional de la República, que se basaba en el argumento de que Valores y Consorcio no tenían la nacionalidad española requerida por el APPRI[315]. Al respecto, Venezuela sostiene que la decisión del Tribunal con respecto a la aplicación del test de nacionalidad se ve afectada por los vicios de falta de expresión de motivos y quebrantamiento de una norma fundamental de procedimiento.

### 1.    Argumentos de Venezuela

#### a)    *Falta de motivación*

267.    En cuanto al vicio de falta de motivos en relación con la decisión del Tribunal sobre la cuarta objeción jurisdiccional, Venezuela explica que este se configura porque el Tribunal ha basado su decisión en "*conclusiones*" contradictorias. Según la República, la contradicción consiste en que, en un primer momento, el Tribunal sostuvo que el criterio previsto en el APPRI para determinar la nacionalidad de los inversores personas jurídicas era el de constitución, con excepción de los casos en que hubiera ocurrido un abuso; sin embargo, al momento de aplicar el estándar, el Tribunal dijo que el único criterio era el de constitución, sin excepciones[316].

268.    Venezuela afirma que, en su cuarta objeción jurisdiccional, invocó que las Demandadas en Anulación estaban abusando de la nacionalidad española, puesto que eran en realidad inversores mexicanos, y que a su vez Gruma, el verdadero inversor, estaba abusando de "*la supuesta nacionalidad de Valores y Consorcio*". A pesar de ello – afirma la República –, el Tribunal no analizó estos argumentos, por lo que se contradijo con lo que había manifestado en primer término sobre el criterio de nacionalidad en relación con el que admitió la relevancia del abuso[317].

269.    Adicionalmente, la República resalta que Valores y Consorcio no han negado la existencia de la

---

[314] En el ¶ 131 del MdA, Venezuela sostuvo que las Demandadas en Anulación "*reconocieron* [la reclamación por expropiación] *como Demanda Subordinada*" y citó a tal efecto la nota al pie 322 del Memorial de Demanda de Valores y Consorcio (R-219), donde estas específicamente afirmaron: "*Las Demandantes incluyen una pretensión por expropiación en este Memorial de conformidad con el Acuerdo, el Convenio CIADI, la Regla 40 de las Reglas Procesales Aplicables a los Procedimientos de Arbitraje (Reglas de Arbitraje) y la reserva realizada en su Solicitud de Arbitraje*".

[315] Laudo, § IV.C.4; véanse ¶¶ 72-73 *supra*.

[316] MdA, ¶¶ 142, 146-147; Réplica de Anulación, ¶¶ 120-121; Tr. Día 1, 72:9-74:4; Tr. Día 2, 295:22-296:14.

[317] MdA, ¶ 147; Réplica de Anulación, ¶¶ 123, 128; Tr. Día 2, 291:16-292:5.

contradicción del Tribunal, sino que solo se han limitado a alegar, falazmente, que Venezuela nunca había invocado un abuso conforme al derecho internacional. Para controvertir esta afirmación de las Demandadas en Anulación, Venezuela presentó en la Réplica de Anulación un cuadro con peticiones y argumentos desarrollados por ella en el Arbitraje Subyacente en los que argumentaba "*un abuso del sistema de protección de inversiones extranjeras conforme el derecho internacional*". En la Audiencia de Anulación, insistió en que había realizado "*un planteo de abuso sobre este tema*" en "*una sección entera de un memorial*" y explicó que la doctrina del abuso no se limitaba al ejemplo – a su juicio equivocado – propuesto por el Tribunal en el ¶ 280 del Laudo[318].

270. Para concluir, Venezuela afirma que, si el Tribunal no hubiera llegado a conclusiones contradictorias y opuestas, habría al menos analizado sus argumentos sobre el abuso de la nacionalidad española de las Demandadas en Anulación[319].

### b) *Quebrantamiento grave de una norma fundamental de procedimiento*

271. En cuanto al quebrantamiento grave de una norma fundamental de procedimiento, la República manifiesta que el Tribunal ha violado la norma que lo obligaba a tratar todas las cuestiones que las Partes le han sometido (Artículo 48(1) y (3) del Convenio del CIADI), puesto que no tuvo en cuenta la pretensión de Venezuela relativa al abuso de nacionalidad de las Demandadas en Anulación y sus respectivas pruebas. Según Venezuela, esto resulta claro del ¶ 283 del Laudo, en el que el Tribunal, luego de dar la motivación contradictoria apenas reseñada, "*reconoció que no trataría una de las cuestiones planteadas*", es decir, la relativa al abuso. De haber sido tratada, esta cuestión – introducida tempestivamente en el Arbitraje Subyacente – habría conducido al acogimiento de la objeción jurisdiccional, ya que el mismo Tribunal aclaró que el abuso era una excepción al test de nacionalidad que había adoptado[320].

### 2. Argumentos de Valores y Consorcio

272. Las Demandadas en Anulación argumentan preliminarmente que Venezuela "*se basa* […] *en premisas falsas*", ya que la objeción jurisdiccional *ratione personae* no fue presentada en el Arbitraje Subyacente en los mismos términos en que Venezuela la plantea en este procedimiento. Por lo tanto, no era razonable que el Tribunal se pronunciara al respecto[321].

273. Además, Valores y Consorcio señalan que el Tribunal no incurrió en falta de motivación por contradicción ni quebrantó una norma de procedimiento al rechazar la cuarta objeción jurisdiccional tal y como fue efectivamente planteada por Venezuela en el Arbitraje, ya que su

---

[318] Réplica de Anulación, ¶¶ 125-127; Tr. Día 1, 69:12-70:5, 70:18-71:1, 74:5-76:15; Tr. Día 2, 292:6-20, 293:9-294:19, 295:4-16.

[319] Réplica de Anulación, ¶ 129.

[320] MdA, ¶¶ 150, 152-153; Réplica de Anulación, ¶¶ 131, 133-137, 140. Respondiendo a una pregunta del Comité, en la Audiencia de Anulación, Venezuela dijo que, tal como lo demostraba el caso *Gold Reserve c. Venezuela* (Laudo) (CLA-103), el Tribunal debería haber analizado las alegaciones de abuso a pesar de que el test de nacionalidad fuera el de constitución (Tr. Día 1, 79:10-80:21).

[321] MdC de Anulación, ¶¶ 101, 103-105.

razonamiento fue coherente y se pronunció sobre todos los argumentos de la República.

### a) Falta de motivación

274. Valores y Consorcio explican que la cuarta objeción jurisdiccional de Venezuela se basó en que ellas no cumplían con el requisito de la nacionalidad del Artículo 25 del Convenio del CIADI porque eran meras "*empresas de papel*" sin conexión genuina con España. Para Venezuela, el verdadero inversor era Gruma, nacional de un estado no contratante del CIADI (México) que estaba abusando del sistema de protección de inversiones. Las Demandadas en Anulación expresan que lo que pidió Venezuela en el Arbitraje Subyacente fue que el Tribunal fuera más allá de los requisitos de nacionalidad del APPRI e indagara si había una conexión genuina entre ellas y España[322].

275. Según las Demandadas en Anulación, para rechazar esta objeción, el Tribunal siguió el siguiente recorrido argumentativo, carente de contradicciones y perfectamente comprensible para cualquier lector. En primer lugar, indicó que, ante la ausencia de una definición de nacionalidad en el Convenio del CIADI, debía otorgar deferencia a la definición del APPRI. En segundo lugar, encontró que, en este caso, el criterio de nacionalidad del APPRI para personas jurídicas era el de constitución de conformidad con el derecho español y expresó que la jurisprudencia internacional consideraba que, en tal circunstancia, los tribunales no debían apartarse de este criterio, salvo en casos de abuso. En tercer lugar, el Tribunal notó que Valores y Consorcio eran sociedades constituidas de conformidad con el derecho español y que Venezuela no había invocado ningún motivo para desconocer su personalidad jurídica o indagar sobre el cumplimiento de requisitos de nacionalidad adicionales a los del APPRI. Por lo tanto, el Tribunal concluyó que las Demandadas en Anulación cumplían con el requisito de constitución del APPRI, que era el único relevante para establecer su jurisdicción *ratione personae*, lo que tornaba irrelevantes las alegaciones fácticas de Venezuela[323].

276. Valores y Consorcio explican que, según la jurisprudencia de numerosos tribunales[324], solo existe abuso conforme al derecho internacional cuando se reestructuran las inversiones luego del nacimiento de una disputa para beneficiarse de la protección de los tratados de inversiones, o cuando se comete fraude. Al no haber Venezuela alegado ninguna de estas circunstancias (ni siquiera mencionó la palabra "*abuso*" en sus escritos), el mero uso de sociedades tenedoras de acciones como Valores y Consorcio para la realización de inversiones no constituye un abuso conforme al derecho internacional, por más que la República así lo califique con fines retóricos. Precisamente por esta falta de alegación, el Tribunal concluyó que Venezuela no había invocado ningún motivo para indagar sobre el cumplimiento de requisitos de nacionalidad adicionales a los

---

[322] MdC de Anulación, ¶¶ 103-104; Dúplica de Anulación, ¶ 86; Tr. Día 1, 150:3-13, 153:15-154:3; Tr. Día 2, 335:12-17.

[323] MdC de Anulación, ¶¶ 108-115; Dúplica de Anulación, ¶¶ 85-89.

[324] MdC de Anulación, ¶ 106; Dúplica de Anulación, ¶ 91; *Tidewater c. Venezuela (Jurisdicción)*, ¶ 184 (CLA-011); *Barcelona Traction*, ¶ 56 (CLA-120); *Gold Reserve c. Venezuela* (Laudo), ¶ 252 (CLA-103).

del APPRI[325].

277.   En suma, las Demandadas en Anulación afirman que el Tribunal motivó adecuadamente su decisión y no incurrió en contradicción.

### b)   Quebrantamiento grave de una norma fundamental de procedimiento

278.   Considerando lo expuesto en la sección anterior, Valores y Consorcio sostienen que el Tribunal no violó ninguna norma de procedimiento, ya que sí analizó la cuestión de forma completa y resolvió la pretensión de la República teniendo en cuenta sus alegaciones de hecho, aunque las consideró irrelevantes debido a que el APPRI no permite indagar si se han cumplido requisitos adicionales a los establecidos en su Artículo XI(1)(b). En todo caso, Valores y Consorcio señalan que, incluso si hubiera existido una violación de una norma de procedimiento, esta no habría sido grave como lo exige el Convenio del CIADI en cuanto no habría tenido un impacto material sobre la decisión. En este punto, Valores y Venezuela explican que, aun si hubiera examinado detalladamente las alegaciones fácticas de la República, el resultado hubiera sido el mismo ya que, conforme al APPRI el único criterio relevante es el de constitución y Valores y Consorcio cumplen con ese requisito.[326]

### 3.   Análisis del Comité

279.   Venezuela argumenta que, con motivación contradictoria y sin siquiera haber analizado su argumento sobre el abuso de la nacionalidad española, el Tribunal decidió que Valores y Consorcio calificaban como inversores españoles y gozaban de la protección del APPRI. Por esta razón, la República considera que el rechazo de su cuarta objeción jurisdiccional está viciado por falta de motivación y por el quebrantamiento de una norma fundamental de procedimiento.

280.   Por su parte, las Demandadas en Anulación niegan la existencia de ambas causales de anulación. Como argumento preliminar, si bien reconocen que el Tribunal no trató la cuestión del abuso, afirman que esto fue así simplemente porque Venezuela nunca expresó en el Arbitraje Subyacente el argumento de abuso en los términos en los que basa su pedido de anulación.

281.   Para establecer si el argumento preliminar de Valores y Consorcio es correcto, el Comité considera oportuno comenzar por comprobar qué invocó Venezuela en el Arbitraje Subyacente, qué dijo el Laudo al respecto y qué invoca la República en este procedimiento para luego considerar las consecuencias que esto conlleva sobre las causales de anulación invocadas.

### a)   ¿El abuso al que se refiere Venezuela en este procedimiento fue invocado en el Arbitraje Subyacente?

282.   En cuanto a la postura de Venezuela en el Arbitraje Subyacente, el Comité resalta que – tal como se desprende de los ¶¶ 161 a 166 del Laudo y del resumen contenido en los ¶¶ 127 y 134 de la Réplica de Anulación – las alegaciones de la República estaban dirigidas a demostrar que el

---

[325] MdC de Anulación, ¶¶ 103, 105-106; Dúplica de Anulación, ¶¶ 90-96; Tr. Día 2, 333:14-334:6.

[326] MdC de Anulación, ¶¶ 117-121; Dúplica de Anulación, ¶¶ 98-100.

verdadero inversor era Gruma, sociedad mexicana, y no Valores y Consorcio, a quienes la República calificaba como "*empresas de papel*". Por tanto, según Venezuela, Gruma no habría podido beneficiarse del sistema CIADI, puesto que México no era en esos momentos un Estado contratante del Convenio del CIADI. El Tribunal notó que Venezuela también adujo que "[e]*l cumplimiento del requisito de nacionalidad del Artículo 25 del Convenio CIADI est*[aba] *por encima del término 'inversores' del APPRI*". En todo caso, Venezuela consideró que, siendo Valores y Consorcio "*empresas de papel*", no calificaban como nacionales españoles bajo el derecho español.

283.   En cuanto a lo manifestado por el Tribunal, en el Laudo se rechazó la cuarta objeción jurisdiccional de Venezuela sobre la base del siguiente razonamiento. Primero, el Tribunal expuso que el Artículo 25 del Convenio del CIADI no contiene ningún criterio para determinar la nacionalidad de los inversores que sean personas jurídicas, por lo que les corresponde a los Estados establecer los requisitos de nacionalidad. En concreto, afirmó que, para decidir si Valores y Consorcio calificaban como nacionales de España para beneficiarse de la protección del AAPRI y del Convenio del CIADI, debía otorgar deferencia al criterio de nacionalidad de las personas jurídicas establecido en el mismo APPRI[327].

284.   Segundo, el Tribunal encontró que el APPRI requería que las Demandadas en Anulación estuvieran constituidas de conformidad con las leyes de España y expresó:

> 278. Tratándose de personas jurídicas constituidas fuera de Venezuela, el Artículo I(1)(b) del APPRI establece como *único* requisito para determinar si tales personas son inversores bajo el Tratado que éstas estén constituidas o debidamente organizadas según el derecho español. En otras palabras, el APPRI adopta el criterio de constitución para establecer si una persona jurídica califica como "inversor" bajo el Tratado.

> 280. […] Por lo tanto, cuando el test de nacionalidad establecido en el tratado correspondiente es el de "constitución" –y no uno de control o conexión genuina, por ejemplo– el tribunal no debe ir más allá de lo dispuesto en el tratado, a menos que haya ocurrido alguna forma de abuso, por ejemplo, si el inversor es una sociedad constituida en un Estado determinado con posterioridad al surgimiento de la controversia, con el fin de obtener provecho de un tratado concluido por ese Estado.

285.   El Comité entiende que en estos dos párrafos, que se complementan mutuamente, el Tribunal falló que el único estándar para la determinación de la nacionalidad de los inversores personas jurídicas de acuerdo con el Artículo I(1)(b) del APPRI es el de la constitución, excepto en caso de abuso. A este respecto – tal como lo demuestran el ejemplo contenido en el mismo ¶ 280 del Laudo y la cita al caso *Gold Reserve c. Venezuela*[328] – el Tribunal especificó que el abuso al que se estaba refiriendo (que no está explicitado en el Tratado) era un concreto abuso del criterio de constitución para obtener beneficios indebidos, lo que podría llamarse *ex post treaty shopping*.

286.   Tercero, el Tribunal consideró probado que Valores y Consorcio eran sociedades constituidas en España, que las acciones calificaban como inversiones bajo el APPRI y que las Demandadas en Anulación eran propietarias de acciones en Monaca y Demaseca desde años antes de que surgiera

---

[327] Laudo, ¶¶ 270, 271, 273, 275.

[328] *Gold Reserve c. Venezuela* (Laudo), ¶ 252 (CLA-103).

la controversia. Por ello, el Tribunal concluyó:

> 282. La Demandada no ha invocado ningún motivo que justifique desconocer la personalidad jurídica de las Demandantes o indagar por el cumplimiento de requisitos de nacionalidad adicionales a los expresamente establecidos en el Artículo XI(1)(b) [[329]] del APPRI. El Tribunal tampoco encuentra razón alguna para hacerlo.

> 283. Tal como explicó el Tribunal, el criterio de "constitución" establecido en el APPRI es el único criterio relevante, y también suficiente, para establecer su jurisdicción *ratione personae*, y las Demandantes cumplen con dicho requisito. Por lo tanto, no es necesario que el Tribunal entre a examinar las alegaciones fácticas planteadas por la Demandada en relación con esta objeción jurisdiccional.

287. Habiendo establecido el alcance de lo invocado por Venezuela en el Arbitraje Subyacente y lo decidido en el Laudo, el Comité pasa ahora a examinar qué alega Venezuela en este procedimiento de anulación.

288. Ante este Comité, Venezuela alega que, al argumentar en el Arbitraje Subyacente que Valores y Consorcio eran "*empresas de papel*", estaba diciendo que se había configurado un abuso del "*régimen jurídico de protección internacional de inversiones extranjeras*". En línea con esto, sostiene que su argumento calificaba como uno de abuso en los mismos términos en que lo definió el Tribunal en el ¶ 280 del Laudo[330].

289. Sin embargo, el Comité no está de acuerdo con esta reconstrucción que Venezuela ahora hace de su posición original en el Arbitraje Subyacente. Tal como se ha detallado más arriba[331], el argumento planteado por la República en aquel entonces no era, en realidad, un planteamiento de abuso del tipo que describió el Tribunal en el ¶ 280 del Laudo, es decir, un *ex post treaty shopping*.

290. Esto se deduce especialmente de la tabla del ¶ 127 de la Réplica de Anulación[332], que detalla las alegaciones de Venezuela acerca del abuso en el Arbitraje Subyacente. El Comité nota que en esta tabla solo figura dos veces la palabra "*abuso*", que, además, fue utilizada únicamente en la audiencia del Arbitraje Subyacente y en el marco de referencias genéricas. Ahora bien, lo más relevante para esta decisión es que ambas referencias tienen por objeto las alegaciones fácticas relacionadas con la supuesta calidad de "*empresas de papel*" de Valores y Consorcio, y con la calificación de la empresa mexicana Gruma como el verdadero inversor. El Comité entiende, entonces, que fue en relación con estos argumentos – y no con el *ex post treaty shopping* – que Venezuela utilizó la expresión "*abuso del sistema*" durante la audiencia del Arbitraje Subyacente.

291. Lo anterior fue confirmado por la propia República en el ¶ 128 de la Réplica de Anulación donde afirma que, en el Arbitraje Subyacente, ella "*efectivamente argumentó la existencia de un abuso, en virtud de que el verdadero 'inversor' era Gruma*".

---

[329] El Comité nota que la cita del Artículo obedece a un error de tipeo del Tribunal, ya que la definición de inversores se encuentra en el Artículo I(1) del APPRI, cuyo literal (b) se refiere a las personas jurídicas.

[330] Réplica de Anulación, ¶¶ 133, 136; Tr. Día 1, 69:12-16, 71:22-72:3, 72:7-20.

[331] Véase ¶ 282 *supra*.

[332] Réplica de Anulación, págs. 41-45.

292. Como resulta evidente, esta hipótesis de abuso es distinta a la que se refirió el Tribunal en el ¶ 280 del Laudo. Para que su argumento coincidiera con el abuso en los términos del Laudo, Venezuela debería haber argumentado que las Demandadas en Anulación, en vista de la disputa y para beneficiarse del APPRI y del Convenio del CIADI, habían reorganizado sus inversiones para adquirir la nacionalidad española. Y, tal como lo señalan las Demandadas en Anulación, ese argumento no fue planteado por la República en el Arbitraje Subyacente[333].

### b) Las consecuencias sobre las causales de anulación

293. La conclusión a la que acaba de llegar el Comité tiene una consecuencia inmediata sobre la configurabilidad de la causal de quebrantamiento de una norma fundamental de procedimiento. El hecho de que Venezuela no haya invocado, en el Arbitraje Subyacente, un abuso de la misma manera en que lo plantea en este procedimiento de anulación conlleva a que, contrariamente a lo que alega, no puede configurarse la "*falta de tratamiento*" de esta cuestión. Por ende, no existe quebrantamiento grave del Artículo 48(1) y 48(3) del Convenio del CIADI.

294. Asimismo, la mencionada conclusión también conlleva el rechazo del argumento de Venezuela con respecto a la falta de motivación.

295. Para fundar la contradicción del Tribunal, Venezuela invoca el ¶ 283 del Laudo citado arriba. Según la República, en ese párrafo el Tribunal habría aplicado un criterio distinto al establecido previamente, es decir, el *test* de "*constitución, excepto abuso*", puesto que habría dejado de lado la excepción de abuso.[334]

296. El Comité no está de acuerdo con el argumento de Venezuela. Tal como se ha explicado en la sección sobre la interpretación del Artículo 52(1)(e) del Convenio del CIADI[335], para determinar si en el ¶ 283 del Laudo el Tribunal aplicó coherentemente el criterio de nacionalidad enunciado en los ¶¶ 278 y 280, no se puede prescindir de los ¶¶ 281 y 282, ya que es precisamente allí donde el Tribunal descartó que se hubiera planteado un argumento referido al abuso.

297. En el ¶ 282 del Laudo el Tribunal dijo claramente que Venezuela no había invocado "*ningún motivo que justifique desconocer la personalidad jurídica de las Demandantes o indagar por el cumplimiento de requisitos de nacionalidad adicionales*" a los establecidos en el AAPRI. Esto se vincula con el hallazgo del Tribunal en el ¶ 281 de que Valores y Consorcio detentaban sus acciones en las Compañías "*desde años antes de que surgiera la controversia*".

298. El Comité considera que estas manifestaciones del Tribunal equivalen a constatar que la República no había invocado en el Arbitraje Subyacente un abuso tal como había sido definido en el ¶ 280 del Laudo (*ex post treaty shopping*).

299. En suma, no hay ninguna contradicción en el razonamiento del Tribunal en cuanto al estándar de

---

[333] El Comité nota que es irrelevante si el ejemplo del Tribunal para explicar su concepto de abuso es correcto o equivocado – como sostuvo Venezuela en la Audiencia (Tr. Día 1, 74:21-76:15) –, ya que, incluso siendo equivocado, se trataría de un error de derecho irrevisable por este Comité.

[334] Réplica de Anulación, ¶¶ 131-137.

[335] Véase ¶ 190 *supra*.

nacionalidad identificado y el efectivamente aplicado. Por un lado, en los ¶¶ 278 y 280 del Laudo, el Tribunal manifestó que el estándar era el de "*constitución, excepto abuso*"; por el otro, en los ¶ 281 y 282, sostuvo que no se había invocado un abuso en los términos delineados en el ¶ 280. Es por ello que, en el ¶ 283, el Tribunal explicó que, es este caso específico, la nacionalidad se debía decidir solamente teniendo en cuenta el criterio de constitución.

### c)    Conclusión

300.   En conclusión, el Comité considera que la República no ha probado que el Tribunal haya incurrido en falta de motivación o haya quebrantado una norma fundamental de procedimiento con respecto a su decisión de rechazar la cuarta objeción jurisdiccional, por lo que su solicitud en este punto se debe rechazar.

### D.    SOBRE LA CONDENA CON RELACIÓN AL DECRETO NO. 7.394

301.   En el Laudo, el Tribunal consideró arbitrario – y, por este motivo, violatorio de los Artículos III y IV del APPRI – que la República suspendiera indefinidamente el Decreto No. 7.394, que había dado inicio al procedimiento expropiatorio de Monaca, y, al mismo tiempo, aplicara algunos de sus efectos[336]. Con respecto a esta decisión, Venezuela sostiene que el Tribunal incurrió en la causal de anulación de falta de motivación.

### 1.    Argumentos de Venezuela

302.   La República sostiene que el Tribunal únicamente consideró la suspensión del Decreto y la concurrente aplicación de algunos de sus efectos en relación con el estándar de protección contra medidas arbitrarias y discriminatorias del Artículo III(1) en el ¶ 615 del Laudo, que es aquel en el que expresó su conclusión sobre la arbitrariedad de tales medidas. Según Venezuela, de esto se desprende de manera evidente que la motivación fue inexistente – al punto que incluso las Demandadas en Anulación lo admiten –, lo que impide a un lector informado comprender el razonamiento del Tribunal[337].

303.   Venezuela afirma que ni siquiera es posible reconstruir un razonamiento implícito en la decisión del Tribunal, porque la conclusión de que la suspensión del Decreto No. 7.394 y la simultánea aplicación de algunos de su efectos fueron medidas arbitrarias está en contradicción con lo decidido por el Tribunal al analizar, y rechazar, el reclamo por expropiación. A criterio de Venezuela, la contradicción radica en que, "*por un lado,* […] *el procedimiento de expropiación bajo el Decreto 7.394 se encuentra todavía abierto y que eso constituye una medida arbitraria, mientras que, por el otro lado* […] *ese mismo procedimiento que se encuentra abierto no constituye una violación del APPRI sobre expropiación en virtud de que ninguno de los efectos del Decreto 7.394 puede considerarse definitivo*"[338].

---

[336] Laudo, ¶¶ 565-583, ¶ 615; véanse ¶¶ 76-77 *supra*.

[337] MdA, ¶¶ 168-171; Réplica de Anulación, ¶¶ 143, 145-148.

[338] MdA, ¶¶ 173-175; Réplica de Anulación, ¶¶ 183-185.

304.   Por otra parte, Venezuela niega que el Tribunal haya motivado su decisión con respecto al Artículo III(1) de manera indirecta, es decir, "*incorporando por referencia*" en el ¶ 611 del Laudo el análisis de las mismas conductas bajo el TJE del Artículo IV. De entrada, la República explica que la "*doctrina de la 'incorporación por referencia'*" no es pertinente para sustituir la falta de expresión de motivos de un laudo en un arbitraje entre un Estado y un inversor[339].

305.   En todo caso, Venezuela rechaza el argumento según el cual el ¶ 611 del Laudo habría incorporado la sección dedicada al TJE, puesto que, en ese párrafo, el Tribunal afirmó que algunas de las medidas analizadas en relación con el TJE eran también arbitrarias, pero no indicó cuáles ni mucho menos asumió que el análisis sobre TJE supliera o completara el análisis específico de las medidas bajo el Artículo III[340].

306.   Según la Demandante en Anulación, la pretendida "*incorporación por referencia*" carece de sentido porque el Tribunal reconoció – tal como lo plantearon las Demandadas en Anulación en el Arbitraje Subyacente – que las protecciones previstas por los Artículos III(1) y IV eran distintas y generaban obligaciones diversas. Por lo tanto, si fuera cierto que, en el ¶ 611, el Tribunal hubiera "*incorporado por referencia*" los razonamientos vertidos sobre el TJE, se caería en flagrante contradicción con el reconocimiento de que ambas protecciones eran distintas[341].

307.   Venezuela también destaca que las Partes están de acuerdo en que el estándar de protección contra medidas arbitrarias bajo el Artículo III es el del caso *ELSI* de la Corte Internacional de Justicia[342], según el cual una medida es arbitraria cuando configura una "*inobservancia deliberada del debido proceso de ley*". Al ser este un estándar alto, Venezuela argumenta que no le bastaba al Tribunal con utilizar su interpretación en relación con el TJE para justificar que las medidas eran arbitrarias bajo el Artículo III(1), sino que se requería un análisis separado y específico al respecto. Por esta razón, la República sostiene que es contradictorio que Valores y Consorcio pretendan solventar la falta de motivación del Tribunal respecto a las medidas supuestamente arbitrarias bajo el estándar del Artículo III(1) confundiendo este estándar con el TJE[343].

308.   Adicionalmente, tampoco podría incorporarse por referencia el razonamiento bajo el TJE porque, para Venezuela, el Tribunal tampoco expresó motivos para considerar violatoria del TJE la suspensión del Decreto No. 7.394 y la simultánea aplicación de algunos de sus efectos. La República explica que el reclamo por TJE de Valores y Consorcio se basó en que las medidas de Venezuela les hacía imposible distribuir dividendos, aprobar estados financieros, nombrar o remover directores o administradores, vender las acciones de Monaca y Demaseca, o disponer de sus activos. Sin embargo, el Tribunal solamente aceptó que Venezuela había impedido a las Demandadas en Anulación disponer de sus activos y rechazó expresamente el resto de las quejas[344].

---

[339] Réplica de Anulación, ¶¶ 149-150.

[340] Réplica de Anulación, ¶¶ 151-154; Tr. Día 1, 94:6-20.

[341] MdA, ¶¶ 177-178; Réplica de Anulación, ¶¶ 155-161; Tr. Día 1, 93:2-7.

[342] *ELSI* (RLA-252).

[343] Réplica de Anulación, ¶¶ 162-164.

[344] MdA, ¶¶ 179-187; Réplica de Anulación, ¶¶ 165-169; Tr. Día 1, 96:2-97:11.

309. No obstante, para Venezuela, la conclusión de que las Demandadas en Anulación estaban impedidas de disponer de sus activos no está sustentada en la única fuente de prueba en la que el Tribunal se basó, esto es, la declaración del experto legal de Venezuela en el Arbitraje Subyacente. La República manifiesta que el experto nunca confirmó que el Decreto hubiera impedido a Valores y Consorcio cambiar el objeto social de Monaca y Demaseca, cambiar su línea de negocios, retirar equipos fuera de Venezuela y dejar de hacer inversiones, al contrario de lo que decidió el Tribunal[345].

310. Por último, Venezuela afirma que el Tribunal incurrió en contradicción al considerar, por un lado, que las restricciones del Decreto No. 7.394 fueron arbitrarias y, por el otro, que la República podía legítimamente imponer "*el cumplimiento de políticas públicas relacionadas con fines esenciales del Estado*". A criterio de la República, el Tribunal nunca tomó una decisión sobre si la suspensión del procedimiento expropiatorio era imputable a ella. Así, como el Tribunal consideró que los fines del Decreto eran legítimos y que el procedimiento expropiatorio se suspendió con causa justificada, "*no puede ser ilegítimo mantener algunos* [de sus] *efectos* […] *para asegurar los bienes que pretenden protegerse*"[346].

### 2.    Argumentos de Valores y Consorcio

311. Las Demandadas en Anulación sostienen que el Tribunal fundamentó adecuadamente su decisión de considerar que la aplicación de algunas restricciones del Decreto No. 7.394, sumada a la suspensión indefinida del proceso expropiatorio sin que Venezuela mostrara voluntad de concluirlo o revocar el Decreto, constituyó una conducta arbitraria violatoria de los Artículos IV y III(1) del APPRI.

312. Con relación al Artículo IV, Valores y Consorcio explican que una simple lectura de la § V.B.3 del Laudo permite a un lector informado comprender cómo llegó el Tribunal a la conclusión de que Venezuela no había otorgado un TJE a sus inversiones. El Tribunal primero estableció cuál era el estándar aplicable al TJE bajo el Artículo IV y aclaró que este incluía, *inter alia*, la obligación de no actuar de forma arbitraria o discriminatoria. A continuación el Tribunal analizó el conjunto de los hechos sometidos a su consideración y destacó lo siguiente: (*i*) Venezuela inició el procedimiento expropiatorio en mayo de 2010 a través del Decreto No. 7.394; (*ii*) dicho proceso se suspendió en agosto de 2010 para que las Partes pudieran entablar negociaciones amistosas y se mantuvo suspendido por varios años; (*iii*) Valores y Consorcio intentaron impulsar las negociaciones; (*iv*) la República transfirió la responsabilidad de las negociaciones de un funcionario a otro sin justificación; y (*v*) Venezuela entendió que, a pesar de la suspensión del Decreto, eran aplicables algunas de las restricciones sobre los bienes de Monaca y Demaseca. Luego de considerar los hechos y el derecho, el Tribunal concluyó que Venezuela había violado su obligación de TJE al haber mantenido suspendido el procedimiento expropiatorio iniciado con el Decreto por casi diez años sin impulsarlo y, al mismo tiempo, haber aplicado algunas de las restricciones de tal

---

[345] MdA, ¶¶ 193-196; Réplica de Anulación, ¶¶ 170-178.

[346] MdA, ¶¶ 188-189; Réplica de Anulación, ¶¶ 181-182; Tr. Día 1, 88:17-90:11.

Decreto[347].

313. Las Demandadas en Anulación señalan que, ante lo evidente del razonamiento del Tribunal, Venezuela "*inventa contradicciones*" e invoca una falta de motivación inexistente. En primer lugar, contrariamente a lo que afirma la República, el Tribunal no se basó solo en el testimonio del experto legal de Venezuela en el Arbitraje Subyacente para considerar que el Decreto imponía restricciones a los bienes de Monaca y Demaseca, sino que tuvo en cuenta múltiples oficios con los que funcionarios de la República ordenaban tales restricciones[348].

314. En segundo lugar, no es cierto que el Laudo considerase que las restricciones fueran por sí mismas violatorias del TJE, sino que concluyó que lo eran con relación a la suspensión indefinida del procedimiento expropiatorio que la misma Venezuela tenía la obligación de impulsar[349].

315. En tercer lugar, es falso que el Tribunal no se pronunciase sobre cómo se había llegado a la suspensión del procedimiento expropiatorio ni expresase si tal suspensión era imputable a la República. Para Valores y Consorcio, el Tribunal dijo claramente que le correspondía a la República impulsar las negociaciones o levantar la suspensión del procedimiento[350].

316. En cuarto lugar, Valores y Consorcio afirman que no es contradictoria la conclusión del Tribunal, bajo el estándar de expropiación, de que el Decreto no era irreversible y, bajo el de TJE, de que el procedimiento expropiatorio estaba aún abierto y por eso era una medida arbitraria. Señalan que la comparación propuesta por Venezuela "*no es válida*", porque en cuanto al reclamo de expropiación, el Tribunal concluyó que ellas no habían probado la pérdida de control de Monaca y Demaseca en forma definitiva, puesto que el Decreto no tenía efectos irreversibles. En cambio, al analizar el reclamo por TJE, el Tribunal expresó que la República debía impulsar el procedimiento y determinar el momento en que las negociaciones habían llegado a su fin, y que, por ende, Venezuela actuó arbitrariamente al mantenerlo suspendido indefinidamente y aplicar las restricciones[351].

317. En cuanto a la condena a Venezuela por violación del Artículo III(1), las Demandadas en Anulación sostienen que el razonamiento del Tribunal puede comprenderse sin dificultad. El Tribunal primero determinó el alcance del Artículo III(1), tras lo cual "*incorporó por referencia*", en el ¶ 611 del Laudo, el análisis fáctico realizado en la sección sobre TJE y expresó que algunas de las medidas allí analizadas eran por sí mismas arbitrarias, estando entre ellas la suspensión indefinida del procedimiento expropiatorio y la simultánea aplicación de algunas restricciones del Decreto[352].

318. Valores y Consorcio sostienen que, ante este análisis lógico y comprensible del Tribunal, la República intenta decir que sería contradictorio remitirse a lo expresado bajo el estándar del TJE, porque el Tribunal había indicado que ambos estándares eran independientes. Para ellas, esto no

---

[347] MdC de Anulación, ¶¶ 140-142, 146-151; Dúplica de Anulación, ¶¶ 134-137; Tr. Día 1, 186:2-187:11.

[348] MdC de Anulación, ¶¶ 143-145; Dúplica de Anulación, ¶¶ 138-142; Tr. Día 1, 189:1-190:2.

[349] Dúplica de Anulación, ¶ 143.

[350] Dúplica de Anulación, ¶ 144.

[351] Dúplica de Anulación, ¶¶ 145-148.

[352] MdC de Anulación, ¶ 152; Dúplica de Anulación, ¶¶ 149-151.

significa que el análisis de uno sea irrelevante para el otro, en especial porque el Tribunal determinó que el Artículo IV comprende el deber de no actuar de forma arbitraria y el Artículo III(1) prohíbe más concretamente las medidas arbitrarias. Así, era razonable y acorde con los principios de economía procesal que el Tribunal se remitiera a las conclusiones fácticas acerca del estándar de TJE[353].

319.   Por último, las Demandadas en Anulación niegan que el Tribunal haya adoptado el estándar del caso *ELSI*[354], que equipara la arbitrariedad a la "*inobservancia deliberada del debido proceso de ley*". En realidad, basándose en los casos *Azurix c. Argentina*[355] y *Lauder c. República Checa*[356], el Tribunal indicó que el estándar de arbitrariedad comprende medidas "*que no tienen sustento en la razón, los hechos o el derecho*". Por lo tanto, cuando determinó que la suspensión indefinida del procedimiento expropiatorio y la simultánea aplicación de algunas restricciones del Decreto fueron arbitrarias, el Tribunal aplicó el estándar previamente decidido, por lo que no le corresponde al Comité reemplazar el análisis jurídico y fáctico del Tribunal[357].

### 3.   Análisis del Comité

320.   El Tribunal consideró que la suspensión del Decreto No. 7.394 y la simultánea aplicación de algunos de sus efectos no tenían sustento en la razón, por lo que eran medidas arbitrarias. Por ende, concluyó que Venezuela había violado el Artículo IV del APPRI y, por los mismos motivos, también el Artículo III(1).

321.   Con respecto a la decisión sobre el Artículo III(1), la República sostiene que existe una ausencia total de expresión de motivos y que tampoco es posible reconstruir un razonamiento implícito. Por un lado, esta decisión contradice la relativa al reclamo por expropiación y, por el otro, no incorpora aquella relativa al Artículo IV, que, por sí misma, está afectada por falta de motivación.

322.   Por su parte, las Demandadas en Anulación manifiestan que la decisión sobre el Artículo III(1) fue motivada a través de la incorporación del análisis referido al Artículo IV, debido a que las medidas cuestionadas bajo ambos estándares eran las mismas. Valores y Consorcio también niegan que la decisión sobre el Artículo IV no esté debidamente motivada.

323.   Debido al vínculo de dependencia que Valores y Consorcio atribuyen a la decisión del Tribunal sobre el Artículo III(1) con respecto al Artículo IV, el Comité considera conveniente tratar primero la impugnación relativa a este último y luego concentrarse en aquella referida al Artículo III(I).

### a)   La decisión sobre el Artículo IV del APPRI

324.   En cuanto al Artículo IV, la República argumenta que el Tribunal se basó únicamente en la opinión del experto legal de Venezuela para sustentar que esta había impedido a Valores y Consorcio

---

[353] Dúplica de Anulación, ¶¶ 153-155; Tr. Día 1, 187:11-19.

[354] *ELSI* (RLA-252).

[355] *Azurix c. Argentina (Laudo)* (CLA-058).

[356] *Lauder c. República Checa* (Laudo) (CLA-040).

[357] Dúplica de Anulación, ¶¶ 156-157.

disponer de sus activos, aunque, en realidad, el testimonio del experto no soportaba tal conclusión. Además, Venezuela afirma que el Tribunal se contradijo al considerar arbitrarias las restricciones del Decreto No. 7.394, pese a haber decidido que la República podía legítimamente imponer "*el cumplimiento de políticas públicas relacionadas con fines esenciales del Estado*".

325.   El Tribunal inició su análisis determinando el estándar de TJE según el Artículo IV del APPRI, a cuyo fin expresó, con apoyo en la jurisprudencia, que este incluía "*la obligación de no actuar de forma arbitraria o discriminatoria, observar el debido proceso y actuar de forma coherente y transparente*"[358]. Luego de explicar que la determinación de qué era justo o equitativo dependía de los hechos del caso, el Tribunal resaltó que examinaría la actuación de Venezuela en conjunto para verificar si se había adecuado al TJE[359].

326.   Tras esto, el Tribunal hizo un recuento de las medidas adoptadas por Venezuela[360], entre las que se encontraba el Decreto y su posterior suspensión. Sobre esto, en el ¶ 547 del Laudo, expresó:

> A pesar de la suspensión del proceso expropiatorio –que según la Demandada apenas se encuentra en sus inicios– la Demandada ha entendido, y así lo ha hecho saber a las Compañías, que el Decreto No. 7.394 impone obligaciones de conservación y ciertas restricciones sobre los bienes comprendidos en el Decreto, esto es, de aquellos que sirven para el funcionamiento de Monaca o para la producción, procesamiento agroindustrial y almacenamiento a gran escala de determinados productos. Por ejemplo, la Demandada ha señalado que las Demandantes no pueden realizar actos que impliquen que los bienes de las Compañías se destruyan o sean objeto '*incapacitado[s] para cumplir el fin por el cual está[n] siendo apropiado[s]*'. Según el propio perito de Venezuela, estos actos incluirían (i) cambiar su objeto social; (ii) cambiar o eliminar una línea de negocios; (iii) dejar de hacer inversiones para que sus fábricas y equipos sigan funcionando; y (iv) sacar sus maquinarias y equipos de Venezuela. Según el mismo perito, las Demandantes pueden trasparar el bien, pero el 'decreto de afectación' lo perseguirá donde se encuentre. Estas restricciones se mantendrían hasta que haya un acuerdo definitivo respecto de la adquisición de todo o parte de las Compañías o hasta que Venezuela expropie directamente los bienes objeto del Decreto.

327.   Posteriormente, el Tribunal confrontó las medidas con el estándar de TJE[361] y, al llegar al análisis del Decreto No. 7.394[362], explicó que a tal fin era esencial examinar cómo se habían desenvuelto el proceso expropiatorio y las negociaciones entre las Partes para la adquisición amistosa, y la forma en la que se había aplicado el Decreto durante su suspensión[363]. El Tribunal encontró que Venezuela había generado demoras e interrupciones en las negociaciones y que no había cumplido con su responsabilidad de impulsar el procedimiento de expropiación, por lo que el retraso de casi diez años en concluirlo no estaba justificado[364].

328.   Por lo tanto, el Tribunal, en el ¶ 583, concluyó que Venezuela había violado el TJE:

---

[358] Laudo, ¶ 539.

[359] Laudo, ¶ 540.

[360] Laudo, ¶¶ 541-548.

[361] Laudo, ¶¶ 549 ss.

[362] Laudo, ¶¶ 564-583.

[363] Laudo, ¶ 570.

[364] Laudo, ¶¶ 571-579.

> […] al mantener suspendido el proceso expropiatorio por casi diez años sin avanzar decididamente en las negociaciones y, al mismo tiempo, entender que aplican aquellos efectos del Decreto No. 7.394 que imponen limitaciones a las Compañías, incluyendo restricciones para disponer de algunos bienes (los bienes que según Venezuela están comprendido [*sic*] en el Decreto) o realizar determinados actos (los que Venezuela señala estar limitados por la aplicación del Decreto).

329. El Comité nota que el razonamiento del Tribunal resulta sencillo de seguir y comprender para cualquier lector informado, por lo que el requisito mínimo de motivación que impone el Artículo 52(1)(e) del Convenio del CIADI se encuentra cumplido[365]. Tal como se verá a continuación, las críticas de Venezuela no resultan convincentes.

330. El primer cuestionamiento de la República se dirige contra lo manifestado en el ¶ 547 del Laudo citado arriba: para Venezuela, a fin de concluir que el Decreto imponía obligaciones de conservación pese a la suspensión del proceso expropiatorio, el Tribunal solo se basó en la opinión del experto legal de Venezuela, pero este nunca reconoció las restricciones que el Tribunal dio por probadas.

331. El Comité rechaza este cuestionamiento por dos motivos. Por un lado, la impugnación de la República está dirigida a poner en tela de juicio el valor de convicción otorgado por el Tribunal al testimonio de un experto. Por más que Venezuela haya manifestado que no pretende una nueva valoración de la prueba[366], su propio planteo demuestra que su objeción se funda, precisamente, en eso, tal como se desprende del siguiente pasaje de la Réplica de Anulación:

> […] ese es justamente el problema que la República puso de manifiesto en su Memorial de Anulación: que la lectura de la declaración del experto legal de la República durante la audiencia demuestra [*sic*] no puede ser sustento –y mucho menos el único sustento– de la conclusión a la que arribó el Tribunal[367].

332. El argumento de la Demandante en Anulación cuestiona la conclusión que el Tribunal sacó de lo dicho por su experto. Por lo tanto, al tratarse de una disconformidad en relación a cómo el Tribunal interpretó el testimonio del experto, lo que Venezuela pretende excede el restringido ámbito de control de este Comité, que no puede actuar como juez de apelación, como se ha explicado al interpretar el alcance del Artículo 52(1)(e) en el ¶ 177 *supra*.

333. Por otro lado, como correctamente lo resaltan Valores y Consorcio, el testimonio del experto no fue la única prueba con base en la que el Tribunal concluyó que existían restricciones a la disposición de ciertos bienes. Basta comprobar la nota al pie 669 del Laudo para corroborar que en el ¶ 547 el Tribunal se basó también en los anexos documentales C-016, C-115 y C-142, que contenían oficios de funcionarios de Venezuela dirigidos a las Compañías de los cuales se desprende el entendimiento de la República sobre la vigencia del Decreto y el alcance de sus restricciones. De lo anterior se sigue que la premisa en la que Venezuela se apoya – *i.e.*, que el Tribunal se basó únicamente en un solo medio de prueba – es incorrecta, por lo que ni siquiera esto soporta su primer cuestionamiento.

334. En cuanto al segundo cuestionamiento, Venezuela alega que el Tribunal se contradijo al

---

[365] Véase ¶ 176 *supra*.

[366] MdA, ¶ 197.

[367] Réplica de Anulación, ¶ 171.

considerar, por una parte, que las restricciones derivadas del Decreto eran arbitrarias y, por otra parte, que la República tenía la facultad de imponer restricciones fundadas en razones de políticas públicas. Esto último surgiría, según la Demandante en Anulación, del ¶ 467 del Laudo, donde el Tribunal sostuvo:

> […] el Tribunal coincide con la Demandada en que el Estado tiene la facultad de exigir a las empresas, con independencia de si sus accionistas son privados, el cumplimiento de políticas públicas esenciales para el cumplimiento de los fines del Estado, como sería el caso de las políticas alimentarias.

335.   De esto seguiría, según Venezuela, que no podrían considerarse arbitrarias las restricciones del Decreto fundadas en razones de políticas alimentarias. Aparentemente, este argumento reposa sobre la premisa de que el Tribunal consideró que las restricciones del Decreto eran arbitrarias por sí mismas. Para Valores y Consorcio se trata de una premisa incorrecta, puesto que el Tribunal nunca expresó que las restricciones del Decreto fueran, por sí mismas, violatorias del TJE.

336.   El Comité concuerda con las Demandadas en Anulación. En efecto, tal como se explicó en el ¶ 328 *supra*, el Tribunal consideró que lo que violaba el TJE no era que se aplicaran ciertas restricciones del Decreto, sino que ello se hiciera concomitantemente con una suspensión del procedimiento expropiatorio por casi diez años. Es claro, entonces, que, teniendo en cuenta la premisa correcta, la supuesta contradicción acusada por Venezuela desaparece.

337.   No obstante lo anterior, Venezuela parecería sugerir que, como el Tribunal "*no tomó una decisión contraria a la posición de la República respecto de cómo se había llegado a la suspensión del proceso expropiatorio*"[368], el ¶ 467 del Laudo debería conducir a considerar legítimas las restricciones, incluso durante la suspensión del Decreto.

338.   En opinión del Comité, también este argumento debe rechazarse porque no toma en cuenta que, en el ¶ 569 del Laudo, el Tribunal consideró irrelevante la manera en la que se había llegado a la suspensión o si esta había sido lícita o ilícita bajo el derecho venezolano[369]. Para el Tribunal, como ya se ha explicado, lo determinante fue la aplicación de ciertas restricciones del Decreto a pesar de que el procedimiento expropiatorio estuviera suspendido por más de diez años, lo que era imputable a Venezuela[370].

339.   Por todo lo anterior, tampoco el segundo cuestionamiento sobre la supuesta contradicción relativa al ¶ 467 de Laudo puede ser acogido, por lo que el Comité considera que la República no ha probado que la decisión del Tribunal en relación con el Artículo IV del APPRI esté viciada por

---

[368] Réplica de Anulación, ¶ 181.

[369] Laudo, ¶ 569: "*En opinión del Tribunal, la discusión sobre cómo se llegó a la suspensión del proceso no es determinante en este contexto. Independientemente de quién tomó esta decisión y de si la suspensión del proceso expropiatorio es o no válida bajo ley venezolana, quedó demostrado en este arbitraje que funcionarios de Venezuela han interpretado e interpretan que el proceso expropiatorio está suspendido, pero que el Decreto No. 7.394 continúa aplicando y que el mismo impone ciertas limitaciones a la disposición de los bienes de las Compañías por parte de las Demandantes, pero permite el uso de otros bienes no afectos a las políticas alimentarias, y que tales limitaciones no cesarán hasta que haya un acuerdo definitivo respecto de la adquisición de todo o parte de las Compañías, o hasta que cesen los efectos del Decreto como consecuencia de una decisión judicial, o hasta que Venezuela reanude el proceso de expropiación y expropie directamente los bienes objeto del Decreto*".

[370] Laudo, ¶¶ 573-580, 582.

falta de motivación.

### *b)*     *La decisión sobre el Artículo III(1) del APPRI*

340.   Al comenzar el análisis de la reclamación por medidas arbitrarias y discriminatorias, el Tribunal determinó el alcance del Artículo III(1) y expresó que coincidía con las Demandadas en Anulación en que los estándares de los Artículos III(1) y IV eran diferentes, aunque resaltó que estas no habían explicado cómo y en qué medida se diferenciaban. Posteriormente, el Tribunal observó que, para sustentar su reclamo, Valores y Consorcio habían invocado los mismos hechos invocados en su reclamo por TJE – entre los que se encontraba la ejecución del Decreto No. 7.394 – y el mismo estándar de "*arbitrariedad*" y "*discriminación*"[371].

341.   El Tribunal recordó que, al condenar a Venezuela por violar el estándar de TJE bajo el Artículo IV había examinado "*el conjunto de hechos y circunstancias relacionados con las medidas de aseguramiento y administración especial y el Decreto No. 7.394*", llegando a la conclusión, en el ¶ 611 del Laudo, que algunas de las conductas analizadas bajo el TJE eran arbitrarias:

>El Tribunal encuentra que algunas de las medidas o conductas atribuibles a Venezuela alegadas por las Demandantes en el contexto de la reclamación sobre tratamiento justo y equitativo son en sí mismas arbitrarias, es decir, no tienen sustento en la razón, los hechos o el derecho. Tal como lo ha concluido el Tribunal, una misma conducta del Estado puede constituir una violación de distintas obligaciones bajo el APPRI[372].

342.   Dicho esto, el Tribunal pasó a analizar las conductas de Venezuela que Valores y Consorcio calificaban como arbitrarias y discriminatorias bajo el Artículo III(1). En particular, en el ¶ 615 del Laudo, se refirió al Decreto de la siguiente manera:

>Resultan igualmente arbitrarias las conductas ya analizadas por el Tribunal de mantener indefinidamente la suspensión del proceso de expropiación y simultáneamente aplicar algunos de los efectos del Decreto No. 7.394 y la ausencia de una decisión –más de seis años después– sobre la admisibilidad o no del recurso con el cual las Demandantes buscan controvertir medidas cautelares que mientras tanto se mantienen indefinidamente, aunque se alega que son temporales.

343.   Venezuela basa su argumento de la falta de motivación en este pasaje, ya que, según ella, el ¶ 615 es el único párrafo que el Tribunal dedicó al Decreto con relación al Artículo III(1) del APPRI y es allí donde expresó su conclusión; para la República, entonces, el Tribunal solo habría expresado una conclusión sin que consten las premisas que la justifican. Por su parte, Valores y Consorcio cuestionan esa lectura del Laudo sosteniendo que el Tribunal se remitió a la sección sobre TJE, en la cual había analizado las mismas medidas.

344.   El Comité coincide con las Demandadas en Anulación y recuerda preliminarmente que el Convenio

---

[371] Laudo, ¶¶ 607-610.

[372] El Comité nota que en este párrafo el Tribunal hizo referencia a los laudos *Azurix c. Argentina (Laudo)* y *Lauder c. República Checa (Laudo)*, sin mencionar el caso *ELSI* de la Corte Internacional de Justicia. Por lo tanto, no está fundamentado el argumento de Venezuela (Réplica de Anulación, ¶¶ 162-164) basado en este último caso para sostener que el Tribunal debería haber realizado un análisis separado de las medidas bajo el Artículo III(1).

del CIADI no impone a los árbitros ninguna forma en la que deben presentar su motivación[373]. Por lo tanto, el Tribunal bien podía remitirse a otra parte del Laudo para fundar su decisión sobre el reclamo por la violación del Artículo III(1), sobre todo porque esto no impide a un lector informado comprender la motivación del Tribunal al respecto.

345.  Tal como ya se ha explicado[374], al tratar el reclamo por TJE, el Tribunal consideró que Venezuela había obrado de manera injustificada durante el proceso expropiatorio, en las negociaciones entre las Partes y en la aplicación de las medidas del Decreto. A juicio del Comité, los ¶¶ 565 a 583 del Laudo permiten a un lector informado entender por qué, en el ¶ 615, el Tribunal consideró que la suspensión del proceso expropiatorio y la aplicación simultánea de ciertas restricciones del Decreto eran medidas arbitrarias que violaban no solo el TJE, sino también el estándar de arbitrariedad del Artículo III(1).

346.  La remisión a la sección sobre TJE para explicar la arbitrariedad bajo el Artículo III(1), que se desprende particularmente del uso de la expresión "*conductas ya analizadas*" al comienzo del ¶ 615, se justifica por dos razones. Por un lado, estos estándares – aun siendo protecciones diversas con alcance distinto – tienen un núcleo común, pues la arbitrariedad es no solo objeto del Artículo III(1), sino también, como sostuvo el Tribunal en el ¶ 539 del Laudo, uno de los componentes del TJE. Por otro lado, las medidas objeto de la valoración de la arbitrariedad eran las mismas medidas de Venezuela.

347.  Por lo tanto, a criterio del Comité, no existe contradicción entre, por una parte, la genérica afirmación del Tribunal en el ¶ 609 del Laudo según la cual las protecciones de los Artículos III(1) y IV son distintas y, por otra parte, la calificación del Decreto como arbitrario en violación del Artículo III(1) con base en el análisis de la misma medida bajo el Artículo IV. Mucho menos puede considerarse que el Tribunal haya incurrido en una ausencia total de motivación. Como se acaba de evidenciar, el Laudo contiene un examen detallado y coherente de las medidas que llevaron al Tribunal a la conclusión de que la República había violado el Artículo III(1) del APPRI, cumpliendo así con el requisito mínimo de motivación del Artículo 52(1)(e) del Convenio del CIADI[375].

348.  Por último, el Comité considera que el argumento de la República según el cual existiría una contradicción entre la decisión sobre el Artículo III(1) y aquella sobre el reclamo por expropiación con relación al Decreto no está fundamentado[376]. La conclusión del párrafo anterior, según la cual la decisión del Tribunal acerca del Artículo III(1) está motivada, desmiente la premisa de Venezuela de que no sería posible reconstruir un razonamiento implícito del Tribunal acerca de su decisión sobre el Artículo III(1). Además, el Comité encuentra que no existe contradicción entre las conclusiones del Tribunal, pues el estándar de expropiación bajo el Artículo V y bajo el Artículo III(1) son sumamente distintos, pues una misma conducta puede ser arbitraria, y no expropiatoria.

---

[373] Véase ¶ 195 *supra*.

[374] Véase ¶ 327 *supra*.

[375] Véase ¶ 176 *supra*.

[376] MdA, ¶¶ 172-175.

### c) Conclusión

349. Con base en lo anterior, el Comité concluye que las críticas de Venezuela a las decisiones del Tribunal sobre los Artículos III(1) y IV con referencia al Decreto No. 7.394 carecen de fundamento y, por lo tanto, no se configura la falta de motivación alegada por la República.

### E. SOBRE EL TRATAMIENTO DE LA PRUEBA EN RELACIÓN CON LA COMISIÓN DE ENLACE

350. En el Laudo, el Tribunal consideró que una de las medidas arbitrarias de Venezuela consistió en imponer, en el marco del procedimiento expropiatorio, una Comisión de Enlace sobre las Compañías a través de la cual miembros designados por la República actuarían en coordinación con los cargos ejecutivos de aquellas hasta que la expropiación hubiera finalizado[377]. Venezuela sostiene que al decidir así el Tribunal quebrantó normas fundamentales de procedimiento e incurrió en falta de motivación.

### 1. Argumentos de Venezuela

### a) Quebrantamiento grave de una norma fundamental de procedimiento

351. En cuanto a la violación de normas de procedimiento, Venezuela argumenta, en primer término, que el Tribunal invirtió la carga de la prueba poniendo en cabeza suya la carga de probar que la Comisión de Enlace no había sido arbitraria. A criterio de la República, esto surge con claridad del ¶ 614 del Laudo, en el que el Tribunal consideró arbitraria la Comisión de Enlace señalando que "*no se* [había aportado] *al arbitraje instrumento alguno que* [diera] *cuenta de su creación* [de la Comisión de Enlace]*, legal o convencional*". De esta manera, según Venezuela, el Tribunal violó reglas fundamentales de procedimiento, ya que en el marco del derecho internacional "la *carga de la prueba es de quien alega la arbitrariedad de la medida*"[378].

352. En segundo término, la Demandante en Anulación afirma que el Tribunal también violó una norma de procedimiento al haber ignorado los dichos de las Partes y las pruebas del expediente que acreditaban que la Comisión de Enlace había sido creada de común acuerdo entre las Partes, lo cual descartaba su carácter arbitrario. En particular, Venezuela se refiere a los siguientes documentos: (*i*) un correo electrónico del 15 de mayo de 2010 del Sr. Homero Huerta Moreno (C-078)[379], (*ii*) una nota de las Demandadas en Anulación al Dr. Reinaldo Muñoz Pedroza, en aquel entonces consultor jurídico del Ministerio de Agricultura de la República (C-083)[380], y (*iii*) un correo electrónico del Sr. Rafael Rodríguez, miembro de la Comisión de Enlace, al Sr. Nicolás Constantino, de Monaca (C-191)[381]. Según Venezuela, estos documentos contradicen abiertamente la decisión del Tribunal de considerar que la Comisión de Enlace había sido

---

[377] Laudo, ¶ 614; véase ¶ 58 *supra*.

[378] MdA, ¶¶ 156-157, 162; Réplica de Anulación, ¶¶ 190-192.

[379] Correo electrónico del Sr. Homero Huerta Moreno al Sr. Roberto González Alcalá del 15 de mayo de 2010 (C-078).

[380] Carta del Sr. Roberto González Alcalá al Dr. Reinaldo Muñoz del 28 de mayo de 2010 (C-083).

[381] Correo electrónico del Sr. Rafael Rodríguez al Sr. Nicolás Constantino del 29 de julio de 2010 (C-191).

impuesta por la República, que fue la razón por la que se declaró arbitraria la conducta de Venezuela[382].

### b)   Falta de motivación

353.   En cuanto a la falta de motivación, Venezuela se basa en la alegada omisión del Tribunal de considerar las pruebas reseñadas en el ¶ 352 *supra*, que hace "*imposible de entender*" la decisión de considerar arbitraria la Comisión de Enlace[383]. Apoyándose en el caso *TECO c. Guatemala*[384], la República afirma que los tribunales deben analizar las pruebas que las partes consideran relevantes, aunque solo sea para rechazarlas con la debida justificación acerca de su irrelevancia. Al no haber el Tribunal cumplido con ese deber en este caso, Venezuela concluye que el vicio de falta de motivación está configurado[385].

### 2.   Argumentos de Valores y Consorcio

354.   Las Demandadas en Anulación consideran que, al afirmar que la Comisión de Enlace era arbitraria, el Tribunal no solo no violó ninguna norma de procedimiento, sino que realizó un razonamiento comprensible para cualquier lector informado. El Tribunal, después de establecer el estándar jurídico aplicable, determinó que la Comisión de Enlace había sido impuesta por Venezuela y había afectado el funcionamiento de Monaca y Demaseca, por lo que decidió que esto violaba el estándar de arbitrariedad[386].

### a)   Quebrantamiento grave de una norma fundamental de procedimiento

355.   Valores y Consorcio niegan que el Tribunal haya invertido la carga de la prueba en relación con la arbitrariedad de la Comisión de Enlace, como sostiene Venezuela tergiversando el ¶ 614 del Laudo. La frase en la que se apoya Venezuela ("[e]*l Tribunal tampoco está convencido de que la Comisión de Enlace se hubiese creado por acuerdo entre las Partes, entre otras razones, porque no se aportó al arbitraje instrumento alguno que dé cuenta de su creación, legal o convencional*") no constituye una inversión implícita de la carga de la prueba, sino que es solo una conclusión de hecho sobre la imposición unilateral de la Comisión de Enlace[387].

356.   El Tribunal llegó a tal conclusión luego de haber comprobado que la figura de la Comisión de Enlace no estaba prevista en la ley de expropiación ni en el Decreto No. 7.394, y de haber valorado y descartado la prueba ofrecida por Venezuela para sostener que aquella había sido creada por

---

[382] MdA, ¶¶ 158-161; Réplica de Anulación, ¶¶ 193-198.

[383] MdA, ¶ 166; Réplica de Anulación, ¶ 202; Tr. Día 1, 102:10-103:2, 113:20-114:4.

[384] *TECO c. Guatemala* (RLA-197).

[385] MdA, ¶¶ 164-166; Réplica de Anulación, ¶¶ 200-203.

[386] MdC de Anulación, ¶ 182; Dúplica de Anulación, ¶¶ 125-127; Tr. Día 1, 184:5-185:21.

[387] Dúplica de Anulación, ¶¶ 107-108.

acuerdo de las Partes[388]. En particular, el Tribunal tuvo en consideración el anexo C-078[389], que demuestra que la creación de la Comisión de Enlace fue simplemente comunicada a las Demandadas en Anulación, por lo que su naturaleza no consensual resultaba clara. Valores y Consorcio sostienen que Venezuela pretende introducir argumentos nuevos, y por lo tanto inadmisibles, sobre ese documento en este procedimiento de anulación[390].

357. Valores y Consorcio afirman que correspondía a Venezuela refutar su demostración de que la Comisión de Enlace fue creada unilateralmente por la República, pero la prueba ofrecida por ella no fue considerada "*fehaciente*" por el Tribunal. En concreto, este examinó los anexos C-191[391] y C-083[392] – que contienen comunicaciones de fecha posterior al anuncio de Venezuela de que se había creado la Comisión de Enlace –, pero no aceptó que constituyeran prueba del carácter consensual de la Comisión. Además, valoró el hecho de que no se había aportado al expediente ningún documento que diera cuenta de la creación de tal Comisión[393].

358. En conclusión, a criterio de las Demandadas en Anulación, Venezuela solo pretende reabrir el debate sobre las conclusiones de hecho a las que llegó el Tribunal luego de haber valorado las pruebas del expediente sin haberles dedicado la atención o el espacio que la República hubiera querido. Sin embargo, Valores y Consorcio expresan que esto de ninguna manera significa que el Tribunal haya violado una norma de procedimiento. En todo caso, ellas alegan que el hipotético quebrantamiento de una norma fundamental de procedimiento no sería grave, porque la creación de la Comisión de Enlace es solo una de las numerosas medidas que el Tribunal consideró arbitrarias, en violación del Artículo III(1)[394].

### b)    Falta de motivación

359. Valores y Consorcio afirman que el Tribunal expuso en forma lógica y razonable los motivos en los que se basó para concluir que la Comisión de Enlace no había sido creada por acuerdo de las Partes y que su imposición constituyó una medida arbitraria. El Tribunal llegó a esta conclusión tomando como punto de partida los hechos que consideró probados con base en el expediente, sin que hubiera contradicción o frivolidad en su análisis[395].

### 3.    Análisis del Comité

360. La República afirma que, para concluir que la imposición de la Comisión de Enlace fue arbitraria, el Tribunal (*i*) quebrantó la norma de procedimiento que pone la carga de la prueba de una

---

[388] MdC de Anulación, ¶¶ 126-127; Dúplica de Anulación, ¶ 118.

[389] Correo electrónico del Sr. Homero Huerta Moreno al Sr. Roberto González Alcalá del 15 de mayo de 2010 (C-078).

[390] MdC de Anulación, ¶¶ 128-129; Dúplica de Anulación, ¶¶ 113-114.

[391] Correo electrónico del Sr. Rafael Rodríguez al Sr. Nicolás Constantino del 29 de julio de 2010 (C-191).

[392] Carta del Sr. Roberto González Alcalá al Dr. Reinaldo Muñoz del 28 de mayo de 2010 (C-083).

[393] MdC de Anulación, ¶¶ 130-132; Dúplica de Anulación, ¶¶ 115-116, 128; Tr. Día 1, 181:22-182:16.

[394] MdC de Anulación, ¶ 134; Dúplica de Anulación, ¶¶ 123-124; Tr. Día 1, 182:17-183:9; *Impregilo c. Argentina*, ¶ 176 (RLA-226); *Dogan c. Turkmenistán*, ¶¶ 129-130 (RLA-246).

[395] MdC de Anulación, ¶¶ 128-129; Dúplica de Anulación, ¶¶ 125-131.

alegación en cabeza de quien la alega e (*ii*) incurrió en falta de motivación y quebrantó normas de procedimiento al ignorar los dichos de las Partes y las pruebas del expediente. Las Demandadas en Anulación niegan la existencia de tales vicios y sostienen que los argumentos de Venezuela reposan en una lectura incorrecta y parcial del Laudo.

361. Con base en lo anterior, el Comité estima oportuno analizar los vicios alegados por Venezuela, en lugar de examinar separadamente las dos causales de anulación invocadas.

### *a)   La alegada inversión de la carga de la prueba*

362. Para sostener que el Tribunal invirtió la carga de la prueba con respecto al carácter arbitrario de la instauración de la Comisión de Enlace, quebrantando así una norma fundamental, Venezuela se basa exclusivamente en el ¶ 614 del Laudo. Allí el Tribunal, analizando la reclamación por la violación del Artículo III(1) del APPRI, manifestó:

> Asimismo, encuentra el Tribunal que la imposición de la Comisión de Enlace fue arbitraria. Las Partes disputan si mediante la Comisión de Enlace Venezuela 'ocupó' las Compañías sin cumplir los requisitos establecidos en la Ley de Expropiación. Independientemente de si se configuró o no una ocupación bajo derecho venezolano, la propia Demandada admite –y el Tribunal así lo ha comprobado– que la figura de una 'comisión de enlace', como la que se estableció para las Compañías tras la expedición del Decreto No. 7.394 y hasta septiembre de 2013, no está prevista en el Decreto o en la Ley de Expropiación. El Tribunal tampoco está convencido de que la Comisión de Enlace se hubiese creado por acuerdo entre las Partes, entre otras razones, porque no se aportó al arbitraje instrumento alguno que dé cuenta de su creación, legal o convencional, y que establezca con precisión el alcance de sus funciones.

363. Según Venezuela, de la última frase de este párrafo resulta evidente la inversión de la carga de la prueba, que surgiría del hecho de que el Tribunal consideró arbitraria la medida porque no se había aportado al arbitraje ningún instrumento que acreditara la constitución legal o convencional de la Comisión[396].

364. Preliminarmente, el Comité señala que, contrariamente a lo que parecería sostener Venezuela, el Tribunal no determinó que la única razón para considerar arbitraria la imposición de la Comisión de Enlace era que no constaba en el expediente el instrumento de su constitución. Esto fue solo un motivo adicional en que el Tribunal apoyó su conclusión. Como resulta claro del ¶ 614 del Laudo, el Tribunal primero expresó que era un hecho comprobado que ni el Decreto No. 7.394 ni la ley de expropiación preveían la figura de una comisión de enlace. De esta premisa, y considerando el estándar de arbitrariedad adoptado en el Laudo[397], se infiere que el Tribunal estimó que, al no estar sustentada en el derecho, la imposición de la Comisión de Enlace era arbitraria.

365. En ese contexto, el Comité encuentra razonable la afirmación del Tribunal criticada por Venezuela según la cual "*no se aportó al arbitraje instrumento alguno*" en mérito a la creación legal o convencional de la Comisión de Enlace. Puesto que fue Venezuela quien, para rebatir la alegación de arbitrariedad de la Comisión (que surgía ya de la falta de previsión en la ley de expropiación o

---

[396] Réplica de Anulación, ¶¶ 190-191.

[397] Véase ¶ 341 *supra*.

en el Decreto), argumentó que esta había sido creada convencionalmente[398], le incumbía a ella probar su alegación. Esto no es sino una aplicación lisa y llana de la regla que obliga a cada parte a probar los hechos en que se basa.

366.   Por lo tanto, no puede considerarse que el Tribunal haya invertido la carga de la prueba de la arbitrariedad de la medida, por lo que no se configura un quebrantamiento a este respecto.

###### b)   *La alegada omisión en el análisis de las afirmaciones de las Partes y de las pruebas por ellas aportadas*

367.   Además de sostener que la decisión del Tribunal de considerar arbitraria la imposición de la Comisión de Enlace fue tomada invirtiendo la carga de la prueba, Venezuela alega que esta decisión está viciada porque el Tribunal omitió analizar tanto las manifestaciones de las Partes como la prueba del Arbitraje Subyacente que "*indicaban claramente* [su] *carácter consensual*"[399]. Por ende, considera que el Tribunal quebrantó una norma fundamental e incurrió en falta de motivación.

368.   Con respecto a las afirmaciones de las Partes, una simple lectura del Laudo muestra que el Tribunal las analizó y consideró que, contrariamente a lo afirmado por Venezuela, las Partes no coincidían en el carácter consensual de la creación de la Comisión de Enlace. Si el Tribunal hubiera interpretado las manifestaciones de Valores y Consorcio en el Arbitraje Subyacente como una admisión del carácter consensual, en el ¶ 126 del Laudo no habría expresado que, para ellas, "*la Comisión de Enlace* [...] [tenía] *su origen y fundamento en las órdenes del Presidente Chávez de 'ocupar' y 'recuperar' las Compañías*". Esto demuestra que el Tribunal consideró las manifestaciones de Valores y Consorcio, aunque les dio una interpretación distinta a la que sugiere Venezuela en este procedimiento.

369.   En cuanto a la alegada omisión de considerar prueba, Venezuela señala que esta surge – al igual que la supuesta inversión de la carga de la prueba – de la última frase del ¶ 614 del Laudo ya citado[400].

370.   Antes que nada, el Comité destaca que – tal como se desprende de los ¶¶ 546 y 614 del Laudo – el análisis debe partir del hecho de que el Tribunal entendió que, visto que era Venezuela quien invocaba el acuerdo sobre la creación de la Comisión de Enlace, le incumbía a ella probarlo fehacientemente con base en el instrumento por el cual ambas Partes habían decidido crearla.

371.   Bajo esta premisa, y no siendo controvertido que tal instrumento no se aportó al expediente del Arbitraje Subyacente, el Comité estima que no se puede reprochar al Tribunal la falta de consideración de pruebas que Venezuela invoca, en particular los anexos C-078, C-083 y C-191[401]. De todas maneras, la alegada omisión no podría considerarse grave desde el punto de vista de la

---

[398] El Comité nota que, en el ¶ 546 del Laudo, el Tribunal consignó específicamente que fue Venezuela quien alegó que la Comisión de Enlace había sido creada por acuerdo de las Partes.

[399] MdA, ¶ 156.

[400] Véase ¶ 362 *supra*.

[401] Véase ¶ 352 *supra*.

causal del quebrantamiento de una norma fundamental de procedimiento, ya que no hubiera tenido el potencial de conducir al Tribunal a un resultado distinto del que llegó, tal como lo requiere el Artículo 52(1)(d) según se ha explicado en el ¶ 151 *supra*[402]. Desde la perspectiva de la falta de motivación, la supuesta omisión no impediría a un lector informado comprender cómo llegó el Tribunal a su decisión, lo que evidencia que la motivación, en realidad, no está ausente.

372.   En cualquier caso, el Comité resalta que, tal como han señalado las Demandadas en Anulación[403], las pruebas C-078, C-083 y C-191 fueron mencionadas en los ¶¶ 103 y 106 del Laudo sobre los antecedentes de hecho.

373.   En definitiva, en lo que hace a la alegada omisión del Tribunal de tomar en cuenta tanto las afirmaciones de las Partes como las pruebas por ellas aportadas, el Comité estima que la queja de Venezuela no es nada más que un intento de revisar la valoración de tales afirmaciones y pruebas que hizo el Tribunal. Sin embargo, como se ha resaltado arriba[404], esto no está permitido en un procedimiento de anulación al amparo del Convenio del CIADI, en el cual un comité no puede ingresar en el mérito de la valoración probatoria tal como si fuera una corte de apelación.

### c)   Conclusión

374.   A la luz de lo anterior, el Comité concluye que la República no ha probado que el Tribunal quebrantó una norma fundamental de procedimiento o incurrió en falta de motivación al considerar que la imposición de la Comisión de Enlace por parte de Venezuela era una medida arbitraria.

### F.   SOBRE LA DECISIÓN CON RESPECTO A LOS DAÑOS

375.   En el Laudo, el Tribunal consideró que Valores y Consorcio habían sufrido daños a causa de las medidas ilícitas de Venezuela y, para cuantificarlos, aplicó una metodología de cálculo con la que consideró que las Partes estaban de acuerdo[405]. A través de la presente impugnación, la República sostiene que el Tribunal incurrió en falta de motivación al no expresar razones para determinar la existencia de daños y utilizar una metodología de cálculo no acordada por las Partes, y quebrantó una norma de procedimiento al no darle una oportunidad de ser oída sobre la metodología de cálculo aplicada en el Laudo.

### 1.   Argumentos de Venezuela

### a)   Falta de motivación

376.   Venezuela explica que el Tribunal desestimó el reclamo de Valores y Consorcio por expropiación, y descartó que las medidas tomadas por la República, analizadas en la § V.A.3(a-c) del Laudo, hubieran destruido el valor de la inversión. En concreto, el Tribunal determinó que (*i*) el Decreto

---

[402] Véase ¶ 151 *supra*.

[403] MdC de Anulación, ¶¶ 129-132.

[404] Véanse ¶¶ 177, 195-196 *supra*.

[405] Laudo, § VI.

No. 7.394 no impedía a las Demandadas en Anulación repartir utilidades o vender sus acciones en Monaca y Demaseca, ni afectaba sustancialmente la facultad de disponer de sus bienes; (*ii*) la Comisión de Enlace y la presencia de los administradores especiales no hicieron que Valores y Consorcio perdieran el control de su inversión; (*iii*) la Providencia Administrativa no significó un cambio material en las facultades de los administradores especiales; y (*iv*) la circular del SAREN y la falta de actualización de los registros de inversión extranjera por parte de la SIEX no impidieron la celebración de actos societarios válidos de las Compañías[406].

377.    La República afirma que, en consonancia con la desestimación del reclamo por expropiación, el Tribunal correctamente consideró que "*sería inapropiado aplicar la metodología del total valor justo de mercado o de tomar el valor de las Inversiones como cero en el escenario real*" para determinar la compensación por la violación de los otros estándares de protección del APPRI. Venezuela agrega que el Tribunal estimó que el impacto concreto de las medidas violatorias del APPRI había sido la depreciación del valor de las acciones de Monaca y Demaseca, y que ningún comprador "*pagaría el mismo valor de las acciones* [...] *si no existieran las medidas violatorias del APPRI*". Debido a esto, el Tribunal sostuvo que el método de valoración adecuado era tomar la diferencia entre su valor bajo un escenario real, que tuviera en cuenta las medidas, y un escenario contra fáctico, que no las considerara[407].

378.    Venezuela argumenta que el Tribunal no fundamentó su conclusión de que las medidas causaron la depreciación del valor de las acciones. Añade que el Tribunal no explicó por qué habría que tener en cuenta lo que pagaría un potencial comprador a los fines de determinar si las Demandadas en Anulación habían sufrido daños por las medidas de Venezuela, siendo que estas nunca se desprendieron de sus acciones[408].

379.    Con relación al impacto de las medidas, Venezuela señala que hay incompatibilidad entre las afirmaciones del Tribunal de que (*i*) el valor de las acciones de Monaca y Demaseca era menor a causa de aquellas y de que (*ii*) las Demandadas en Anulación nunca fueron privadas de estas acciones y que estas no habían perdido la capacidad de generarles ganancias. Según la República, es contradictorio que el Tribunal haya decidido que las medidas de Venezuela no constituían expropiación pero sí habían generado un impacto negativo en el valor de las inversiones[409].

380.    En cuanto a la metodología de cálculo de los daños, la República sostiene que el vicio radica en que el Tribunal calculó los daños basándose en un supuesto acuerdo entre las Partes y sus expertos, pese a que el expediente del Arbitraje Subyacente demuestra que este nunca existió. En concreto, Valores y Consorcio (*i*) argumentaron que los daños debían calcularse según el valor justo de mercado de Monaca y Demaseca, y que su inversión había sido aniquilada; y (*ii*) no tuvieron en cuenta las medidas previas a la fecha de valuación ni plantearon una cuantificación del impacto de las medidas en relación con los estándares de protección del APPRI distintos a la expropiación. Venezuela aclara que todos estos puntos fueron criticados y resalta que, además,

---

[406] MdA, ¶¶ 200-209; Réplica de Anulación, ¶¶ 209-213.

[407] MdA, ¶¶ 209-211; Réplica de Anulación, ¶ 214.

[408] MdA, ¶¶ 211-214, 223.

[409] MdA, ¶¶ 216-221; Réplica de Anulación, ¶¶ 214-218.

el Tribunal se contradijo, puesto que en los ¶¶ 675 y 676 expresó las diferencias esenciales entre las metodologías propuestas por los expertos de las Partes mientras que, en el ¶ 697, dijo que aquellos coincidían[410].

381. Por otra parte, si bien Venezuela acepta que el Tribunal tiene cierta discrecionalidad en materia de cálculo de daños, aduce que esto no descarta por sí mismo la configuración de una causal de anulación. Citando al Profesor Schreuer, la República sostiene que el ejercicio de una facultad discrecional y el deber de expresar razones corren por carriles distintos, por lo que aquel no exime al Tribunal de este[411].

382. Adicionalmente, la Demandante en Anulación manifiesta que "*el resultado de la liquidación de daños del Tribunal arrojó resultados absurdos*", ya que el monto de la compensación representa casi el 60% del valor propuesto por las Demandadas en Anulación como total de la inversión. Según Venezuela, no hay correlación entre esta compensación "*por la casi totalidad del valor de mercado de la inversión*" y las conclusiones del Tribunal de que (*i*) no hubo expropiación, (*ii*) la inversión no había perdido sustancialmente su valor y (*iii*) las acciones en Monaca y Demaseca todavía podían generar ganancias a Valores y Consorcio[412].

### b) Quebrantamiento grave de una norma fundamental de procedimiento

383. Basándose en el caso *Pey Casado c. Chile*[413], Venezuela sostiene que el Tribunal quebrantó una norma fundamental de procedimiento porque determinó que los daños "*debían ser estimados en relación con lo que un tercero hipotéticamente pagaría por la tenencia accionaria de Consorcio y Valores en Monaca y Demaseca*" sin darle oportunidad de ser oída al respecto. Según la República, el Tribunal calculó los daños en el Laudo aplicando esa metodología sin que las Partes la hubieran tratado en el Arbitraje Subyacente. Es más, las Demandadas en Anulación únicamente propusieron una metodología de cálculo de daños para su caso de expropiación – con la cual Venezuela no concordó –, pero no una metodología alternativa para los demás estándares del APPRI. Por lo tanto, la República concluye que el Tribunal, incluso si contaba con cierta discrecionalidad en cuanto al cálculo de daños, no estaba facultado para adoptar su propia metodología sin concederle a las Partes la posibilidad de expresarse[414].

### 2. Argumentos de Valores y Consorcio

### a) Falta de motivación

384. Valores y Consorcio afirman que no se configura la causal de falta de motivación, puesto que

---

[410] MdA, ¶¶ 227-228, 232-233, 241; Réplica de Anulación, ¶¶ 227-232; Tr. Día 1, 119:3-121:15.

[411] Réplica de Anulación, ¶¶ 221-222; C. Schreuer, L. Malintoppi, A. Reinisch y A. Sinclair, *The ICSID Convention: A Commentary*, 2da Ed., 2009, págs. 1235-1236 (RLA-249).

[412] MdA, ¶ 242; Réplica de Anulación, ¶ 233.

[413] *Pey Casado c. Chile* (Anulación I) (RLA-201).

[414] MdA, ¶¶ 248, 250-254; Réplica de Anulación, ¶¶ 236-237, 240, 242-243; Tr. Día 2, 302:16-303:6.

cualquier lector puede comprender cómo el Tribunal determinó el daño sufrido por ellas, su nexo causal con las medidas de Venezuela y la metodología para cuantificar la compensación.

385. Las Demandadas en Anulación explican que el Tribunal, tras decidir que la República había violado los Artículos III, IV y VII del APPRI, razonó de la siguiente manera.

386. Primero, determinó que, a falta de un estándar y una metodología en el APPRI para cuantificar los daños por las mencionadas violaciones y teniendo en cuenta que el Artículo XI(5) le da el poder de fijar el monto de la indemnización, aplicaría el principio de la reparación integral del derecho internacional consuetudinario[415].

387. Segundo, adoptó la metodología de cálculo de Venezuela y determinó el monto de la indemnización teniendo en cuenta la diferencia entre el valor de Monaca y Demaseca en un escenario real y uno contra fáctico que no consideraba las medidas ilícitas. El Tribunal reconoció que esta metodología era prácticamente idéntica a la de las Demandadas en Anulación y explicó que la diferencia entre las Partes radicaba en el valor asignado a Monaca y Demaseca en el escenario real, es decir, si la pérdida de su valor había sido total, como sostenían Valores y Consorcio, o parcial, como argumentó Venezuela[416].

388. Contraponiéndose al argumento de Venezuela de que las Partes no estaban de acuerdo en la metodología de cálculo, las Demandadas en Anulación señalan que, incluso a falta de acuerdo, la decisión del Tribunal sería válida, ya que este gozaba de discrecionalidad para adoptar la metodología que considerara adecuada[417].

389. Tercero, el Tribunal rechazó que en el escenario real el valor de Monaca y Demaseca fuera nulo, pero reconoció que las medidas ilícitas de Venezuela, pese a no ser expropiatorias, habían obstaculizado el ejercicio de los derechos de las Demandadas en Anulación. El Tribunal también consideró que las medidas habían impactado el valor de la inversión, por lo que ningún comprador habría pagado por las acciones de Monaca y Demaseca el mismo precio en ambos escenarios. Valores y Consorcio explican que, de esta manera, el Tribunal justificó adecuadamente el nexo causal y rechazan que exista una contradicción en el razonamiento, puesto que una cosa es la pérdida total de valor de la inversión, descartada por el Tribunal, y otra distinta es la disminución de valor. Posteriormente, el Tribunal determinó el valor del escenario real en US$ 192,6 millones, que resultaba del valor propuesto por Venezuela – basado en el precio al cual Gruma adquirió la totalidad de las acciones que un tercero tenía en Valores y Consorcio en diciembre de 2012 (semanas antes de la fecha de valuación del reclamo) – menos el monto correspondiente a deuda por regalías[418].

390. Cuarto, el Tribunal calculó el valor en el escenario contra fáctico recurriendo a un modelo de flujo de fondos descontados, que ambas Partes habían utilizado, aunque con diferencias sustanciales en algunos aspectos. Tras analizar las variables propuestas por las Partes, el Tribunal aplicó los

---

[415] MdC de Anulación, ¶ 167; Dúplica de Anulación, ¶¶ 163-164.

[416] MdC de Anulación, ¶¶ 168-170; Dúplica de Anulación, ¶¶ 178-182.

[417] MdC de Anulación, ¶¶ 181-183; Dúplica de Anulación, ¶ 177.

[418] MdC de Anulación, ¶¶ 171-175; Dúplica de Anulación, ¶¶ 168-171.

valores que estimó adecuados y obtuvo como resultado que el valor de Monaca y Demaseca en el escenario contra fáctico era US$ 572,8 millones[419].

391.   Determinados los valores en ambos escenarios, el Tribunal calculó su diferencia en US$ 380,2 millones, a lo cual agregó US$ 50,2 millones relacionados con la medida de redireccionamiento del maíz. Así, el monto total de la compensación fue US$ 430,4 millones[420].

392.   Con base en este resumen del Laudo, Valores y Consorcio concluyen que la decisión del Tribunal está debidamente fundamentada en cuanto a la existencia de daños y la modalidad utilizada para calcularlos. Agregan que no existe contradicción en desestimar el reclamo por expropiación y, al mismo tiempo, compensar con US$ 430,4 millones, ya que esta suma representa casi US$ 200 millones menos que lo reclamado en el Arbitraje Subyacente[421].

### b)   Quebrantamiento grave de una norma fundamental de procedimiento

393.   En cuanto al supuesto quebrantamiento de una norma fundamental de procedimiento, las Demandadas en Anulación sostienen que la República se apoya en dos premisas falsas.

394.   En primer lugar, no es cierto, como pretende Venezuela, que las Partes solamente hayan debatido sobre un modelo de valuación de daños derivados de una expropiación y no de los demás estándares de protección del APPRI. Valores y Consorcio argumentaron expresamente en el Arbitraje Subyacente la misma metodología que el Tribunal terminó aplicando, lo cual fue reconocido en el ¶ 703 del Laudo. Tal modelo de valuación fue ampliamente debatido entre las Partes, al punto que los expertos de daños de Venezuela propusieron la misma metodología de evaluación de daños que los expertos de las Demandadas en Anulación, aunque "*con variables de diferente valor*". Por ende, es evidente que la República tuvo oportunidad de defenderse al respecto, tal como efectivamente lo hizo[422].

395.   En segundo lugar, es falso que Valores y Consorcio no hayan cuantificado los daños causados por la violación de estándares de protección distintos de la expropiación. De hecho, ellas sostuvieron que los daños, sea por expropiación o por violaciones no expropiatorias, debían cuantificarse calculando la diferencia entre el valor de las inversiones en un escenario real y uno contra fáctico, y propusieron que el valor en el escenario real era cero. Esto último fue rechazado por el Tribunal, que se inclinó por el valor propuesto por Venezuela como ha sido descrito arriba[423].

396.   A todo evento, Valores y Consorcio señalan que el Tribunal no estaba obligado a seguir el método de valuación de daños propuesto por las Partes. Basándose en los casos *Tidewater c. Venezuela*[424]

---

[419] MdC de Anulación, ¶¶ 176-177; Dúplica de Anulación, ¶ 186.

[420] MdC de Anulación, ¶ 178; Dúplica de Anulación, ¶ 186.

[421] Dúplica de Anulación, ¶ 187.

[422] MdC de Anulación, ¶¶ 191-193; Dúplica de Anulación, ¶¶ 189-190.

[423] MdC de Anulación, ¶ 190; Dúplica de Anulación, ¶ 191.

[424] *Tidewater c. Venezuela* (RLA-232).

y *Rumeli c. Kazajistán*[425], las Demandadas en Anulación explican que el Tribunal contaba con amplia discrecionalidad para determinar los daños con base en la mejor evidencia disponible. Por lo tanto, aun si el Tribunal no hubiera adoptado la metodología de valuación de las Partes como efectivamente hizo, tampoco habría quebrantado una norma fundamental de procedimiento[426].

### 3.   Análisis del Comité

397.   Venezuela imputa dos causales de anulación a la decisión del Tribunal sobre daños por violación de los Artículos III, IV y VII del APPRI: por un lado, sostiene que hubo falta de motivación con respecto a la existencia y el método de cálculo de los daños; por el otro, que el Tribunal quebrantó su derecho a ser oída sobre la forma en que debía medirse el daño sufrido por Valores y Consorcio.

### a)   Falta de motivación

398.   Venezuela alega que el Tribunal incurrió en falta de motivación, ya que (*i*) no explicó por qué las medidas de la República habían causado la depreciación del valor de las acciones de Monaca y Demaseca, (*ii*) se basó en un "*hecho desmentido por la realidad procesal como justificación de la aplicación de una metodología para calcular los daños*"[427] y (*iii*) se contradijo al condenar a Venezuela a pagar "*casi el valor total de sus alegadas inversiones*"[428] bajo los Artículos III, IV y VII del APPRI pese a haber rechazado el reclamo por expropiación.

399.   Por su parte, Valores y Consorcio sostienen que cualquier lector informado puede comprender la decisión del Tribunal sobre daños. En particular, afirman que el Tribunal (*i*) justificó la existencia de daños al afirmar que las medidas de Venezuela, si bien no eran equivalentes a una pérdida total de valor, habían obstaculizado injustificadamente el ejercicio de los derechos de las Demandadas en Anulación reduciendo el valor de las acciones de las Compañías; (*ii*) aplicó la metodología de cálculo de daños propuesta por Venezuela, que coincidía sustancialmente con la de Valores y Consorcio; y (*iii*) no se contradijo con su decisión sobre expropiación al conceder a las Demandadas en Anulación una indemnización de US$ 430,4 millones, puesto que esto representa casi US$ 200 millones menos de lo solicitado en el reclamo por expropiación.

400.   Para facilitar el análisis, el Comité tratará los cuestionamientos de Venezuela siguiendo el orden argumental del Tribunal en el Laudo, por lo que examinará sucesivamente la metodología de cálculo, la existencia del daño y el nexo causal, y la alegada contradicción entre lo resuelto respecto de los reclamos por expropiación y por las violaciones no expropiatorias del Tratado.

### (1)   La metodología para cuantificar los daños

401.   Sobre la cuestión de los daños, el Tribunal notó preliminarmente que el APPRI no prevé un estándar y una metodología para las compensaciones por violaciones distintas de la expropiación,

---

[425] *Rumeli c. Kazajistán* (RLA-237).

[426] MdC de Anulación, ¶ 194; Dúplica de Anulación, ¶¶ 193-194.

[427] Réplica de Anulación, ¶ 232.

[428] Réplica de Anulación, ¶ 234.

pero su Artículo XI(5)[429] le reconoce el poder de fijar el monto de la indemnización en caso de incumplimiento del APPRI. Luego señaló que, para cuantificar los daños, aplicaría el principio de reparación integral del derecho internacional consuetudinario siguiendo los casos de la *Fábrica de Chorzów*[430] y *Gold Reserve c. Venezuela*[431], y el Artículo 31 de los Artículos sobre Responsabilidad del Estado por Hechos Internacionalmente Ilícitos de la Comisión de Derecho Internacional de las Naciones Unidas[432].

402.   El Tribunal aclaró que correspondía a Valores y Consorcio probar la existencia del daño y que el Tribunal gozaba de amplia discrecionalidad para determinar el valor probatorio de las pruebas tendientes a demostrar el daño, el nexo de causalidad y la metodología aplicable para ordenar la indemnización. Con respecto a esto último, el Tribunal manifestó que los tribunales arbitrales tienen libertad para optar entre diversos métodos de valuación e incluso para adaptarlos en función de los hechos y los argumentos de las partes[433].

403.   Sobre la metodología de valuación para el caso concreto, en el ¶ 697 del Laudo, el Tribunal expresó:

> En el presente caso, los expertos de ambas Partes concuerdan en que la metodología a utilizar para calcular los daños ocasionados a las Demandantes sería la diferencia en el valor del capital accionario de Monaca y Demaseca bajo un *escenario real*, que incluya el efecto de las medidas violatorias del Tratado, y un *escenario contrafáctico*, que refleje el valor de las inversiones de las Demandantes sin dichas medidas. (énfasis en el original)

404.   Luego de explicitar las coincidencias de los expertos, el Tribunal concordó con ellos en que el método propuesto era apropiado para cuantificar los daños sufridos por Valores y Consorcio, ya que su aplicación eliminaría el efecto de las medidas ilícitas de Venezuela y restablecería la situación anterior a tales medidas[434].

405.   Con respecto al cuestionamiento según el cual el Tribunal no explicó las razones para aplicar la metodología de cálculo descrita arriba, el Comité nota que Venezuela se basa en que el Tribunal solamente habría adoptado esa metodología debido a la concordancia de los expertos de las Partes al respecto, tal como lo dijo en el ¶ 697 del Laudo. Venezuela, sin embargo, sostiene que en realidad no hubo acuerdo entre los expertos y que existe contradicción entre lo manifestado en los ¶¶ 675 y 676 (que resumen la posición de Venezuela), por un lado, y el ¶ 697 citado arriba, por el otro. Por ende, para la República, la metodología utilizada para calcular los daños estaría desprovista de fundamento en el Laudo.

406.   A criterio del Comité, Venezuela no ha logrado probar el vicio alegado, ya que su argumento se

---

[429] El Artículo XI(5) del Tratado dispone: "*El laudo arbitral se limitará a determinar si existe incumplimiento por la Parte Contratante de sus obligaciones bajo el presente Acuerdo, si tal incumplimiento de obligaciones ha causado daño al inversor de la otra Parte Contratante, y, en tal caso, a fijar el monto de la compensación*".

[430] *Fábrica de Chorzów* (CLA-077).

[431] G*old Reserve c. Venezuela* (Laudo) (CLA-103).

[432] Laudo, ¶¶ 690-694.

[433] Laudo, ¶¶ 695-696.

[434] Laudo, ¶ 700.

basa en premisas incorrectas.

407.   En primer lugar, el argumento reposa sobre la premisa de que los tribunales no tienen la potestad de adoptar metodologías de cuantificación distintas a las propuestas por las partes. Sin embargo, en el ¶ 696 del Laudo, el Tribunal partió de una premisa distinta al considerar que los tribunales "*pueden optar por aplicar determinados métodos de valuación, así como adaptarlos luego de evaluar distintos argumentos u opiniones de las Partes y de los hechos probados por ellas*". Por lo tanto, el cuestionamiento de Venezuela tiende, en realidad, a contestar a lo que – en el mejor de los casos – sería un error de derecho no revisable por el Comité.

408.   En segundo lugar, no es cierto que el Tribunal haya adoptado la metodología de cuantificación basándose exclusivamente en el acuerdo entre los expertos de las Partes. Del ¶ 700 del Laudo se desprende que consideró que esta metodología era adecuada porque permitía eliminar las consecuencias de las medidas ilícitas de Venezuela según el principio de reparación integral[435]. Por lo tanto, es razonable concluir que el Tribunal habría aplicado la metodología escogida aun de no haber considerado que los expertos de las Partes coincidían en esta.

409.   En tercer lugar, el argumento de Venezuela según el cual "*el expediente del procedimiento subyacente revela* […] *que las partes difirieron esencialmente en el enfoque metodológico para calcular los eventuales daños*"[436] no es nada más que un cuestionamiento de la valoración del Tribunal sobre las manifestaciones de las Partes y la prueba, en especial de los informes de los expertos. Esto, como ya se ha dicho[437], es irrevisable por el Comité.

410.   En cuarto lugar, la República no aporta ningún sustento a su afirmación de que los ¶¶ 675 y 676 del Laudo (que resumen la posición de Venezuela sobre la metodología de cuantificación) "*sin duda contradicen*" la conclusión del ¶ 697[438]. El Comité no encuentra contradicción, especialmente porque, en la nota al pie 883 al ¶ 697, el Tribunal explicó con claridad en qué concordaban y en qué diferían los expertos haciendo totalmente comprensible su razonamiento:

> […] la diferencia principal entre las Partes es que, para Dellepiane/Spiller, el valor de las Inversiones en el *escenario real* equivale a cero. Sin embargo, la metodología propuesta por Dellepiane/Spiller implica una comparación entre el valor de las Inversiones en el *escenario contrafáctico* y en ese supuesto *escenario real* donde se habría aniquilado el valor de las Inversiones (valor cero). Esta comparación lleva necesariamente a considerar que el valor total de las Inversiones en el *escenario contrafáctico*, medido por las Demandantes y Dellepiane/Spiller con el método de FFD equivale al valor a indemnizar. Venezuela por su parte alega que el valor de las Inversiones en el *escenario real* no equivale a cero. **La diferencia entonces no radica en la metodología a utilizar (ésta, para el Tribunal, es más una diferencia en lenguaje)**, sino en lo que cada Parte considera es el valor de las Inversiones en el *escenario real* y en el *escenario contrafáctico*. (énfasis añadido)

411.   Por todo lo anterior, el Comité considera que Venezuela no ha probado que el Tribunal haya incurrido en falta de motivación con respecto a la metodología para cuantificar el daño sufrido

---

[435] El Comité nota que el argumento de Venezuela de que el Tribunal no había motivado la adopción del estándar de reparación integral aparece por primera vez en la Réplica de Anulación (¶¶ 206-208), pero que la adopción de tal estándar fue debidamente explicada por el Tribunal (véase ¶ 401 *supra*).

[436] MdA, ¶ 228.

[437] Véanse ¶¶ 177, 195-196 *supra*.

[438] Réplica de Anulación, ¶ 231.

por Valores y Consorcio.

(2)   La existencia del daño y el nexo causal

412.   Venezuela basa su argumento relativo a la falta de motivación en relación con la existencia del daño en el ¶ 711 del Laudo. En ese párrafo el Tribunal, tras haber dicho que las medidas de Venezuela no habían constituido una expropiación y que el valor de las inversiones no había sido aniquilado, concluyó que aquellas sí habían violado los Artículos III, IV y VII del APPRI[439], sostuvo:

> Aunque el Tribunal ha determinado que estas conductas no equivalen a una pérdida total o sustancial del control o del valor de las Inversiones, sí han llegado a obstaculizar de manera irrazonable e injustificada el ejercicio de los derechos de las Demandantes como accionistas de Monaca y Demaseca y a someter a una situación de incertidumbre el futuro ejercicio de estos derechos. El hecho que las Compañías continúen operando, o que sus ventas se hayan comportado de manera satisfactoria durante los años en los cuales la Demandada ejerció su conducta contraria al APPRI, no refleja el valor real de las Inversiones, es decir, de las acciones que las Demandantes tienen en Monaca y Demaseca. A juicio del Tribunal, estas conductas ilícitas de Venezuela han generado un impacto en el valor de las Inversiones de las Demandantes[.] [...] El Tribunal está convencido de que ningún potencial comprador pagaría el mismo valor de las acciones de las Demandantes en Monaca y Demaseca si no existieran las medidas violatorias del APPRI.

413.   Venezuela aduce que, en este párrafo, el Tribunal no explicó suficientemente por qué "*las inversiones de Valores y Consorcio en las Compañías tenían un valor 'menor' a raíz de las medidas impugnadas*"[440], ni su decisión de tomar como referencia a un comprador potencial para medir el impacto concreto de las medidas. Además, sostiene que la conclusión de que las acciones de las Compañías tenían menor valor es incompatible con las afirmaciones del Laudo, respectivamente en los ¶¶ 720 y 712, de que las Compañías no habían dejado "*de tener valor alguno*" y de que las acciones todavía tenían "*la capacidad de generarles ganancias*"[441].

414.   El Comité no comprende el fundamento de las quejas de la República.

415.   En el ¶ 711 el Tribunal resaltó que, como consecuencia de las medidas ilícitas de Venezuela, el ejercicio de los derechos de Valores y Consorcio en cuanto accionistas de las Compañías había sido obstaculizado irrazonable e injustificadamente, y su ejercicio futuro estaba en una situación de incertidumbre. Así las cosas, el Comité entiende que es obvio que para el Tribunal hubo un nexo causal entre esta situación y la merma en el valor en sus inversiones: es evidente que un derecho patrimonial – como lo son las acciones – cuyo ejercicio actual se ve obstaculizado y cuyo ejercicio futuro es incierto tiene un menor valor que aquel que puede ser ejercido en plenitud.

416.   De lo anterior se sigue – también de manera obvia – que "*ningún potencial comprador pagaría el mismo valor de las acciones de las Demandantes en Monaca y Demaseca si no existieran las medidas violatorias del APPRI*"[442]. Esto es un simple corolario del menor valor de las acciones causado por las medidas de la República.

---

[439] Laudo, ¶¶ 708-710.

[440] Réplica de Anulación, ¶ 215.

[441] Réplica de Anulación, ¶¶ 215-218.

[442] Laudo, ¶ 711.

417.   Sin embargo, la queja de Venezuela pareciera orientarse a que el Tribunal hizo referencia a la figura del comprador potencial sin ningún fundamento. Esta queja es improcedente, por cuanto en los ¶¶ 702[443] y 738[444] del Laudo el Tribunal consignó que ambos expertos de las Partes habían hecho referencia a la figura del comprador potencial al calcular el valor de las acciones de las Compañías bajo el escenario real y el contra fáctico. Por lo tanto, la referencia del Tribunal al comprador potencial era coherente con lo manifestado por los expertos. Esto basta para descartar el cuestionamiento de la República al respecto sin necesidad de mayor análisis.

418.   No se entiende tampoco la alegada incompatibilidad entre la conclusión del Tribunal de que las acciones tenían menor valor por las medidas de Venezuela y la afirmación del ¶ 720 del Laudo de que Valores y Consorcio "*no han probado que las Compañías dejaron de tener valor alguno*", es decir, que no acreditaron que su valor era cero. En efecto, no hay incompatibilidad entre afirmar que las acciones de Monaca y Demaseca no habían perdido la totalidad de su valor, sino solo una parte de este: que las acciones tengan un menor valor significa – evidentemente – que hubo una pérdida parcial de valor (disminución). Por lo tanto, el argumento de Venezuela es equivocado porque confunde la pérdida parcial de valor con una total.

419.   De la misma manera, tampoco se configura una contradicción entre la disminución de valor de las acciones de las Compañías y el hecho de que estas pudieran todavía generarles ganancias a las Demandadas en Anulación. Venezuela plantea la contradicción como si fuera evidente por sí misma, pero no explica en qué radicaría. A criterio del Comité, cualquier lector informado puede comprender, comparando los resultados determinados por el Tribunal para el escenario real y el contra fáctico, la disminución del valor de las acciones, independientemente de que estas pudieran aún generar ganancias.

   (3)   La alegada contradicción entre lo resuelto en cuanto al reclamo por expropiación y en cuanto a las pretensiones por violaciones no expropiatorias

420.   El último cuestionamiento de Venezuela apunta contra el monto de la indemnización por violación de los Artículos III, IV y VII del APPRI otorgada por el Tribunal en el ¶ 813 del Laudo, donde se dispuso:

> Con fundamento en lo hasta aquí expuesto, el pago al que tienen derecho las Demandantes está dado por la diferencia entre el valor de las Inversiones en el *escenario real*, que corresponde al valor estimado resultante de la Transacción ADM –US$192,6 millones–, y no a valor "cero" como lo afirman las Demandantes, y el valor de las Inversiones en el *escenario contrafáctico* que, aplicando las variables antes mencionadas, incluyendo los intereses, corresponde a la suma de

---

[443] En el ¶ 702 del Laudo, al analiza el escenario real, el Tribunal expresó: "*Dellepiane/Spiller estiman que en el escenario real el valor de Monaca y Demaseca para sus accionistas, o en su lugar, para un comprador potencial, es cero*". El Comité nota que el comprador potencial también es mencionado en el ¶ 704.

[444] En el ¶ 738 del Laudo, en el análisis del escenario contra fáctico, el Tribunal reportó la opinión de los expertos de Venezuela que mencionaba específicamente la figura del comprador potencial: "*Por su parte, Hart/Vélez consideran que en la valoración de las Compañías se debe considerar el impacto de las propias acciones de las Demandantes en la potencial venta a un tercero* [...]". En la nota al pie 922, el Tribunal citó los ¶¶ 42 y siguientes del Primer Informe Credibility Consulting (R-228) que, efectivamente, hacen referencia a un "*third-party buyer*".

US$572,8 millones. Esa diferencia es la suma de US$380,2 millones. A lo anterior, se le deben sumar [...]. En consecuencia, el pago al que tienen derecho las Demandantes es la suma de US$430,4 millones.

421.    Venezuela argumenta que el Tribunal incurrió en falta de motivación, ya que, "[a]*l disponer el pago de una compensación por el casi totalidad del valor de mercado de la inversión* [...] *contradijo su pronunciamiento de que la República no había, a través de las medidas impugnadas, aniquilado el valor de la inversión*"[445].

422.    Antes que nada, el Comité nota que, tal como lo ha reconocido la misma Venezuela, la indemnización otorgada a Valores y Consorcio fue de casi un 60% del valor total de sus inversiones, por lo que, según el significado común de las palabras, no puede predicarse que el 60% del valor represente "*casi el valor total de sus alegadas inversiones*"[446] como pretende la República. El argumento de Venezuela reposa entonces sobre una premisa incorrecta.

423.    Además, el monto de la indemnización acordada por el Tribunal es perfectamente coherente con el hecho, explicado en el apartado anterior[447], de que las acciones de las Demandadas en Anulación en Monaca y Demaseca no perdieron todo su valor, sino solo parte de este.

424.    Por lo tanto, el Comité considera que Venezuela no ha probado que el Tribunal haya incurrido en falta de motivación con respecto a la suma otorgada a Valores y Consorcio por violación de las protecciones distintas a la expropiación.

### b)    Quebrantamiento grave de una norma fundamental de procedimiento

425.    Venezuela afirma que el Tribunal quebrantó una norma fundamental de procedimiento porque no le dio la oportunidad de ser oída con respecto a la metodología de cálculo de daños finalmente aplicada y, en particular, "*en relación con la premisa de que los daños debían ser estimados en relación con lo que un tercero hipotéticamente pagaría por la tenencia accionaria de Consorcio y Valores en Monaca y Demaseca*"[448].

426.    Estas afirmaciones están claramente desmentidas por los hallazgos del Tribunal, mencionados en los ¶¶ 410 y 417 *supra*, según los cuales la metodología de cálculo de las Partes era la misma y ambas habían hecho referencia a la figura del comprador potencial. Esto significa evidentemente que el Tribunal tuvo en cuenta la posición de Venezuela sobre estos aspectos.

427.    Por lo tanto, el Comité concluye que Venezuela no ha probado que se haya configurado un quebrantamiento grave de una norma fundamental de procedimiento en este punto.

### c)    Conclusión

428.    En suma, el Comité concluye que la República no ha demostrado ni un quebrantamiento de una

---

[445] Réplica de Anulación, ¶ 233.

[446] Réplica de Anulación, ¶ 234.

[447] Véase ¶ 418 *supra*.

[448] MdA, ¶ 250.

norma fundamental de procedimiento, ni una falta de motivación en la decisión del Tribunal con respecto a los daños.

**G.   Sobre la decisión de atribución de costos en el Arbitraje Subyacente**

429.   En el Laudo, el Tribunal ordenó que la República asumiera la totalidad de sus propios costos y el 60% de los costos del arbitraje y de los honorarios de la representación legal de Valores y Consorcio[449]. Por medio de su última impugnación, Venezuela afirma que, al tomar esta decisión, el Tribunal incurrió en quebrantamiento de una norma fundamental de procedimiento y falta de motivación.

### 1.   Argumentos de Venezuela

430.   Preliminarmente, en respuesta al argumento de Valores y Consorcio, Venezuela concuerda con ellas en que los tribunales arbitrales tienen discrecionalidad en materia de costos, pero aclara que esta no es absoluta y no justifica que se quebranten normas de procedimiento o no se expresen los motivos de la decisión[450].

#### a)   *Quebrantamiento grave de una norma fundamental de procedimiento*

431.   Venezuela explica que cada Parte pidió la condena en costas de la contraria: Valores y Consorcio con base en el principio "*el vencido paga*" y ella con base en la falta de buena fe de los inversores. Sin embargo, el Tribunal, sin ofrecer justificación, estableció su propio estándar consistente en que las costas debían distribuirse teniendo en cuenta el éxito relativo de las reclamaciones y defensas de cada Parte violando así el principio de *non ultra petita* y su derecho a ser oída. Para Venezuela, la aplicación de un estándar de atribución de costos no discutido por las Partes y sobre el cual ella no tuvo posibilidad de ser oída quebrantó una norma fundamental de procedimiento[451].

#### b)   *Falta de motivación*

432.   Venezuela sostiene que el Tribunal no motivó la decisión de condenarla a pagar el 60% de los costos del arbitraje bajo el estándar que él mismo había establecido. Según Venezuela, el Tribunal analizó equivocadamente el éxito relativo de las defensas y los reclamos, especialmente porque "*ignoró absolutamente* […] *el triunfo de la República en materia de intereses*". Además, a criterio de la República, para un lector del Laudo es inentendible que ella deba soportar el 60% de los costos siendo que prevaleció en el reclamo de expropiación, que fue el que más trabajo, tiempo

---

[449] Laudo, ¶ 832.

[450] Réplica de Anulación, ¶¶ 246, 258, 271.

[451] MdA, ¶¶ 265-267; Réplica de Anulación, ¶¶ 266, 268, 272-274. La República cita en apoyo de su postura el caso *Caratube c. Kazajistán*, ¶ 93 (RLA-202).

y recursos insumió[452].

433.    Además, Venezuela indica que el Tribunal también incurrió en falta de motivación al no haberse expedido sobre su solicitud subsidiaria de que, en todo caso, se condenara a Valores y Consorcio a sufragar los costos por su tardía producción de ciertos documentos. La República aclara que, si bien el Tribunal mencionó esta solicitud en el ¶ 826 del Laudo, omitió considerarla en el análisis de los costos. Venezuela afirma que Valores y Consorcio intentan completar el razonamiento del Tribunal cuando dicen que la solicitud fue rechazada porque ninguna de las Partes había sido negligente[453].

### 2.    Argumentos de Valores y Consorcio

434.    Las Demandadas en Anulación destacan que el Tribunal tomó la decisión sobre los costos dentro de la amplia discrecionalidad que le otorgan el Artículo 61(2) del Convenio del CIADI y la Regla de Arbitraje 28(1), sin quebrantar ninguna norma fundamental de procedimiento y con una adecuada motivación.

### a)    *Quebrantamiento grave de una norma fundamental de procedimiento*

435.    En cuanto al supuesto quebrantamiento de una norma de procedimiento, las Demandadas en Anulación niegan que el Tribunal se haya apartado de los criterios propuestos por las Partes a la hora de atribuir los costos, como sostiene Venezuela. Por el contrario, el Tribunal aplicó el criterio propuesto por Valores y Consorcio, "*el vencido paga*" o "*los costos siguen el evento*", con base en el éxito relativo de las reclamaciones y defensas de cada Parte[454].

436.    Las Demandadas en Anulación señalan que, incluso de haberse apartado de los criterios de las Partes, el Tribunal no habría quebrantado ninguna norma de procedimiento, ya que los argumentos de las Partes sobre costos "*no constituyen un 'marco jurídico' que limite la discreción del Tribunal*" al respecto. La discrecionalidad del Tribunal en materia de costos solamente podría haberse circunscripto por acuerdo de las Partes, lo que no sucedió en el Arbitraje Subyacente[455].

### b)    *Falta de motivación*

437.    Valores y Consorcio señalan que, para condenar a Venezuela a soportar el 60% de los costos, el Tribunal analizó puntualmente (*i*) el éxito relativo de las reclamaciones, (*ii*) las circunstancias del caso y (*iii*) la conducta de las Partes en el procedimiento, siguiendo las decisiones en *EDF c. Rumania*, *Generation Ukraine c. Ucrania* y *Desert Line c. Yemen*[456]. Según ellas, no es cierto que el Tribunal haya ignorado su victoria en materia de intereses, ya que esta no existió: si bien el

---

[452] MdA, ¶¶ 257-259, 261-262; Réplica de Anulación, ¶¶ 256-261.

[453] MdA, ¶¶ 271, 274-275; Réplica de Anulación, ¶¶ 262-265.

[454] MdC de Anulación, ¶ 221.

[455] MdC de Anulación, ¶¶ 223-224; Dúplica de Anulación, ¶¶ 211-213.

[456] *EDF c. Rumania*, ¶¶ 327-329 (RLA-089); *Generation Ukraine c. Ucraina* (Laudo), § 24 (CLA-022); *Desert Line c. Yemen* (Laudo), ¶¶ 303-304 (RLA-078).

Tribunal aplicó la tasa LIBOR más 2% propuesta por Venezuela, le dio la razón a ellas en que debía aplicarse interés compuesto y no simple[457].

438.   Por último, Valores y Consorcio afirman que el Tribunal sí tuvo en cuenta en su decisión sobre costos la petición subsidiaria de Venezuela por la tardía producción de documentos. El Tribunal explicó que Venezuela había manifestado que dichos gastos eran atribuibles a la negligencia de las Demandadas en Anulación, pero en el ¶ 831 del Laudo descartó que ellas hubieran actuado negligentemente, por lo que no las condenó a pagar los costos del incidente[458].

### 3.   Análisis del Comité

439.   Venezuela sostiene que la decisión sobre costos debe ser anulada porque el Tribunal no expresó motivos al (*i*) adoptar un estándar que no había sido discutido entre las Partes, (*ii*) condenar a la República a pagar el 60% de los costos y (*iii*) omitir un pronunciamiento sobre su pretensión subsidiaria de condena en costas a Valores y Consorcio por la tardía producción de documentos. Además, alega que el punto (*i*) configura también un quebrantamiento de normas fundamentales de procedimiento como el derecho a ser oído y el principio de *non ultra petita*.

440.   Valores y Consorcio se oponen aduciendo que el Tribunal (*a*) aplicó el estándar que ellas habían propuesto en el Arbitraje Subyacente, (*b*) motivó adecuadamente la imposición del 60% de los costos a Venezuela y (*c*) analizó y descartó la pretensión subsidiaria de la República.

441.   Comenzando con la decisión del Tribunal, este dejó en claro inicialmente que contaba con amplia facultad para determinar y distribuir los costos del Arbitraje Subyacente en virtud del Artículo 61(2) del Convenio del CIADI y la Regla de Arbitraje 28(1), y afirmó que las Partes no parecían disputar esto. Tras determinar los costos del arbitraje[459], el Tribunal sostuvo en el ¶ 828 del Laudo:

> En ejercicio de la facultad descrita en el párrafo 827 *supra*, el Tribunal estima que la distribución de los costos deberá efectuarse tomando en consideración el éxito relativo de las reclamaciones y defensas de cada una de las Partes, en conjunto con las circunstancias del caso y la conducta de las Partes en el procedimiento [...].

442.   A continuación, el Tribunal recordó que Valores y Consorcio habían prevalecido en las cuatro objeciones jurisdiccionales, pero consideró que ambas Partes habían presentado argumentos válidos al respecto. En cuanto al fondo, resaltó que Venezuela había vencido sobre el reclamo por expropiación y que las Demandadas en Anulación habían prevalecido en sus reclamaciones por violación de los Artículos III, IV y VII del APPRI, aunque no lograron probar que, en el escenario real, el valor de las Compañías era cero.

443.   En relación con la conducta procesal de las Partes, en el ¶ 831, el Tribunal destacó:

> Finalmente, el Tribunal considera que, en términos generales, ambas Partes presentaron su caso de acuerdo con los principios de lealtad y buena fe procesal. Por lo tanto, no estima procedente imputar ciertos costos a una de las Partes en razón de su alegada falta de diligencia o colaboración.

---

[457] MdC de Anulación, ¶¶ 197, 200, 208-213; Dúplica de Anulación, ¶¶ 200, 206-208.

[458] MdC de Anulación, ¶¶ 217-218; Dúplica de Anulación, ¶ 209.

[459] Laudo, ¶ 827.

444.    Por último, en aplicación de las premisas anteriores, el Tribunal decidió que la República debía asumir la totalidad de sus costos y un 60% de aquellos correspondientes a las Demandadas en Anulación.

445.    Previo a entrar en el detalle de cada causal de anulación invocada por Venezuela, el Comité pone de relieve que ambas Partes han reconocido que el Tribunal gozaba de discrecionalidad en cuanto a la determinación y distribución de los costos del Arbitraje Subyacente[460], y coincide con Venezuela en que esta discrecionalidad no implicaba que el Tribunal pudiera tomar su decisión quebrantando reglas de procedimiento o sin motivación[461].

### a)    Quebrantamiento grave de una norma fundamental de procedimiento

446.    Según Venezuela, el quebrantamiento de una norma fundamental consiste en la supuesta aplicación de un estándar no discutido entre las Partes. Las Demandadas en Anulación lo niegan y subrayan que el Tribunal aplicó el criterio "*los costos siguen el evento*" propuesto por ellas en el Arbitraje Subyacente. En consecuencia, el Comité tiene que decidir preliminarmente si la premisa de Venezuela es cierta.

447.    Al respecto, el Comité nota que en el ¶ 824[462] del Laudo el Tribunal reconoció que Valores y Consorcio habían pedido la aplicación del mencionado criterio a la distribución de costos y, en el ¶ 828, expresó que tendría en cuenta "*el éxito relativo de las reclamaciones y defensas de cada una de las Partes*", lo cual, a criterio del Comité, es una indubitable referencia al principio "*los costos siguen el evento*". Por eso, y considerando precisamente que en el Arbitraje Subyacente el "*evento*" consistió en vencimientos recíprocos, el Tribunal no condenó a ninguna de las Partes a soportar la totalidad de los costos, sino que los repartió entre las Partes, aunque en proporciones disímiles.

448.    Por tanto, del mismo Laudo resulta que la premisa en la que Venezuela basa el quebrantamiento de normas fundamentales de procedimiento es incorrecta, ya que el Tribunal no introdujo su propio criterio, diferente a los planteados por las Partes.

449.    De todas maneras, y en particular con relación al quebrantamiento del principio de *non ultra petita*, el Comité considera conceptualmente imposible la configuración de este vicio en este caso, puesto que el Tribunal no le otorgó a Valores y Consorcio más de lo que ellas habían pedido.

450.    Por lo tanto, el Comité considera que Venezuela no ha probado la configuración de la causal invocada.

---

[460] MdC de Anulación, ¶ 200; Réplica de Anulación, ¶ 246.

[461] Réplica de Anulación, ¶ 246.

[462] Reportando la posición de Valores y Consorcio, en el ¶ 824 del Laudo el Tribunal expresó: "*Apelando a la 'amplia discrecionalidad' del Tribunal para distribuir los costos y gastos del arbitraje, y* **con base en el principio según el cual 'los costos siguen el evento'** *y el principio de reparación integral del daño, las Demandantes solicitan que la Demandada sea condenada en costas* [...]". (énfasis añadido)

### b)   Falta de motivación

451.   Venezuela imputa tres hipótesis de falta de motivación a la decisión del Tribunal sobre costos en relación con (*i*) el estándar adoptado, (*ii*) la decisión de cargarle el 60% de los costos y (*iii*) la supuesta omisión del Tribunal al no decidir sobre su petición subsidiaria de costos.

452.   Respecto de la primera hipótesis, no se configura falta de motivación porque, como se acaba de ver en la sección anterior, y contrariamente a lo que alega Venezuela, el Tribunal no adoptó un criterio distinto a los propuestos por las Partes. Por el contrario, siguió el estándar sugerido por Valores y Consorcio, adaptándolo al caso concreto.

453.   Con relación a la segunda hipótesis, la República se queja de que el Tribunal no expresó "*las razones por los* [sic] *cuales llegó a dicho porcentaje* [60%] *–y no a otro–, no analizó cómo impactaba cada uno de los éxitos de las reclamaciones y defensas mencionadas, y dejó afuera otras reclamaciones y defensas exitosas que, de este modo, no fueron cuantificadas*"[463].

454.   Sobre esta hipótesis, es útil recordar, por un lado, que tanto las Partes como el Tribunal coincidieron en que este tenía amplia discrecionalidad en cuanto a la distribución de los costos[464] y, por el otro, que los tribunales tienen también discrecionalidad en cuanto a la forma de expresar los motivos en sus laudos[465].

455.   Bajo estas premisas, y considerando el desarrollo argumental del Tribunal explicado en los ¶¶ 441 y 444 *supra*, el Comité considera que las quejas de Venezuela no configuran una falta de motivación. Por una parte, el Comité destaca que la determinación del porcentaje del 60% de los costos – que el Tribunal atribuyó a Venezuela y que esta cuestiona – entra sin dudas dentro de la discrecionalidad del Tribunal: no se requiere que los tribunales apliquen fórmulas matemáticas para decidir los porcentajes de los costos que las partes deben soportar. Además, el Tribunal llegó a aquel porcentaje luego de evaluar, en los ¶¶ 829 a 831 del Laudo, el éxito de las reclamaciones y defensas que consideró adecuadas a la luz de los criterios de distribución de los costos identificados en el ¶ 828, por lo que la motivación es fácil de seguir.

456.   Por otro lado, en contra de lo que parece implícitamente sostener la República, el Tribunal no estaba obligado a analizar el éxito de cada argumento de las Partes ni mucho menos a darle un valor preciso. El Tribunal evaluó el éxito de cada defensa y reclamación distinguiendo entre jurisdicción y fondo, y tuvo en cuenta también la reducción del *quantum* de la indemnización conseguida por Venezuela mediante la prueba del valor de las inversiones en el escenario real[466]. A criterio del Comité, esto constituye una motivación suficiente y cumple con el requisito mínimo de motivación del Artículo 52(1)(e) del Convenio del CIADI[467].

457.   Por lo tanto, el Comité considera que la Demandante en Anulación no ha probado una falta de

---

[463] Réplica de Anulación, ¶ 256.

[464] Véase ¶ 445 *supra*.

[465] Véase ¶ 195 *supra*.

[466] Véase ¶ 403 *supra*.

[467] Véase ¶ 176 *supra*.

motivación con respecto a este punto.

458.   Con relación a la tercera hipótesis de falta de motivación, referida a la alegada omisión de pronunciarse sobre la petición subsidiaria de Venezuela relativa a la presentación tardía de documentos, el Comité estima que el cuestionamiento de la República se debe rechazar porque reposa en una premisa errónea. El Comité nota que cualquier lector informado, consultando los ¶¶ 826 y 831 del Laudo, puede entender fácilmente que el Tribunal consideró y rechazó la pretensión subsidiaria de Venezuela.

459.   En el primero de los párrafos, el Tribunal reportó la petición de la República de la siguiente manera:

> Subsidiariamente, la Demandada solicita que el Tribunal condene a las Demandantes a pagar los costos que les serían atribuibles directa y exclusivamente a sus acciones u omisiones. En este sentido, Venezuela alega que las Demandantes no proporcionaron unos documentos […]. La Demandada alega que los costos asociados a la obtención de tales documentos […] son atribuibles a la negligencia de las Demandantes y, en consecuencia, deben ser solventados por ellas[468].

460.   A criterio del Comité, es evidente que, cuando el Tribunal – luego de haber resaltado la buena fe procesal de las Partes – sostuvo que "*no estima*[ba] *procedente imputar ciertos costos a una de las Partes en razón de su alegada falta de diligencia o colaboración*", estaba haciendo referencia a la pretensión subsidiaria de Venezuela. De hecho, esta era la única petición que tenía por objeto "*ciertos costos*" específicos, esto es, los relativos a la producción documental, separados de la condena global en costas. Por ende, la única forma de entender la decisión del ¶ 831 del Laudo es vincularla con la pretensión subsidiaria de Venezuela resumida por el Tribunal en el ¶ 826.

461.   Establecido ese vínculo, cualquier lector está en grado de comprender que el Tribunal rechazó la petición subsidiaria basada en una supuesta negligencia de Valores y Consorcio porque esta no había existido. Por lo tanto, no es posible afirmar que la decisión sobre este punto haya carecido de motivos.

462.   En conclusión, el Comité considera que la República no ha probado la falta de motivación alegada con respecto a la decisión del Tribunal sobre los costos.

### c)   Conclusión

463.   En resumen, el Comité concluye que la decisión del Tribunal sobre los costos no está viciada por quebrantamiento de una norma fundamental de procedimiento ni por falta de motivación.

## VII.   COSTOS

464.   Venezuela ha presentado una declaración de costos por US$ 1.625.783, de los cuales US$ 524.958 corresponden a derechos de registro y pagos anticipados – abonados por ella en cumplimiento de la Regla 14(3)(e) del Reglamento Administrativo y Financiero del CIADI –, y US$ 1.100.825, a honorarios de sus abogados, incluidos aquellos relativos al incidente sobre la representación de

---

[468] Laudo, ¶ 826.

la República cuantificados en US$ 44.291,25[469]. Además, Venezuela ha añadido que, después de presentar su declaración de costos, efectuó el pago del tercer anticipo por un monto de US$ 199.958[470]. Por su parte, las Demandadas en Anulación han presentado una declaración de costos por US$ 2.414.613,59 correspondientes a honorarios y gastos de sus abogados desde noviembre de 2017 hasta noviembre de 2020, de los cuales US$ 66.579,80 atañen al mencionado incidente[471].

465. Las costas del procedimiento de anulación, incluyendo los honorarios y gastos del Comité, los cargos administrativos del CIADI, y los gastos directos, ascienden a:

| | |
|---|---|
| **Honorarios y gastos del Comité** | **US$  437.840,35** |
| Prof. Luca G. Radicati di Brozolo | US$  205.715,35 |
| Prof. José Antonio Moreno Rodríguez | US$    98.625,00 |
| Prof. Fausto de Quadros | US$  130.125,00 |
| Prof. Dyalá Jimenez[472] | US$      3.375,00 |
| **Cargos administrativos del CIADI** | **US$  210.000,00** |
| **Gastos directos** | **US$    12.191,22** |
| **Total** | **US$  660.031,57** |

466. Los costos detallados *supra* han sido sufragados en su totalidad con los anticipos que realizó Venezuela[473].

467. Según lo dispuesto por el Artículo 61(2) del Convenio del CIADI[474] y la Regla de Arbitraje 47(1)(j)[475], aplicables a los procedimientos de anulación en virtud del Artículo 52(4) del Convenio del CIADI y la Regla de Arbitraje 53, el Comité tiene amplia discrecionalidad para distribuir los gastos incurridos por las Partes en el marco de este procedimiento, los honorarios y gastos de los

---

[469] Véanse ¶¶ 29-30 *supra*.

[470] Correo de la Demandante en Anulación al CIADI del 19 de octubre de 2021.

[471] Correo de las Demandadas en Anulación al CIADI del 11 de octubre de 2021; Carta de las Demandadas en Anulación al CIADI del 14 de agosto de 2019.

[472] Hasta la fecha de su renuncia, el 25 de abril de 2018.

[473] El saldo restante se reembolsará a Venezuela.

[474] El Artículo 61(2) del Convenio del CIADI establece: "*En el caso de procedimiento de arbitraje el Tribunal determinará, salvo acuerdo contrario de las partes, los gastos en que estas hubieren incurrido en el procedimiento, y decidirá la forma de pago y la manera de distribución de tales gastos, de los honorarios y gastos de los miembros del Tribunal y de los derechos devengados por la utilización del Centro. Tal fijación y distribución formarán parte del laudo*".

[475] La Regla de Arbitraje 47(1)(j) establece que el laudo será escrito y contendrá "*la decisión del Tribunal sobre las costas procesales*".

miembros del Comité y los derechos devengados por la utilización de los servicios del CIADI.

468. De entrada, el Comité observa que la tendencia más reciente de los comités *ad hoc* en caso de rechazo de la solicitud de anulación es condenar a la parte solicitante al pago de las costas del procedimiento (honorarios y gastos del comité y del CIADI)[476]. En algunos casos, la parte perdedora ha sido condenada también al pago – total o parcial – de los honorarios legales y gastos incurridos por la parte ganadora[477]. El Comité nota que, cuando esto no ha ocurrido, y se ha optado por resolver que cada parte se hiciera cargo de sus propios costos de representación, esto ha dependido, a menudo, de la consideración de que la solicitud de anulación se presentó de buena fe y no era "*fundamentally lacking in merit*" o no era "*to any reasonable and impartial observer, most unlikely to succeed*"[478].

469. Teniendo en cuenta esta jurisprudencia, el Comité estima razonable seguir el criterio según el cual "*los costos siguen el evento*", ya que a su criterio – en principio – una parte que ha debido defender un laudo a ella favorable de una solicitud de anulación que ha sido rechazada por entero no debería incurrir en ningún costo[479].

470. El Comité recuerda que, en la Resolución Procesal No. 2, se decidió que cada uno de los intervinientes en el incidente sobre la representación de la República debía soportar sus propios costos[480].

471. En cuanto al resto del procedimiento, dado que se ha rechazado la Solicitud de Anulación en su totalidad así como el pedido de Venezuela relativo a la suspensión de la ejecución del Laudo[481], y puesto que no existen circunstancias excepcionales, el Comité aplicará el criterio de "*los costos siguen el evento*". En consecuencia, el Comité decide que la Demandante en Anulación (*i*) deberá hacerse cargo de sus propios costos de representación y de las costas del procedimiento de anulación detalladas en el ¶ 465 *supra*, y (*ii*) deberá además reembolsar a las Demandadas en Anulación los costos en que ellas han incurrido en este procedimiento, con exclusión de aquellos

---

[476] Documento de antecedentes, ¶ 65 (pág. 30-35) (RLA-173) y, para la jurisprudencia más reciente *Total c. Argentina*, ¶ 324 (RLA-196); *Micula c. Rumania*, ¶ 349 (RLA-235); *SAUR c. Argentina*, ¶¶ 339-341 (RLA-212); *Vivendi c. Argentina (II)*, ¶ 434 (RLA-247); *Venoklim c. Venezuela (I)*, ¶¶ 293-296 (RLA-217); *CEAC c. Montenegro*, ¶ 151; *Quiborax c. Bolivia*, ¶ 197 (CLA-252); *OI European c. Venezuela*, ¶ 385 (CLA-267); *Tenaris c. Venezuela (II)*, ¶¶ 486-487 (CMTLA-1); *Teinver c. Argentina*, ¶ 256; *Glencore c. Colombia*, ¶¶ 418-421.

[477] Documento de antecedentes, ¶ 65 (págs. 30-35). Para casos más recientes que han condenado a la demandante en anulación al pago de la totalidad de los costos de representación de la demandada en anulación, véanse *Venoklim c. Venezuela (I)*, ¶¶ 293-296 (RLA-217); *CEAC c. Montenegro*, ¶¶ 154-155; *OI European c. Venezuela*, ¶¶ 388-391 (CLA-267); *Tenaris c. Venezuela (II)*, ¶¶ 486-487 (CMTLA-1). En cambio, en *Teinver c. Argentina*, ¶ 257, Argentina fue condenada al pago de aproximadamente dos tercios de los costos legales de las demandadas en anulación (para un planteamiento similar, véase *Hydro c. Albania*, ¶¶ 241-243), mientras que en *Glencore c. Colombia*, ¶¶ 419-423 Colombia fue condenada al pago de aproximadamente el 80% de los costos legales de las demandadas en anulación.

[478] *CDC c. Seychelles*, ¶ 89 (RLA-198). Véanse también *MTD c. Chile*, ¶ 111 (RLA-215); *Kilic c. Turkmenistán*, ¶ 208 (RLA-228); *EDF c. Argentina*, ¶ 389 (RLA-195); *Vivendi c. Argentina (II)*, ¶ 433 (RLA-247); *Hydro c. Albania*, ¶ 241.

[479] *Alapli c. Turquía*, ¶ 263 (RLA-231); *Dogan c. Turkmenistán*, ¶ 279 (RLA- 246); *OI European c. Venezuela*, ¶ 389 (CLA-267); *Glencore c. Colombia*, ¶ 418.

[480] Véase ¶ 30 *supra*.

[481] Véase ¶ 24 *supra*.

correspondientes al incidente sobre la representación de Venezuela.

472.   En cuanto al punto sub (*ii*), el Comité estima que, sin necesidad de poner en duda que la Solicitud de Anulación fue presentada por Venezuela en buena fe, cualquier observador razonable e imparcial habría considerado muy improbable el acogimiento de dicha Solicitud[482], ya que varios de los vicios atribuidos al Laudo por Venezuela partían de una lectura no completa o parcialmente incorrecta de las afirmaciones del Tribunal Arbitral.

473.   Además, contrariamente a lo que sostiene Venezuela[483], el Comité considera razonables los costos de representación de Valores y Consorcio, teniendo en cuenta el número de vicios que Venezuela imputó al Laudo, la importancia de las cuestiones, el monto en disputa, el hecho de que la República pidió la suspensión de la ejecución del Laudo y la ubicación geográfica de los abogados de las Demandadas en Anulación (que son los mismos que las representaron en el Arbitraje Subyacente).

474.   Por lo tanto el Comité resuelve que la República deberá pagar a Valores y Consorcio US$ 2,348,033.79 (= US$ 2.414.613,59 [honorarios y gastos de abogados] – US$ 66.579,80 [gastos relacionados al incidente sobre la representación de la República]).

## VIII.   DECISIÓN

475.   Por las razones expuestas en esta Decisión, el Comité resuelve, por unanimidad:

   a) Rechazar íntegramente la Solicitud de Anulación del Laudo planteada por la Demandante en Anulación; y

   b) Condenar a la Demandante en Anulación a pagar a las Demandadas en Anulación US$ 2,348,033.79 en concepto de costos.

   c) Condenar a la Demandante en Anulación a pagar US$ 660.031,57 en concepto de costas del procedimiento de anulación.

---

[482] *CDC c. Seychelles*, ¶ 89 (RLA-198).

[483] Carta de Venezuela al Comité del 11 de diciembre de 2020.

_____          _____
Prof. José Antonio Moreno Rodríguez                Prof. Fausto de Quadros
Miembro del Comité *ad hoc*                      Miembro del Comité *ad hoc*

Fecha:  09 de diciembre del 2021      Fecha:

_____
Prof. Luca G. Radicati di Brozolo
Presidente del Comité *ad hoc*

Fecha:

_____
Prof. José Antonio Moreno Rodríguez
Miembro del Comité *ad hoc*

Fecha:

_____
Prof. Fausto de Quadros
Miembro del Comité *ad hoc*

Fecha:    9 – 12 – 2021

_____
Prof. Luca G. Radicati di Brozolo
Presidente del Comité *ad hoc*

Fecha:

Prof. José Antonio Moreno Rodríguez
Miembro del Comité *ad hoc*

Fecha:

Prof. Fausto de Quadros
Miembro del Comité *ad hoc*

Fecha:

Prof. Luca G. Radicati di Brozolo
Presidente del Comité *ad hoc*

Fecha: 10 de diciembre de 2021

104